**[ORAL ARGUMENT NOT SCHEDULED]**
Nos. 26-5185, 26-5186

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN HISTORICAL ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

DONALD TRUMP, *in his official capacity as President of the United States and in his personal capacity*, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.    Parties and Amici**

American Historical Association and American Oversight are plaintiffs-appellees in No. 26-5185.

Freedom of the Press Foundation and Citizens for Responsibility and Ethics in Washington are plaintiffs-appellees in No. 26-5186.

Donald J. Trump, in his official capacity as President of the United States of America; James David Vance, in his official capacity as Vice President of the United States of America; the Office of the Vice President of the United States; the White House Office; Susan Wiles, in her official capacity as White House Chief of Staff; the National Archives and Records Administration; and, Edward C. Forst, in his official capacity as Acting Archivist of the United States are defendants-appellants in Nos. 26-5185 and 26-5186.

Philip C. Droege, in his official capacity as Director of the Office of Records Management; the National Security Council; Catherine Keller, in her official capacity as Executive Secretary of the National Security Council;

the Homeland Security Council; Stephen Miller, in his official capacity as Homeland Security Advisor; the Council on Economic Advisers; Pierre Yared, in his official capacity as Acting Chairman of the White House Council of Economic Advisers; the Executive Residence; Robert B. Downing, in his official capacity as White House Chief Usher; the President's Intelligence Advisory Board; Devin Nunes, in his official capacity as Chairman of the President's Intelligence Advisory Board; the Office of Administration; Joshua Fisher, in his official capacity as Director of the Office of Administration; Jacob Reses, in his official capacity as Chief of Staff to the Vice President; the United States DOGE Service; Amy Gleason, in her official capacity as Acting Administrator of the United States DOGE Service; the United States Department of Justice; and Todd Blanche,* in his official capacity as Acting Attorney General of the United States are defendants-appellants in No. 26-5185 only.

The Executive Office of the President of the United States is defendant-appellant in No. 26-5185 only.

---

* Todd Blanche has been automatically substituted for his predecessor. *See* Fed. R. App. P. 43(c)(2).

ii

No amici curiae appeared in district court, although John H. Page and David Krucoff sought and were denied leave to appear as amici.

No amici have appeared to date in this Court.

## B.     Rulings Under Review

Defendants appeal from the memorandum opinion and orders issued by the district court (Bates, J.) on May 20, 2026. The opinion is not yet published but is available at 2026 WL 1412395 and is reproduced in the joint appendix at JA248–301.

## C.     Related Cases

This case has not previously been before this Court or any court other than the district court. Counsel for defendants-appellants are unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI

iii

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES............................................................................v

GLOSSARY ............................................................................................ xi

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF THE ISSUE ........................................................... 4

PERTINENT STATUTES AND REGULATIONS........................ 4

STATEMENT OF THE CASE............................................................ 4

    A.    Historical and Statutory Background ...............................4

    B.    Factual Background and Prior Proceedings................................15

SUMMARY OF ARGUMENT...................................................................18

STANDARD OF REVIEW.........................................................................21

ARGUMENT ...............................................................................................22

The Presidential Records Act is unconstitutional..................................22

    A.    The Presidential Records Act exceeds Congress's authority. ...............................................................................22

    B.    The district court erred in concluding that the Presidential Records Act is constitutional. .......................................38

CONCLUSION..............................................................................................48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                  **Page(s)**

*Buckley v. Valeo,*
    424 U.S. 1 (1976)..................................................................33

*Cheney v. U.S. Dist. Ct.,*
    542 U.S. 367 (2004) ............................................... 19, 23, 24, 39, 41

*Chiafalo v. Washington,*
    591 U.S. 578 (2020) ................................................................ 34

*Clinton v. Jones,*
    520 U.S. 681 (1997) ................................................................ 22

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ................................................................... 27

*Fleming v. Page,*
    50 U.S. (9 How.) 603 (1850) ................................................... 46

*Folsom v. Marsh,*
    9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901)...............................6

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................ 42

*Gravel v. United States,*
    408 U.S. 606 (1972) ................................................................ 34

*Immigration & Naturalization Serv. v. Chadha,*
    462 U.S. 919 (1983).......................................................... 33, 42

*Jinks v. Richland County,*
    538 U.S. 456 (2003) ................................................................ 45

*Judicial Watch, Inc. v. U.S. Secret Serv.,*
    726 F.3d 208 (D.C. Cir. 2013) .............................................. 26, 27

*Kiyemba v. Obama,*
    561 F.3d 509 (D.C. Cir. 2009) ................................................. 21

*Kohl v. United States,*
91 U.S. 367 (1875) ...................................................................... 45

*Landor v. Louisiana Dep't of Corr. & Pub. Safety,*
No. 23-1197, 2026 WL 1791277 (U.S. June 23, 2026) ................................ 31

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819).................................................................45

*Mistretta v. United States*
488 U.S. 361 (1989) ...................................................................... 33

*Nixon v. GSA,*
433 U.S. 425 (1977) .............................. 2, 8, 9, 10, 11, 19, 22, 23, 30, 36, 37, 38

*Nixon v. Sampson,*
389 F. Supp. 107 (D.D.C. 1975) ......................................................... 9

*Nixon v. United States,*
978 F.2d 1269 (D.C. Cir. 1992) ...................... 4, 5, 6, 7, 8, 9, 10, 11, 35, 43, 44

*Prize Cases,*
67 U.S. (2 Black) 635 (1862) ........................................................... 46

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
490 U.S. 477 (1989) ...................................................................... 38

*Sealed Case (Espy), In re,*
121 F.3d 729 (D.C. Cir. 1997) ......................................................... 28

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) ...................................................................... 35

*Sherley v. Sebelius,*
644 F.3d 388 (D.C. Cir. 2011) ......................................................... 21

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ...................................................................... 47

*Trump v. Mazars USA, LLP,*
591 U.S. 848 (2020) ................... 19, 20, 24, 24–25, 25, 30, 31, 32, 33, 35, 37, 39

*Trump v. Slaughter,*
  No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) .................. 25, 35, 42, 43

*Trump v. Thompson*:
  20 F.4th 10 (D.C. Cir. 2021) ....................................................... 29
  142 S. Ct. 680 (2022) ............................................................. 27, 28

*Trump v. United States,*
  603 U.S. 593 (2024) ............................................................... 18, 25

*Tyler v. Hennepin County,*
  598 U.S. 631 (2023) ....................................................................... 44

*United States v. American Tel. & Tel. Co.,*
  551 F.2d 384 (D.C. Cir. 1976) ...................................................... 35

*United States v. Klein,*
  80 U.S. (13 Wall.) 128 (1872) ............................................ 25–26, 46

*United States v. Lopez,*
  514 U.S. 549 (1995) ................................................................. 30, 31

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................ 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ..................................................................... 46

**U.S. Constitution:**

Art. I, § 8, cl. 18 ......................................................................... 45

Art. IV, § 3, cl. 2 ........................................................................ 43

**Statutes:**

Act of Aug. 16, 1957, Pub. L. No. 85-147, 71 Stat. 368 ........................................8

Freedom of Information Act (FOIA):
  5 U.S.C. § 552(a)(4)(B) ................................................................. 4
  5 U.S.C. § 552(a)(6)(C)(i) .............................................................. 4
  5 U.S.C. § 552(b)(5) ..................................................................... 14

Presidential and Federal Records Act Amendments of 2014,
    Pub. L. No. 113-187, 128 Stat. 2003
    (codified at 44 U.S.C. § 2209)....................................................................14

Presidential Recordings and Materials Preservation Act,
    Pub. L. No. 93-526, 88 Stat. 1695 (1974)..................................................1–2, 10

Presidential Records Act,
    Pub. L. No. 95-591, 92 Stat. 2523
    (codified as amended at 44 U.S.C. §§ 2201–2209) ........................................11
    44 U.S.C. § 2201(2) ................................................................ 12, 19, 41
    44 U.S.C. § 2201(2)(B) .................................................................. 12
    44 U.S.C. § 2202 .................................................................... 2, 12
    44 U.S.C. § 2203 ................................................................... 11, 19
    44 U.S.C. § 2203(a) .................................................................12, 41
    44 U.S.C. § 2203(c) ..................................................................... 12
    44 U.S.C. § 2203(d) .................................................................... 13
    44 U.S.C. § 2203(e) .................................................................... 13
    44 U.S.C. § 2203(g)(1) ...................................................... 2, 13, 28, 29
    44 U.S.C. § 2204 ....................................................................... 14
    44 U.S.C. § 2204(a)(1) ................................................................. 13
    44 U.S.C. § 2204(c)(1) ................................................................. 14
    44 U.S.C. § 2205(2)(C) ...................................................... 2, 14, 20, 34
    44 U.S.C. § 2208 .................................................................... 2, 13
    44 U.S.C. § 2209(a) .................................................................... 15
    44 U.S.C. § 2209(c)(1) .................................................................. 15

28 U.S.C. § 1292(a)(1) ................................................................... 4

28 U.S.C. § 1331 ........................................................................ 3

28 U.S.C. § 1361 ........................................................................ 3

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................... 4

**Legislative Materials:**

H.R. Rep. No. 89-892 (1965) ...........................................................8

H.R. Rep. No. 93-1507 (1974) ...............................................................10

H.R. Rep. No. 95-1487, pt. 1 (1978)..............................................8, 11

*The "Public Documents Act": Hearings Before the Subcomm.
    on Printing of the H. Comm. on Admin. on H.R. 16902,*
    93d Cong. (1974) ........................................................................6

**Other Authorities:**

*Assertion of Executive Privilege with Respect to Clemency Decision,*

    23 Op. O.L.C. 1 (1999) ........................................................ 26

*Congressional Oversight of the White House,*
    45 Op. O.L.C. ___, 2021 WL 222744 (Jan. 8, 2021)........................29

*Constitutionality of the Presidential Records Act,*
    50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026) ........................... 3, 15, 26,
    29, 31, 35, 36, 37, 38, 41, 45, 47

Letter from Chester Arthur III to Thomas P. Martin
    (Apr. 15, 1938)..........................................................................7

Letter from James Madison to Charles J. Ingersoll (June 25,
    1831), *in* 4 *Letters and Other Writings of James Madison* 183
    (1865) ..............................................................................42–43

Letter from James Madison to Spencer Roane (Sep. 2, 1819),
    in 8 *The Writings of James Madison* 447
    (Gaillard Hunt ed., 1908)..................................................34–35

Letter from President Grover Cleveland to the U.S. Senate
    (Mar. 1, 1886), *quoted in* Carl McGowan, *Presidents and
    Their Papers*, 68 Minn. L. Rev. 409 (1984) .....................................6

Letter from President Theodore Roosevelt to Herbert Putnam,
    Libr. of Cong. (Dec. 5, 1916), https://perma.cc/DUH9-X93G .......................6

Carl McGowan, *Presidents and Their Papers,*
    68 Minn. L. Rev. 409 (1984) ........................................................ 6, 7

Caleb Nelson, *The Constitutionality of Civil Forfeiture*,
125 Yale L.J. 2446 (2016)............................................................................42

*Presidential Authority to Decline to Execute Unconstitutional Statutes*,
18 Op. O.L.C. 199 (1994) ......................................................................... 42

Press Release, Dep't of Just., Government Announces
Settlement over Nixon Presidential Papers (June 12, 2000),
https://perma.cc/Z7S9-2V8C ..................................................................11

William H. Taft, *Our Chief Magistrate and His Powers*
(1916) ..................................................................................................... 5

*Testimonial Immunity Before Congress of the Former Counsel to the
President*,
43 Op. O.L.C. 108 (2019)........................................................................27

*Title to Presidential Papers—Subpoenas*,
43 Op. Att'ys Gen. 11 (1974).................................................................35

The Federalist No. 71 (Alexander Hamilton)
(Jacob E. Cooke ed., 1961).....................................................................33

x

# GLOSSARY

| | |
|---|---|
| AHA | American Historical Association |
| FOIA | Freedom of Information Act |
| FPF | Freedom of the Press Foundation |
| GSA | Administrator of General Services |
| NARA | National Archive and Records Administration |
| OLC | Office of Legal Counsel |
| Preservation Act | Presidential Recordings and Materials Preservation Act |

xi

**INTRODUCTION**

For nearly two centuries, Presidents owned and controlled their own presidential papers. Some burned their papers; others left their papers to their heirs; and still others sold their papers to Congress. Presidents and Congress alike accepted this tradition until shortly after President Nixon resigned, when Congress first enacted a law targeting Nixon's presidential papers and tapes in response to a specific perceived need. At issue here is Congress's subsequent and much more dramatic deviation from historical tradition in the form of the Presidential Records Act, a sweeping law that asserts title to and control over basically every official paper that concerns the President. That sweeping intrusion on the President's executive functions, unsupported by any particularized finding of compelling need, lies beyond Congress's authority.

When Congress seeks to regulate the President directly, it must proceed cautiously and point to exceptionally compelling justifications. Congress at least tried to honor that principle when it took action in the wake of Watergate to preserve specific presidential records from destruction, *see* Presidential Recordings and Materials Preservation Act, Pub. L. No. 93-526,

88 Stat. 1695 (1974) (Preservation Act), and the Supreme Court upheld that narrowly tailored statute in *Nixon v. GSA*, 433 U.S. 425 (1977).

But Congress eschewed caution with the Presidential Records Act, which purports to regulate *every* record reflecting *every* President's performance of his vast constitutional, statutory, and ceremonial duties, for his entire term in Office—regardless of subject matter and without regard to any particularized or compelling congressional need. The Act declares not merely that such records become the property of the federal government, 44 U.S.C. § 2202, but also that they must be made "available to the public as rapidly and completely as possible," *id.* § 2203(g)(1), except for records covered by a valid invocation of executive privilege, *see id.* § 2208. And the Act reserves special-access privileges for Members of Congress, to whom the Act exposes virtually all the President's nonprivileged records immediately after the conclusion of the President's term in office. *Id.* § 2205(2)(C).

The Presidential Records Act exceeds Congress's authority and violates the separation of powers. Without any commensurate finding of legislative need, the Act abolishes the historical prerogative of the President to control his own papers and compels the President to throw open all of his nonprivileged files to the world. To make matters worse, its special

2

provisions guaranteeing immediate access for Members of Congress to an outgoing President's papers is pure congressional aggrandizement. Nothing in our Constitution, nor any aspect of our Nation's history or tradition, suggests that Congress may unilaterally wrest from a President control of all his nonprivileged papers and expose them to scrutiny by his constitutional rivals. "Just as Congress could not constitutionally invade the independence of the Supreme Court and expropriate the papers of the Chief Justice or Associate Justices, Congress cannot invade the independence of the President and expropriate the papers of the Chief Executive." *Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007, at *1 (Apr. 1, 2026).

Regardless of whether some hypothetical presidential-records law might be able to survive constitutional scrutiny, the Presidential Records Act does not. The district court erred in concluding otherwise and in enjoining the government's asserted non-compliance with the Presidential Records Act. The preliminary injunction should be vacated.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1361 (mandamus) as

well as 5 U.S.C. § 552(a)(4)(B) and (a)(6)(C)(i) (Freedom of Information Act (FOIA)). American Historical Ass'n (AHA) Complaint, JA18; Freedom of the Press Foundation (FPF) Complaint JA455. The district court entered preliminary injunctions on May 20, 2026. AHA Order, JA245–47; FPF Order, JA539–40. The government filed timely notices of appeal on June 2, 2026. AHA Notice of Appeal, JA308; FPF Notice of Appeal, JA541; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred in holding that the Presidential Records Act is constitutional and enjoining asserted non-compliance by White House officials.

## PERTINENT STATUTES AND REGULATIONS

The Presidential Records Act is reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Historical and Statutory Background

1. "History, custom, and usage indicate unequivocally that, prior to [1974], Presidents exercised complete dominion and control over their presidential papers." *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992). Under that tradition, "[t]he Executive office of the President [was] not

4

a recording office." William H. Taft, *Our Chief Magistrate and His Powers* 34 (1916). "The vast amount of correspondence that [went] through it, signed either by the President or his Secretaries, [did] not become the property or a record of the government, unless it [went] on to the official files of the department to which it may [have been] addressed." *Id.* President Taft compared this practice to that of "the British Foreign Office," under which ambassadors wrote personal letters to the foreign secretary that gave "a much more accurate and detailed account of the diplomatic relations of Great Britain than the official files." *Id.*

"[W]ithout notable exception," every President from Washington to Nixon "'regarded their presidential files as their personal property.'" *Nixon*, 978 F.2d at 1277–78 (quoting Franklin D. Roosevelt). President Cleveland, for example, articulated a theory of complete presidential control over presidential records:

> I regard the papers and documents … addressed to me or intended for my use and action purely unofficial and private, not infrequently confidential, and having reference to the performance of a duty exclusively mine. … I suppose if I desired to take them into my custody I might do so with entire propriety, and if I saw fit to destroy them no one could complain.

5

Letter from President Grover Cleveland to the U.S. Senate (Mar. 1, 1886), *quoted in* Carl McGowan, *Presidents and Their Papers*, 68 Minn. L. Rev. 409, 412 (1984) (second alteration in original).

Presidents dealt with their records as private property. President Washington, "relying on the British tradition that the sovereign's working papers were the sovereign's personal property," kept his "correspondence, notes, drafts, and working papers." *The "Public Documents Act": Hearings Before the Subcomm. on Printing of the H. Comm. on Admin. on H.R. 16902*, 93d Cong. 34 (1974) (statement of Dr. James B. Rhoads, Archivist of the U.S.). Upon his death, he bequeathed his papers to his nephew, Justice Bushrod Washington, *see Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (No. 4901) (Story, J.), and 13 other presidents similarly "made specific bequests of their papers," *Nixon*, 978 F.2d at 1278. Some Presidents made gifts of their presidential papers to public institutions, *see Nixon*, 978 F.2d at 1278, such as Theodore Roosevelt who offered his papers to the Library of Congress "with a clear understanding that no one else was to see them until after [his] death," Letter from President Theodore Roosevelt to Herbert Putnam, Libr. of Cong. (Dec. 5, 1916), https://perma.cc/DUH9-X93G.

Many Presidents destroyed vast quantities of their records. President Van Buren "destroyed incoming correspondence while he was still the Chief Executive," and after his Presidency burned records that he did not want to archive. *Nixon*, 978 F.2d at 1290. "President Pierce destroyed virtually all of his presidential papers." *Id.* at 1291. Presidents Garfield and Coolidge destroyed many of their papers. *Id.* at 1292, 1294. President Arthur "had 'caused to be burned three large garbage cans, each at least four feet high, full of papers.'" *Id.* (quoting Letter from Chester Arthur III to Thomas P. Martin (Apr. 15, 1938)). President Grant too "either destroyed or otherwise disposed of a large portion of the correspondence he received during his years as President." *Id.* at 1292. The records of the Taylor, Filmore, and Harding administrations were largely destroyed after the death of those presidents. *Id.* at 1291, 1294.

For nearly two centuries, Congress "acquiesced in this tradition" of presidential control and its attendant consequences. *Nixon*, 978 F.2d at 1282. Congress repeatedly purchased presidential papers from former presidents or their estates, and those sales were subject to conditions set by the seller. *See id.* at 1281; McGowan, *supra*, at 411 & n.13. "Indeed, by statute, Congress ratified the practice by mandating that the Library of Congress

comply with any restriction placed on deposited presidential papers." *Nixon*, 978 F.2d at 1283 (citing Act of Aug. 16, 1957, Pub. L. No. 85-147, 71 Stat. 368). And the House Committee on Governmental Operations accepted that "[t]he papers authored and received by a President during his term of office in the White House have been historically recognized as his property, and Presidents have disposed of them as they wished." *Id.* at 1283 n.31 (quoting H.R. Rep. No. 89-892, at 7 (1965)); *see also* H.R. Rep. No. 95-1487, pt. 1, at 5 (1978) (committee report accompanying Presidential Records Act) ("From the founding of the country until 1974, … the tradition of treating Presidential records as the personal property of a President was never seriously challenged.").

2. This system of exclusive presidential control over presidential records persisted up until the Watergate scandal. After President Nixon resigned, he "arranged to have his presidential papers removed to California." *Nixon*, 978 F.2d at 1271. The Watergate Special Prosecutor, however, "advised President Ford of his continuing need for the materials." *Nixon v. GSA*, 433 U.S. 425, 431 (1977). Thus, Nixon and the Administrator of General Services (GSA) agreed that Nixon would:

> deposit all of his presidential papers with the Administrator of General Services, Arthur F. Sampson, for a temporary period,

8

> after which certain of the materials would be donated permanently to the United States. The agreement guaranteed the full integrity and completeness of the materials so that valid legal process might be satisfied. With that exception, Mr. Nixon retained title to his papers and the right to exclude others from viewing or using the materials while they were in government custody pursuant to the agreement.

*Nixon*, 978 F.2d at 1271 (footnote omitted); *see also Nixon v. Sampson*, 389 F. Supp. 107, 160–62 (D.D.C. 1975) (reproducing the text of the Nixon–Sampson Agreement).

The Nixon–Sampson Agreement also provided that Nixon's White House tapes would be deposited with the GSA and donated to the United States, subject to a pair of conditions. *GSA*, 433 U.S. at 432. First, "until September 1, 1979," access to the tapes was limited to Nixon "except as he might authorize access by others on terms prescribed by him." *Id.* Second, "subsequent to September 1, 1979[,] the Administrator shall destroy such tapes as Mr. Nixon may direct and in any event the tapes shall be destroyed at the time of his death or on September 1, 1984, whichever event shall first occur." *Id.* (cleaned up).

In response to that agreement, Congress enacted the Preservation Act. The House committee report explained that "[t]he disposition of public documents has taken on immediate significance because of the uncertainty

9

regarding the preservation of [Nixon's] tapes and other materials[,] … which could provide a full and accurate account of the series of events that have come to be known as 'Watergate.'" H.R. Rep. No. 93-1507, at 2 (1974). The Preservation Act "effectively abrogated the Nixon–Sampson Agreement." *Nixon*, 978 F.2d at 1271; *see also* H.R. Rep. 93-1507, at 4. It required the GSA to "retain 'complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials that constitute the presidential historical materials of Richard M. Nixon'" and to "receive and retain possession of the White House tapes." *Nixon*, 978 F.2d at 1271 (quoting Preservation Act § 101(b)(1), 88 Stat. at 1695; citing Preservation Act § 101(a), 88 Stat. at 1695). The Preservation Act also prohibited the destruction of any of Nixon's records, allowed for public access to the records on terms to be determined by the GSA, and created a cause of action with exclusive jurisdiction in the District Court for the District of Columbia to provide just compensation to Nixon or his estate for any private property taken by the act. Preservation Act §§ 102, 104–105, 88 Stat. at 1696–98.

Nixon sued to challenge the constitutionality of the Preservation Act. *GSA*, 433 U.S. at 430. The Supreme Court rejected Nixon's separation-of-powers, presidential-privilege, privacy, First Amendment, and bill-of-

10

attainder claims. *Id.* at 439–84. After decades of litigation, *see, e.g.*, *Nixon*, 978 F.2d at 1272–75, the D.C. Circuit agreed that the Preservation Act effected a taking of Nixon's private property, *id.* at 1287. The United States then reached a settlement with Nixon's estate of the claim that the Preservation Act took his private property, paying $18 million in compensation. Press Release, Dep't of Just., Government Announces Settlement over Nixon Presidential Papers (June 12, 2000), https://perma.cc/Z7S9-2V8C.

3. In 1978, Congress enacted the Presidential Records Act, Pub. L. No. 95-591, 92 Stat. 2523 (codified as amended at 44 U.S.C. §§ 2201–2209). The House Committee on Government Operations acknowledged that the Act was intended to "terminate the tradition of private ownership of Presidential papers." H.R. Rep. 95-1487, at 2.

The Presidential Records Act governs the creation, retention, and disposition of all "Presidential records." 44 U.S.C. § 2203. Presidential records are defined as "documentary materials" that are

> created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to … the constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(2). Presidential records do not include "official records of an agency" or the President's "personal records." *Id.* § 2201(2)(B). The Presidential Records Act purports to vest title to presidential records in the United States. *Id.* § 2202.

The Presidential Records Act imposes a number of obligations and restrictions on the President. It directs the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented." 44 U.S.C. § 2203(a). It also requires the President to ensure that "such records are preserved and maintained." *Id.* An incumbent President may dispose of his presidential records "that no longer have administrative, historical, informational, or evidentiary value," but only if he "obtains the views, in writing, of the Archivist" on the matter, and so long as "the Archivist does not intend to take any action under" § 2203(e). *Id.* § 2203(c). That provision requires the Archivist to "request the advice" of certain congressional committees "with respect to any proposed disposal of Presidential records" if the Archivist believes that "these particular records may be of special interest to the Congress," or if consultation "is in the public

12

interest." *Id.* § 2203(e). Even if the Archivist avails himself of that interbranch consultative process, however, the President may still dispose of records "if copies of the disposal schedule are submitted" to the relevant congressional committees at least 60 days of continuous session of Congress before the records' destruction. *Id.* § 2203(d).

The Presidential Records Act generally requires the public disclosure of all presidential records no later than 12 years after the President leaves office. Upon the President's departure, the Archivist assumes "responsibility for the custody, control, and preservation" of the President's papers. 44 U.S.C. § 2203(g)(1). The Archivist must "make such records available to the public as rapidly and completely as possible," consistent with the terms of the Presidential Records Act, including the provisions allowing the President to restrict certain documents from disclosure for no more than 12 years. *Id.*; *see also id.* § 2204(a)(1) (permitting temporary restrictions of up to 12 years for documents meeting any of six criteria). The Presidential Records Act does, however, allow an incumbent or former President to assert claims of constitutionally based privileges to bar public disclosure even after the expiration of the 12-year period. *Id.* § 2208. After the 12-year restricted-access period ends, NARA treats presidential records as agency records

13

subject to FOIA except that NARA may not invoke Exemption 5. *Id.*

§ 2204(c)(1); *see* 5 U.S.C. § 552(b)(5).

The Presidential Records Act also secures for Congress special access

to the records of former Presidents. Notwithstanding the temporal

restrictions on access imposed by the Act, *see* 44 U.S.C. § 2204, the Act

requires that:

> subject to any rights, defenses, or privileges which the United
> States or any agency or person may invoke, Presidential records
> shall be made available … to either House of Congress, or, to the
> extent of matter within its jurisdiction, to any committee or
> subcommittee thereof if such records contain information that is
> needed for the conduct of its business and that is not otherwise
> available.

*Id.* § 2205(2)(C).

Congress amended the Presidential Records Act in 2014 to expressly

provide for "official business conducted using non-official electronic

messaging accounts." Presidential and Federal Records Act Amendments of

2014, Pub. L. No. 113-187, § 2(e)(1), 128 Stat. 2003, 2006–07 (codified at

44 U.S.C. § 2209). Under that provision, "[t]he President, the Vice President,

or a covered employee may not create or send a Presidential or Vice

Presidential record using a non-official electronic message account" without

"cop[ying] an official electronic messaging account" or "forward[ing] a

14

complete copy of the Presidential or Vice Presidential record to an official electronic messaging account" within 20 days.[1] 44 U.S.C. § 2209(a).

## B.    Factual Background and Prior Proceedings

1. On April 1, 2026, the Department of Justice's Office of Legal Counsel (OLC) issued an opinion in response to a request from White House Counsel David Warrington to evaluate the constitutionality of the Presidential Records Act. OLC concluded that the Presidential Records Act is unconstitutional. *See Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007, at *1 (Apr. 1, 2026). OLC accordingly advised that "the President need not further comply with [the] dictates" of the Presidential Records Act. *Id.* at 35.

The next day, the White House Counsel issued a memorandum to establish a records retention policy for White House staff. Records Retention Policy, JA235–37. The memorandum directed staff within the Executive Office of the President to "preserve any material related to the performance

---

[1] This section of the Presidential Records Act defines "covered employee" to encompass: "the immediate staff of the President"; "the immediate staff of the Vice President"; "a unit or individual of the Executive Office of the President whose function is to advise and assist the President"; and "a unit or individual of the Office of the Vice President whose function is to advise and assist the Vice President." 44 U.S.C. § 2209(c)(1).

15

of their duties." *Id.*, JA236. Under this policy, "[t]he medium of the material does not matter—printed, electronic, or hand-written materials are considered records and should be saved." *Id.*

The National Archives and Records Administration (NARA) also continues to preserve all presidential records in its custody, including records of President Trump's first term in office, and continues to accept and process FOIA requests seeking presidential records. McClure Declaration, JA239–40.

2. Two sets of litigants filed suit.

The AHA and American Oversight sued the President, the Vice President, various components and employees within the Executive Office of the President, and NARA on non-statutory causes of action arising from defendants' alleged failure to comply with the Presidential Records Act. AHA Complaint, JA20–24, 49–54, 57. They also raised claims under the Administrative Procedure Act against the Department of Justice and NARA. *Id.*, JA54–57.

The FPF and Citizens for Responsibility and Ethics in Washington also sued. Like the AHA plaintiffs, they brought non-statutory causes of action against the President, the Vice President, various components and

16

employees within the Executive Office of the President, and NARA.

FPF Complaint, JA456–58, 484–89. They also brought claims under the

Administrative Procedure Act and FOIA against NARA. *Id.*, JA489–91.

Both sets of plaintiffs sought preliminary injunctions. AHA Motion for

Preliminary Injunction, JA60; FPF Motion for Preliminary Injunction,

JA493–95.

3. The district court granted in part and denied in part plaintiffs'

motions for preliminary injunctions. AHA Order, JA245–47; FPF Order,

JA539–40.

The district court narrowed the dispute by agreeing with the

government that the AHA plaintiffs had not established standing to sue

NARA or the Department of Justice, and that it would not enjoin the

President and Vice President in the performance of their official duties.

Memorandum Opinion, JA265–67, 298–300. The court concluded, however,

that there was certain non-compliance with the Presidential Records Act by

White House officials that injured plaintiffs and could be redressed. *Id.*,

JA259–65, 267–68.

On the merits, the district court concluded that the Presidential

Records Act is constitutional and that the government must comply with it.

The district court reasoned that Congress has authority under the Property Clause to regulate governmental records, Memorandum Opinion, JA274–84, and found further support for Congress's power to enact the Presidential Records Act in the Necessary and Proper Clause, *id.*, JA285–287. The district court rejected the government's argument that the Presidential Records Act poses a separation-of-powers problem by chilling the President's advisors from offering him candid advice or by imposing improper burdens on White House operations. *Id.*, JA288–97.

The district court thus entered a preliminary injunction to prevent and restrain asserted non-compliance with the Presidential Records Act against a set of defendants consisting of staff and components of the Executive Office of the President. AHA Order, JA245–47; FPF Order, JA539–40. The district court refused the AHA plaintiffs' request to enjoin the President and Vice President personally. Memorandum Opinion, JA298–300.

## SUMMARY OF ARGUMENT

Congress cannot force the President to live in a fishbowl. Because of the President's singular role, *see Trump v. United States*, 603 U.S. 593, 607 (2024), "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality

of its communications are implicated," *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004); *see also Trump v. Mazars USA, LLP*, 591 U.S. 848, 866–68 (2020) (articulating weighty separation-of-powers concerns implicated by congressional demands even for the President's personal financial records). Accordingly, from the Founding, Presidents asserted control over their own papers, free from congressional influence. The Preservation Act represented a limited deviation from that tradition tied to the specific threat that records of the Watergate scandal would be destroyed; considering that articulated legislative need, the Supreme Court upheld the Preservation Act in *Nixon v. GSA*, 433 U.S. 425 (1977).

The Presidential Records Act, by contrast, is a blunderbuss. The Presidential Records Act covers all documents that "relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2); *see id.* § 2203. Before demanding preservation of all presidential records and access to all nonprivileged presidential records, Congress failed to establish sufficient need, take steps to protect the President's interest in confidentiality, and ensure that it could obtain information from other sources. Regardless of whether Congress may be able to enact a more targeted law to preserve and

19

provide for access to materials in which Congress has a specific and articulated interest, Congress lacks authority to intrude generally on the President's execution of his Article II authority without a particularized showing of need "sufficiently powerful to justify access" to the President's records, *Mazars*, 591 U.S. at 870.

Congress made no serious effort to justify the Presidential Records Act. In particular, Congress did not articulate any legislative need for all records of all Presidents. And while Congress provided a mechanism for asserting executive privilege, Congress otherwise failed to consider the inevitable impingement on presidential prerogatives that the sweeping statute occasions. These constitutional concerns are exacerbated by Congress's aggrandizement of its own power by providing itself with immediate and unrestricted access to records of former Presidents so long as "such records contain information that is needed for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C).

The Presidential Records Act also stands as a historical aberration. Over nearly two centuries, Presidents and Congress accepted that Presidents retain personal control over their records and may dispose of them as they see fit. The way for Congress to obtain records was through

20

bargaining and accommodation. The novelty of Congress's decision to walk away from that tradition and instead categorically to seize title to and control over presidential records weighs against the Act's constitutionality.

As plaintiffs have not shown a likelihood of success on the merits, the district court erred in granting them a preliminary injunction.

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A court considering a request for preliminary relief must examine four factors: (1) the moving party's likelihood of success on the merits; (2) irreparable injury to the moving party if an injunction is denied; (3) substantial injury to the opposing party if an injunction is granted; and (4) the public interest." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009). This Court "review[s] for abuse of discretion the district court's weighing of these factors; insofar as 'the district court's decision hinges on questions of law,' however, … review is *de novo*." *Id.*

21

# ARGUMENT

## THE PRESIDENTIAL RECORDS ACT IS UNCONSTITUTIONAL.

### A. The Presidential Records Act exceeds Congress's authority.

The Presidential Records Act departs from nearly two centuries of historical practice under which Presidents exercised exclusive control and ownership over their presidential records. *See supra* pp. 4–8. It seeks to regulate directly the day-to-day activities of the President and his closest advisors. And it aggrandizes one Branch's power at the expense of another's. All these factors demand close scrutiny of the Act's constitutionality. And unlike the Preservation Act upheld in *Nixon v. GSA*, 433 U.S. 425 (1977), the Act cannot survive that scrutiny because Congress utterly failed to justify the Act's novelty, intrusion on the Presidency, and legislative aggrandizement.

1. The Presidential Records Act directly regulates the official conduct of the President and his closest aides. Any attempt by Congress to regulate the President implicates the constitutional principle that one branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quotation marks omitted). As the Supreme Court has held, if a statute causes "disruption" by "prevent[ing] the

22

Executive Branch from accomplishing its constitutionally assigned functions," then the statute is unconstitutional absent a showing (at least) that "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *GSA*, 433 U.S. at 443. Direct regulation of the recordkeeping of the President and his staff requires even more caution because it necessarily implicates the "Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 372 (2004).

The Supreme Court has applied this principle on a number of occasions in assessing whether another Branch's demand that the Executive disclose information passes constitutional muster. For example, in *Cheney*, the Court considered the permissibility of discovery orders requiring "the Vice President and other senior officials in the Executive Branch to produce information about a task force established to give advice and make policy recommendations to the President." 542 U.S. at 372. In vacating this Court's refusal to grant the Executive Branch relief, the Court emphasized the "separation-of-powers concerns" that arose from the "overbroad" discovery requests that "ask[ed] for everything under the sky." *Id.* at 383, 387. On the

23

one hand, the Court suggested that the court's discovery orders imposed a constitutionally significant burden on the Executive Branch—both by undermining "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications" and also by requiring "the Executive Branch to bear the onus of" responding to "the unacceptable discovery requests line by line." *Id.* at 385, 388. Conversely, although the requests arose in a suit intended to enforce a federal statute, the Court explained that the Executive Branch's failure to disclose the relevant information would not necessarily "impair[ ]" "Congress' central Article I powers." *Id.* at 385.

More recently, the Court again relied on similar principles in articulating the appropriate framework for assessing "congressional subpoenas for the President's information," including even his personal-capacity records. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020). The Court explained that such subpoenas raise "significant separation of powers issues"; in particular, the Court feared that "[w]ithout limits on its subpoena powers, Congress could exert an imperious controul over the Executive Branch" and seek to "compel compliance" with its requests "in court" rather than "negotiating over information requests" with the Executive. *Id.* at 866–

67 (quotation marks omitted). In light of those concerns, the Court made clear that, in assessing the constitutionality of such subpoenas, "courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake." *Id.* at 869. Specifically, the Court directed, that analysis should include (among other considerations) whether Congress's asserted interest "warrants the significant step of involving the President" or could instead be pursued through "other sources," whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective," and whether the subpoena imposes undue "burdens" on the President. *Id.* at 869–71.

The Presidential Records Act cannot survive scrutiny under that framework. Evidencing its indiscriminate approach, the Presidential Records Act embraces records within the President's "conclusive and preclusive" authority, though Congress is "disable[d] … from acting upon the subject." *Trump v. United States*, 603 U.S. 593, 607 (2024) (cleaned up); *see Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *19 (U.S. June 29, 2026). As one example, the Act requires the preservation of lists of persons whom the President considered but declined to pardon. Congress lacks power to impose that requirement. *See Trump*, 603 U.S. at 608; *United States v. Klein*,

25

80 U.S. (13 Wall.) 128, 147–48 (1872); *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 3–4 (1999) ("Accordingly, it appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision."); *see also Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007, at *15 (Apr. 1, 2026). There is no justification for extending the Presidential Records Act to require preservation of those records or to permit disclosure if any invocation of executive privilege were to be overcome.

More generally, Congress cannot force the President to carry out his official duties in a fishbowl. *Cf. Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 226 (D.C. Cir. 2013) (applying constitutional avoidance to hold that White House visitor logs are not subject to FOIA). As OLC explained, the Presidential Records Act "may chill the President's advisers from offering candid or unpopular advice, because there is uncertainty as to whether the President will invoke the privilege on that specific topic." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *31

26

(citing *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. 108, 111–14 (2019)). Beyond these questions of whether privilege will be invoked, there are weighty confidentiality concerns implicated by nonprivileged records as well. As this Court has recognized, even records as to which a claim of privilege might be difficult to maintain can implicate sensitive matters, particularly when combined with other information. For example, this Court recognized that disclosure of White House visitor logs could "substantially affect the President's ability to meet confidentially with foreign leaders, agency officials, or members of the public." *See Judicial Watch*, 726 F.3d at 226; *see also id.* at 227–28 (visitor logs are subject to Presidential Records Act).[2]

These are not abstract concerns. It is "obvious … that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); *see also Trump v. Thompson*, 142 S. Ct. 680, 681 (2022) (Kavanaugh, J., statement respecting

---

[2] The Court assumed in *Judicial Watch* that subjecting visitor logs to the Presidential Records Act avoids separation-of-powers problems. 726 F.3d at 227–28. As explained here, the Presidential Records Act also impinges upon the separation of powers.

denial of application for stay). "Confidentiality is what ensures the expression of 'candid, objective, and even blunt or harsh opinions' and the comprehensive exploration of all policy alternatives before a presidential course of action is selected." *In re Sealed Case* (*Espy*), 121 F.3d 729, 750 (D.C. Cir. 1997). "Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends." *Thompson*, 142 S. Ct. at 681 (Kavanaugh, J., statement respecting denial of application for stay).

For these reasons, this Court has long recognized, "the critical role that confidentiality plays in ensuring an adequate exploration of alternatives cannot be gainsaid." *Espy*, 121 F.3d at 750. And while "potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President," *id.*, the Presidential Records Act demands that NARA "make [presidential] records available to the public as rapidly and completely as possible," 44 U.S.C. § 2203(g)(1), so an advisor should have little doubt that every nonprivileged record they produce will come to light. In an age of heightened partisanship, these records will be available not only to presidential historians but to political

28

opponents and zealous journalists looking to embarrass both the former President and the advisors.

Further, the mechanisms for asserting privilege contained in the Presidential Records Act are imperfect, *see* 44 U.S.C. § 2203(g)(1), and where an incumbent President declines to assert privilege, a court may well give less weight to a former President's claim, *see Trump v. Thompson*, 20 F.4th 10, 32 (D.C. Cir. 2021). As OLC explained, the Presidential Records Act "poses a risk of inadvertent disclosure of sensitive or privileged information" given the "sheer volume of records that must be created, preserved, and reviewed and from the [Act's] default toward disclosure if grounds for special treatment are not identified and affirmatively asserted." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *32. The risk is not just that records will ultimately be disclosed, but also that the Act "might 'burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties.'" *Id.* (quoting *Congressional Oversight of the White House*, 45 Op. O.L.C. ___, 2021 WL 222744, at *34 (Jan. 8, 2021). Together, these concerns require that Congress must "justif[y]" the Presidential Records Act's impact on Executive Branch operations "by an overriding need to promote

objectives within the constitutional authority of Congress." *GSA*, 433 U.S. at 443.

Congress utterly failed to do so. The Presidential Records Act indiscriminately imposes burdens on all manner of presidential actions. The absence of any plausible congressional justification for the Act is underscored by its application, noted above, to records relating to the President's exercise of his conclusive and preclusive powers. But even as to areas in which Congress could hypothetically claim a legislative interest, Congress has entirely failed to articulate reasons for requiring the creation, preservation, and eventual disclosure of any category of presidential record. *See Mazars*, 591 U.S. at 870. Had it enacted a more highly reticulated scheme, Congress perhaps could have justified some requirements for some categories of records. Here, however, Congress neither tailored its legislation to particular needs sufficient to justify access to presidential records nor provided a justification rooted in the proper exercise of its legislative powers. And without Congressional findings, there is no basis for this court to "evaluate the legislative judgment," *United States v. Lopez*, 514 U.S. 549, 563 (1995), that invasion of the "President's unique constitutional position," *Mazars*, 591 U.S. at 870, is justified. That Congress might have been able to

craft a tailored law within its authority in this context cannot sustain the sweeping, unjustified law it actually enacted. *See Lopez*, 514 U.S. at 561–62; *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, No. 23-1197, 2026 WL 1791277, at \*7 (U.S. June 23, 2026). Vague gesturing towards historical preservation and governmental efficiency cannot justify stripping the President of control of *all* his papers, contrary to all historical practice and precedent.

Supreme Court precedent makes clear that much more is required to intrude on the President's prerogatives in this fashion. In *Mazars*, the Court considered a subpoena for the President's personal financial records, which allowed courts to "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." 591 U.S. at 869. Similarly, when Congress seeks information because it is contemplating "legislation concerning the Presidency," it must "adequately identif[y] its aims" and explain how "the President's information will advance its consideration of the possible legislation." *Id.* at 870–71; *see also Constitutionality of the Presidential Records Act*, 2026 WL 963007, at \*15. Here, Congress did not even purport to be contemplating legislation, much

31

less provide a legislative justification for the wholesale intrusion on the "President's unique constitutional position," *Mazars*, 591 U.S. at 870.

Previous Presidents have declined to challenge the Presidential Records Act, and the White House Counsel has instructed White House staff, as a general matter, to apply preservation measures similar, but not identical, to those set forth in the Presidential Records Act, *see* Records Retention Policy, JA235–37. But those accommodations do nothing to save the statute's constitutionality. *See infra* pp. 41–43 (presidential acquiescence is immaterial to separation-of-powers analysis). The White House has not, in engaging in an accommodation of the sort that Presidents and Congress have informally arranged since the founding, acknowledged any legitimate congressional interest in any record. Indeed, even if there were some records as to which Congress could have asserted a legitimate interest, it would be anomalous to force the Executive Branch to guess at or anticipate that interest in order to effectuate a statute in which no such interest had been articulated or substantiated. Moreover, the burden on the presidency may arise from disclosure, not from retention, and at that point the statute limits the former President's ability to protect his own prerogatives.

2. By both abrogating the President's historical control over his own records and enhancing Congress's access to and scrutiny of those records, the Presidential Records Act greatly aggrandizes Congress at the expense of the Executive. A core concern of the separation-of-powers doctrine is "the encroachment or aggrandizement of one branch [of the federal government] at the expense of the other." *Mistretta v. United States* 488 U.S. 361, 382 (1989) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam)). That concern "has animated … separation-of-powers jurisprudence and aroused [the Supreme Court's] vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'" *Id.* (quoting *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983)). And aggrandizement concerns are especially acute in matters of presidential records, where, "[w]ithout limits … Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Mazars*, 591 U.S. at 867 (quoting *The Federalist* No. 71, at 484 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)). Thus, where a law "undermine[s] the authority and independence of one or another coordinate Branch," the Supreme Court "ha[s] not hesitated to strike [it] down." *Mistretta*, 488 U.S. at 382.

In the Presidential Records Act, Congress granted itself immediate and unrestricted access to the records of former Presidents so long as "such records contain information that is needed for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C). Congress has thus taken exclusive control over presidential records from the Executive Branch and seized for itself special authority.

Congress's provision of special access for itself is all the more problematic because there is no constraint preventing members of Congress from publicly disclosing the content of presidential records even if the Act did not authorize public release. The Act itself imposes no such restrictions. And the Speech and Debate Clause would immunize a member of Congress who simply read a sensitive presidential document into the Congressional Record. *See Gravel v. United States*, 408 U.S. 606, 624–25 (1972).

3. The unbroken pattern of presidential control over presidential records prior to 1974 underscores the unconstitutionality of the Presidential Records Act. When interpreting the Constitution, "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases." *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020) (quotation marks omitted) (quoting Letter from James Madison to Spencer

34

Roane (Sep. 2, 1819), in 8 *The Writings of James Madison* 447, 450 (Gaillard Hunt ed., 1908)); *see Slaughter*, 2026 WL 1855612, at *9; *see also Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *7.

Over nearly two centuries, Presidents and Congress accepted that Presidents retain personal control over their records and may dispose of them as they see fit. *See Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992); *Title to Presidential Papers—Subpoenas*, 43 Op. Att'ys Gen. 11, 17 (1974); *see also supra* pp. 4–8. Congress's need for records was resolved through interbranch dialogue and accommodation—"the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 859; *see United States v. American Tel. & Tel. Co.*, 551 F.2d 384, 394–95 (D.C. Cir. 1976); *see also Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *7, *17. The Presidential Records Act is a novel aberration from that well-settled tradition. Instead of negotiation and accommodation, Congress walked away from the bargaining table and adopted a one-size-fits-all measure to seize title to and control over presidential records. That novelty counsels against the Act's constitutionality. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 220 (2020).

35

4. As the district court correctly recognized, *GSA* does not control the outcome here. *See* Memorandum Opinion, JA289. *GSA* "is distinguishable because it addressed a materially narrower statute under extraordinary circumstances." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *28. Watergate is the key to understanding the *GSA* decision. The Court explained that there were "substantial public interests" in "restor[ing] public confidence in our political processes by preserving the materials as a source for facilitating a full airing of the events leading to [Nixon]'s resignation," in "understand[ing] how those political processes had in fact operated in order to gauge the necessity for remedial legislation," and in preserving materials that "shed light upon issues in civil or criminal litigation." *GSA*, 433 U.S. at 453. The Court also gestured to more general legislative goals noted in the legislative history of the Preservation Act, *id.* at 452–53, but in discussing those topics too, "[t]he Court was addressing Nixon's materials specifically—records of Watergate, an aborted Presidency, and ongoing criminal and congressional investigations." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *29. Considering that context and those objectives, *GSA* held that "the scheme adopted by

Congress for preservation of [Nixon]'s Presidential materials cannot be said to be overbroad." 433 U.S. at 454.

In other words, the Preservation Act at least purported to address a narrow category of records in which Congress identified a particularized and compelling need for preservation, and the Supreme Court upheld it on that basis. The Presidential Records Act, "by contrast, applies to all Presidents in perpetuity, regardless of scandal or specific investigatory need." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *29. This undifferentiated statute cannot be justified on the same basis as a targeted one because Congress lacks the authority to regulate the President—its constitutional rival—at will. Absent a particularized and compelling need, Congress has no valid basis to regulate and compel disclosure of the President's papers. *See Mazars*, 591 U.S. at 869–71.

There is certainly no occasion to extend *GSA* to a new statute and a new set of facts. The *GSA* court did not have the advantages of more recent separation-of-powers decisions like *Mazars* and *Trump v. United States*. And the *GSA* court may have been more willing to dismiss the chilling effects of a mandatory preservation and disclosure statute in a less polarized era. But this Court must evaluate the Presidential Record Act on its own terms,

without the shadow of Watergate hovering over a more limited statute. This Court is, of course, bound to follow *GSA* unless the Supreme Court overturns it.[3] *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). But this Court should construe *GSA* narrowly in light of that case's unique factual context and the subsequent doctrinal developments.

**B.    The district court erred in concluding that the Presidential Records Act is constitutional.**

1. The district court reasoned that the Presidential Records Act is "adequately justified by the need to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." Memorandum Opinion, JA291 (quotation marks omitted) (quoting *GSA*, 433 U.S. at 452). The district court also accepted that "the Presidential Records Act also serves the legitimate goal of promoting efficiency and accountability in the Executive Branch" and that it "protects effective transitions of power." *Id.*

These high-level, generic justifications cannot suffice to justify a congressional regulation of the President. Separation-of-powers analysis

---

[3] On that point, the government preserves for further review the argument that *GSA* should be overturned. *See Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *30–33.

requires much more fine-grained consideration. *See Cheney*, 542 U.S. at 386–87; *Mazars*, 591 U.S. at 869–71. The district court's logic would justify far too much. Consider, for example, legislation requiring the President to wear a body camera at all times while conducting official business and to make the recordings available, subject to constitutional privileges, after he left office. A presidential biographer could not hope for a better source; the President's staff could find efficiency gains in having an accessible recording of the boss's instructions; anyone seeking to hold the President accountable for his actions could access have a treasure trove of data; and the next administration could see for itself how a diplomatic negotiation played out from the President's perspective. Yet no one would think that these abstract goals would justify such an intrusion into the Presidency.

As *Mazars* explains, Congress must provide much more to justify the compelled disclosure of a President's papers. 591 U.S. at 869–71. A court must demand a showing of specific legislative need for information, and it must balance that need against the burdens Congress would impose on the Presidency. The district court largely failed to carry out that analysis, although Congress must bear most of the blame for that shortcoming

39

because Congress failed to invoke any particularized need or sufficient interest justifying its intrusion into the Executive Branch.

The district court's separation-of-powers analysis fell short in several other key ways. The district court mistakenly asserted that "nothing suggests that Congress is using the [Presidential] Records Act to aggrandize itself at the expense of the President." Memorandum Opinion, JA291. But, of course, Congress did grant itself special access to a President's records— well in advance of any disclosure to the public—as soon as the President leaves office. *See supra* pp. 14, 33–34. The district court similarly discounted the possibility of Congress using the Presidential Records Act to make public disclosures that are harmful to the President, Memorandum Opinion, JA291, but there are no confidentiality requirements contained within the Presidential Records Act's special access provisions, nor is it clear that a court could properly regulate the use of information in Congress's possession. The district court also misunderstood the efficacy of the Act's temporal restrictions on disclosure. Memorandum Opinion, JA293. The President may shield records for up to 12 years against public disclosure by NARA but not against disclosure to Congress or against any further disclosure a Member of Congress may make.

40

The district court also seriously understated the burdens the Presidential Records Act imposes. The court framed the statute as "narrowly drafted." Memorandum Opinion, JA292. That characterization is impossible to square with the Act itself. *See* 44 U.S.C. § 2201(2) (definition of presidential records); *id.* § 2203(a) (requiring President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records"). "The Act is indiscriminate, collecting and publicly disclosing all 'materials relating to the political activities of the President or members of the President's staff 'that pertain to 'the carrying out of constitutional, statutory, or other official or ceremonial duties of the President, 'subject to certain limited exceptions." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *16. The Act does not demand specific records for which Congress has demonstrated need; it "ask[s] for everything under the sky." *Cheney*, 542 U.S. at 387.

Finally, the district court pointed to the Executive Branch's "acquiescence" to the Presidential Records Act since its enactment.

41

Memorandum Opinion, JA294. Presidents might have any number of political or practical reasons not to set up a constitutional conflict with a coordinate branch. But "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). "[I]t is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds," *Chadha*, 462 U.S. at 942 n.13, which partially explains why "there is no constitutional analogue to the principles of waiver and estoppel," *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994). And comparatively recent history cannot revise the meaning of constitutional provisions long since liquidated. *Compare Slaughter*, 2026 WL 1855612, at *9 (looking to liquidation of meaning of Appointments Clause in early Republic), *with id.* at *12–13 (rejecting more recent historical practices). *See also* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2453 (2016) ("In the absence of 'extraordinary and peculiar circumstances,' … liquidations were expected to be permanent; they would fix the Constitution's meaning on points that could otherwise have been disputed." (footnote omitted) (quoting Letter from

James Madison to Charles J. Ingersoll (June 25, 1831), *in* 4 *Letters and Other Writings of James Madison* 183, 185 (1865))). "No branch may rely on adverse possession to claim power that the Constitution vests elsewhere." *Slaughter*, 2026 WL 1855612, at \*16.

2. The district court relied on the Property Clause and Necessary and Proper Clause to justify enactment of the Presidential Records Act. *See* Memorandum Opinion, JA274–87. That analysis too was seriously flawed.

Congress's power to regulate "Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2, obviously does not include the power to convert private property into public property. The district court reasoned that Congress has a "latent property interest" in presidential records, *id.*, JA281–83, but this Court has already rejected that analysis as "flatly at odds with the historical record," *Nixon*, 978 F.2d at 1276. Instead, Congress and the President alike long understood that presidential records belonged to the President *without* any need for a legislative enactment under the Property Clause that transferred property rights from the United States to the President. The long historical tradition underscores that prior to the enactment of the Preservation Act, "presidential papers were exclusively the property of the President," without any latent interest held by the United

43

States. *Id.* at 1284. To change the status quo, Congress had to enact a statute, and even then the Preservation Act effected a *per se* taking of personal property for which Nixon was entitled to just compensation. *Id.* at 1284. The district court responded that, unlike the Preservation Act, the Presidential Records Act "operates prospectively, so property rights never vest in an incumbent President at all." Memorandum Opinion, JA284. But the Supreme Court rejected such reasoning in *Tyler v. Hennepin County*, 598 U.S. 631 (2023), holding that the Takings Clause required compensating a homeowner for the confiscation of the excess value after a home-forfeiture sale, even though a statute enacted decades before she purchased her home "purported to extinguish that property interest." *Id.* at 639. And more fundamentally, the district court's prospective-extinguishment rationale begs the question of whether Congress has the authority to alter the President's property rights in his papers, prospectively or otherwise. To do so, Congress must invoke some affirmative grant of authority other than the Property Clause, as the papers were not government property to begin with.[4]

---

[4] The district court posited that the Presidential Records Act "could be justified by the Takings Clause, which allows for the government to take private property for public use." Memorandum Opinion, JA284 n.18. The Takings Clause, however, does not itself grant any power to Congress.

*Continued on next page.*

The district court was also mistaken in its conclusion that the Presidential Records Act is "necessary and proper for carrying into Execution … Powers vested by this Constitution" in the Executive Branch. U.S. Const. art. I, § 8, cl. 18; *see* Memorandum Opinion, JA 285. The district court surmised that the Presidential Records Act "facilitates efficiency in the discharge of official duties by ensuring that future Presidents and Executive Branch personnel are not "dependent on the happenstance or the whim of a prior President when they seek access to records of past decisions that define or channel current decisions." Memorandum Opinion, JA 285 (cleaned up). The Executive Branch itself, however, has reached the opposite conclusion. *See Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *28; *see also id.* at *30–33. And the Executive Branch is in a far better position than the Judicial Branch to determine whether a statute helps or hinders its own operations. Further, even under the district court's theory, the Presidential Records Act is not "plainly adapted" to improving executive efficiency, *Jinks v. Richland County*, 538 U.S. 456, 462 (2003) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 417 (1819)); *see also supra*

---

Instead, the power of eminent domain may be exercised by the federal government "so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution." *Kohl v. United States*, 91 U.S. 367, 372 (1875).

45

pp. 30–32, because its broad scope extends beyond ensuring presidential access by mandating disclosure to the public and Congress.

In any event, the Property Clause and Necessary and Proper Clause add little to the analysis, given that no exercise of Congressional power, regardless of the source of authority, may impede the President from carrying out his Article II functions. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring). For example, Congress's power to raise and fund an army does not allow it to exercise tactical command over troops in the field. *See Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850); *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862). And an appropriations rider forbidding the use of any federal funds to effectuate a pardon surely would be invalid. *See Klein*, 80 U.S. (13 Wall.) at 148. Likewise, under the district court's analysis, Congress could rely on the Property and Necessary and Proper Clauses to pass a law seizing possession of the records of Supreme Court justices and other federal judges and subjecting those records to public inspection. But "[j]ust as Congress could not constitutionally invade the independence of the Supreme Court and expropriate the papers of the Chief Justice or Associate Justices, Congress cannot invade the independence of the President and expropriate the papers

46

of the Chief Executive." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at \*1; *see id.* at \*27. So the question is not whether Congress has some colorable source of authority to enact a law in a vacuum. Rather, Congress's exercise of its enumerated powers must be analyzed in light of the structure of the Constitution. *See id.* The key question is whether the statute violates the separation of powers. As explained, it does. *See supra* pp. 22–38.[5]

---

[5] For the same reasons plaintiffs have not established likelihood of success on the merits, they cannot show irreparable harm or that the balance of the equities favor them. In contrast, in "improperly intrud[ing] on a coordinate branch of the Government," the district court's order imposes irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant*
*Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

JULY 2026

48

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,558 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

44 U.S.C. § 2201 ........................................................................................A1

44 U.S.C. § 2202 ........................................................................................A3

44 U.S.C. § 2203 ........................................................................................A4

44 U.S.C. § 2204 ........................................................................................A7

44 U.S.C. § 2205 ........................................................................................A10

44 U.S.C. § 2206 ........................................................................................A11

44 U.S.C. § 2207 ........................................................................................A12

44 U.S.C. § 2208 ........................................................................................A13

44 U.S.C. § 2209 ........................................................................................A16

**44 U.S.C. § 2201**

**§ 2201. Definitions**

As used in this chapter—

(1) The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form.

(2) The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—

(A) includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

(B) does not include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code); (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

(3) The term "personal records" means all documentary materials, or any reasonably segregable portion therof,[*] of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term includes—

(A) diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for,

---

[*] So in original. Probably should be "thereof,".

A1

or circulated or communicated in the course of, transacting Government business;

(B) materials relating to private political associations, and having no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; and

(C) materials relating exclusively to the President's own election to the office of the Presidency; and materials directly relating to the election of a particular individual or individuals to Federal, State, or local office, which have no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President.

(4) The term "Archivist" means the Archivist of the United States.

(5) The term "former President", when used with respect to Presidential records, means the former President during whose term or terms of office such Presidential records were created.

A2

**44 U.S.C. § 2202**

**§ 2202. Ownership of Presidential records**

The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter.

**44 U.S.C. § 2203**

**§ 2203. Management and custody of Presidential records**

(a) Through the implementation of records management controls and other necessary actions, the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

(b) Documentary materials produced or received by the President, the President's staff, or units or individuals in the Executive Office of the President the function of which is to advise or assist the President, shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately.

(c) During the President's term of office, the President may dispose of those Presidential records of such President that no longer have administrative, historical, informational, or evidentiary value if—

   (1) the President obtains the views, in writing, of the Archivist concerning the proposed disposal of such Presidential records; and

   (2) the Archivist states that the Archivist does not intend to take any action under subsection (e) of this section.

(d) In the event the Archivist notifies the President under subsection (c) that the Archivist does intend to take action under subsection (e), the President may dispose of such Presidential records if copies of the disposal schedule are submitted to the appropriate Congressional Committees at least 60 calendar days of continuous session of Congress in advance of the proposed disposal date. For the purpose of this section, continuity of session is broken only by an adjournment of Congress sine die, and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of the days in which Congress is in continuous session.

(e) The Archivist shall request the advice of the Committee on Rules and Administration and the Committee on Governmental Affairs of the Senate

A4

and the Committee on House Oversight and the Committee on Government Operations of the House of Representatives with respect to any proposed disposal of Presidential records whenever the Archivist considers that—

    (1) these particular records may be of special interest to the Congress; or

    (2) consultation with the Congress regarding the disposal of these particular records is in the public interest.

(f) During a President's term of office, the Archivist may maintain and preserve Presidential records on behalf of the President, including records in digital or electronic form. The President shall remain exclusively responsible for custody, control, and access to such Presidential records.
The Archivist may not disclose any such records, except under direction of the President, until the conclusion of a President's term of office, if a President serves consecutive terms upon the conclusion of the last term, or such other period provided for under section 2204 of this title.

(g)

    (1) Upon the conclusion of a President's term of office, or if a President serves consecutive terms upon the conclusion of the last term, the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President. The Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter.

    (2) The Archivist shall deposit all such Presidential records in a Presidential archival depository or another archival facility operated by the United States. The Archivist is authorized to designate, after consultation with the former President, a director at each depository or facility, who shall be responsible for the care and preservation of such records.

    (3) When the President considers it practicable and in the public interest, the President shall include in the President's budget transmitted to Congress, for each fiscal year in which the term of office of the President will expire, such funds as may be necessary for carrying out the authorities of this subsection.

    (4) The Archivist is authorized to dispose of such Presidential records which the Archivist has appraised and determined to have

A5

insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation. Notice of such disposal shall be published in the Federal Register at least 60 days in advance of the proposed disposal date. Publication of such notice shall constitute a final agency action for purposes of review under chapter 7 of title 5, United States Code.

44 U.S.C. § 2204

## § 2204. Restrictions on access to Presidential records

(a) Prior to the conclusion of a President's term of office or last consecutive term of office, as the case may be, the President shall specify durations, not to exceed 12 years, for which access shall be restricted with respect to information, in a Presidential record, within one or more of the following categories:

(1)

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) in fact properly classified pursuant to such Executive order;

(2) relating to appointments to Federal office;

(3) specifically exempted from disclosure by statute (other than sections 552 and 552b of title 5, United States Code), provided that such statute (A) requires that the material be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of material to be withheld;

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) confidential communications requesting or submitting advice, between the President and the President's advisers, or between such advisers; or

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

(b)

(1) Any Presidential record or reasonably segregable portion thereof containing information within a category restricted by the President under subsection (a) shall be so designated by the Archivist and access thereto shall be restricted until the earlier of—

(A)

(i) the date on which the former President waives the restriction on disclosure of such record, or

A7

(ii) the expiration of the duration specified under subsection (a) for the category of information on the basis of which access to such record has been restricted; or

(B) upon a determination by the Archivist that such record or reasonably segregable portion thereof, or of any significant element or aspect of the information contained in such record or reasonably segregable portion thereof, has been placed in the public domain through publication by the former President, or the President's agents.

(2) Any such record which does not contain information within a category restricted by the President under subsection (a), or contains information within such a category for which the duration of restricted access has expired, shall be exempt from the provisions of subsection (c) until the earlier of—

(A) the date which is 5 years after the date on which the Archivist obtains custody of such record pursuant to section 2203(d)(1);[*] or

(B) the date on which the Archivist completes the processing and organization of such records or integral file segment thereof.

(3) During the period of restricted access specified pursuant to subsection (b)(1), the determination whether access to a Presidential record or reasonably segregable portion thereof shall be restricted shall be made by the Archivist, in the Archivist's discretion, after consultation with the former President, and, during such period, such determinations shall not be subject to judicial review, except as provided in subsection (e) of this section. The Archivist shall establish procedures whereby any person denied access to a Presidential record because such record is restricted pursuant to a determination made under this paragraph, may file an administrative appeal of such determination. Such procedures shall provide for a written determination by the Archivist or the Archivist's designee, within 30 working days after receipt of such an appeal, setting forth the basis for such determination.

(c)

---

[*] So in original. Probably should be "2203(g)(1);".

A8

(1) Subject to the limitations on access imposed pursuant to subsections (a) and (b), Presidential records shall be administered in accordance with section 552 of title 5, United States Code, except that paragraph (b)(5) of that section shall not be available for purposes of withholding any Presidential record, and for the purposes of such section such records shall be deemed to be records of the National Archives and Records Administration. Access to such records shall be granted on nondiscriminatory terms.

(2) Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President.

(d) Upon the death or disability of a President or former President, any discretion or authority the President or former President may have had under this chapter, except section 2208, shall be exercised by the Archivist unless otherwise previously provided by the President or former President in a written notice to the Archivist.

(e) The United States District Court for the District of Columbia shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges.

(f) The Archivist shall not make available any original Presidential records to any individual claiming access to any Presidential record as a designated representative under section 2205(3) of this title if that individual has been convicted of a crime relating to the review, retention, removal, or destruction of records of the Archives.

A9

**44 U.S.C. § 2205**

**§ 2205. Exceptions to restricted access**

Notwithstanding any restrictions on access imposed pursuant to sections 2204 and 2208 of this title—

(1) the Archivist and persons employed by the National Archives and Records Administration who are engaged in the performance of normal archival work shall be permitted access to Presidential records in the custody of the Archivist;

(2) subject to any rights, defenses, or privileges which the United States or any agency or person may invoke, Presidential records shall be made available—

(A) pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding;

(B) to an incumbent President if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available; and

(C) to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available; and

(3) the Presidential records of a former President shall be available to such former President or the former President's designated representative.

**44 U.S.C. § 2206**

**§ 2206. Regulations**

The Archivist shall promulgate in accordance with section 553 of title 5, United States Code, regulations necessary to carry out the provisions of this chapter. Such regulations shall include—

(1) provisions for advance public notice and description of any Presidential records scheduled for disposal pursuant to section 2203(f)(3); [1]

(2) provisions for providing notice to the former President when materials to which access would otherwise be restricted pursuant to section 2204(a) are to be made available in accordance with section 2205(2);

(3) provisions for notice by the Archivist to the former President when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have; and

(4) provisions for establishing procedures for consultation between the Archivist and appropriate Federal agencies regarding materials which may be subject to section 552(b)(7) of title 5, United States Code.

A11

**44 U.S.C. § 2207**

**§ 2207. Vice-Presidential records**

Vice-Presidential records shall be subject to the provisions of this chapter in the same manner as Presidential records. The duties and responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same as the duties and responsibilities of the President under this chapter, except section 2208, with respect to Presidential records. The authority of the Archivist with respect to Vice-Presidential records shall be the same as the authority of the Archivist under this chapter with respect to Presidential records, except that the Archivist may, when the Archivist determines that it is in the public interest, enter into an agreement for the deposit of Vice-Presidential records in a non-Federal archival depository. Nothing in this chapter shall be construed to authorize the establishment of separate archival depositories for such Vice-Presidential records.

**44 U.S.C. § 2208**

**§ 2208. Claims of constitutionally based privilege against disclosure**

(a)

(1) When the Archivist determines under this chapter to make available to the public any Presidential record that has not previously been made available to the public, the Archivist shall—

(A) promptly provide notice of such determination to—

(i) the former President during whose term of office the record was created; and

(ii) the incumbent President; and

(B) make the notice available to the public.

(2) The notice under paragraph (1)—

(A) shall be in writing; and

(B) shall include such information as may be prescribed in regulations issued by the Archivist.

(3)

(A) Upon the expiration of the 60-day period (excepting Saturdays, Sundays, and legal public holidays) beginning on the date the Archivist provides notice under paragraph (1)(A), the Archivist shall make available to the public the Presidential record covered by the notice, except any record (or reasonably segregable part of a record) with respect to which the Archivist receives from a former President or the incumbent President notification of a claim of constitutionally based privilege against disclosure under subsection (b).

(B) A former President or the incumbent President may extend the period under subparagraph (A) once for not more than 30 additional days (excepting Saturdays, Sundays, and legal public holidays) by filing with the Archivist a statement that such an extension is necessary to allow an adequate review of the record.

(C) Notwithstanding subparagraphs (A) and (B), if the 60-day period under subparagraph (A), or any extension of that period under

A13

subparagraph (B), would otherwise expire during the 6-month period after the incumbent President first takes office, then that 60-day period or extension, respectively, shall expire at the end of that 6-month period.

(b)

(1) For purposes of this section, the decision to assert any claim of constitutionally based privilege against disclosure of a Presidential record (or reasonably segregable part of a record) must be made personally by a former President or the incumbent President, as applicable.

(2) A former President or the incumbent President shall notify the Archivist, the Committee on Oversight and Government Reform of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs of the Senate of a privilege claim under paragraph (1) on the same day that the claim is asserted under such paragraph.

(c)

(1) If a claim of constitutionally based privilege against disclosure of a Presidential record (or reasonably segregable part of a record) is asserted under subsection (b) by a former President, the Archivist shall consult with the incumbent President, as soon as practicable during the period specified in paragraph (2)(A), to determine whether the incumbent President will uphold the claim asserted by the former President.

(2)

(A) Not later than the end of the 30-day period beginning on the date on which the Archivist receives notification from a former President of the assertion of a claim of constitutionally based privilege against disclosure, the Archivist shall provide notice to the former President and the public of the decision of the incumbent President under paragraph (1) regarding the claim.

(B) If the incumbent President upholds the claim of privilege asserted by the former President, the Archivist shall not make the Presidential record (or reasonably segregable part of a record) subject to the claim publicly available unless—

A14

(i) the incumbent President withdraws the decision upholding the claim of privilege asserted by the former President; or

(ii) the Archivist is otherwise directed by a final court order that is not subject to appeal.

(C) If the incumbent President determines not to uphold the claim of privilege asserted by the former President, or fails to make the determination under paragraph (1) before the end of the period specified in subparagraph (A), the Archivist shall release the Presidential record subject to the claim at the end of the 90-day period beginning on the date on which the Archivist received notification of the claim, unless otherwise directed by a court order in an action initiated by the former President under section 2204(e) of this title or by a court order in another action in any Federal court.

(d) The Archivist shall not make publicly available a Presidential record (or reasonably segregable part of a record) that is subject to a privilege claim asserted by the incumbent President unless—

(1) the incumbent President withdraws the privilege claim; or

(2) the Archivist is otherwise directed by a final court order that is not subject to appeal.

(e) The Archivist shall adjust any otherwise applicable time period under this section as necessary to comply with the return date of any congressional subpoena, judicial subpoena, or judicial process.

A15

**44 U.S.C. § 2209**

## § 2209. Disclosure requirement for official business conducted using non-official electronic messaging accounts

(a) **In General.—** The President, the Vice President, or a covered employee may not create or send a Presidential or Vice Presidential record using a non-official electronic message account unless the President, Vice President, or covered employee—

(1) copies an official electronic messaging account of the President, Vice President, or covered employee in the original creation or transmission of the Presidential record or Vice Presidential record; or

(2) forwards a complete copy of the Presidential or Vice Presidential record to an official electronic messaging account of the President, Vice President, or covered employee not later than 20 days after the original creation or transmission of the Presidential or Vice Presidential record.

(b) **Adverse Actions.—** The intentional violation of subsection (a) by a covered employee (including any rules, regulations, or other implementing guidelines), as determined by the appropriate supervisor, shall be a basis for disciplinary action in accordance with subchapter I, II, or V of chapter 75 of title 5, as the case may be.

(c) **Definitions.—** In this section:

(1) **Covered employee.—** The term "covered employee" means—

(A) the immediate staff of the President;

(B) the immediate staff of the Vice President;

(C) a unit or individual of the Executive Office of the President whose function is to advise and assist the President; and

(D) a unit or individual of the Office of the Vice President whose function is to advise and assist the Vice President.

(2) **Electronic messages.—** The term "electronic messages" means electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals.

(3) **Electronic messaging account.—** The term "electronic messaging account" means any account that sends electronic messages.

A16