**[ORAL ARGUMENT NOT SCHEDULED]**
**Nos. 26-5185, 26-5186**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

AMERICAN HISTORICAL ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

DONALD TRUMP, *in his official capacity as President of the United States and in his personal capacity, et al.*,
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX**
**VOLUME I OF II**

———————————

DANIEL F. JACOBSON
LYNN D. EISENBERG
STEPHEN K. WIRTH
JOHN ROBINSON
  *Jacobson Lawyers Group PLLC*
  *5100 Wisconsin Avenue NW*
  *Ste. 301*
  *Washington DC, 20016*
  *(301) 823-1148*

LOREE STARK
  *American Oversight*
  *1030 15th Street NW, B255*
  *Washington, D.C. 20005*
  *(202) 869-5246*

*Counsel for Plaintiffs-Appellees*
*American Historical Association*
*and American Oversight*

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant*
  *Attorney General*

MARK R. FREEMAN
DANIEL TENNY
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-0211*

*Counsel for Defendants-*
*Appellants*

*(additional counsel listed on inside cover)*

KELSI BROWN CORKRAN
WILLIAM POWELL
  *Institute for Constitutional*
    *Advocacy & Protection,*
    *Georgetown Law*
  *600 New Jersey Avenue, NW*
  *Washington, DC 20001*
  *(202) 661-6728*

JONATHAN E. MAIER
LAUREN C. BINGHAM
NIKHEL S. SUS
  *Citizens for Responsibility and*
    *Ethics in Washington*
  *PO Box 14596*
  *Washington, DC 20044*
  *(202) 408-5565*

  *Counsel for Plaintiffs-Appellees*
  *Freedom of the Press Foundation*
  *and Citizens for Responsibility*
  *and Ethics in Washington*

# TABLE OF CONTENTS

## VOLUME I
### *American Historical Ass'n v. Trump*, No. 26-cv-1169

Docket Sheet ...........................................................................................JA1

Complaint,
  Dkt. 1 (Apr. 6, 2026)...........................................................................JA14

Motion for Preliminary Injunction,
  Dkt. 13 (Apr. 14, 2026).......................................................................JA60

Declaration of Daniel F. Jacobson, Ex. A (email chain with counsel),
  Dkt. 13-3 (Apr. 14, 2026) ...................................................................JA62

Declaration of Daniel F. Jacobson, Ex. B (Gov't Br. in *Nixon*),
  Dkt. 13-4 (Apr. 14, 2026) ...................................................................JA65

Declaration of Daniel F. Jacobson, Ex. C (Axios article),
  Dkt. 13-5 (Apr. 14, 2026) .................................................................JA133

Declaration of Daniel F. Jacobson, Ex. D (OLC testimony),
  Dkt. 13-6 (Apr. 14, 2026) .................................................................JA141

Declaration of Sarah Weicksel
  Dkt. 13-7 (Apr. 14, 2026) .................................................................JA169

Declaration of Elizabeth Marx,
  Dkt. 13-8 (Apr. 14, 2026) .................................................................JA174

Declaration of Matthew Connelly,
  Dkt. 13-9 (Apr. 14, 2026) .................................................................JA220

Declaration of Timothy J. Naftali,
  Dkt. 13-10 (Apr. 14, 2026) ...............................................................JA225

Declaration of Kathryn Cramer Brownell,
  Dkt. 13-11 (Apr. 14, 2026) ...............................................................JA228

Declaration of Natalia Mehlman Petrzela,
Dkt. 13-12 (Apr. 14, 2026) ..................................................................JA231

Memorandum from David Alan Warrington, Counsel to the President,
re: Records Retention Policy (Apr. 2, 2026),
Dkt. 19-2 (Apr. 21, 2026) ..................................................................JA234

Declaration of Kate Dillon McClure,
Dkt. 19-3 (Apr. 21, 2026) ..................................................................JA238

Declaration of Daniel F. Jacobson, Ex. E (McGahn Memo),
Dkt. 22-2 (Apr. 30, 2026) ..................................................................JA241

Order,
Dkt. 23 (May 20, 2026) ....................................................................JA245

Memorandum Opinion,
Dkt. 24 (May 20, 2026) ....................................................................JA248

Notice of Compliance,
Dkt. 25 (May 28, 2026) ....................................................................JA302

WHCO Compliance Email (without attachments),
Dkt. 25-1 (May 28, 2026) .................................................................JA305

Notice of Appeal,
Dkt. 26 (June 2, 2026)......................................................................JA308

Transcript of Proceedings (May 13, 2026),
Dkt. 32 (June 12, 2026).....................................................................JA310

**VOLUME II**
*Freedom of the Press Foundation v. Trump*, No. 26-cv-1402

Docket Sheet ............................................................................JA446

Complaint,
   Dkt. 1 (Apr. 24, 2026)............................................................JA452

Motion for Preliminary Injunction,
   Dkt. 7 (Apr. 27, 2026)............................................................JA493

Declaration of Kayvan Farchadi,
   Dkt. 7-2 (Apr. 27, 2026) .......................................................JA496

Declaration of Jason R. Baron,
   Dkt. 7-3 (Apr. 27, 2026) .......................................................JA515

Declaration of Lauren Harper,
   Dkt. 7-4 (Apr. 27, 2026) .......................................................JA528

Declaration of Robert J. Eisenhauer,
   Dkt. 11-1 (May 5, 2026).........................................................JA536

Order,
   Dkt. 14 (May 20, 2026) .........................................................JA539

Notice of Appeal,
   Dkt. 18 (June 2, 2026)...........................................................JA541

APPEAL,MANDAMUS,TYPE−E

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:26−cv−01169−JDB

AMERICAN HISTORICAL ASSOCIATION et al v. TRUMP et al
Assigned to: Judge John D. Bates
Related Case: 1:26−cv−01402−JDB
Case in other court: USCA, 26−05185
Cause: 28:1331 Fed. Question

Date Filed: 04/06/2026
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **AMERICAN HISTORICAL ASSOCIATION** | represented by | **Jessica Jensen** <br> AMERICAN OVERSIGHT <br> 1030 15th Street NW, B−255 <br> Washington, DC 20005 <br> 202−869−5246 <br> Email: jessica.jensen@americanoversight.org <br> *TERMINATED: 06/15/2026* <br> *ATTORNEY TO BE NOTICED* |
| | | **John Robinson** <br> JACOBSON LAWYERS GROUP <br> 5100 Wisconsin Ave., Suite 310 <br> Washington, DC 20016 <br> 732−939−2537 <br> Email: john@jacobsonlawyersgroup.com <br> *ATTORNEY TO BE NOTICED* |
| | | **Lynn D. Eisenberg** <br> JACOBSON LAWYERS GROUP <br> 5100 Wisconsin Avenue, NW <br> Suite 301 <br> Washington, DC 20016 <br> 301−823−1148 <br> Email: lynn@jacobsonlawyersgroup.com <br> *ATTORNEY TO BE NOTICED* |
| | | **Stephen K. Wirth** <br> JACOBSON LAWYERS GROUP PLLC <br> 5100 Wisconsin Avenue NW <br> Suite 301 <br> Washington, DC 20016 <br> 406−407−6051 <br> Email: stephen@jacobsonlawyersgroup.com <br> *ATTORNEY TO BE NOTICED* |
| | | **Daniel F. Jacobson** <br> JACOBSON LAWYERS GROUP PLLC <br> 5100 Wisconsin Ave. NW <br> Suite 301 <br> Washington, DC 20016 <br> 301−823−1148 <br> Email: dan@jacobsonlawyersgroup.com <br> *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **AMERICAN OVERSIGHT** | represented by | **Jessica Jensen** <br> (See above for address) <br> *TERMINATED: 06/15/2026* <br> *ATTORNEY TO BE NOTICED* |

JA1

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Loree Stark**
AMERICAN OVERSIGHT
1030 15th Street NW
Suite B255
Washington, DC 20005
914−393−4614
Email: loree.stark@americanoversight.org
*ATTORNEY TO BE NOTICED*

**Lynn D. Eisenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD TRUMP**
*in his official capacity as President of the
United States and in his personal
capacity*

represented by **James R. Powers**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch, Civil Division
1100 L Street NW
Room 11218
Washington, DC 20005
(202) 353−0543
Fax: (202) 616−8470
Email: james.r.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
DOJ−Civ
Civil
950 Pennsylvania Ave NW
Ste 3618
Washington, DC 20530
202−514−6993
Email: john.bailey@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Winston Shi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202−880−0387
Email: winston.g.shi@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES DAVID VANCE**
*in his official capacity as Vice President*

represented by **James R. Powers**
(See above for address)

JA2

*of the United States*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WHITE HOUSE OFFICE**                    represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN WILES**                    represented by    **James R. Powers**
*in her official capacity as White House*                    (See above for address)
*Chief of Staff*                    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PHILIP C. DROEGE**                    represented by    **James R. Powers**
*in his official capacity as Director of the*                    (See above for address)
*Office of Records Management*                    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL SECURITY COUNCIL**                    represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA3**

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CATHERINE KELLER**
*in her official capacity as Executive Secretary of the National Security Council*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOMELAND SECURITY COUNCIL**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN MILLER**
*in his official capacity as Homeland Security Advisor*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**COUNCIL ON ECONOMIC ADVISERS**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

JA4

**PIERRE YARED**
*in his official capacity as Acting Chairman of the White House Council of Economic Advisers*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE RESIDENCE**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT B. DOWNING**
*in his official capacity as White House Chief Usher*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PRESIDENT'S INTELLIGENCE ADVISORY BOARD**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEVIN NUNES**
*in his official capacity as Chairman of the Presidents Intelligence Advisory Board*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**

**JA5**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF ADMINISTRATION**     represented by     **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSHUA FISHER**
*in his official capacity as Director of the*
*Office of Administration*     represented by     **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE VICE PRESIDENT**     represented by     **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACOB RESES**
*in his official capacity as Chief of Staff to*
*the Vice President*     represented by     **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA6**

**Defendant**

**UNITED STATES DOGE SERVICE**      represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**      represented by    **James R. Powers**
*in her official capacity as Acting*       (See above for address)
*Administrator of the United States DOGE*   *LEAD ATTORNEY*
*Service*          *ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF JUSTICE**      represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA BONDI**      represented by    **James R. Powers**
*in her official capacity as Attorney*     (See above for address)
*General of the United States*      *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**      represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA7

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ED FORST**                    represented by **James R. Powers**
*in his official capacity as Acting Archivist*              (See above for address)
*of the United States*                          *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **John Bailey**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Winston Shi**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Movant**

**JOHN H. PAGE**               represented by **JOHN H. PAGE**
                                               1077 30th Street NW
                                               Apartment 411
                                               Washington, DC 20007
                                               202−352−6952
                                               PRO SE

**Movant**

**DAVID KRUCOFF**              represented by **DAVID KRUCOFF**
                                               2870 Upton Street NW
                                               Washington, DC 20008
                                               (202)437−7443
                                               PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2026 | 1 | COMPLAINT against PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, President's Intelligence Advisory Board, JACOB RESES, THE WHITE HOUSE OFFICE, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, SUSAN WILES, Pierre Yared ( Filing fee $ 405 receipt number ADCDC−12344563) filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Donald Trump, # 3 Summons to James David Vance, # 4 Summons to The White House Office, # 5 Summons to Susan Wiles, # 6 Summons to Philip C. Droege, # 7 Summons to National Security Council, # 8 Summons to Catherine Keller, # 9 Summons to Homeland Security Council, # 10 Summons to Stephen Miller, # 11 Summons to Council on Economic Advisers, # 12 Summons to Pierre Yared, # 13 Summons to Executive Residence, # 14 Summons to Robert B. Downing, # 15 Summons to President's Intelligence Advisory Board, # 16 Summons to Devin Nunes, # 17 Summons to Office of Administration, # 18 Summons to Joshua Fisher, # 19 Summons to Office of the Vice President, # 20 Summons to Jacob Reses, # 21 Summons to United States DOGE Service, # 22 Summons to Pamela Bondi, # 23 Summons to NARA, # 24 Summons to Ed Forst, # 25 Summons |

**JA8**

| | | |
|---|---|---|
| | | to Amy Gleason, # 26 Summons to Department of Justice, # 27 Summons to U.S. Attorney's Office, # 28 Summons to Attorney General)(Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT (Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 3 | CIVIL COVER SHEET *(corrected)* by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION re 1 Complaint,,,,,,, filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION. Related document: 1 Complaint,,,,,,, filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION.(Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 4 | NOTICE OF RELATED CASE by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. Case related to Case No. 25−cv−409. (Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 5 | NOTICE of Appearance by Lynn D. Eisenberg on behalf of All Plaintiffs (Eisenberg, Lynn) (Entered: 04/06/2026) |
| 04/07/2026 | | Case Assigned to Judge Beryl A. Howell. (znmw) (Entered: 04/07/2026) |
| 04/07/2026 | 6 | SUMMONS (27) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/07/2026) |
| 04/07/2026 | 7 | NOTICE of Appearance by John Robinson on behalf of All Plaintiffs (Robinson, John) (Entered: 04/07/2026) |
| 04/07/2026 | 8 | NOTICE of Appearance by Loree Stark on behalf of AMERICAN OVERSIGHT (Stark, Loree) (Entered: 04/07/2026) |
| 04/08/2026 | 9 | STANDING ORDER. Signed by Judge Beryl A. Howell on April 8, 2026. (lcbah2) (Entered: 04/08/2026) |
| 04/10/2026 | 10 | RESPONSE re 4 Notice of Related Case, by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Attachments: # 1 Exhibit A)(Powers, James) Modified event on 4/13/2026 (mg). (Entered: 04/10/2026) |
| 04/10/2026 | 11 | NOTICE of Appearance by Winston Shi on behalf of All Defendants (Shi, Winston) (Entered: 04/10/2026) |
| 04/13/2026 | 12 | NOTICE of Appearance by John Bailey on behalf of All Defendants (Bailey, John) (Entered: 04/13/2026) |
| 04/14/2026 | 13 | MOTION for Preliminary Injunction , MOTION to Stay *under 5 USC 705* by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Daniel F. Jacobson, # 3 Declaration Ex. A (email chain with counsel), # 4 Declaration Ex. B Gov't Br. in Nixon, # 5 Declaration Ex. C (Axios article), # 6 Declaration Ex. D (OLC testimony), # 7 Declaration of Sarah Weicksel, # 8 Declaration of Elizabeth Marx, # 9 Declaration of Matthew Connelly, # 10 Declaration of Timothy J. Naftali, # 11 Declaration of Kathryn Cramer Brownell, # 12 Declaration of Natalia Mehlman Petrzela, # 13 Text of Proposed Order)(Jacobson, Daniel) (Entered: 04/14/2026) |
| 04/14/2026 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 13 Motion for Preliminary Injunction and Stay ("Pls.' Mot."), DIRECTING parties to confer and file, by April 15, 2026, at 2:00 PM, a proposed schedule for briefing plaintiffs' Motion. Signed by Judge Beryl A. Howell on April 14, 2026. (lcbah2) (Entered: 04/14/2026) |

**JA9**

| | | |
|---|---|---|
| 04/14/2026 | | MINUTE ORDER (paperless), upon consideration of defendants' 10 Objection to Plaintiffs' Notice of Related Case, filed at 5:00 PM on April 10, 2026, DIRECTING plaintiffs to file any response by April 15, 2026, at 2:00 PM. Signed by Judge Beryl A. Howell on April 14, 2026. (lcbah2) (Entered: 04/14/2026) |
| 04/14/2026 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/8/2026. Answer due for ALL FEDERAL DEFENDANTS by 6/7/2026. (Attachments: # 1 Exhibit Proof of service)(Robinson, John) (Entered: 04/14/2026) |
| 04/15/2026 | | Set/Reset Deadlines: Parties Proposed Briefing Schedule due no later than 2:00PM on 4/15/2026 Plaintiff Response due no later than 2:00PM on 4/15/2026 (mac) (Entered: 04/15/2026) |
| 04/15/2026 | 15 | RESPONSE re 10 MOTION to Reassign Case *Objection to Plaintiffs' Notice of Related Case* filed by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Jacobson, Daniel) (Entered: 04/15/2026) |
| 04/15/2026 | 16 | PROPOSED BRIEFING SCHEDULE *Joint Status Report* by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Jacobson, Daniel) (Entered: 04/15/2026) |
| 04/15/2026 | 17 | MEMORANDUM AND ORDER SUSTAINING defendants' 10 Objection to Plaintiffs' Notice of Related Case. See Order for further details. This case is hereby TRANSFERRED to the Calendar and Case Management Committee for random assignment. Signed by Judge Beryl A. Howell on April 15, 2026. (lcbah2) (Entered: 04/15/2026) |
| 04/15/2026 | | Case randomly reassigned to Judge John D. Bates pursuant to the 17 Order dated 4/15/2026. Judge Beryl A. Howell is no longer assigned to the case. (ztnr) (Entered: 04/15/2026) |
| 04/16/2026 | | MINUTE ORDER: Upon consideration of 16 the parties' joint status report and proposed briefing schedules, and the entire record herein, it is hereby ORDERED that defendants shall file their response to 13 plaintiffs' motion for a preliminary injunction by not later than April 21, 2026, and plaintiffs shall file their reply by not later than April 28, 2026. It is further ORDERED that a hearing on plaintiffs' motion is set for May 5, 2026, at 2:00 PM in Courtroom 30A (in person) before Judge John D. Bates. SO ORDERED. Signed by Judge John D. Bates on 4/16/2026. (lcjdb1) (Entered: 04/16/2026) |
| 04/16/2026 | 18 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Amicus Brief − David Krucoff & John Page. Reason(s): Filer is not a party to the case. (zjm) (Entered: 04/20/2026) |
| 04/21/2026 | | MINUTE ORDER re **Request for Leave to File Review:** Upon consideration of 18 the request for leave to file amicus brief, and the entire record herein, it is hereby ORDERED that leave to file is DENIED without prejudice. Non−parties who seek to submit an amicus brief in the matter must file a motion for leave to file that complies with the requirements of D.D.C. Local Civil Rule 7(o)(2). Due to the expedited nature of this matter, such motions must be filed not later than April 28, 2026, with any oppositions to be filed not later than April 30, 2026. SO ORDERED. Signed by Judge John D. Bates on 4/21/2026. (lcjdb2). (Entered: 04/21/2026) |
| 04/21/2026 | 19 | Memorandum in opposition to re 13 MOTION for Preliminary Injunction MOTION to Stay *under 5 USC 705* filed by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Attachments: # 1 Declaration of James R. Powers, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Powers, James) (Entered: 04/21/2026) |

| | | |
|---|---|---|
| 04/21/2026 | 20 | MOTION for Leave to File Amicus Brief by JOHN H. PAGE, DAVID KRUCOFF. (zjm) (Entered: 04/22/2026) |
| 04/28/2026 | | SCHEDULING ORDER: Upon consideration of the filing of the related case Freedom of the Press Foundation v. Trump, 26−1402, and the entire record herein, the schedule entered on April 16, 2026, is hereby VACATED. It is hereby ORDERED that the plaintiffs' reply is now due not later than April 30, 2026, and a consolidated hearing on the motions for preliminary injunction in both cases is set for May 13, 2026, at 10:00AM in Courtroom 30A (in person) before Judge John D. Bates. SO ORDERED. Signed by Judge John D. Bates on April 28, 2026. (lcjdb2). (Entered: 04/28/2026) |
| 04/29/2026 | 21 | NOTICE of Appearance by Jessica Jensen on behalf of All Plaintiffs (Jensen, Jessica) (Entered: 04/29/2026) |
| 04/30/2026 | 22 | REPLY to opposition to motion re 13 Motion for Preliminary Injunction,,, Motion to Stay,, filed by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Declaration of Daniel Jacobson, # 2 Exhibit E (McGahn Memo))(Jacobson, Daniel) (Entered: 04/30/2026) |
| 05/08/2026 | | MINUTE ORDER: The Court will hold a hearing on 13 motion for Preliminary Injunction on May 13, 2026, at 10:00AM in Courtroom 30. A public line will be available at: 833−990−9400; meeting ID: 367524674. Signed by Judge John D. Bates on 5/8/2026. (lcjdb2). (Entered: 05/08/2026) |
| 05/08/2026 | | MINUTE ORDER: Upon consideration of 20 the motion for leave to file amicus brief, and the entire record herein, it is hereby ORDERED that the motion is DENIED. The motion does not comply with the requirements of D.D.C. Local Civil Rule 7(o)(2), such as the requirement that the motion state the position of each party as to the filing of such a brief, state the nature of the amicis interest in the matter, and be accompanied by a proposed order. SO ORDERED. Signed by Judge John D. Bates on 5/8/2026. (lcjdb2). (Entered: 05/08/2026) |
| 05/13/2026 | | Minute Entry for Preliminary Injunction proceeding held on 5/13/2026 before Judge John D. Bates: Parties presented oral argument. Matter taken under advisement. Order forthcoming. (Court Reporter Stacy Johns.) (zed) (Entered: 05/13/2026) |
| 05/20/2026 | 23 | ORDER granting in part and denying in part 13 motion for preliminary injunction and stay. See text of order and accompanying memorandum opinion for details. Signed by Judge John D. Bates on 5/20/2026. (lcjdb3) (Entered: 05/20/2026) |
| 05/20/2026 | 24 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 5/20/2026. (lcjdb3) (Entered: 05/20/2026) |
| 05/26/2026 | | MINUTE ORDER: The parties are hereby ORDERED to meet and confer and to file a joint status report by not later than June 4, 2026, proposing a schedule to govern further proceedings. If the parties cannot agree on a schedule, they may file separate proposals. SO ORDERED by Judge John D. Bates on 5/26/2026. Modified on 5/28/2026 (znbn). (Entered: 05/26/2026) |
| 05/28/2026 | 25 | NOTICE *of Compliance* by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED re 23 Order on Motion for Preliminary Injunction, Order on Motion to Stay (Attachments: # 1 Exhibit WHCO Compliance Email)(Shi, Winston) (Entered: 05/28/2026) |
| 06/02/2026 | 26 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 24 Memorandum & Opinion, 23 Order on Motion for Preliminary Injunction, Order on Motion to Stay by STEPHEN MILLER, JACOB RESES, PHILIP C. DROEGE, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, DEVIN NUNES, UNITED STATES DOGE SERVICE, OFFICE OF ADMINISTRATION, AMY GLEASON, PIERRE YARED, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, SUSAN |

| | | |
|---|---|---|
| | | WILES, ED FORST, PAMELA BONDI, DONALD TRUMP, CATHERINE KELLER, COUNCIL ON ECONOMIC ADVISERS, EXECUTIVE RESIDENCE, ROBERT B. DOWNING, OFFICE OF THE VICE PRESIDENT, NATIONAL SECURITY COUNCIL, JAMES DAVID VANCE, UNITED STATES DEPARTMENT OF JUSTICE, HOMELAND SECURITY COUNCIL, JOSHUA FISHER, WHITE HOUSE OFFICE. Fee Status: No Fee Paid. (Powers, James) (Entered: 06/02/2026) |
| 06/02/2026 | 27 | NOTICE of Appearance by Stephen K. Wirth on behalf of AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT (Wirth, Stephen) (Entered: 06/02/2026) |
| 06/02/2026 | 28 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 26 Notice of Appeal to DC Circuit Court,,. (zjm) (Entered: 06/02/2026) |
| 06/03/2026 | | USCA Case Number 26−5185 for 26 Notice of Appeal to DC Circuit Court,, filed by DONALD TRUMP, AMY GLEASON, OFFICE OF ADMINISTRATION, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, PIERRE YARED, ROBERT B. DOWNING, COUNCIL ON ECONOMIC ADVISERS, SUSAN WILES, ED FORST, WHITE HOUSE OFFICE, JAMES DAVID VANCE, CATHERINE KELLER, UNITED STATES DOGE SERVICE, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, DEVIN NUNES, UNITED STATES DEPARTMENT OF JUSTICE, JOSHUA FISHER, OFFICE OF THE VICE PRESIDENT, NATIONAL SECURITY COUNCIL, STEPHEN MILLER, JACOB RESES, HOMELAND SECURITY COUNCIL, PAMELA BONDI. (zjm) (Entered: 06/03/2026) |
| 06/04/2026 | 29 | Joint STATUS REPORT by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Powers, James) (Entered: 06/04/2026) |
| 06/05/2026 | | MINUTE ORDER: Upon consideration of 29 the parties' joint status report and their respective proposals for further proceedings, and the entire record herein, it is hereby ORDERED that defendants' motion for a stay shall be filed by June 11, 2026; plaintiffs' opposition shall be filed by June 18, 2026; and defendants' reply shall be filed by June 22, 2026. SO ORDERED. Signed by Judge John D. Bates on 6/5/2026. (lcjdb3) (Entered: 06/05/2026) |
| 06/08/2026 | 30 | MOTION for Alternative Service by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Declaration of Lynn Eisenberg, # 2 Exhibit A (Email from DOJ counsel), # 3 Exhibit B (Emails to private counsel), # 4 Text of Proposed Order)(Eisenberg, Lynn) (Entered: 06/08/2026) |
| 06/11/2026 | 31 | MOTION to Stay *District Court Proceedings Pending Appeal of Preliminary Injunction* by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Shi, Winston) (Entered: 06/11/2026) |

| | | |
|---|---|---|
| 06/12/2026 | 32 | TRANSCRIPT OF PROCEEDINGS before Judge John D. Bates held on May 13, 2026. Page Numbers: 1−136. Date of Issuance: June 12, 2026. Court Reporter: Stacy Johns. Email address: Stacy_Johns@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/3/2026. Redacted Transcript Deadline set for 7/13/2026. Release of Transcript Restriction set for 9/10/2026.(Johns, Stacy) (Entered: 06/12/2026) |
| 06/15/2026 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. Attorney Jessica Jensen terminated. (Jensen, Jessica) (Entered: 06/15/2026) |
| 06/18/2026 | 34 | RESPONSE re 31 MOTION to Stay *District Court Proceedings Pending Appeal of Preliminary Injunction* filed by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Text of Proposed Order)(Eisenberg, Lynn) (Entered: 06/18/2026) |
| 06/22/2026 | 35 | REPLY to opposition to motion re 31 Motion to Stay,,, filed by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Powers, James) (Entered: 06/22/2026) |

**JA13**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL ASSOCIATION,
400 A Street SE
Washington, DC 20003,

AMERICAN OVERSIGHT,
1030 15th Street NW, B255
Washington, DC 20005,

      Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States and in his personal
capacity,
1600 Pennsylvania Ave NW
Washington, DC 20500,

JAMES DAVID VANCE, in his official capacity as
Vice President of the United States,
1600 Pennsylvania Ave NW
Washington, DC 20500,

THE WHITE HOUSE OFFICE,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

SUSAN WILES, in her official capacity as White
House Chief of Staff,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PHILIP C. DROEGE, in his official capacity as
Director of the Office of Records Management,
1650 17th St NW,
Washington, DC 20006,

NATIONAL SECURITY COUNCIL,
1600 Pennsylvania Ave NW
Washington, DC 20500,

CATHERINE KELLER, in her official capacity as
Executive Secretary of the National Security Council,

Civil Action No.

**JA14**

1600 Pennsylvania Ave NW
Washington, DC 20500.

HOMELAND SECURITY COUNCIL,
1600 Pennsylvania Ave NW
Washington, DC 20500,

STEPHEN MILLER, in his official capacity as
Homeland Security Advisor,
1600 Pennsylvania Ave NW
Washington, DC 20500,

COUNCIL ON ECONOMIC ADVISERS,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PIERRE YARED, in his official capacity as Acting
Chairman of the White House Council of Economic
Advisers,
1650 17th St NW
Washington, DC 20006,

EXECUTIVE RESIDENCE,
1600 Pennsylvania Ave NW
Washington, DC 20500,

ROBERT B. DOWNING, in his official capacity as
White House Chief Usher,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PRESIDENT'S INTELLIGENCE ADVISORY
BOARD,
1600 Pennsylvania Ave NW
Washington, DC 20500,

DEVIN NUNES, in his official capacity as Chairman
of the President's Intelligence Advisory Board,
1600 Pennsylvania Ave NW
Washington, DC 20500,

OFFICE OF ADMINISTRATION,
1650 17th St NW
Washington, DC 20006,

2
**JA15**

JOSHUA FISHER, in his official capacity as
Director of the Office of Administration,
1650 17th St NW
Washington, DC 20006,

OFFICE OF THE VICE PRESIDENT,
1650 17th St NW
Washington, DC 20006,

JACOB RESES, in his official capacity as Chief of
Staff to the Vice President,
1650 17th St NW
Washington, DC 20006,

UNITED STATES DOGE SERVICE,
736 Jackson Pl NW
Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
736 Jackson Pl NW
Washington, DC 20503,

UNITED STATES DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave NW
Washington, DC 20530,

PAMELA BONDI, in her official capacity as
Attorney General of the United States
950 Pennsylvania Ave NW
Washington, DC 20530,

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,
8601 Adelphi Road
College Park, MD 20740,

ED FORST, in his official capacity as Acting
Archivist of the United States,
8601 Adelphi Road
College Park, MD 20740,

    Defendants.

3
**JA16**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case is about the preservation of records that document our nation's history, and whether the American people are able to access and learn from that history.

2. Yet the stakes of this case are even greater. The Executive Branch has declared the power to override the legal determinations of the U.S. Supreme Court, in order to override the laws passed by Congress to preserve and provide public access to official records of the President's activities. The Executive Branch has nullified the determinations of the other two branches of government so that the President may claim these official government records to be his own.

3. Days ago, the Office of Legal Counsel (OLC) advised the White House that the President may disregard the Presidential Records Act—the longstanding federal law requiring the preservation of records reflecting the official activities of the President, the Vice President, and White House staff. As of this moment, the Administration believes that the President is legally free to destroy records of his official government conduct, or even spirit away the records for his own future personal use. In the Administration's view, the records of the official activities of the President and nearly 1,000 White House employees—generated using taxpayer funds, on government property, regarding official government business—belong to the President personally, and not to the American people. Government for the people, by the people, and of the people this is not.

4. OLC has declared the Presidential Records Act (PRA) "unconstitutional" by fiat even though the Supreme Court upheld the constitutionality of a materially identical law 50 years ago in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). The OLC legal opinion declaring the Presidential Records Act unconstitutional makes no serious effort to distinguish the

4

**JA17**

Presidential Records Act from the prior law that the Supreme Court upheld, the Presidential Recordings and Materials Preservation Act. Nor could it. Instead, OLC simply decided that the Supreme Court got it "wrong." The Administration's actions nullifying a law duly enacted by Congress, based on a legal determination that contravenes a decision of the Supreme Court, violate the separation of powers twice over.

5.      Plaintiffs the American Historical Association and American Oversight file this suit to stop the unconstitutional actions of the government, ensure the President and his administration abide by the recordkeeping obligations required by federal law, and to preserve the historical record that belongs to the American people, before it is forever lost.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law, specifically the constitutional separation of powers and the Presidential Records Act, 44 U.S.C. § 2201, *et seq.*, the Administrative Procedure Act, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Mandamus Act, 28 U.S.C. § 1361.

7.      This Court has jurisdiction to review final agency action pursuant to the APA. 5 U.S.C. § 702 ("A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

9.      Plaintiff American Historical Association (AHA) is a nonprofit organization founded in 1884 and incorporated by Congress in 1889 "for the promotion of historical studies, the collection and preservation of historical manuscripts and for kindred purposes in the interest

**JA18**

of American history and of history in America." AHA's mission is to enhance the work of historians, including by promoting professional standards and ethics, innovative scholarship and teaching, academic freedom, and international collaboration. AHA is the largest membership association of historians in the world, with over 10,200 members. AHA serves historians in a wide variety of professions, and represents every historical era and geographical area. AHA and many of its members have a unique interest in presidential records and have previously pursued legal action to enforce the PRA. *See, e.g.*, *Am. Hist. Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995); *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 516 F. Supp. 2d 90 (D.D.C. 2007). AHA and its members regularly request and make use of presidential and vice-presidential records. AHA is headquartered in Washington, D.C.

10.    Plaintiff American Oversight is a nonpartisan, non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code and incorporated under the laws of the District of Columbia. It is committed to promoting transparency in government, educating the public about government activities, and ensuring the accountability of government officials. Through research and requests made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, American Oversight uses the information it gathers, and its analysis of that information, to educate the public about the activities and operations of the federal government through reports, published analyses, press releases and other media. American Oversight is headquartered in Washington, D.C. In November 2020, American Oversight launched a document preservation initiative to ensure that presidential records (and federal agency records) from President Trump's

first term were properly preserved.[1] American Oversight currently has at least five pending open FOIA requests seeking presidential records from President Trump's first term.

11.    Defendant Donald J. Trump is the President of the United States. He is sued in his official and personal capacities.

12.    Defendant J.D. Vance is the Vice President of the United States. He is sued in his official capacity.

13.    Defendant The White House Office is an entity within the Executive Office of the President (EOP) that is subject to the PRA. Congress has prescribed the number of allowable White House Office employees and their compensation under 3 U.S.C. §§ 105, 107(a), and 109. Congress annually appropriates funding for the White House Office. For Fiscal Year 2026, Congress appropriated $78,904,000 for salaries and expenses of the White House Office. As of October 1, 2025, the White House Office had 373 full-time employees.

14.    Defendant Susan Wiles is the White House Chief of Staff and the head of the White House Office. She is sued in her official capacity.

15.    Defendant Philip C. Droege is the Director of the White House Office of Records Management. In that role, he is responsible for managing, preserving, and forwarding to the National Archives and Records Administration (NARA) at the appropriate time records reflecting the business of the Presidency and Vice Presidency, in accordance with the Presidential Records Act. He is sued in his official capacity only.

16.    Defendant National Security Council is an entity within the EOP that is subject to the PRA. Congress has prescribed the functions, membership, and staff allocations for the

---

[1] American Oversight, *American Oversight Launches Document Preservation Initiative* (Nov. 10, 2020), https://americanoversight.org/american-oversight-launches-document-preservation-initiative/.

National Security Council under 50 U.S.C. § 3021. Congress annually appropriates funding for the National Security Council. For Fiscal Year 2026, Congress appropriated $19 million to be shared by the National Security Council and the Homeland Security Council for salaries and expenses. As of October 1, 2025, the National Security Council staff included 31 full-time employees, plus many more detailees from other federal agencies.

17.    Defendant Catherine Keller is the Executive Secretary of the National Security Council, in which role she serves as the head of National Security Council staff, pursuant to 50 U.S.C. § 3021(e)(1). She is sued in her official capacity only.

18.    Defendant Homeland Security Council is an entity within the EOP that is subject to the PRA. Congress established the Homeland Security Council within the EOP in 2002. *See* 6 U.S.C. § 491. Congress annually appropriates funding for the Homeland Security Council. For Fiscal Year 2026, Congress appropriated $19 million to be shared by the National Security Council and the Homeland Security Council for salaries and expenses.

19.    Defendant Stephen Miller serves as the Homeland Security Advisor, in which role he directs the Homeland Security Council. He is sued in his official capacity only.

20.    Defendant Council on Economic Advisors is an entity within the EOP that is subject to the PRA. Congress created the Council on Economic Advisers as an entity within the EOP. *See* 15 U.S.C. § 1023(a)(1). Congress has prescribed by statute the composition, duties, and compensation of members of the Council of Economic Advisors and its staff. *See id.* § 1023. Congress annually appropriates funding for the Council of Economic Advisers. For Fiscal Year 2026, Congress appropriated $4,854,000 for salaries and expenses of the Council of Economic Advisers and its staff. As of October 1, 2025, the Council on Economic Advisors had 25 full-time employees.

**JA21**

21.     Defendant Pierre Yared is the Acting Chairman of the Council of Economic Advisers. He is sued in his official capacity only.

22.     Defendant the Executive Residence is an entity within the EOP that is subject to the PRA. Congress annually appropriates funding for the Executive Residence. For Fiscal Year 2026, Congress appropriated $14,453,000 for the operating expenses of the Executive Residence, plus additional amounts for Repair and Restoration expenses. As of October 1, 2025, the Executive Residence had 82 full-time employees.

23.     Defendant Robert B. Downing is the White House Chief Usher. He is sued in his official capacity only.

24.     Defendant President's Intelligence Advisory Board is an entity within the Executive Office of the President that is subject to the PRA.

25.     Defendant Devin Nunes is the Chairman of the President's Intelligence Advisory Board. He is sued in his official capacity only.

26.     Defendant Office of Administration is an entity within the EOP that is subject to the PRA. The Office of Administration performs administrative and operational functions for the components of the EOP, including managing electronic and paper records covered by the Presidential Records Act and providing those records to NARA at the end of any presidential administration. Congress has limited the number of political appointees that may work within the Office of Administration (at 10 political employees), 3 U.S.C. § 107(b), and has prescribed their compensation and the compensation and hiring of career employees within the Office of Administration. Congress annually appropriates funding for the Office of Administration. For Fiscal Year 2026, Congress appropriated $114,308,000 for salaries and expenses of the Office of

9
**JA22**

Administration. As of October 1, 2025, the Office of Administration had 268 full-time employees.

27. Defendant Joshua Fisher is the Director of the Office of Administration. He is sued in his official capacity only.

28. Defendant Office of the Vice President is an entity within the EOP that is subject to the PRA. Congress has prescribed the number of employees of the Office of the Vice President and their compensation under 3 U.S.C. § 106. Congress annually appropriates funding for the Office of the Vice President. For Fiscal Year 2026, Congress appropriated $6,015,000 for salaries and expenses of the Office of the Vice President. As of October 1, 2025, the Office of the Vice President had 18 full-time employees.

29. Defendant Jacob Reses is the Chief of Staff to the Vice President. He is sued in his official capacity only.

30. Defendant United States DOGE Service is a component of the EOP established by Executive Order 14158 on January 20, 2025. It has claimed to be subject to the PRA and that it maintains records in compliance with the PRA.

31. Defendant Amy Gleason is the Acting Administrator of the United States DOGE Service and is DOGE's highest ranking official. She is sued in her official capacity only.

32. Defendant United States Department of Justice is an agency of the United States government. The Office of Legal Counsel is a component of the Department of Justice currently headed by Assistant Attorney General Elliot Gaiser. By delegation from the Attorney General, the Assistant Attorney General in charge of OLC provides legal advice to the President and all executive branch agencies.

33.     Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity only.

34.     Defendant National Archives and Records Administration (NARA) is an agency of the United States government. After each Presidential administration, NARA implements the Presidential Records Act, including relating to the preservation, protection and access of Presidential Records as defined in the PRA. The Archivist of the United States serves as the highest ranking official at NARA. The Archivist is appointed by the President and confirmed by the Senate, and may be removed at will by the President.

35.     Defendant Ed Forst is the Acting Archivist of the United States and is sued in his official capacity only.

## BACKGROUND

**A.     History Leading Up to the PRA**

36.     Following the resignation of President Nixon, Congress passed the Presidential Recordings and Materials Preservation Act (Preservation Act). *See* Pub. L. No. 93-526, 88 Stat. 1695 (1974). The Preservation Act provided for the United States to take ownership and custody of 42 million pages of documents and 880 tape records of conversations from President Nixon's terms in office. The Act directed the Administrator of General Services to take custody of President Nixon's records and promulgate regulations that (i) provided for the orderly processing and screening by Executive Branch archivists and (ii) determined the terms and conditions upon which the public would have access to the records. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 429 (1977) (*Nixon v. GSA*). The Act also prohibited the destruction of the President's records. *Id.* at 434.

37.     The day after President Ford signed the Preservation Act into law, former President Nixon filed suit in the U.S. District Court for the District of Columbia, contending that the Act violated the constitutional separation of powers and executive privilege. Nixon's primary contention was "that the Act encroaches upon the Presidential prerogative to control internal operations of the Presidential office and therefore offends the autonomy of the Executive Branch." *Nixon v. GSA*, 433 U.S. at 439–40.

38.     A three-judge district court rejected President Nixon's challenge and upheld the law. *Nixon v. GSA*, 408 F. Supp. 321, 333 (D.D.C. 1976). As for President Nixon's argument that the Act unduly intruded on executive confidentiality, the court held that the "review of the materials by government archivists would constitute" at most a "minimal" intrusion, noting that "every President since the establishment in 1934 of the National Archives" had turned over presidential papers for governmental preservation and disclosure anyway. *Id.* at 346–47. The court also found that Congress had good reason to entrust the review of records with the General Services Administration rather than the President, as "Chief Executives are not by nature professional archivists," and "Congress could legitimately wish to establish regularized procedures to ensure that the process by which the materials would be reviewed would be adequate to the task" and that those "entrusted with reviewing such materials be . . . disinterested." *Id.* at 347–48.

39.     The district court comprehensively reviewed the legislative history of the Preservation Act and concluded that the Act supported at least two strong congressional interests in the preservation of presidential records. "First, and most broadly," such preservation "serves the national interest by preserving materials upon which historians must draw in order accurately to recount and to judge the political history of our time." *Id.* at 349 (citing S. Rep. No. 93-1181,

12
**JA25**

93d Cong., 2d Sess., at 1, 3 (1974); H.R. Rep. No. 93-1507, 93d Cong.2d Sess., at 2, 3, 8 (1974); Senate Hearings on GSA Regulations at 256; 120 Cong. Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18235 (daily ed. Oct. 3, 1974); *id.* at S 18248 (remarks of Sen. Ervin); id. at S 18259 (remarks of Sen. Huddleston); *id.* at S 18260 (remarks of Sen. Ribicoff); *id.* at S 18261 (remarks of Sen. Muskie); *id.* at S 18325 (daily ed. Oct. 4, 1974) (remarks of Sen. Nelson); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas)).

40.     Second, Congress believed that "preservation of these materials is needed to ensure their availability for successive administrations engaged in policymaking." *Id.* at 350 (citing S. Rep. No. 93-1181, 93d Cong., 2d Sess., at 3, 4, 5 (1974); H.R. Rep. No. 93-1507, 93d Cong., 2d Sess., at 3 (1974); 120 Cong. Rec. H 11211 (daily ed. Dec. 3, 1974) (remarks of Rep. Abzug)). As the court explained, "[g]overnmental programs and policies do not expire every four or eight years," and "the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." *Id.*

41.     The Supreme Court affirmed the district court's decision, holding that "neither [President Nixon's] separation-of-powers claim nor his claim of breach of constitutional privilege has merit." *Nixon v. GSA*, 433 U.S. at 439. As to Nixon's separation-of-powers claim, the Supreme Court "reject[ed]" the argument that "the Act's regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the separation of powers." *Id.* at 441. The Court explained that it was "highly relevant" to the separation-of-powers analysis that "the Act provides for custody of the materials in officials of the Executive Branch and that employees of that branch have access to the materials only 'for lawful Government use, subject to the (Administrator's) regulations.'" *Id.* at 443–44. The Court further emphasized that, "although some of the materials may eventually be made available for

public access, the Act expressly recognize[d] the need both to protect any party's opportunity to assert any legally or constitutionally based right or privilege." *Id.* at 444 (quotations omitted). The Court thus held that the Act was not "unduly disruptive of the Executive Branch" because "[t]he Executive Branch remain[ed] in full control of the Presidential materials, and the Act facially [was] designed to ensure that the materials [could] be released only when release [was] not barred by some applicable privilege inherent in that branch." *Id.* at 444–45.

42.    The Court held that there was "congressional power to regulate Executive Branch documents . . . in this instance, a power that is augmented by the important interests that the Act seeks to attain." *Id.* at 445–46. Citing myriad statutes regulating the disclosure and disposition of government records, the Court noted that "there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." *Id.* at 445.

43.    As to the executive privilege claim, the Court "agree[d] with the District Court" that it could "readily resolve[]" the question because the screening of presidential records contemplated by the Act "constitutes a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns." *Id.* at 451. The Court further held that "adequate justifications are shown for this limited intrusion into executive confidentiality," endorsing the district court's "exhaustive" treatment of the legislative history. *Id.* at 452. That history "clearly reveal[ed]" that "among other purposes, Congress acted to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." *Id.* "An incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.* The Court rejected Nixon's argument that the Act was necessarily

unconstitutional because "the potential disclosure of communications given to [him] in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 449–50

44.     Shortly after *Nixon v. GSA*, OLC recognized that "[t]he Supreme Court's opinion in *Nixon . . .* makes clear that it is within the appropriate ambit of Congress' power to legislate with respect to the preservation of historically valuable papers of the Chief Executive." *See* Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm on Gov't Operations at 112, 95th Cong. 87–133 (1978) (statement of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel). OLC further noted that "Justice Powell's separate concurrence . . . makes the same point at somewhat greater length and concludes that Congress' power in this area is 'unquestionable.'" *Id.* (quoting *Nixon v. GSA*, 433 U.S. at 498 (Powell, J., concurring)). Given *Nixon*, OLC concluded that Congress's declaring the President's official papers to be public property "is not subject to serious challenge." *Id.*

45.     Congress also believed that the Supreme Court in *Nixon* had "established principles that would govern legislation dealing more broadly with control of and access to presidential papers." H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 USCCAN 5732, 5737. Accordingly, a year after *Nixon* was decided, Congress enacted the PRA "to insure the preservation and public access to the official records of the President." *Armstrong v. Bush*, 924 F.2d 282, 287 (D.C. Cir. 1991) (quoting Presidential Records Act of 1978, Pub. L. No. 95-591, 1978 U.S. Code Cong. & Admin. News (92 Stat.)).

46.     In 2014, Congress amended the PRA in the Presidential and Federal Records Act Amendments of 2014. The amendments passed with bipartisan support. The amendments

modernized the PRA by expanding the definition of federal records to expressly include electronic records. The amendments also required federal officials to use official government email accounts when sending presidential records electronically or to forward emails to an official account within 20 days.

47.    Since the PRA took effect 45 years ago, no administration of either party—including the first Trump Administration—has questioned the PRA's constitutionality or contended that it unduly interferes with the President's discharge of his constitutional responsibilities.

**B.    The Presidential Records Act**

48.    In the PRA, 44 U.S.C. §§ 2201 *et seq*., Congress set forth a reticulated statutory scheme for the preservation of official government records created or received by the President, the Vice President, and certain staff during a President's term in office, for the transfer of those records to NARA at the end of a President's term in office, and for access to those records after a President's term in office by an incumbent President, the public, Congress, and the former President himself.

49.    Like the Preservation Act that preceded it, the PRA establishes public ownership of presidential records. Specifically, the PRA declares: "The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of [the PRA]."44 U.S.C.§ 2202.

50.    The PRA defines "Presidential Records" as "documentary materials, or any reasonably seg-regable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an

effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2).

51.     The EOP currently considers the following components to be "unit[s] . . . of the Executive Office of the President whose function is to advise or assist the President," and thus subject to the PRA: the White House Office, the Office of the Vice President, the National Security Council, the Homeland Security Council, the Office of Administration, the President's Intelligence Advisory Board, the Council of Economic Advisors, the Executive Residence, and the U.S. DOGE Service. As of October 1, 2025, these components collectively had 842 full-time employees, all covered by the PRA.

52.     The PRA defines "documentary material" to include "books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form." 44 U.S.C. § 2201(1).

53.     The PRA excludes from the definition of covered Presidential records: "documentary materials relating to the political activities of the President or members of the President's staff . . . if such activities [do not] relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President," as well as documentary materials that are "official records of an agency" covered by the Federal Records Act, "personal records,' "stocks of publications and stationery," and "extra copies of documents." *Id.* § 2201(2).

54.     The statute in turn defines "personal records" as all "documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do

not relate to or have an effect upon the carrying out of the constitutional, statutory, or other

official or ceremonial duties of the President." *Id.* § 2201(3). Personal records include "(A)

diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal

which are not prepared or utilized for, or circulated or communicated in the course of,

transacting Government business; (B) materials relating to private political associations, and . . .

(C) materials relating exclusively to the President's own election to the office of the Presidency."

*Id.*

55.    The PRA requires that the President "take all such steps as may be necessary to

assure that the activities, deliberations, decisions, and policies that reflect the performance of the

President's constitutional, statutory, or other official or ceremonial duties are adequately

documented and that such records are preserved and maintained as Presidential records…." *Id.* §

2203(a).

56.    Where the President, the Vice President, or an employee covered by the PRA

sends, receives, or creates a Presidential record on an unofficial electronic messaging account—

such as email, text messaging, Signal or other encrypted messaging accounts, or social media—

the President or employee must either copy an official account or forward a copy to an official

account within 20 days of the original creation of the record. *Id.* § 2209.

57.    The PRA lays out requirements governing the maintenance and disposition of

Presidential records both during and after an incumbent's term in office, including through the

preservation of Presidential privileges.

58.    During a President's term in office, the President "remain[s] exclusively

responsible for custody, control, and access to … Presidential records." *Id.* at § 2203(f); *see also*

36 C.F.R 1270.20 (recognizing that, even when the Archivist or NARA has physical custody of

Presidential records, "the President remains exclusively responsible for control and access to their records until their term of office concludes").

59.    The PRA provides for a process for the President to identify and dispose of Presidential records that "no longer have administrative, historical, informational, or evidentiary value." *Id.* at § 2203(c). Before doing so, the President must "obtain[] the views…of the Archivist" and either provide notice to Congress or learn from the Archivist that the Archivist does not believe the documents are of "special interest to the Congress or [that] consultation with the Congress…is in the public interest." *Id.* at §§ 2203(c)-(e).

60.    When a President leaves office, the Archivist "shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* at § 2203(g)(1).

61.    Even after NARA has taken custody of a former President's records, the former Presidents may access their own Presidential records notwithstanding any other limitations  at any time. *Id.* § 2205(3).

62.    In addition, "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke," Presidential records in NARA's custody "shall be made available to an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." *Id.* § 2205(2)(B).

63.    Subject to the same rights, defenses, or privileges, Presidential records in NARA's custody shall be made available "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding." *Id.* § 2205(2)(A).

64.    And subject to the same rights, defenses, or privileges, including of a former President, Presidential records in NARA's custody shall be made available "to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." *Id.* § 2205(2)(C).

65.    The PRA also provides for delayed public access to Presidential records in NARA's custody. Subject to the limitations and procedures described below, the Archivist has "an affirmative duty to make such records available to the public as rapidly and completely as possible." *Id.* § 2203(g)(1).

66.    Although the Archivist must seek to make records publicly available, the earliest any Presidential records are generally accessible by the public is five years after the President has left office and transferred custody of the records to the Archivist. *Id.* at § 2204(b)(2); *see also* 36 CFR § 1270.38. At that point, if the President has not specified a longer withholding period as described below, members of the public can request access to the documents pursuant to the Freedom of Information Act if the Archivist has not processed and affirmatively released the records by that time. *Id.*

67.    The President has substantial control to delay the timing of any release of Presidential records. The PRA provides that, prior to leaving office, the President "shall specify durations, not to exceed 12 years, for which access shall be restricted with respect to information, in a Presidential record, within" several broad categories of records. *Id.* at § 2204(a). These include any records marked as classified pursuant to an Executive Order; relating to appointments to federal office; exempt from disclosure by another statute; including privileged

20
**JA33**

trade secrets, commercial information, or financial information; advice from presidential advisors or the solicitation of such advice; and personnel and medical files. *Id.*

68.     Once a Presidential record is so designated, the Archivist cannot make it public until the expiration of the designation, the Archivist receives a waiver from the former President, or the former President or President's agents otherwise make the document public. *Id.* at § 2204(b)(1).

69.     In addition to the temporal limitations discussed above, public access to Presidential records is limited by the same exceptions and exemptions that exist under the Freedom of Information Act, 5 U.S.C. § 552, except that documents otherwise available for disclosure cannot be withheld pursuant to the deliberative process privilege. *Id.* at § 2204(c)(1).

70.     In crafting the PRA and through its amendments, Congress made clear that "[n]othing in [the PRA] shall be construed to confirm, limit, or expand any constitutionally-based privilege" of a President or former President. *Id.* at § 2204(c)(2).

71.     To that end the PRA carefully balances the goal of expeditious release of information with safeguarding Presidential assertions of executive privilege.

72.     Prior to making any Presidential record public for the first time, the Archivist must notify the incumbent President as well as the relevant former President. *Id.* at § 2208(a). This notification must itself be made public. *Id.*

73.     Upon issuing that notice, the Archivist cannot make the Presidential Record(s) public for 60 business days—this period can be extended for another 30 by the President or former President. If the current or relevant former President notifies the Archivist of a claim of a constitutionally-based privilege, the Archivist shall not release the record. *Id.* at § 2208(a)(3).

74.     Any such claim of privilege must be made personally by the President or former President, who must also notify relevant Congressional committees. *Id.* at § 2208(b).

75.     If the incumbent President asserts a claim of privilege, the Archivist shall not release the document unless the President withdraws the claim or the Archivist is ordered to do so by a court order not subject to appeal. *Id.* at § 2208(d).

76.     If a former President asserts a claim of privilege, the Archivist must consult with the current President to determine whether the current President will uphold the claim. *Id.* at § 2208(c). If the current President does not uphold the claim, the document will be released subject to the former President's right to seek a court order. A former President may bring an action in the United States District Court for the District of Columbia where the former President believes that "a determination made by the Archivist violates the former President's rights or privileges." *Id.* at § 2204(e).

77.     The Archivist is required to and has promulgated regulations to effectuate the PRA, including to provide notice to a former President when documents are being made public prior to the expiration of the restricted period or where such disclosure "may adversely affect any rights and privileges which the former President may have." 44 U.S.C § 2206.

78.     With the exception of provisions relating to Presidential privileges, 44 U.S. Code § 2208, Vice-Presidential records are treated in exactly the same way as Presidential records under the Act and the Vice President and Vice President's staff have the same preservation responsibilities as the President. *Id.* at § 2207.[2]

---

[2] As such, except with respect to Presidential privileges, where this Complaint refers to requirements of the President or refers to "Presidential records" the Complaint incorporates requirements of the Vice President and related to Vice-Presidential records.

**C.    The Trump Administration's Prior Guidance on the PRA**

79.    As previously stated, no Presidential administration since the PRA took effect—including the first Trump administration—has flatly refused to comply with the Presidential Records Act.

80.    On the first day of the first Trump Administration in 2017, "representatives from White House Counsel provided personal briefings to all new White House employees on ethics compliance, including recordkeeping responsibilities under the PRA."[3] White House officials invited NARA to participate in developing White House guidance on the PRA, and NARA supplied the White House with written materials on compliance.[4]

81.    On February 22, 2017, the White House Counsel's Office issued a memorandum "to remind all personnel of their obligation to preserve and maintain presidential records, as required by the Presidential Records Act (PRA)."[5] The memorandum recognized that the PRA requires that the Administration take steps to "assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained." *Id.* at 1. The memorandum included guidance on what documents constitute presidential records, and reminded personnel to "please keep in mind that presidential records are the property of the United States." *Id.* at 3. It noted that "[t]he willful destruction or concealment of federal records is a federal crime punishable by fines and imprisonment." *Id.*

---

[3] Staff Memo on White House Counsel Briefing on PRA at 3, https://www.hsgac.senate.gov/library/files/hsgac-democratic-staff-memo-on-white-house-counsel-briefing-on-pra/.

[4] *Id.*.

[5] Memorandum for All Personnel (Feb. 22, 2017), *available at* https://www.archives.gov/files/foia/Memo%20to%20WH%20Staff%20Re%20Presidential%20Records%20Act%20(Trump,%2002-22-17)_redacted%20(1).pdf.

82.     Following public reporting that certain White House advisers had used private email accounts to discuss official matters, the first Trump Administration took additional action to seek to ensure compliance with the PRA, reminding the advisers of their obligations under the PRA and admonishing them not to delete any records.[6]

83.     The current Trump Administration, too, has for at least the past year insisted that it would seek to comply with the PRA. In litigation over the retention practices of the United States DOGE Service, for example, the government—which holds the United States DOGE Service out as an entity subject to the PRA—submitted the DOGE Service's records retention policy. That policy states that, "[a]s a component of the Executive Office of the President, US DOGE Service (USDS) personnel . . . are subject to certain records retention obligations under the Presidential Records Act . . . ." *See* Dkt. 13-2 in *American Oversight v. DOGE*, No. 25-cv-409 (D.D.C. Mar. 27, 2025).

84.     To be sure, in both the first Trump administration and in the first thirteen months of the second Trump administration, there were numerous incidents of high-level White House officials, including (as set forth in section E below) President Trump himself, acting in a manner inconsistent with PRA requirements.

85.     But before April of this year, neither the President nor his Administration suggested that the PRA unduly interfered with the Executive Branch or that they believed the PRA to violate the constitutional separation of powers. No Administration had openly declared that it was free to "not further comply with [the PRA's] dictates," *see* Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr. 1, 2026) (OLC Op.) (slip op. at 52), nor had any

---

[6] Staff Memo, *supra* note 3, at 4–5; *see, e.g.*, Josh Dawsey, *Kushner Used Private Email to Conduct White House Business*, POLITICO (Sept. 24, 2017, 7:27 PM), https://www.politico.com/story/2017/09/24/jared-kushner-private-email-white-house-243071.

prior Administration advised officials and staff covered by the PRA that they need not preserve all Presidential records as defined under the PRA. To the contrary, as explained, the Trump Administration—like every presidential administration over the last five decades—made at least some effort to comply with the PRA. Indeed, far from denying the applicability or constitutionality of the PRA, President Trump rather argued in federal court that the PRA authorized him to retain once-classified records from his administration after his presidency, and therefore shielded him from criminal liability.

**D.      The OLC Opinion and Subsequent White House Policy Guidance**

86.      At some point during President Trump's second term in office, the White House Counsel David Warrington requested that OLC provide an opinion on whether the PRA is constitutional.

87.      On April 1, 2026, Assistant Attorney General for OLC, T. Elliot Gaiser, issued an opinion declaring that the PRA is facially unconstitutional, in its entirety. *See generally* OLC Op. OLC declared that "[t]he PRA is unconstitutional for two independent but interlocking reasons: It exceeds Congress's enumerated and implied powers, and it aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive." OLC Op. 1.

88.      On the first reason, OLC concluded that the PRA could not be sustained as an exercise of Congress' "oversight power," its "inherent preservation power," its "implicit authority to regulate government agencies and offices created by statute," or its powers under the Appropriations Clause or Spending Clause. OLC Op. 17. OLC further concluded that Congress could not rely on "[t]he public's interest in the President's papers" as a basis for enacting the PRA. *Id.* at 22. And OLC opined that the Necessary and Proper Clause did not provide authority either, because that clause purportedly only permits legislation that "facilitates" rather than "burdens" the "exercise of executive power." *Id.* at 41.

89. On the second reason, OLC found that even if the PRA served a valid legislative purpose, it is "overbroad" and unduly burdensome. OLC acknowledged that "the Act may not place a severe and direct burden on the President personally," but nevertheless found a constitutionally impermissible burden because "the White House Counsel's Office spends a considerable amount of time to ensure the President's compliance with the PRA." OLC Op. 24. OLC further speculated that "the PRA *might* burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties." *Id.* at 48 (emphasis added) (cleaned up).

90. Despite the controlling nature of *Nixon v. GSA*, OLC declared that this on-point Supreme Court decision "does not save the PRA." OLC Op. 41. OLC briefly attempted to distinguish the PRA from the Preservation Act. Despite claiming that "[t]he PRMPA and the PRA could not be more different," OLC did not attempt to meaningfully distinguish the substantive requirements of the two laws. *See id.* at 41–42. Instead, OLC merely pointed to the fact that the PRMPA was specific to President Nixon and enacted "in the wreckage of Watergate." *Id.*

91. OLC quickly made clear, however, the real reason it did not treat *Nixon v. GSA* as controlling: OLC simply believes the Supreme Court's decision was "wrong." OLC Op. 45. OLC described the case as "wrong" (twice) and "mistaken," and asserted that the Supreme Court "fail[ed] to appreciate the Article II consequences of permitting Congress to regulate presidential records." *Id.* at 45–49. OLC relied almost exclusively on its own prior opinions to explain why it was right and the Supreme Court was wrong; over the span of four single-spaced pages of analysis, OLC did not cite a single judicial precedent to support its analysis or conclusions. *See id.* at 46–49.

92.     OLC then concluded in summary fashion that the constitutionally impermissible portions of the PRA were inseverable from the remainder of the PRA, justifying nullifying the entire Act. OLC Op. 49–51. OLC's severability analysis is difficult to follow, since it never actually identified the specific unconstitutional provisions, let alone explained how those specific provisions were inseverable from the remaining provisions. Nevertheless, based on its self-described "rigorous severability analysis," OLC declared that "the PRA falls entirely." *Id.* at 51.

93.     In its conclusion, OLC provided the President permission to ignore the law: "For these reasons, the PRA is unconstitutional, and the President need not further comply with its dictates." OLC Op. 52.

94.     Contemporaneous with the release of the OLC Opinion, White House spokesperson Abigail Jackson described Defendants' new policy for the collection, retention, and preservation of their official records (the "Post-OLC PRA Policy"). Jackson stated that staff covered by the PRA "must undertake records training so they properly preserve all materials related to: the performance of their duties for historical value, the administrative record of policy decisions and actions, and litigation needs." Jackson added that "[t]he President will also retain the program currently in place for electronic records – emails and documents cannot be deleted from the White House system."

95.     Jackson did not indicate whether the President himself would preserve records falling into these three limited categories of records that she said staff would be trained to preserve. Nor did Jackson indicate that staff covered by the PRA will be required to comply with the PRA's restriction on using non-official electronic messaging accounts. Messages on such non-official platforms—including personal email, text messages, Signal, or other applications in which users can set messages to automatically delete—are not saved to "the White House

system" by default. These messages are preserved only if a staff member manually forwards the message to their official account or otherwise saves the message onto the White House network.

96.     On information and belief, the Post-OLC PRA Policy does not prohibit the President, the Vice President, and staff covered by the PRA from sending from their personal devices, including text messages and direct messages on applications that feature auto-deletion options, like Signal or WhatsApp. On information and belief, nor does the Post-OLC PRA Policy require such persons to forward all such communications to their official accounts as the PRA requires. On information and belief, the Post-OLC PRA Policy does not prohibit the President, the Vice President, and staff covered by the PRA from deleting electronic messages on personal accounts or devices that constitute Presidential records under the PRA.

97.     On information and belief, the Post-OLC PRA Policy does not require the President to preserve all paper records and other physical records in his possession that constitute Presidential records under the PRA. On information and belief, the Post-OLC PRA Policy also does not prohibit the President from taking records that constitute Presidential records under the PRA with him after his term in office for his personal use.

98.     On information and belief, Defendants' position is that not even records containing national defense information held by the President legally must be retained within the government and sent to NARA after the President's term concludes. On information and belief, Defendants' position is that the President may lawfully take records containing national defense information within him at the end of his Administration.

99.     On information and belief, Acting Archivist Ed Forst has adopted the position that NARA "need not further comply with [the PRA's] dictates," OLC Op. 52, because the President has commanded by Executive Order that "[t]he President and the Attorney General's opinions on

questions of law are controlling on all employees in the conduct of their official duties," and that

"[n]o employee of the executive branch acting in their official capacity may advance an

interpretation of the law as the position of the United States that contravenes the President or the

Attorney General's opinion on a matter of law." E.O. 14,125 § 7 (Feb. 18, 2025). Indeed, Acting

Archivist Forst is also the politically appointed Administrator of the General Services

Administration, and he was installed as Acting Archivist on the same day that OLC issued its

opinion declaring the PRA unconstitutional.

### E.    There Is Strong Reason to Believe President Trump Will Retain Presidential Records for Himself after His Term in Office

100.    As with prior Administrations, shortly after taking office in 2017, President

Trump's White House Counsel, Donald McGahn II, issued a memorandum for all White House

personnel detailing their obligations under the PRA. The memorandum provided the statutory

definition of a "Presidential record," directed staff not to use personal electronic

communications for official business, and directed: "[y]ou may not dispose of presidential

records."[7]

101.    Still, President Trump repeatedly violated and disregarded the PRA, both during

and after his first term in office.

102.    Upon leaving office, President Trump kept significant numbers of official records,

rather than transferring them to NARA as required. NARA ultimately collected 15 boxes

containing thousands of documents from President Trump's personal residence at Mar-a-Lago.

---

[7] Memorandum for All Personnel (Feb. 22, 2017), *available at*
https://www.archives.gov/files/foia/Memo%20to%20WH%20Staff%20Re%20Presidential%20R
ecords%20Act%20(Trump,%2002-22-17)_redacted%20(1).pdf.

103.     Following NARA's collection, the Federal Bureau of Investigation conducted a search of Mar-a-Lago, identifying more official documents, including over 100 documents marked as classified.

104.     President Trump later claimed that he was authorized, including under the PRA, to retain sole possession of all of these records, to the exclusion of the government. President Trump maintained his claim that the documents were personal despite the fact that hundreds of documents were found to be marked classified and others clearly related to his official duties, such as the exercise of his clemency power, immigration policies,[8] and intelligence matters.[9]

105.     A memorandum from federal prosecutors in 2023 reportedly stated that the FBI had found that certain classified documents President Trump had retained "would be pertinent to certain business interests," which may have been "a motive for retaining them."[10]

106.     At no point has President Trump stated or otherwise accepted that he was required under the PRA to turn over custody and control over his documents to the National Archives upon leaving office. Rather, he has declared a right to keep classified and other documents that are squarely Presidential records under the PRA.

---

[8] See Erin Snodgrass, *Trump Claims First Batch of Reviewed White House Documents are His Personal Property in Likely Sign of Further Legal Battles*, BUSINESS INSIDER (Oct. 21, 2022), https://www.businessinsider.com/trump-claims-9-white-house-records-are-his-personal-property-2022-10.

[9] See Andrew Goudsward, *US Pushes Back on Judge over Trump Claim that Classified Records he Kept Were Personal*, REUTERS (Apr. 3, 2024), https://www.reuters.com/world/us/us-pushes-back-judge-over-trump-claim-that-classified-records-he-kept-were-2024-04-03/.

[10] *See* Letter from Jamie Raskin, Ranking Member of the House Committee on the Judiciary, to Pamela Bondi, Attorney General (Mar. 24, 2026), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-03-24-raskin-to-bondi-doj-re-classified-docs.pdf.

**JA43**

107.    In light of this history of conduct, and OLC's permission to President Trump to disregard the PRA, there is a substantial likelihood that President Trump will keep or destroy numerous records after his term in office that the PRA requires to be sent to NARA.

**F.      Plaintiffs Will Be Harmed By Defendants' Attempted Nullification of the PRA**

108.    Plaintiffs—both organizations that rely heavily on access to historical records about the inner-workings of the federal government to undertake their missions—will be significantly harmed by Defendants' actions.

*Harms to Plaintiff American Historical Association*

109.    The AHA is an association whose members include historians, researchers, and educators who routinely seek and use Presidential records covered by the PRA as part of their academic research and educational work. Such members include Matthew Connelly, Professor of History and Vice Dean for AI Initiatives in Arts and Sciences at Columbia University; Natalia Mehlman Petrzela, Professor of History at The New School; Timothy Naftali, Senior Research Scholar in the Faculty of International and Public Affairs at Columbia University; Kyle Longley, Salvatori Professor at Chapman University; and Kathryn Brownwell, Professor of History at Purdue University. AHA's members rely on Presidential records to explore and reveal the functioning of every aspect of the executive branch—from policy consideration to policy implementation. AHA's members use Presidential records preserved and made public under the PRA for the purposes Congress intended in enacting the PRA, including producing historical scholarship, teaching, and museum work. Records made accessible under the PRA also enable AHA members to serve as expert witnesses.

110.    If Presidential records are not preserved and made publicly accessible as the PRA requires, AHA's members will be directly injured. They will lose access to information that would create the historical record of presidential activities, and that would help to educate the

public about that history. AHA members would be left with an incomplete historical record by which to professionally research, produce scholarship on, and teach U.S. history. Once lost, this information is irretrievable and thus the harm irreparable. Absent relief, AHA and its members will lose access to the documents and other materials essential to understanding, and learning from, our past.

111.    AHA is well aware of the perils of failing to preserve and make available historical information about the functioning of the federal government. In 1910, having found that many governmental records from the previous century had been lost or destroyed, AHA petitioned Congress to construct a "national archive depository, where the records of the Government may be concentrated, properly cared for, and preserved."[11] These records, AHA asserted, were both "muniments of our national advancement" and "material which historians must use in order to ascertain the truth." The resulting institution became the National Archives and Records Administration.

*Harms to Plaintiff American Oversight*

112.    American Oversight regularly requests public records—including presidential records subject to the PRA—under FOIA and disseminates those records to the public via its website in order to educate the public and further its mission of promoting transparency in government.

113.    Since its inception in 2017, American Oversight has submitted multiple FOIA requests to Defendant NARA seeking presidential records of past administrations.

---

[11] First Annual Report of the Archivist of the United States, 1934-1935, https://perma.cc/HS62-USWD.

114.    Currently, at least five requests submitted by American Oversight under FOIA seeking presidential records from President Trump's first administration are pending with NARA.

115.    Most recently, on January 20, 2026, American Oversight submitted multiple FOIA requests to NARA seeking presidential records from President Trump's first term.

116.    The first request, bearing American Oversight internal tracking number NARA-26-0108, seeks records reflecting external email communications sent by or on behalf of Senior Advisor for Policy Stephen Miller.

117.    On February 17, 2026, NARA acknowledged the request and assigned it two tracking numbers, NW 90931 and 26-19758-F, for classified and non-classified searches respectively.

118.    On April 1, 2026, NARA notified American Oversight that no classified records responsive to the second request exist. The non-classified search remains pending.

119.    The second request, bearing American Oversight internal tracking number NARA-26-0109, seeks records reflecting external email communications sent by or on behalf of Director of Social Media Dan Scavino.

120.    On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-19821-F.

121.    American Oversight's second request remains pending.

122.    The third request, bearing American Oversight internal tracking number NARA-26-0110, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Jared Kushner.

123. On February 17, 2026, NARA acknowledged the request and assigned it two tracking numbers, NW 90930 and 26-19724-F, for classified and non-classified searches respectively.

124. On April 1, 2026, NARA notified American Oversight that no classified records responsive to the third request exist. The non-classified search remains pending.

125. The fourth request, bearing American Oversight internal tracking number NARA-26-0111, seeks records reflecting external email communications sent by or on behalf of Domestic Policy Council Director Brooke Rollins.

126. On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-20344-F.

127. American Oversight's fourth request remains pending.

128. The fifth request, bearing American Oversight internal tracking number NARA-26-0112, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Ivanka Trump.

129. On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-20575-F.

130. American Oversight's fifth request remains pending.

131. The Post-OLC PRA Policy will harm American Oversight by impeding its access to presidential records and impeding its ability to share those records with the public in furtherance of its mission.

132. If presidential records are not preserved and made publicly accessible as required by the PRA, American Oversight will be directly injured.

133. Specifically, failure by Defendants to preserve and make available information that should be publicly accessible will impede American Oversight's activities because it will be unable to disseminate to the public the records that it would otherwise be entitled to under FOIA.

134. The records that are at risk of destruction due to Defendants' implementation of the Post-OLC PRA Policy include (1) records from President Trump's first term that are already in NARA's custody and for which American Oversight has already submitted FOIA requests, (2) records from President Trump's first term that are already in NARA's custody but for which American Oversight has not yet submitted FOIA requests, (3) records from President Trump's first term that are required by the PRA to be in NARA's custody but are not, and which would be responsive to American Oversight's current or future FOIA requests; and (4) records from President Trump's second term, which American Oversight may seek to request under FOIA once they become available under the PRA.

135. Additionally, American Oversight is currently in litigation with Defendants U.S. DOGE Service and Gleason in *American Oversight v. DOGE*, No. 25-cv-409 (D.D.C. filed Feb. 11, 2025). In that case, Defendants argued that they should *not* be subject to a judicial preservation order for records subject to Freedom of Information Act requests because they are purportedly subject to, and preserving records consistent with, the PRA. *See* ECF No. 13. Since these Defendants now view themselves as not bound by the PRA, if that case is resolved with a finding that (as Defendants argued) they are subject to the PRA rather than FOIA, then (without judicial relief in *this* case) Defendants may destroy these records. The destruction or disposal of those records will result in irreparable harm to American Oversight.

35

**JA48**

136.    The unlawful Post-OLC PRA Policy presents an imminent threat that Presidential records may be destroyed, transferred, or otherwise disposed of under the theory that the individuals and entities subject to the PRA have no legal obligation to preserve records.

137.    If Presidential records are not preserved in accordance with the PRA, the information will be irretrievably lost and the harm to American Oversight will be irreparable.

138.    Absent relief, American Oversight will be foreclosed from accessing important Presidential records and prevented from vindicating its mission of educating the public and promoting transparency in government.

## CLAIMS FOR RELIEF

### COUNT I – Separation of Powers
### (Against All Defendants)

139.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

140.    Plaintiffs have an equitable right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), including through separation-of-powers claims where the Executive Branch openly disregards a statute on the ground that it is unconstitutional, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

141.    It undisputed that there is a complete "absence of any statutory authority" for Defendants' disregard of the PRA's requirements. *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (citing *Youngstown*, 343 U.S. 579). Rather, the only basis upon which Defendants are disregarding the PRA's requirements is their contention that the PRA is facially unconstitutional in its entirety. That assertion of unconstitutionality is erroneous, and the Executive Branch's

36
**JA49**

refusal to comply with a statute based on erroneous assertions of Executive power violates the separation of powers.

142.    *Nixon v. GSA* conclusively resolves the question of the constitutionality of the Act. The Supreme Court in fact specifically addressed and rejected each of the arguments that OLC now makes for the Act's unconstitutionality. For instance:

a.  OLC concludes that the PRA violates the separation of powers, but the Supreme Court unambiguously held that "the [Preservation] Act's regulation of the disposition of Presidential materials within the Executive Branch" does not facially constitute "a violation of the principle of separation of powers." 433 U.S. at 441.

b.  OLC asserts that the PRA "exceeds Congress' enumerated and implied powers," OLC Op. 1, but the Supreme Court held that "congressional power to regulate Executive Branch documents exists" with respect to a President's records, and indeed is a "a power that is augmented by the important interests that the Act seeks to attain," 433 U.S. at 445–46.

c.  OLC asserts that the PRA is unduly burdensome and "threatens to impede" the President's performance of his duties, OLC Op. 41, but the Supreme Court held that "nothing contained in the [Preservation] Act renders it unduly disruptive of the Executive Branch and, therefore, unconstitutional on its face," 433 U.S. at 445.

d.  OLC asserts that Congress lacked any "valid legislative purpose," OLC Op. 21, but the Supreme Court held that preserving and ultimately providing public access to Presidential records serves valid and "important congressional purposes." 433 U.S. at 453–54. There, the Preservation Act served "legitimate historical and governmental purposes" such as

ensuring future Presidents have access to important information as needed, and providing the American people a historical record of their government's operations. *Id.*

e.  OLC asserts that "the PRA may chill the President's advisers from offering candid or unpopular advice," OLC Op. 47, but the Supreme Court rejected the identical argument made by President Nixon—that retaining and possibly disclosing presidential materials "will chill the future exercise of constitutionally protected executive functions, thereby impairing the ability of future Presidents to obtain the candid advice necessary to the conduct of their constitutionally imposed duties," 433 U.S. at 441.

143.    *Nixon v. GSA* is squarely controlling on the PRA's constitutionality, and the Executive Branch lacks constitutional authority to nullify Supreme Court decisions by declaring that the Supreme Court simply got it "wrong."

144.    Even putting aside the controlling nature of *Nixon v. GSA*, the PRA is constitutional. Congress has multiple sources of authority for enacting the PRA, including but not limited to:

a.  The Property Clause, which grants Congress plenary "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

b.  The Necessary and Proper Clause, which gives Congress the authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

c.  The Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7; and

d.  Congress' implied and implicit authorities.

145.  The PRA serves numerous valid purposes, including preventing the destruction or removal of government property, including government records that could be used against the interests of the United States if shared outside the federal government; preserving records of the Executive Branch's activities so that information is available as needed by a future President, by Congress for legislative or oversight purposes, or by the Judiciary in adjudicating cases; and providing a historical record for the public to assess, study, and understand presidential conduct and the Executive Branch's activities. The PRA further facilitates continuity and the orderly transition of power across Presidential administrations. During any transition there is a high turnover of personnel within the White House, and accordingly the need for access to information of a prior administration on pressing public interest matters is acute. If an incumbent Administration were free to delete or destroy all of its records covered by the PRA before a transition, the risks to government operations and the public interest would be enormous.

146.  The PRA does not impermissibly burden or intrude upon the functioning of the Executive Branch. During a President's term in office, the PRA requires only preservation of records and does not provide for any disclosure of records to the public or Congress. The PRA provides for screening and maintenance of Presidential records within the Executive Branch after a President's term in office, and the President can ensure that most records do not become publicly available until at least 12 years after the President's term in office. Even then, the PRA

provides the incumbent and former Presidents the ability to shield or attempt to shield records from disclosure based on executive privilege or other applicable bases for withholding.

147. The PRA is constitutional, and Defendants' disregard of this duly enacted law violates the separation of powers.

### COUNT II – Equitable Claim to Enjoin Violations of PRA
### (Against All Defendants)

148. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

149. Federal courts possess inherent equitable power to enjoin federal officials from violating federal law. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). This power also extends "to violations of federal law by federal officials." *Id.*

150. As set forth above, the PRA imposes various duties on the President, the Vice President, and the heads of EOP components subject to the PRA, including to collect and preserve Presidential records, and to provide those records to NARA at the conclusion of a presidential administration. The PRA imposes restrictions on the use of non-official messaging accounts for communications that constitute Presidential records under the PRA.

151. The PRA also imposes duties on the Archivist in maintaining Presidential records once in NARA's custody and in providing access to Presidential records to the public, incumbent Presidents, and Congress subject to the PRA's parameters.

152. The OLC opinion concludes that "the PRA is unconstitutional, and the President need not further comply with its dictates." OLC Op. 52.

153. The White House has announced that those covered by the PRA will no longer comply with the PRA. Under the Post-OLC PRA Policy, covered persons will be trained to

collect and retain only a limited subset of records that fall far short of all Presidential records that the PRA requires to be retained. On information and belief, persons covered by the PRA will no longer be required to use official messaging accounts for their communications and will not be required to forward communication about official work from non-official messaging accounts to official ones.

154.    On information and belief, NARA no longer considers itself bound to comply with the PRA in light of the OLC Opinion and the President's determination to follow the OLC Opinion. The Court has inherent equitable authority to enjoin the Defendants from violating the PRA on an ongoing basis.

## COUNT III – Ultra Vires Actions
## (Against All Defendants)

155.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

156.    A nonstatutory right of action is available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure" from a "statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

157.    Defendants lack legal authority to disregard the prohibitions and mandates of the PRA, including because the PRA is constitutional. Defendants' open refusal to comply with the PRA's dictates is "blatantly lawless" and a "clear departure" from the PRA's requirements.

## COUNT IV – Administrative Procedure Act:
## NARA Actions Contrary to Law
## (Against Defendants NARA and Forst)

158.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

159.    Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

160.    On information and belief, NARA has decided that it is no longer legally bound to comply with the PRA in light of the OLC Opinion and the President's determination to follow the OLC Opinion. That decision is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

161.    NARA's decision violates the constitutional separation of powers and the PRA, and therefore is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." The Court must declare unlawful and set aside NARA's unlawful decision and actions under 5 U.S.C. § 706(2).

### COUNT V – Administrative Procedure Act:
### NARA Actions Unlawfully Withheld or Unreasonably Delayed
### (Against Defendants NARA and Forst)

162.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

163.    Under the Administrative Procedure Act, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

164.    On information and belief, in reliance on the OLC Opinion and as required by the President's determination to follow the OLC Opinion, NARA is also unlawfully withholding or unreasonably delaying proactively making Presidential records from prior administrations, including from the first Trump administration, publicly available.

165.    NARA's withholding in proactively making such records publicly available, is "unlawful." 5 U.S.C. § 706(1).

166.    Alternatively, NARA is unreasonably delaying in proactively making Presidential records publicly available.

167.    The Court must compel NARA to not take these unlawfully withheld or unreasonably delayed actions pursuant to 5 U.S.C. § 706(1).

**COUNT VI – Administrative Procedure Act:**
**DOJ Action Contrary to Law**
**(Against Defendants DOJ and Bondi)**

168.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

169.    Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

170.    The OLC Opinion declaring the PRA facially unconstitutional in its entirety, and directing the President that he "need not further comply with its dictates," OLC Op. 52, is contrary to law.

171.    DOJ lacks legal authority to purportedly overrule on-point Supreme Court precedent, or to advise the President and other Executive Branch officials that they may act in contravention to Supreme Court precedent, on the basis that OLC deems the Supreme Court to be "wrong." Article III of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, §1. "It is emphatically the province and duty of the judicial department"—and not the Executive Branch—"to say what the law is."

43
**JA56**

*Marbury v. Madison*, 5 U.S. 137, 177 (1803). The OLC Opinion purporting to overrule Supreme Court precedent and advising the President that he may act in contravention of Supreme Court precedent violates the separation of powers.

172.    The OLC Opinion advising the President that he may disregard the dictates of the PRA is also not in accordance with the PRA.

173.    Because the OLC Opinion is contrary to law, the Court must declare it unlawful and set it aside pursuant to 5 U.S.C. § 706(2).

## COUNT VII – Mandamus
### (Against Individual Defendants)

174.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

175.    If relief is not available on Plaintiffs' other claims, the Court should enter a writ of mandamus compelling the individual Defendants to comply with their affirmative, mandatory duties under the PRA.

176.    Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials. *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (quotations omitted).

177.    The PRA imposes non-discretionary duties on the President, the Vice President, and the heads of EOP components subject to the PRA to collect and preserve Presidential records, and to provide those records to NARA at the conclusion of a presidential administration.

178.    The PRA also imposes non-discretionary duties on the Archivist in maintaining Presidential records once in NARA's custody and in providing access to Presidential records to the public, incumbent Presidents, and Congress subject to the PRA's parameters.

179.    Mandamus is warranted here to compel the individual Defendants to comply with their non-discretionary duties under the PRA, if Plaintiffs are unable to obtain complete relief on their other claims.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that the PRA is constitutional, that the OLC Opinion is contrary to law and cannot be relied upon by Defendants, and that Defendants remain bound by the requirements of the PRA.

B.    Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin NARA's decisions not to comply with all of the PRA's requirements of NARA.

C.    Compel NARA, pursuant to 5 U.S.C. § 706(1), to proactively make such records publicly available, in accordance with the PRA's requirements.

D.    Enjoin Defendants from relying on the OLC Opinion or otherwise treating the PRA as non-binding, and to comply with their mandatory duties under the PRA.

E.    Enjoin the individual Defendants, other than President Trump in his official capacity, to disclose to the Court any known instances in which the President destroys, converts for personal use, or otherwise fails to maintain Presidential records as required by the PRA.

F.    Enjoin President Trump, in his personal capacity after the conclusion of his term in office, from retaining, destroying, disposing, or otherwise handling Presidential records in a manner not in accordance with the PRA, and to turn over all Presidential records in his actual or constructive possession to NARA as required by the PRA.

G.    Issue a writ of mandamus compelling Defendants to carry out their non-discretionary duties under the PRA, if complete relief is not available under Plaintiffs' other claims.

H.    Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action.

I.       Grant Plaintiffs any other relief this Court deems appropriate.


April 6, 2026                              Respectfully submitted,

                                          */s/ Daniel F. Jacobson*
                                          Daniel F. Jacobson (D.C. Bar 1016621)
                                          Lynn D. Eisenberg (D.C. Bar 1017511)
                                          John Robinson (D.C. Bar 1044072)
                                          JACOBSON LAWYERS GROUP PLLC
                                          5100 Wisconsin Ave NW, Suite 301
                                          Washington DC, 20016
                                          (301) 823-1148
                                          dan@jacobsonlawyersgroup.com


                                          */s/ Loree Stark*
                                          Loree Stark
                                          D.C. Bar No. 90021926
                                          American Oversight
                                          1030 15th Street NW, B255
                                          Washington, D.C. 20005
                                          (202) 869-5246
                                          loree.stark@americanoversight.org

                                          *Counsel for Plaintiffs*

**JA59**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 26-cv-1169 |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 7 and 65.1, Plaintiffs hereby move for a preliminary injunction under Rule 65(a)(2). The grounds for this motion are set forth in Plaintiffs' accompanying memorandum of law in support of their motion.

Wherefore, Plaintiffs respectfully request that the Court enter the relief in the form set forth in the proposed order attached to this motion. The Court should waive the need for any bond or require a nominal bond of $100.

Pursuant to Local Rule 65.1(d), Plaintiffs request a hearing within 21 days.

Plaintiffs' counsel have conferred with counsel for Defendants, who have stated that they oppose this motion.

Dated: April 14, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar 1016621)

**JA60**

Lynn D. Eisenberg (D.C. Bar 1017511)
John Robinson (D.C. Bar 1044072)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave NW, Suite 301
Washington DC, 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com


*/s/ Loree Stark*
Loree Stark
D.C. Bar No. 90021926

American Oversight
1030 15th Street NW, B255
Washington, D.C. 20005
(202) 869-5246
loree.stark@americanoversight.org

*Counsel for Plaintiffs*

**JA61**

# Exhibit A

Case 1:26-cv-01169-BAH   Document 13-3   Filed 04/14/26   Page 2 of 3
USCA Case #26-5185     Document #2183052     Filed: 07/13/2026     Page 68 of 450

Outlook

## Re: American Historical Ass'n v. Trump (DDC) - meet and confer

**From** Dan Jacobson <dan@jacobsonlawyersgroup.com>

**Date** Fri 4/10/2026 3:50 PM

**To** Powers, James R. (CIV) <James.R.Powers@usdoj.gov>; Katherine Anthony <katherine.anthony@americanoversight.org>; John Robinson <john@jacobsonlawyersgroup.com>; Loree Stark <loree.stark@americanoversight.org>; lynn@jacobsonlawyersgroup.com <lynn@jacobsonlawyersgroup.com>

**Cc** Shi, Winston G (CIV) <Winston.G.Shi@usdoj.gov>; Anna Brier <anna.brier@americanoversight.org>

Hi Jim,

Thanks for letting us know the government's position. For posterity, here are the stipulations we requested the government agree to several days ago to avoid or limit emergency motions practice, which the government has now indicated that it cannot agree to.

- A statement that for the pendency of the litigation, NARA:
  - (1) will not destroy and will otherwise maintain any Presidential records (as defined by the PRA) already in its custody, as required under the terms of the PRA
  - (2) will fulfill its obligations under the PRA  to work expeditiously to make public Presidential records of prior administrations, including the first Trump Administration, subject only to the exceptions set forth in the PRA
  - (3) will fulfill its obligations under the PRA to timely process FOIA requests for Presidential records of prior Administrations, including the first Trump Administration, subject only to the exceptions set forth in the PRA.
- A statement that PRA components in the EOP (including all those named in the complaint) will for the pendency of the litigation collect and preserve all records that qualify as presidential records under the PRA, as required by the PRA
- A statement that all persons covered by the PRA will comply for the pendency of the litigation with the requirements of 44 USC 2209, where such compliance requires treating all emails, text messages, and messages on encrypted messaging apps like Signal and What's App that relate to their official duties as Presidential records that must be preserved on official accounts in accordance with the PRA,
- A statement that the President and Vice President will comply for the pendency of the litigation with the PRA's requirements, including by preserving all presidential records as defined by the PRA.

Best,
Dan

**From:** Powers, James R. (CIV) <James.R.Powers@usdoj.gov>
**Sent:** Friday, April 10, 2026 2:57 PM
**To:** Dan Jacobson <dan@jacobsonlawyersgroup.com>; Katherine Anthony <katherine.anthony@americanoversight.org>; John Robinson <john@jacobsonlawyersgroup.com>; Loree Stark <loree.stark@americanoversight.org>; lynn@jacobsonlawyersgroup.com <lynn@jacobsonlawyersgroup.com>

**JA63**

Case 1:26-cv-01169-BAH    Document 13-3    Filed 04/14/26    Page 3 of 3
USCA Case #26-5185      Document #2183052        Filed: 07/13/2026      Page 69 of 450

**Cc:** Shi, Winston G (CIV) <Winston.G.Shi@usdoj.gov>
**Subject:** American Historical Ass'n v. Trump (DDC) - meet and confer

Counsel,
I'm reaching out about two matters.

First, we plan to file today an objection to the related case designation you filed on the ground that the designation does not meet the standard of the local rules. I assume you oppose but please confirm.

Second, thanks for your call earlier this week. I am following up on our conversation in light of your anticipated Monday filing date. We cannot agree to a stipulated order regarding the issues you raised in our call and are not yet in a position to make additional representations about the Government's approach to those issues.

Thanks,
Jim

**James R. Powers**
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, NW, Room 11006
Washington, DC 20005
Telephone: (202) 353-0543
Email: James.R.Powers@usdoj.gov

**JA64**

# Exhibit B

**JA65**

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 72 of 450



# INDEX

| | Page |
|---|---|
| Opinions below | 1 |
| Jurisdiction | 1 |
| Questions presented | 2 |
| Constitutional provisions and statute involved | 2 |
| Statement | 3 |
| Introduction and summary of argument | 11 |
| Argument | 22 |
| The Presidential Recordings and Materials Preservation Act is not unconstitutional on its face | 22 |
| A. The Act does not invade the autonomy of the Executive Branch | 23 |
| 1. The principle of separation of powers does not prevent employees of the Executive Branch from screening materials created by the Executive Branch | 23 |
| 2. The Act does not presage a wholesale invasion of the prerogatives of the Executive Branch | 26 |
| B. The Act does not breach appellant's privilege with respect to confidential presidential communications | 32 |
| C. The Act is not a bill of attainder | 38 |
| D. Review of the materials by archivists does not invade appellant's privacy | 48 |

JA68

II

Argument—Continued                                    Page

    E.  The Act does not abridge the free-
        doms of speech and association _____   55
Conclusion _____   57

## CITATIONS

Cases:

Administrator, Federal Aviation Admin-
    istration v. Robertson, 422 U.S. 255____   27
Andresen v. Maryland, No. 74-1646, de-
    cided June 29, 1976 _____   53
Berman v. Parker, 348 U.S. 26 _____   30
Broadrick v. Oklahoma, 413 U.S. 601_____   17
Buckley v. Valeo, 424 U.S. 1_____ 17, 22, 26, 31,
                                              55, 56

City of New Orleans v. Dukes, No. 74-
    775, decided June 25, 1976 _____   39
Civil Service Commission v. Letter Car-
    riers, 413 U.S. 548 _____  55, 56
Colonnade Catering Corp. v. United
    States, 397 U.S. 72 _____   54
Communist Party v. Subversive Activities
    Control Board, 367 U.S. 1 _____   55
Couch v. United States, 409 U.S. 322____   53
Cox v. Louisiana, 379 U.S. 536 _____   55
Craig v. Boren, No. 75-628, decided De-
    cember 20, 1976 _____   18
Cummings v. Missouri, 4 Wall. 277 _____   39
Dandridge v. Williams, 397 U.S. 471____   39
Dellums v. Powell, C.A.D.C., No. 76-1336,
    decided January 28, 1977 _____   35
Department of the Air Force v. Rose, 425
    U.S. 352 _____  35, 52
De Veau v. Braisted, 363 U.S. 144 _____   43

BLEED THROUGH

III

Cases—Continued                                                Page

Environmental Protection Agency v.
  Mink, 410 U.S. 73 _____   27
Fisher v. United States, 425 U.S. 391 _____   34, 53
Flemming v. Nestor, 363 U.S. 603 _____   43, 44
Folsom v. Marsh, 9 Fed. Cas. 342 _____ 28, 29, 32
Goldblatt v. Town of Hempstead, 369
  U.S. 590 _____   30
Katz v. United States, 389 U.S. 347 _____   49
Kennedy v. Mendoza-Martinez, 372 U.S.
  144 _____   44
Kerr v. United States District Court, 426
  U.S. 394 _____   35
Kleppe v. New Mexico, 426 U.S. 529 _____   29
Lovell v. Griffin, 303 U.S. 444 _____   55
Mathews v. DeCastro, No. 75-1197, de-
  cided December 13, 1976 _____   39
Monitor Patroit Co. v. Roy, 401 U.S. 265 _   48
Myers v. United States, 272 U.S. 52 _____   31
National Labor Relations Board v. Sears,
  Roebuck & Co., 421 U.S. 132 _____   31
New York Times Co. v. Sullivan, 376
  U.S. 254 _____   48
Nixon v. Sampson, 389 F. Supp. 107 _____   10
Parker v. Levy, 417 U.S. 733 _____   56
Regional Rail Reorganization Act Cases,
  419 U.S. 102 _____   46
Sanford v. Texas, 379 U.S. 476 _____   53
Uniformed Sanitation Men v. Sanitation
  Commissioner, 392 U.S. 280 _____   48
United States v. Biswell, 406 U.S. 311 __ 53, 54
United States v. Brown, 381 U.S. 437 38-39, 45
United States v. Dionisio, 410 U.S. 1 ___   49
United States v. Gettysburg Electric Ry.,
  160 U.S. 668 _____   30

**JA70**

IV

Cases—Continued                                                    Page

United States v. *Harriss*, 347 U.S. 612____          22
United States v. *Lovett*, 328 U.S. 303 .       38, 47
United States v. *Miller*, 425 U.S. 435_____          49
United States v. *Mitchell*, C.A.D.C., No.
   75-1409, decided October 26, 1976, peti-
   tion for a writ of certiorari pending
   *sub nom. Nixon* v. *Warner Communi-
   cations, Inc.*, No. 76-944 _____ ____       37-38
United States v. *National Dairy Products
   Corp.*, 372 U.S. 29 _____           22
United States v. *Nixon*, 418 U.S. 683 ___ *passim*
United States v. *Wurzbach*, 280 U.S. 396 .       23
*Weinberger* v. *Salfi*, 422 U.S. 749_____       39
*Williamson* v. *Lee Optical Co.*, 348 U.S.
   483 _____           39
*Wyman* v. *James*, 400 U.S. 309 ___ _____        54
*Young* v. *American Mini Theatres, Inc.*,
   No. 74-312, decided June 24, 1976 _____        17

Constitution, statutes and regulations:

United States Constitution:

   Article I, Section 9, clause 3 .  . ...           2
   Article II ____ _____ __ __ __              30
      Section 3 _____ ___ . .                     27

   Article III _____ -            19
   Article IV, Section 3, clause 2 __ .          2, 29
   First Amendment _____ _____ ___ 2, 55, 56
   Fourth Amendment _____ 3, 52, 53
   Fifth Amendment ___ ____ _____ 3, 39, 53

Federal Records Act, 44 U.S.C. 2101 *et
   seq.* _____          5, 27
Freedom of *Information Act*, 5 U.S.C.
   (Supp. V) 552 ___  _____          6, 27

BLEED THROUGH

v

Constitution, statutes and
regulations—Continued                           Page

Government in the Sunshine Act, Pub. L.
94-409, 90 Stat. 1241, adding 5 U.S.C.
552b ............................................................    28
Presidential Libraries Act, 44 U.S.C.
2101, 2107 and 2108 .............................    38
Presidential Recordings and Materials
Preservation Act, 88 Stat. 1695 *et seq.*,
44 U.S.C. (Supp. V) 2107 note and
3315-3324 ..................................................    7

Section 101 ..............................................    7
Section 102 ..............................................    9
Section 102(b) ..............................7, 42, 45
Section 102(c) ..................................7, 45
Section 102(d) ..................................7, 23
Section 103 ........................................7, 9
Section 104 ..............................................    7
Section 104(a) ........................................    7
Section 104(a)(3) ...................................    15
Section 104(a)(5) .......................... *passim*
Section 104(a)(7) ......16, 21, 24, 45, 51
Section 104(b) ..........................8, 26, 50
Section 105 ................................8, 25, 45

Privacy Act of 1974, 5 U.S.C. (Supp. V)
552a ..........................................................    27

13 U.S.C. 8-9 ............................................    27
26 U.S.C. 6103 ........................................    27
41 C.F.R. Part 105-63 .............................
41 C.F.R. Subpart 105-63.2 ..................    42
42 C.F.R. 105-63.205 .............................    23
41 C.F.R. 105-63.206 .............................    23
41 C.F.R. 105-63.301 .............................    42
41 C.F.R. 105-63.302 .............................    23

**JA72**

VI

| Miscellaneous: | Page |
|---|---|
| Comment, *The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification*, 54 Cal. L. Rev. 212 (1966) | 42 |
| 120 Cong. Rec. (1974): | |
| p. 33419 | 34 |
| p. 33855 | 41 |
| p. 33857 | 41 |
| pp. 33857-33863 | 41 |
| p. 33859 | 47 |
| p. 33871 | 43 |
| p. 33872 | 44 |
| p. 33873 | 42 |
| p. 33874 | 41 |
| pp. 33874-33875 | 44 |
| p. 33875 | 42, 44 |
| p. 33958 | 47 |
| p. 33959 | 41, 44, 47 |
| p. 33962 | 41 |
| p. 33963 | 43 |
| p. 33968 | 43 |
| p. 33975 | 43 |
| p. 37902 | 41 |
| 121 Cong. Rec. S15803-S15808 (daily ed., September 11, 1975) | 8 |
| 122 Cong. Rec. (daily ed., April 8, 1976): | |
| p. S5290-S5291 | 9 |
| p. S5291 | 25 |
| 122 Cong. Rec. H10043-H1044 (daily ed., September 14, 1976) | 9, 25 |
| 40 Fed. Reg. 2669 | 9 |

BLEED THROUGH

JA73

VII

Miscellaneous—Continued                         Page

General Services Administration, Pro-
    posed Public Access Regulations, Sec-
    tion 105-63.401-2 (April 13, 1976)..         25
Hearings on H.R. 16902 and Related Leg-
    islation before the Subcommittee on
    Printing of the Committee on House
    Administration, 93d Cong., 2d Sess.
    (1974) _____        52
H.R. Rep. No. 93-1305, 93d Cong., 2d
    Sess. (1974) _____       51
H.R. Rep. No. 93-1507, 93d Cong., 2d
    Sess. (1974) _____      41, 43
H.R. Res. 1505, 94th Cong., 2d Sess.
    (1976) _____         9
McCormick, *Evidence* § 94 (Cleary ed.
    1972) _____       34
43 Op. Att'y Gen. No. 1 (September 6,
    1974) ____ _____                               4
S. Rep. No. 93-1181, 93d Cong., 2d Sess.
    (1974) _____    41, 43
S. Res. 244, 94th Cong., 1st Sess. (1975)       8
S. Res. 428, 94th Cong., 2d Sess. (1976)        9
Watson, *Congress Steps Out: A Look at
    Congressional Control of the Executive*,
    63 Cal. L. Rev. 983 (1975)                     26
9 Weekly Comp. of Pres. Docs. (1973):

        p. 1370 ___ _____ ____                    51
        p. 1372 ____ _____               51

10 Weekly Comp. of Pres. Docs. (1974):

        p. 450 _____ ___ ___                        37
        pp. 450-458 . ___ _____ _                   51
        p. 1104 _____ _____ ____            5

VIII

Miscellaneous—Continued                                          Page

    12 Weekly Comp. of Pres. Docs. 1709
      (1976) _____ 40
        p. 1711 _____ 40
        pp. 1712-1713 _____ 40
        p. 1713 _____ 40

BLEED THROUGH

**JA75**

# In the Supreme Court of the United States

OCTOBER TERM, 1976

No. 75-1605

RICHARD NIXON, APPELLANT

*v.*

ADMINISTRATOR OF GENERAL SERVICES, ET AL.

*ON APPEAL FROM THE UNITED STATES DISTRICT*
*COURT FOR THE DISTRICT OF COLUMBIA*

**BRIEF FOR THE FEDERAL APPELLEES**

### OPINIONS BELOW

The opinion of the three-judge district court (J.S. App. 1a-106a) is reported at 408 F. Supp. 321. Opinions of the court of appeals concerning the convening of the three-judge district court (J.S. App. 139a-202a) are reported at 513 F. 2d 427 and 430.

### JURISDICTION

The judgment of the three-judge district court (J.S. App. 107a-108a) was entered on January 7, 1976. A notice of appeal (J.S. App. 109a) was filed on March 4, 1976, and the jurisdictional statement

(1)

**JA76**

2

was filed on May 3, 1976. Probable jurisdiction was noted on November 29, 1976. The jurisdiction of this Court rests upon 28 U.S.C. 1253.

### QUESTIONS PRESENTED

Whether the Presidential Recordings and Materials Preservation Act is unconstitutional on its face as a violation of (1) the separation of powers; (2) presidential privilege doctrines; (3) the Bill of Attainder Clause; (4) appellant's privacy interests; or (5) appellant's First Amendment rights.

### CONSTITUTIONAL PROVISIONS AND STATUTE INVOLVED

Article I, Section 9, clause 3 of the Constitution provides:

> No Bill of Attainder or ex post facto Law shall be passed.

Article IV, Section 3, clause 2 of the Constitution provides:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

The First Amendment to the Constitution provides in relevant part:

> Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *.

BLEED THROUGH

**JA77**

3

The Fourth Amendment to the Constitution provides in relevant part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.

The Fifth Amendment to the Constitution provides in relevant part:

> No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The Presidential Recordings and Materials Preservation Act, 88 Stat. 1695 *et seq.*, 44 U.S.C. (Supp. V) 2107 note and 3315-3324, is set out at J.S. App. 110a-123a.

## STATEMENT

1. Appellant resigned as President of the United States effective August 9, 1974. When he left office a large quantity of documents, files, and other materials, which had been accumulated by him and his staff during his terms as President, remained in the government's custody (J.S. App. 7a-9a). These materials include approximately 42 million pages of documents (J.S. App. 40a; A. 514). Appellant estimates that he personally prepared or reviewed 200,-000 documents from this collection (A. 516). The materials also include more than 800 reels of tape recordings of conversations in the Oval Office, the Cabinet Room, and the Lincoln Sitting Room in the

**JA78**

4

White House, and in appellant's offices in the Executive Office Building and Camp David. Numerous dictabelt recordings of appellant's recollections of daily events also are included (J.S. App. 40a; A. 178, 218).[1] After appellant's resignation, government archivists began to collect these materials for shipment to California, in accord with appellant's instructions (J.S. App. 9a-10a).

Before releasing any materials for disposition according to appellant's pre-resignation instructions, President Ford asked the Attorney General for advice about the ownership of the materials. The Attorney General concluded that, with the possible exception of one type of document, the materials were owned by appellant by virtue of historical practice and the absence of any statute to the contrary (43 Op. Att'y Gen. No. 1 (September 6, 1974); A. 220-230).[2] Appellant's ownership interest was not regarded as unqualified, however. The Attorney General informed President Ford (A. 226):

---

[1] On leaving the White House, appellant took with him some personal notes, diaries, and dictabelts (A. 600-601). He has full possession of these materials.

[2] The Attorney General expressed no opinion concerning ownership of certain "permanent files." These files consist of materials traditionally retained in the White House from administration to administration, such as "White House budget and personnel material, and records or copies of some Presidential actions useful to the Clerk's office for such purposes as keeping track of the terms of Presidential appointments and providing models or precedents for future Presidential action" (A. 228). Appellant claims no rights to these materials in this action (J.S. 12).

BLEED THROUGH

**JA79**

5

Historically, there has been consistent acknowledgement that Presidential materials are peculiarly affected by a public interest which may justify subjecting the absolute ownership rights of the ex-President to certain limitations directly related to the character of the documents as records of government activity.

The Attorney General's opinion also stated that appellant's ownership interest was qualified by exposure to court orders regarding the materials and based upon their unique nature (A. 229-230).

Following President Ford's receipt of this opinion, the Administrator of General Services executed a depository agreement with appellant (A. 38-43).[3] Under the agreement, appellant retained title to all of his presidential historical materials but agreed to donate a substantial portion of the materials to the United States at a future date so that they would "be made available, with appropriate restrictions, for research and study" (A. 38). While appellant reviewed the materials, they were to be deposited with the General Services Administration ("GSA") under the Federal Records Act, 44 U.S.C. 2101 et seq., and transferred to California, where they would be stored in locked areas. Neither appellant nor GSA could gain access to the materials without the consent of the other (A. 39).

The agreement provided that for three years appellant would not withdraw any original writing, al-

---

[3] The agreement is reported at 10 Weekly Comp. of Pres. Docs. 1104 (1974).

**JA80**

6

though he could make and withdraw copies. After the initial three-year period appellant could withdraw any of the materials other than tape recordings (A. 39-40). Appellant agreed not to withdraw any original tape recording of conversations in the White House or Executive Office Building for five years, and to make reproductions of the tapes only with GSA's consent.

During the three and five year periods, appellant or government archivists working under his direction were to review the materials; those he did not withdraw would be donated to the United States, with appropriate restrictions on public access (A. 43). Following the initial five-year period for the review of tape recordings, appellant would be entitled to designate any tape recording to be destroyed. All of the tape recordings were to be destroyed after the expiration of ten years (September 1, 1984) or upon appellant's death, whichever event occurred first (A. 41).

Implementation of this agreement was delayed at the request of the Watergate Special Prosecutor (J.S. App. 12a). Appellant then brought suit for specific performance of the agreement. The Special Prosecutor and Jack Anderson, a reporter, intervened; the case was consolidated with actions brought by other plaintiffs that claimed to be interested in appellant's presidential materials, all seeking to enjoin transfer of the materials and to gain access to them under the Freedom of Information Act, 5 U.S.C. (Supp. V) 552.

2. While these consolidated actions were pending,

BLEED THROUGH

**JA81**

7

Congress passed and the President signed the Presidential Recordings and Materials Preservation Act, 88 Stat. 1695 *et seq.*, 44 U.S.C. (Supp. V) 2107 note and 3315-3324. Section 101 of the Act abrogates appellant's depository agreement with GSA and directs the Administrator of General Services to obtain and retain possession and control of all the presidential historical materials and tape recordings from appellant's administration. Section 102(b) provides that these materials and recordings shall be made available for use in any judicial proceeding, "subject to any rights, defenses, or privileges which the Federal Government or any person may invoke * * *." Sections 102(c) and (d) provide that appellant (or his designate) and the Executive Branch shall have access to the materials, subject to the Administrator's regulations.

Section 103 requires the Administrator to issue regulations to govern custody of and access to the materials. Section 104 requires the Administrator to issue regulations providing "public access" to the materials; these regulations must "take into account" seven factors (Section 104(a)):

   (1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";
   (2) the need to make such recordings and materials available for use in judicial proceedings;

**JA82**

8

(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

(4) the need to protect every individual's right to a fair and impartial trial;

(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

Section 104(a) requires the Administrator to submit the "public access" regulations and any subsequent changes in them to both Houses of Congress and provides that the regulations or changes can be disapproved by a resolution of either House within 90 legislative days of submission.[4] Section 105 pro-

---

[4] The Administrator has submitted to Congress three sets of "public access" regulations. The first set was disapproved by the Senate. S. Res. 24*, 94th Cong , 1st Sess. (1975); 121 Cong. Rec. S15803-S15808 (daily ed., September 11, 1975). The Administrator has not sought to enforce these disapproved regulations, and no party to this litigation claims any rights under them. The second set was withdrawn; the

BLEED THROUGH

JA83

9

vides for "just compensation" to any individual whose private property is taken under the Act.

Title II of the Act establishes a National Study Commission to study and recommend procedures regarding the control, disposition, and preservation of the records of all federal executive, judicial, and legislative officers. The National Study Commission has been appointed but has not yet submitted its report; it is not involved in this litigation.

3. The day after the Act became effective, appellant commenced this action for declaratory and in-

Senate disapproved seven provisions of those regulations, believing that the Administrator lacked power to withdraw them. S. Res. 428, 94th Cong., 2d Sess. (1976); 122 Cong. Rec. S5290-S5291 (daily ed., April 8, 1976). The third set was submitted on April 13, 1976, and on September 14, 1976, the House disapproved six of the provisions. H.R. Res. 1505, 94th Cong., 2d Sess. (1976). The six provisions disapproved by the House were among the seven that had been disapproved by the Senate after the second proposed set of regulations had been withdrawn. The sponsor of the resolution disapproving the six provisions stated that, in his view, all of the submitted regulations except the disapproved provisions thereupon became effective. 122 Cong. Rec. H10043-H10044 (daily ed., September 14, 1976). It is the position of the Administrator, however, that the regulations cannot become effective until they have been approved as a package, since the approval of isolated regulations does not leave a coherent program. The Administrator therefore is preparing a fourth set of regulations and expects to submit them to Congress soon.

Regulations implementing Sections 102 and 103 of the Act are not required to be submitted to Congress. These regulations were published on January 14, 1975. 40 Fed. Reg. 2669; 41 C.F.R. Part 105-63. The district court has enjoined the effectiveness of some of these regulations pending disposition of this appeal (J.S. App. 104a-108a).

10

junctive relief in the United States District Court for the District of Columbia. He challenged the constitutionality of the Act on various grounds, and sought the convening of a three-judge district court. The district court declined to rule upon the request; it filed an opinion in the consolidated cases growing out of appellant's agreement with GSA. *Nixon* v. *Sampson*, 389 F. Supp. 107 (D. D.C.). The Court of Appeals for the District of Columbia Circuit stayed entry of judgment in the consolidated cases to enable a three-judge district court to determine whether priority should be accorded to the present action (J.S. App. 139a-202a).

A three-judge district court was convened, and the court allowed the other parties to the consolidated cases, who were not originally parties to this case, to intervene. The Special Prosecutor intervened and subsequently withdrew (A. 130, 484-487). Since the court of appeals' stay barred any *res judicata* or collateral estoppel effects of the single judge's opinion in *Nixon* v. *Sampson*, *supra*, the three-judge district court independently considered appellant's arguments.

The court rejected appellant's challenges to the facial constitutionality of the Act (J.S. App. 1a-106a). Noting that the regulations to implement the Act are not yet effective and that any challenge to the implementation of the Act is premature, the court limited its inquiry to the taking of the materials into the government's custody and their screening by government archivists (J.S. App. 3a-4a, 19a-

BLEED THROUGH

JA85

11

31a). The court carefully considered and rejected each of the arguments appellant makes here.

### INTRODUCTION AND SUMMARY OF ARGUMENT

This case requires the Court to determine whether the Act of Congress allowing officials of the Executive Branch to take custody of and examine certain materials generated by the Executive Branch during appellant's terms as President is constitutional on its face. Appellant contends that it is not. His arguments are identical in function, if not in form, to those he made, and this Court rejected, in *United States* v. *Nixon*, 418 U.S. 683.

Appellant maintains nothing less than that he is the only proper judge of his claims of privilege and privacy. He contends not only that he has the final decision whether particular documents are private or privileged, but also that no person may scrutinize his decisions. Under his argument, only he can look at the materials, because for anyone else to look at or listen to the materials to determine whether they are privileged or private would itself be a breach of privacy and a violation of his privilege. The upshot of this is that appellant has not only the last say but also the only say. In *United States* v. *Nixon, supra,* appellant made similar arguments in the context of an inquiry by the Judicial Branch of government; now he makes them in the context of an inquiry by the Executive Branch.

The arguments fare no better now than they did before. The question whether particular documents

JA86

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 92 of 450

12

(or categories of documents) are private or privileged may be quite difficult, but the decision need not be left to appellant. The answer usually will depend upon the purpose for which the material was created, the extent to which the material was circulated to persons other than appellant, the effect disclosure would have upon the giving of advice and the uninhibited discussion of policies that is essential to the proper functioning of the Executive Branch, and the countervailing interests of other persons in obtaining access to the materials. No categorical answer can be given, and the problems will require sensitive tools for their resolution.

For example, the parties agree that the considerations of politics and personalities that influence the nomination of a person as a federal judge ought not to be spread upon the public record. Such disclosure would inhibit the submission and consideration of frank views, and it would invade the privacy not only of those who submitted opinions but also of those who were considered for the position. On the other hand, no privilege would attach to a revelation that a nomination had been made in exchange for a political contribution, because that would amount not to the discussion of politics or public affairs, but to the commission of a crime. Although we do not suggest that nominations were in fact exchanged for money, this example suggests that a blanket claim of privacy or privilege cannot be sustained.

Moreover, the files of the White House Office contain many types of documents that are inter-

BLEED THROUGH

**JA87**

## 13

mingled. Copies of the Congressional Record and committee prints are among the documents; photocopies of newspaper and magazine articles are there; documents that were circulated among Cabinet departments but never seen by appellant are there. Appellant has not argued that these documents are privileged or that disclosure of them would invade his privacy. Separation of the privileged from the unprivileged, the private from the public, cannot be accomplished merely by naming categories of documents, however; because many documents are commingled, someone must sort through them.

Appellant argues that he is the only person who may do the sorting, the only person who may separate the public from the private, the privileged from the unprivileged. This claim entails assertion of authority over all materials, whatever their status; in appellant's view, no one may second-guess his decisions, because no one else legitimately may have access to the information necessary to second-guess him. This assertion fails because not all materials accumulated during appellant's terms of office are privileged or private.

Appellant contends that he can be counted upon to decide fairly and accurately which information is privileged and which is not. Whether or not this is correct, the archivists who will do the screening under the Act challenged here also can be counted upon to decide fairly and correctly which information is privileged or private and which is not. Their record for discretion is unblemished.

14

Appellant responds that the archivists will apply incorrect standards. They will, appellant contends (Br. 69, 80-81), require him to justify every claim of privilege, thus turning the presumptive privilege recognized in *United States* v. *Nixon, supra,* into a presumptive absence of privilege. But appellant overlooks the fact that he is challenging the Act on its face, and that such a challenge limits the range of arguments that may be considered.

The most important feature of this case, one we emphasize repeatedly in this brief, is that almost all appellant's arguments are based upon hypothetical possibilities, none of which has occurred. There has been no public access; he has never been denied access to any of his presidential materials; no claims of privilege have been determined adversely to him; no presumption has been reversed. Appellant argues as if massive disclosures of private or privileged documents or tapes are imminent, but they are not.

The portions of the Act at issue here do three things. First, the Act provides that appellant does not have sole control of the materials of his presidency. Under the Act, appellant receives, on request, a copy of any of the materials that have been impounded. In this respect, the Act is not significantly different from the depository agreement appellant voluntarily proposed to the GSA; that depository agreement established a two-key system under which appellant could not gain access to any materials without the permission of GSA.

BLEED THROUGH

**JA89**

15

Second, the Act provides that employees of the Executive Branch have access to the materials for lawful purposes. There is no flaw here for, as appellant recognizes (Br. 116-117), legal principles establish that employees of the Executive Branch have access to presidential papers when necessary for the conduct of governmental business. Appellant has not argued that any access provided to employees of the government has to date infringed any privilege of his or invaded his privacy.

Third, the Act provides that government archivists will screen the materials, sorting out those of general historical interest or related to abuse of power.[5] The Administrator is directed to promulgate regulations that will govern both the screening of the materials and the conditions of eventual access to some of them by persons outside the government.

The Act has not left the Administrator without standards in executing this sensitive task. It explicitly provides that there is a "need to prevent general access * * * to information relating to the Nation's security" (Section 104(a)(3)). It directs that the regulations recognize "the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege" (Section 104(a)(5)). And it directs that the regulations recognize

---

[5] The Act also provides that the materials must be held available to the judicial process, but in this respect it does not change any expectation of appellant. Appellant does not argue that this exposure is unconstitutional, nor could he. *United States* v. *Nixon, supra.*

**JA90**

16

"the need to give to Richard M. Nixon or his heirs, for his sole custody and use, tape recordings and other materials" not related to abuse of power and "not otherwise of general historical significance" (Section 104(a)(7)). These standards deprive appellant's arguments of much of their force and demonstrate that most of his claims are premature.

In light of these statutory standards, three general questions must be decided before any presidential material will be made public. First, will personnel of the Executive Branch have access to any of the materials, for any purpose? Second, how will the archivists screen the materials and go about making decisions concerning them? Third, what should be done with particular materials? Only the first of these questions is presented in this case, because only it can be resolved by comparing the Act on its face with the requirements of the Constitution.

Most of appellant's arguments rest upon the premise that already his privileges have been abrogated and his privacy invaded. Yet the Act, on its face, carefully preserves all of his privileges and provides for the return of private materials to appellant. Appellant responds that these guarantees are illusory because his privileges will be ignored in fact and private documents will not be returned. These arguments, however, do not attack the statute on its face. To the contrary, Section 104(a)(5) guarantees appellant all of his privileges—including the presumptive privilege for presidential communications recognized in *United States v. Nixon, supra.*

BLEED THROUGH

**JA91**

17

The only claim properly before the Court is that no constitutional set of regulations implementing the Act could be drafted. That claim could be correct only if no eyes other than appellant's may see the materials for any purpose. We do not argue that that claim is unripe—far from it; the Act is in operation, the Administrator has custody of the materials, and screening by archivists is inevitable. The fact that this attack on the face of the statute is ripe for decision does not mean, however, that every hypothetical question concerning future administration of the Act also is ripe for decision. The claim is ripe, but narrow.[6]

Appellant attempts to evade the limitations upon facial challenges by invoking the rights of future Presidents and by arguing against the portions of the regulations already issued. Appellant's attempt to invoke the rights of other Presidents, even if otherwise permissible, fails because the Presidents follow-

---

[6] Appellant's discussion of ripeness (Br. 46-48) is therefore beside the point. The question is not whether this Court should abstain altogether, but whether it should dissect all of the arguments appellant presents. Cf. *Young* v. *American Mini Theatres, Inc.*, No. 74-312, decided June 24, 1976, slip op. 7-11 (declining to decide all tendered challenges to an ordinance affecting First Amendment interests); *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611-614. Some of the consequences of the Act are inevitable and therefore ripe for disposition (see *Buckley* v. *Valeo*, 424 U.S. 1, 114-118), but other consequences predicted by appellant are speculative, abstract, and contingent on the promulgation of regulations and the taking of discretionary action in particular circumstances under those regulations; they therefore are unripe.

**JA92**

18

ing appellant do not agree with the position he attempts to assert on their behalf; President Ford signed and defended the Act, and the incumbent President also supports the Act.[7] Moreover, although some presently effective regulations may be causing appellant cognizable harm, his complaint (A. 17-35) does not challenge any of these regulations, and none was considered by the district court.

If, as appellant contends, the regulations that have been and will be issued conflict with the Act or give insufficient weight to his legitimate interests, those regulations may be attacked and set aside *as violations of the Act*. That hardly would demonstrate that the Act is unconstitutional on its face. Appellant's assertion (Br. 48) that regulations sufficient to protect his interests "are remote from the Administrator's mind" therefore tells us nothing about the facial constitutionality of the Act.

The Court should not accept appellant's invitation to reach out to decide the difficult questions that may be presented by future administration of this Act. It is enough at the present time to determine whether depriving appellant of absolute custody over the materials, and allowing the materials to be screened by disinterested archivists, is constitutional. It would not be a proper exercise of the judicial func-

---

[7] None of this Court's cases allowing parties to invoke the rights of third persons (see, *e.g.*, *Craig* v. *Boren*, No. 75-628, decided December 20, 1976, slip op. 4-6) has dealt with a situation in which the third persons explicitly repudiated the litigant who purported to act in their best interests.

BLEED THROUGH

19

tion under Article III of the Constitution for this Court now to rush to judgment on the many serious and sensitive issues that, in time, may have to be decided. Those issues are not yet so squarely presented that definitive resolution by this Court is necessary or appropriate. As the district court put it (J.S. App. 21a): "Objections [appellant] now presses might be mooted by regulations that protect the very rights whose infringement he now alleges; hypothetical horrors paraded before us as abstract possibilities might never come to pass * * *."

A. Appellant first argues that, under the principle of separation of powers, each branch of government must have the ability to control the disposition of its own papers. Nothing is being done under the Act, however, against the will of the Executive Branch. The Administrator of GSA, the custodian of the materials, is an Executive Branch official, appointed by the President. The Administrator makes all regulations; Executive Branch archivists will do the screening. All that is at stake now is whether employees of the Executive Branch can take custody of and examine materials accumulated during appellant's tenure. A former President cannot rely upon the separation of powers to keep the incumbent President and Executive Branch personnel from examining materials generated and held by the Executive Branch.

In any event, the argument that the Executive Branch is immune from all congressional regulation of its papers is incorrect. The Freedom of Informa-

JA94

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 100 of 450

20

tion Act and many other laws demonstrate this. There is no general principle, based on the separation of powers, forbidding Congress to require that some Executive Branch papers must be made available to the public. The inhibition on disclosure comes, if at all, from presidential or executive privileges.

B. Appellant's argument that the Act annuls his presidential privilege is incorrect. Although a President has a presumptive privilege vis-a-vis the public, he has no similar privilege vis-a-vis his successors and the Executive Branch. The papers appellant seeks to withhold from the archivists were generated by the Executive Branch and paid for with public funds. Many of them may be important to the continuing conduct of the affairs of state. No blanket privilege exists with respect to these documents.

Appellant's privilege might well be breached by exposure of some of these materials to persons outside the Executive Branch. But the Act states (Section 104(a)(5)) that no documents shall be released in violation of such a privilege, and it therefore is not unconstitutional on its face. Whether particular materials or categories of materials are privileged is a question that must be resolved at a later date. Appellant does not argue that all of the 42 million pages of documents the Administrator now holds are privileged, and he therefore cannot maintain that any public disclosure of any document would be inconsistent with his privilege.

C. The Act is not a bill of attainder or of pains and penalties. Appellant argues that he was singled

BLEED THROUGH

**JA95**

21

out for special treatment, and that he has suffered trial by legislature. But the Act was narrow because the need for legislation was narrow. Because of his resignation, appellant's status is unique, and the documents of his presidency thereby assume unusual historical significance. Moreover, at the time of enactment appellant was the only former President whose materials were not in a presidential library. The Act draws a distinction that was justified by the problems confronting Congress. Moreover, it is difficult to understand how an act providing for just compensation for any property taken can be thought to be a bill of pains and penalties.

D. Appellant's argument that the process of screening the materials itself will invade his privacy is unpersuasive. Appellant was a public figure; he willingly sought the office of President, and by doing so he surrendered any "privacy" interest in the way he discharged his duties and administered his public trust.

It is true that, among the documents now held by the Administrator, many are genuinely private because they do not pertain to appellant's performance of his duties. But a relatively small proportion of the documents meet that description, and the Act provides (Section 104(a)(7)) that these shall be returned to appellant once they are identified. Appellant contends that this provision might be narrowly interpreted in a way that enables the public to view his private letters and communications with his family, but there is no reason to suppose that

**JA96**

22

this will be so. The Act should not be construed in a way that makes it unconstitutional; the Court's duty, rather, is to give the Act a construction that preserves it against constitutional challenge."

E. Appellant's assertion that the Act chills his freedom of speech and association must fall with his argument concerning privacy. Not every statute having an incidental effect upon speech is unconstitutional. *Buckley* v. *Valeo*, 424 U.S. 1. The Act would affect appellant's speech only insofar as it improperly invaded his privacy, and there is no facially invalid invasion of privacy here. Moreover, the Act applies only to presidential papers and does not apply to any statements made or received by appellant after leaving office. The Act therefore has no prospective effect upon his speech.

### ARGUMENT

#### THE PRESIDENTIAL RECORDINGS AND MATERIALS PRESERVATION ACT IS NOT UNCONSTITUTIONAL ON ITS FACE

Appellant makes a number of sweeping arguments, which he augments with multiple hypothetical illustrations. He then discusses the illustrations and endeavors to show why the Act would be unconstitutional if it brought about such a parade of horribles. We have argued at pages 11-19, *supra*, that this Court should not now consider these elaborate hypotheticals and the abstract legal principles that might per-

---

" See, *e.g.*, *United States* v. *National Dairy Products Corp.*, 372 U.S. 29, 32; *United States* v. *Harriss*, 347 U.S. 612, 618.

BLEED THROUGH

**JA97**

23

tain to them. There will be time enough to pass upon them when the public access regulations have been promulgated and when decisions with respect to particular materials are being made. Review of such regulations and decisions would provide the courts with the concrete situations that are conducive to proper resolution of the difficult problems that may be involved.

As to what remains, appellant's position is not persuasive. Appellant's "elaborate argument * * * does not need an elaborate answer." *United States* v. *Wurzbach*, 280 U.S. 396, 399 (Holmes, J.).

#### A. The Act Does Not Invade The Autonomy Of The Executive Branch

##### 1. *The principle of separation of powers does not prevent employees of the Executive Branch from screening materials created by the Executive Branch*

Appellant's principal argument is that the Act is an unconstitutional encroachment on powers reserved to the Executive Branch. Far from invading the autonomy of the Executive Branch, however, the Act places the materials in the custody of the Administrator, an executive official responsible to the President, and provides that Executive Branch employees have access to the materials "for lawful Government use, subject to the [Administrator's] regulations" (Section 102(d)). See 41 C.F.R. 105-63.205, 105-63.206 and 105-63.302.

The Act also provides that the materials are to be made available for use in judicial proceedings, but

JA98

24

such availability is expressly subject to any rights, defenses, or privileges which any person may invoke. Although the Act contemplates that the public ultimately will have access to some of the materials of historical value, it also recognizes the need "to protect any party's opportunity to assert any legally or constitutionally based right or privilege" (Section 104(a)(5)) and provides for the return of other materials to appellant (Section 104(a)(7)). The Act thus ensures that there will be no disclosure of the materials to persons outside the Executive Branch in violation of any defenses or privileges asserted by appellant or the Executive Branch. Cf. *United States* v. *Nixon*, 418 U.S. 683.

Appellant is in much the same position he would have occupied if the Administrator, instead of entering into a depository agreement, had refused to allow appellant to take physical possession of the materials and had asserted that the Executive Branch has full dominion over them. Appellant could not have objected to this on separation of powers grounds.

The central point, in this regard, is that nothing is being done against the will of the Executive Branch. All that is at stake now, in a challenge to the facial validity of the Act, is whether Executive Branch employees may have access to papers and other materials accumulated during appellant's terms of office, either to screen the papers and materials for the purposes set forth in the Act or to use them to the extent necessary in carrying out their executive

BLEED THROUGH

**JA99**

25

responsibilities.[9] No case suggests that a former official of the Executive Branch, even a former President, can raise a separation of powers argument to keep the incumbent President and Executive Branch personnel from examining materials generated and held by the Executive Branch.[10]

In short, there is no violation of the principle of separation of powers when Congress acts to preserve the Executive Branch's access to executive papers and materials, and that is all that is involved at this stage of the operation of the Act. Nor, as we discuss immediately below, does the perhaps inevitable dis-

---

[9] Appellant concedes that the Act "does not make the presidential materials available to the Congress—except insofar as Congressmen are members of the public and entitled to access when the public has it" (Br. 119).

[10] Section 105-63.401-2 of the Administrator's proposed public access regulations provides that the Senior Archival Panel of Executive Branch employees processing the materials shall, in limited circumstances, submit specific materials to a Presidential Materials Review Board for a determination whether the materials relate to abuses of government power or otherwise have general historical significance. Cf. 122 Cong. Rec. S5291 (daily ed., April 8, 1976). Two of the four members of this Board (the Librarian of Congress and a nominee of the Council of the Society of American Archivists) are not Executive Branch officials. This provision was disapproved by the House on September 14, 1976 (122 Cong. Rec. H10043-H10044 (daily ed., September 14, 1976)). If it or a similar provision becomes effective, Section 105 of the Act expressly authorizes a judicial action to determine whether such screening of materials by personnel outside the Executive Branch would offend the Constitution. There is no need for this Court to render an advisory opinion on that issue in this case.

**JA100**

26

closure of nonprivileged materials threaten interference with the operations or proper independence of the Executive Branch. Accordingly, appellant's contention that the public interest in preserving the materials is not sufficiently substantial to justify, or could not under any circumstances justify, a violation of the principle of separation of powers (Br. 102-121) is simply beside the point; no such violation has occurred or is threatened.

### 2. *The Act does not presage a wholesale invasion of the prerogatives of the Executive Branch*

Notwithstanding the fact that the Act is administered by the Executive Branch, that the incumbent President does not object to its provisions, and that all legitimate privileges are preserved by Section 104(a)(5), appellant argues that the Act is unconstitutional because it invades the autonomy of the Executive Branch to control its own affairs. This argument fails because its premise is false; with a possible exception not here relevant,[11] the Act does

---

[11] As the district court noted (J.S. App. 25a-26a n. 17), the constitutionality of Section 104(b), which authorizes a single House of Congress to disapprove regulations of the Administrator, is unsettled. See *Buckley* v. *Valeo, supra,* 424 U.S. at 140 n. 176. Cf. *id.* at 120-124, 137-141. At least in some forms, one-house veto provisions may well be unconstitutional attempts by Congress to participate in the detailed administration of a statute, which is fundamentally an Executive Branch function. See Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63 Cal. L. Rev. 983 (1975). The one-house veto provision, however, is not in issue here. The district court did not pass upon it, and appellant does not claim any right under the disapproved regulations.

BLEED THROUGH

**JA101**

27

not interfere with the constitutional prerogatives of the Executive Branch.

An Act of Congress does not invade the "autonomy" of the Executive Branch simply because it requires the Executive Branch to act in specified ways. The Constitution, which commands the President to "take Care that the Laws be faithfully executed" (Article II, Section 3), makes the President a servant of laws passed within the scope of a grant of power to Congress. Congress has frequently enacted measures providing for disclosure of documents in the possession of the Executive Branch. The Freedom of Information Act, 5 U.S.C. (Supp. V) 552, the Privacy Act of 1974, 5 U.S.C. (Supp. V) 552a, the Federal Records Act, 44 U.S.C. 2101 *et seq.*, and the statutes regarding census data, 13 U.S.C. 8-9, and tax returns, 26 U.S.C. 6103, are a few of many such acts. Legislation of this sort has never been considered a facially invalid invasion of the autonomy of the Executive Branch. Cf. *Environmental Protection Agency* v. *Mink*, 410 U.S. 73; *Administrator, Federal Aviation Administration* v. *Robertson*, 422 U.S. 255.[12]

---

[12] Appellant's analogy of presidential materials to judicial drafts (Br. 109-112) is not convincing. Each case reaching a court is a separate event, and only the opinion of the court is a precedent. But the situation with respect to executive papers is otherwise. The conduct of the Nation's government by the Executive Branch is a continuous process, in which unpublished documents may hold the key not only to proper historical understanding but also to successful conduct of ongoing affairs. As the district court put it (J.S. App. 52a-53a), "[g]overnmental programs and policies do not expire every

28

Like the documents governed by these statutes, presidential materials are an appropriate subject for legislation.[13] Since *Folsom* v. *Marsh*, 9 Fed. Cas. 342, it has been recognized that regardless of where legal title lies, the government's interest in disclosure or nondisclosure of presidential materials can take precedence over the desires of the authors. As Mr. Justice Story there noted (*id.* at 347), "from the nature of the public service, or the character of the documents, embracing historical, military, _ diplomatic information, it may be the right, and even the duty, of the government, to give them publicity, even against the will of the writers."

Legislation regulating access to the materials from appellant's tenure as President is supported not only by the strong need for access by government officials to the materials but also by the need to have access for general historical purposes. For example, in carrying out their duties, officials of the succeeding administration found it necessary to review portions of the presidential materials from appellant's adminis-

---

four or eight years; the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." Procedures suitable for the records of individual jurists therefore may be quite intolerable if applied to executive officials.

[13] So are meetings by federal agencies. The Government in the Sunshine Act, Pub. L. 94-409, 90 Stat. 1241, adding 5 U.S.C. 552b, requires federal agencies to transact their business in open meetings. Although this may inhibit discussion to some extent, it would be difficult to argue that the Government in the Sunshine Act is a facially invalid invasion of the autonomy of the Executive Branch.

BLEED THROUGH

**JA103**

29

tration concerning SALT negotiations with the Soviet Union, our relations with the People's Republic of China, the Vietnamese negotiations concluded in 1973, and negotiations regarding the Middle East situation (A. 259-261). Some important documents, such as memoranda of conversations between appellant and foreign leaders, can be found only in the materials at issue here (A. 259, 261, 698-701). Far from constituting a breach of executive autonomy, the Act therefore is an appropriate means of ensuring that the Executive Branch will have access to the materials necessary to the performance of its duties.

Presidential materials, which by and large are produced by public employees at public expense, are affected at their creation by a public interest (*Folsom* v. *Marsh, supra*) that gives the Nation important rights to them. Congress is empowered by the Property Clause (Article IV, Section 3) to "make all needful Rules and Regulations respecting * * * Property belonging to the United States." Although the Property Clause would not enable Congress to override a legitimate claim of privilege, it establishes authority to legislate with respect to materials in which the United States has an interest.[14]

As a regulation of property affected by the public interest, the Act is constitutional without regard to

_____

[14] "[D]eterminations under the Property Clause are entrusted primarily to the judgment of Congress" (*Kleppe* v. *New Mexico*, 426 U.S. 529, 536), and this Court has repeatedly given the Property Clause an "expansive reading" (*id.* at 539). See also J.S. App. 63a-66a n. 49.

**JA104**

30

whether appellant has a valid claim of ownership to the materials. Appellant's discussion of the tradition of presidential ownership of such materials (Br. 90-102) therefore is not pertinent.[15] To the extent that the Act interferes with any of appellant's property interests, Congress has exercised its power of eminent domain and provided for whatever compensation may be constitutionally necessary.[16] Use of the eminent domain power to acquire and preserve the historical record is proper. Cf. *Berman* v. *Parker*, 348 U.S. 26, 32; *United States* v. *Gettysburg Electric Ry.*, 160 U.S. 668. Once the materials have been so acquired, the Property Clause confers amply authority for their disposition under the Act.

We would have greater pause if the Act hindered the Executive Branch in carrying out its functions under Article II of the Constitution. The Executive Branch has a right to "autonomy" in the sense that Congress cannot so hamstring its operations in executing the laws that its ability to function as an

---

[15] Appellant concedes that his alleged ownership interest may be subjected to some forms of legislative restriction, apparently without any requirement of compensation (Br. 121).

[16] We do not concede that the Act is a "taking." The Act preserves appellant's access to the materials. Although it may diminish their monetary value to appellant, that is not always enough to constitute a "taking." *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590. This issue is not before the Court, however; appellant seeks not just compensation but full possession and control of all the materials at issue.

BLEED THROUGH

**JA105**

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 111 of 450

31

executive is frustrated.[17] Thus the Act would be open to question if it so threw open the process of decision-making in the Executive Branch that it became difficult for the President to obtain candid advice from the other Executive Branch officials, or for those officials to speak frankly to each other. Cf. *United States* v. *Nixon, supra*, 418 U.S. at 705-706, 715; *National Labor Relations Board* v. *Sears, Roebuck & Co.*, 421 U.S. 132, 149-155.

The Act does not create this sort of hazard, however; because it recognizes the importance of privacy and preserves existing privileges, and because the Executive Branch, acting through the Administrator, is entrusted with control of the day-to-day administration of the materials, we submit that the Act does not create such dangers of widespread breach of confidence that it is unconstitutional on its face. Any prospect of widespread breach of confidence can be detected, and rectified, when the Act is placed into operation. Cf. *Buckley* v. *Valeo, supra*, 424 U.S. at 68-72 (constitutionality of disclosure of names of contributors must be assessed case-by-case rather than on the face of the statute).

---

[17] Appellant incorrectly relies (see, *e.g.*, Br. 103-108) upon *Buckley* v. *Valeo, supra, Myers* v. *United States*, 272 U.S. 52, and similar cases for the proposition that the Executive Branch is entitled to some broader scope of freedom from congressional interference. Those cases, however, involved only the President's power to select and dismiss officers of the United States, the persons who would execute the laws. They do not establish any limitation upon the power of Congress to prescribe substantive rules that properly appointed officers of the United States must follow.

**JA106**

32

### B. The Act Does Not Breach Appellant's Privilege With Respect To Confidential Presidential Communications

The Act is consistent with the qualified privilege for confidential presidential communications, which, as this Court recognized in *United States* v. *Nixon, supra*, 418 U.S. at 715, is founded upon "the singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article."

That privilege is based upon the harm that could be done to the decision-making process by public disclosure of confidential communications. It therefore does not pertain to all presidential materials (although an incumbent President may have other privileges with respect to other presidential materials), and it does not pertain to disclosure to incumbent officials of the Executive Branch. See *Folsom* v. *Marsh, supra*. The business of government requires that the President and other executive officials have access to the governmental papers of their predecessors. The privilege for confidential communications does not bar access by the Executive Branch to papers and materials generated by the Executive Branch for the use of the Executive Branch.[18] Indeed, the pur-

---

[18] Appellant asserts that *United States* v. *Nixon, supra*, recognized a presidential privilege that would bar access by an executive official. That is incorrect. *United States* v. *Nixon* involved a judicial subpoena for papers that were required to be used in the judicial process. The subpoena required the delivery of the materials to the court. In a very real sense, therefore, that case involved not only public access (the materials were to be introduced in evidence in open court) but also

BLEED THROUGH

**JA107**

33

pose of the privilege is to facilitate the flow of information within the Executive Branch; it would be an ironic frustration of that purpose to permit the privilege to place each administration in a separate watertight compartment and thereby dam the flow from one administration to the next.

We do not imply that appellant has no presidential privilege. The district court expressed doubt (J.S. App. 39a-40a) whether a former President may assert a presidential privilege, but we do not share that doubt. This Court held in *United States* v. *Nixon, supra*, that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.[19]

---

access by a separate branch of government. In its present posture, this case involves neither public access nor access by anyone outside the Executive Branch.

[19] For similar reasons, the attorney-client privilege survives disbarment of the lawyer and termination of the confidential relationship. It is for the benefit of the client, not for the

34

Furthermore, in view of the fact that the privilege serves societal, not individual, purposes, when a private person seeks access to presidential communications it should not matter whether the issue of privilege is raised by an incumbent President, a former President, or no one at all. The need for confidentiality exists no matter who raises the privilege.[20] Cf. Letter of Harry S. Truman to Harold H. Velde, dated November 12, 1953, reprinted at 120 Cong. Rec. 33419 (1974), in which former President Truman invoked a privilege of confidentiality after leaving office.

Our agreement with appellant in these regards, however, does not help him in the instant case. The privilege of confidentiality pertains to disclosures outside the Executive Branch, but not to disclosures within it. The President is a public trustee with inside knowledge and awesome responsibilities. He is answerable at the polls for his mistakes, and he is subject to political pressure from Congress. These

---

benefit of the lawyer. There, as here, the free exchange of views can be promoted only by the promise of enduring confidentiality. See McCormick, *Evidence* § 94 (Cleary ed. 1972) (the privilege survives the death of the client in most cases). Cf. *Fisher* v. *United States*, 425 U.S. 391, 402-405.

[20] We discuss here only the privilege for confidential communications. As appellant himself acknowledges (Br. 81-90), a difference must be recognized between the privilege for state secrets and sensitive information, which may be raised only by the incumbent officeholder, and the privilege for confidential communications and pre-decisional advice, which may be raised by a former President.

BLEED THROUGH

**JA109**

35

things separate an incumbent from a former President, and they counsel against allowing a former President to stop up the flow of information to the incumbent and his staff. The government should not be required to start from scratch each time a new President assumes office.

At the present time, and for the foreseeable future, only appellant, officials of the Executive Branch in the conduct of their official duties, and archivists who will screen and classify the materials, have access to them. No access by the public is imminent, and before any such access is provided all materials will undergo a rigorous scrutiny designed to separate privileged matters (which will not be disclosed) from nonprivileged matters (which, if they are not private, will be disclosed under appropriate restrictions). Appellant has not made a persuasive argument that this screening process must lead to disclosures in violation of his privilege; indeed, it would be difficult to do so, in light of Section 104(a)(5)'s explicit preservation of his privilege.

Access by the archivists themselves is not meaningfully different from screening by a court *in camera*; it poses no realistic danger of breach of confidence or inhibition of discussions among executive officials. See *United States* v. *Nixon, supra*, 418 U.S. at 706, 714-716. See also *Department of the Air Force* v. *Rose*, 425 U.S. 352, 381-382 (*in camera* inspection, together with redaction of private details, will safeguard privacy); *Kerr* v. *United States District Court*, 426 U.S. 394, 404-406; *Dellums* v. *Powell*, C.A.D.C., No. 76-1336, decided January 28, 1977, slip op. 16-17.

**JA110**

36

Difficult questions still may arise concerning particular screening techniques and eventual public access to particular types of materials and subject matters, but consideration of these questions should not take place in the relatively abstract setting afforded by this case. A more concrete dispute, concerning particular techniques or subject matters, would provide a better perspective. The opinion of the district court manifests great solicitude for appellant's rights. It observes that access by nonarchivist executive officials to certain tyes of documents may be forbidden (J.S. App. 26a-27a n. 18) and that concern for appellant's rights must be "paramount" (*id.* at 22a); it suggests ways in which the screening of the materials can be accomplished with a minimum of intrusion (*id.* at 29a-31a).

There is no basis for appellant's apparent belief either that his legitimate interests will be overlooked if and when he seeks judicial review of the regulations governing screening and public access or that the presumption in favor of privilege has been reversed (Br. 69). The privilege is no more "reversed" by the Act than it is when a person attempts to secure materials, by subpoena, from appellant's hands. In either case appellant would be required to invoke his privilege; once it had been invoked, however, the burden would be on the proponent of disclosure.

In any event, only a small portion of the 42 million pages of documents and more than 800 reels of tape in issue could be subject to a legitimate claim

BLEED THROUGH

**JA111**

37

of privilege by appellant.[21] The privilege does not attach to materials unrelated to the performance of executive duties.[22] *United States* v. *Nixon, supra*, 418 U.S. at 703-714. Not even all materials related to the performance of executive duties are privileged; the privilege applies only to communications originating in confidence [23] and not yet disclosed to the public. Some of the materials have become matters of public record through appellant's voluntary disclosures and are no longer privileged. See, *e.g.*, 10 Weekly Comp. of Pres. Docs. 450 (1974). Between 16 and 20 hours of edited tapes were played at the criminal trial of four of appellant's aides. These tapes are no longer confidential. *United States* v. *Mitchell*, C.A.D.C., No. 75-1409, decided October 26, 1976, petition for a writ of certiorari pending *sub*

---

[21] Appellant states that he is primarily concerned about the 200,000 documents that he personally prepared or reviewed (A. 514-516), and about "records of the 'internal operations' of a President's office" (Br. 13).

[22] Some materials unrelated to appellant's presidential duties may be subject to another privilege, such as attorney-client or husband-wife. But it may be anticipated that few of the documents are subject to such privileges, and it is impossible to determine which these are until the archivists have examined them.

[23] Appellant would define the scope of the privilege more broadly (Br. 70-73). But since much of the materials at issue would be unprivileged under any conceivable definition, and because public disclosure of even arguably privileged material is not imminently threatened, judicial resolution of this aspect of the disagreement between the parties must await a more concrete dispute, if one ever arises, involving a determination to disclose specified materials.

**JA112**

38

*nom. Nixon* v. *Warner Communications, Inc.,* No. 76-944. Most of the material therefore falls outside the scope of any recognizable privilege.

Finally, appellant cannot claim that all of the materials were created with the expectation that they would be kept privileged or private in perpetuity. Every President since Hoover has deposited most of his presidential materials in a library pursuant to the Presidential Libraries Act, 44 U.S.C. 2101, 2107 and 2108 (see J.S. App. 43a). Only a few presidential materials have been withheld. Each President or his representative has allowed professional archivists to screen the materials and to suggest appropriate restrictions upon access; appellant had planned to follow a similar course (A. 182-184). The sheer bulk of the materials would make any other course infeasible (J.S. App. 72a, 83a n. 59). With or without the Act, then, eyes other than appellant's would screen most of the materials and separate the public from the private, the privileged from the unprivileged, the sensitive from the mundane.

### C. The Act Is Not A Bill Of Attainder

Bills of attainder are "legislative acts, no matter what their form, that [1] apply either to named individuals or to easily ascertainable members of a group [2] in such a way as to inflict punishment on them [3] without a judicial trial * * *." *United States* v. *Lovett,* 328 U.S. 303, 315; *United States*

BLEED THROUGH

**JA113**

39

v. *Brown*, 381 U.S. 437, 448-449.[24] Noting that Title I of the Presidential Recordings and Materials Preservation Act applies only to the presidential materials of his administration and refers to him by name, appellant argues that the Act is a bill of attainder (Br. 130-141). The Act, however, lacks two necessary elements of a bill of attainder: it does not inflict punishment, and it does not encroach upon the judicial function.

That Title I of the Act refers to appellant by name and applies only to his presidential materials does not render the Act unconstitutional.[25] As the district

---

[24] At common law, "bills of attainder" imposed the death sentence, while legislative acts imposing lesser sanctions were known as "bills of pains and penalties." The Constitution proscribes bills of attainder and bills of pains and penalties alike. *United States* v. *Brown, supra,* 381 U.S. at 441, 447; *Cummings* v. *Missouri,* 4 Wall. 277, 323.

[25] This Court's equal protection decisions show that a legislature can constitutionally address specific problems directly. See, *e.g., City of New Orleans* v. *Dukes,* No. 74-775, decided June 25, 1976; *Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 489. Congress also can attack a problem piecemeal. See, *e.g., Mathews* v. *DeCastro,* No. 75-1197, decided December 13, 1976; *Dandridge* v. *Williams,* 397 U.S. 471. The test of validity under equal protection principles is whether the classification is rationally related to the problem at hand. *Weinberger* v. *Salfi,* 422 U.S. 749, 768-769. These precepts apply to the Act at issue no less than to broad social welfare measures such as the Social Security Act, and the decision by Congress to address in detail the problems of the disposition of appellant's papers therefore comports with equal protection principles. Appellant apparently concedes this much, for he has abandoned his former argument (J.S. 28) that the Act violates the equal protection component of the Due Process Clause of the Fifth Amendment.

---

40

court observed (J.S. App. 93a-94a), appellant's status and the materials of his administration are unique. Appellant, alone among all Presidents, resigned in the face of impending impeachment by the House of Representatives; indeed, the allegations against him were sufficiently serious that after his resignation appellant accepted a pardon for all crimes he may have committed while in office. The circumstances leading to the recommendation by the House Judiciary Committee that appellant be impeached cast a pall over his conduct in office. The materials of his administration are "peculiarly informative" (J.S. App. 58a) with regard to these unusual circumstances and therefore are especially fit for historic preservation.

Other more mundane things also set appellant apart. When Congress acted, the presidential papers of all other recent past Presidents were already available in presidential libraries, former President Ford, then the incumbent, needed his presidential papers to carry out his duties,[26] and the papers of future Presi-

---

[26] On December 13, 1976, President Ford donated his presidential, vice-presidential, and congressional materials to the United States for preservation in a presidential library and museum. 12 Weekly Comp. of Pres. Docs. 1709 (1976). The deed provides for the prompt processing of all materials by archivists, and Mr. Ford did not retain any power to select them or influence their conduct (*id.* at 1712-1713). Specified personal items, however, are excluded from the gift (*id.* at 1711), and Mr. Ford restricted access (except by archivists) to designed classes of materials such as personnel investigations, confidential communications, and classified materials (*id.* at 1713).

BLEED THROUGH

**JA115**

41

dents posed no immediate problem. Moreover, Title II of the Act establishes a special commission to study and recommend appropriate legislation regarding the preservation of the records of future Presidents and all other federal executive, legislative, and judicial officials.

Congress considered bills that would have governed the papers of all federal officials. 120 Cong. Rec. 33855, 33857-33863, 37902 (1974). That approach was rejected, however, after sponsors of the Act emphasized the urgency of the situation regarding appellant's materials. Members of Congress also pointed out differences between a President's and a legislator's papers; they expressed concern about the fact that the costs of a statute applicable to all officials were unknown. 120 Cong. Rec. 33857, 33959, 33962, 37902 (1974) (remarks of Senators Nelson and Ervin and Representative Brademas).

Congress believed that it should act promptly with respect to appellant's presidential materials; in the view of the responsible committees, appellant's depository agreement with GSA created an imminent danger that the tape recordings would be destroyed if appellant, who had contracted phlebitis, were to die. S. Rep. No. 93-1181, 93d Cong., 2d Sess. 4 (1974); H.R. Rep. No. 93-1507, 93d Cong., 2d Sess. 2-3 (1974); 120 Cong. Rec. 33874 (1974) (remarks of Senator Huddleston).[27] In addition, several legis-

---

[27] There was some confusion whether the depository agreement (A. 41) called for the destruction of the tapes immediately upon appellant's death or only upon his death more than

42

lators believed that Congress should act promptly to overcome the "greatly lower public confidence in our Government" attributable to the events that almost led to appellant's impeachment. 120 Cong. Rec. 33873 (1974) (remarks of Senator Cranston); 120 Cong. Rec. 33875 (1974) (remarks of Senator Huddleston).

The Act Congress designed to cope with these pressing problems lacks the punitive intent that is an essential element of a bill of attainder. The Act does not contain an express declaration of guilt, nor does it impose a punitive sanction. Cf. Comment, *The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification*, 54 Cal. L. Rev. 212, 214 (1966).

Appellant asserts that the Act is punitive because it has deprived him of ready access to his presidential materials and because the materials are to be processed by archivists whom he has not selected (Br. 104). Under appellant's depository agreement with GSA, however, appellant willingly surrendered access to the materials for an initial three years (five years in the case of the tape recordings), except through a two-key system under which the consent of the Administrator was necessary (J.S. App. 135a). The Act (Section 102(b)), and its implementing regulations (41 C.F.R. Subpart 105-63.2, 105-63.301), do not deprive appellant of substantial

---

five years after the initial deposit. Cf. Appellant's Br. 159 n. 69.

BLEED THROUGH

**JA117**

43

rights of access preserved in the depository agreement; to the contrary, they ensure appellant's right of access to the materials, including his right to obtain copies on request (see J.S. App. 13a, 107a). The latter provision minimizes any inconvenience to appellant that might otherwise arise from the fact that the materials are stored in the Washington, D.C., area rather than in California, as the depository agreement had envisaged.

Even if the Act were seen as imposing discomfort or inconvenience, this would not make it a bill of attainder.

> The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation * * *.

*Flemming* v. *Nestor*, 363 U.S. 603, 614, quoting from *De Veau* v. *Braisted*, 363 U.S. 144, 160 (plurality opinion). The legislative history of the Act demonstrates that it is a regulatory statute designed to preserve, process, and make available, with appropriate limitations, the materials relating to appellant's Presidency. S. Rep. No. 93-1181, *supra*, at 1; H.R. Rep. No. 93-1507, *supra*, at 1.[28] The object

---

[28] Some members of Congress who opposed the Act characterized it as a bill of attainder or a punitive measure. *E.g.*, 120 Cong. Rec. 33871, 33963, 33968, 33975 (1974) (remarks of Senators Hruska, H. Scott, Thurmond, W. Scott). Those

**JA118**

44

"on which the enactment in question was focused" (*Flemming* v. *Nestor*, 363 U.S. 603; see also *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168-169), was the legitimate concern relating to the materials of appellant's Presidency. Congress was not seeking to punish him.[29] See J.S. App. 100a.

who sponsored or supported the Act, however, expressly disavowed that purpose. *E.g.*, 120 Cong. Rec. 33872, 33959, 33874-33875 (1974) (remarks of Senators Ervin and Huddleston). For example, Senator Huddleston stated (120 Cong. Rec. 33875 (1974)):

> I[t] seems to me that the most important thing we can do in the aftermath of a tide of events that led to the resignation of a President of the United States and numerous indictments and convictions of high public officials is to assure that the American people know the complete story—not just the present generation, but all generations to come.
>
> It should be made clear that this proposed legislation is not designed to cause Mr. Nixon any additional embarrassment, humiliation or suffering. In my opinion his resignation from the highest office of the land has been substantial punishment in itself and we should not seek to inflict more. This is why the pending legislation affords the former President every protection and consideration while at the same time protecting the right of the public to be completely informed about a matter that affects us all so intimately.

[29] Appellant argues that the Act effectively punishes him because it will compel him to devote time and money to making arguments (both to the Administrator and in court) designed to avert disclosure of private or privileged matters. He contends, in short, that he has been condemned to become a continual litigant. Although we do not gainsay the hardship such a status may entail, we believe that here, too, appellant's arguments are premature. Once regulations have been promulgated and the process of classification has begun,

BLEED THROUGH

JA119

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 125 of 450

45

The Act also lacks a further element of a bill of attainder, a "trial by legislature." *United States* v. *Brown, supra,* 381 U.S. at 442. Section 105 of the Act expressly provides for judicial determination of whether the Act deprives any individual of property and, if so, what amount should be paid as just compensation. Section 104(a)(5) preserves appellant's privileges, and any question concerning their applicability can, if necessary, be resolved by a court. Section 104(a)(7) protects appellant's right to purely personal materials; Section 102(c) ensures his access to all of the materials. These provisions, and others that safeguard appellant's interests,[30] refute the claim that the Act supplants the judicial process in the manner of a bill of attainder.

Appellant's argument that the Act is a bill of attainder would appear to reach every legislative exercise of the power of eminent domain over specifically designated property of a specific individual. In each

---

it may become clear that appellant and the Administrator agree on the proper disposition of many categories of materials. In any event, appellant would have faced the need to litigate many of his claims of privilege and privacy whether or not the Act had been passed. Several suits seeking access to the materials had been filed (see pages 6, 10, *supra*), and appellant would have been required to raise his privilege and privacy arguments in defense to these and other suits, subpoenas, and requests for discovery.

[30] See, *e.g.,* Section 102(b), which preserves all of appellant's "rights, defenses, or privileges" in any judicial proceeding involving a subpoena of the materials.

**JA120**

46

case there is a legislative assertion of control over property on the basis of legislative determinations of fact and purpose. But an Act of Congress expressly providing for a judicially-computed award of "just compensation" for any property interest taken cannot be thought to be either an invasion of the province of the judiciary or an imposition of penalties.

For example, the Act appellant challenges is functionally little different from the statute upheld in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, which provided for the transfer of the railroad properties of a small number of railroad companies to a governmentally organized corporation. No one supposed that that statute was a bill of attainder. Neither is the Act involved here. Indeed, to the extent the statutes can be distinguished, the present Act effects the lesser intrusion: Congress simply has placed conditions on the authority of the Administrator of General Services to release materials that were generated by and are in the possession of the United States, and appellant ultimately will be given the materials or facsimiles.

In contending that the Act unconstitutionally invades the province of the judiciary, appellant argues that the Act makes the implicit determination that he would be an unreliable custodian of the materials, and that such a finding can be made only by a court (Br. 137). It is true that, in debating the Act, legislators reviewed the Watergate events, including the 18½ minute erasure in the June 20, 1972, tape made

BLEED THROUGH

**JA121**

47

while appellant had custody of the recordings, the discrepancies between appellant's transcripts of the recordings and those of the House Judiciary Committee, and the fact that appellant had been named by a grand jury as an unindicted conspirator. See, e.g., 120 Cong. Rec. 33859, 33958, 33959 (1974) (remarks of Senators Javits and Ervin). These factors, however, were relevant to the legislative task of determining how best to safeguard the materials. The very fact that questions had arisen concerning appellant's reliability as a custodian [31] made it reasonable for Congress, in the exercise of caution, to preserve the Executive Branch's control over the original materials and to provide for their processing by disinterested archivists.

In sum, although the Act specifies appellant by name, Congress was acting to resolve a situation unique to him and the materials of his presidency.[32]

---

[31] Appellant's argument that only the courts may determine whether he would be a reliable custodian rings hollow in light of his responses at the deposition taken in the present case. When appellant was asked whether he had deliberately misrepresented in his public statements as President the contents of the tape recordings, he refused to answer, invoking a claim of privilege and asserting that the question was irrelevant (A. 581-590).

[32] United States v. Lovett, supra, does not support appellant. In Lovett the Court held that a statute removing from government employment three persons designated by name was a bill of attainder. The statute at issue in Lovett was intended to bypass the judicial process by branding the three persons as subversives and penalized them for their past ac-

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 128 of 450

48

The Act lacks the punitive design and consequences, and the invasion of the judicial function, that are essential elements of a bill of attainder.

### D. Review Of The Materials By Archivists Does Not Invade Appellant's Privacy

Appellant renews his arguments, rejected by the district court (J.S. App. 67a-93a), that the Act invades his privacy and abridges his freedom of expression and association. We discuss these in turn.

Appellant was, for the term of his Presidency, the quintessential "public figure." See, *e.g.*, *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265; *New York Times Co.* v. *Sullivan*, 376 U.S. 254. His voluntary decision to seek the Presidency relinquished any "privacy" interest in the way he conducted that office and administered the public trust. See *Uniformed Sanitation Men* v. *Sanitation Commissioner*, 392 U.S. 280, 284.

A former President may have a "privacy" interest in some of his documents, but that interest would pertain to only a few of the materials in issue here. Most of the papers were prepared or seen by others; many were circulated widely within the government,

---

tivities. For the reasons discussed in the text, the Presidential Recordings and Materials Preservation Act does not have these features. In it, Congress simply expressed a judgment that the *materials* accumulated during appellant's terms should be preserved; any judgment it expressed about appellant was incidental to this end, and specifying appellant by name was simply a convenient way of designating the materials sought to be preserved.

BLEED THROUGH

**JA123**

49

and appellant would have no privacy interest in them. *United States* v. *Miller*, 425 U.S. 435. Appellant himself prepared or reviewed relatively few of the documents. Portions of some of them have been disclosed or discussed in public and therefore no longer are private. See *United States* v. *Dionisio*, 410 U.S. 1, 14; *Katz* v. *United States*, 389 U.S. 347, 351.

Appellant expected to donate most of his materials to a presidential library, where they would be screened by archivists and read by historians and members of the public. Appellant's principal purpose in making the tape recordings was to preserve the conversations for historical purposes (A. 562-563), a purpose that could be fulfilled only by allowing individuals other than appellant to have access to them. The nature of the tapes and most of the documents, and the purpose of their creation, thus demonstrate that as to them the Act does not invade an area in which appellant had an expectation of privacy.

Whatever "privacy" interest appellant may have in the remaining materials (such as communications to and from his family) is insufficient, in light of the strong public interest in preservation of most of the nonprivate materials, to bar archivists from reviewing all the materials initially for the narrow purpose of separating the public from the private.

The substantiality of the interests served by preservation of the materials is self-evident. We have discussed the need of officials of the Executive Branch to have access to the materials in order to

**JA124**

50

conduct the affairs of state. The Act also ensures that materials of historical significance will be preserved and professionally processed in order to make available an accurate historical record (J.S. App. 49a-52a), and it ensures that materials will be preserved for use in judicial proceedings (Section 104 (b)).

Congress reasonably perceived that these and other legitimate public interests would be jeopardized if appellant had the sole right to screen the materials and to separate the private from the public. For one thing, appellant's view of what is "private" may be more generous than that which would be taken by Congress, the Executive Branch, or a reviewing court. Use of disinterested archivists to do the screening leads to the application of generally uniform standards; if the archivists use incorrect standards, their errors may be corrected by a court.[33] If appellant alone had access to the materials, however, no correction of errors could occur.

Congress also was concerned about the possibility of other sorts of errors or distortions during the sorting process. For example, during the time appellant had custody of the tape recordings an unexplained 18½ minute erasure was made in one tape sought by the Special Prosecutor. 9 Weekly Comp.

_____

[33] Appellant's argument (Br. 174-177) that archivists are not judges and cannot be relied upon to protect his privacy is beside the point. If it is deemed necessary, the archivists' decisions will be reviewed by a judge or judges, and the appropriate legal standard of privacy will be judicially enforced.

BLEED THROUGH

JA125

51

of Pres. Docs. 1370, 1372 (1973); H.R. Rep. No. 93-1305, 93d Cong., 2d Sess. 127 (1974). During the hearings on the proposed articles of impeachment appellant released documents that he represented to be transcripts of the taped conversations. 10 Weekly Comp. of Pres. Docs. 450-458 (1974). After the House Judiciary Committee obtained the recordings, it concluded that appellant's transcripts had "proven to be untrustworthy" and contained "significant omissions, misattributions of statements, additions, paraphrases, and other signs of editorial intervention * * *" (H.R. Rep. No. 93-1305, supra, at 205, 129).

Congress took pains to establish a mechanism to mitigate the problems caused by the archivists' review of genuinely private materials. The Act acknowledges the need to give appellant "sole custody and use" of all materials not related to the abuses of power generically referred to as "Watergate" and not of general historical significance (Section 104(a) (7)).[34] The initial screening will be conducted by disinterested archivists; screening of this sort, like submission of materials to a court in camera, does not

---

[34] Appellant asserts (Br. 143-145) that the Administrator will construe Section 104(a)(7) in a way that fails to recognize appellant's legitimate privacy interests. This assertion does not, however, establish that the Act is unconstitutional on its face. Improper decisions by the Administrator may be attacked as violations of the Act, without resort to constitutional arguments. Moreover, when there is need to do so, the Court should construe the Act in a way to save its constitutionality and not, as appellant seemingly contends, in a way to defeat its constitutionality.

52

create a significant invasion of privacy. *Department of the Air Force* v. *Rose*, *supra*.

To the extent screening by the archivists is itself an invasion of privacy, the intrusion is attributable in part to appellant's practice of commingling public and private documents (see J.S. App. 63a). He should not now be entitled to claim that the statute is unconstitutional on its face because the archivists, "whose record for discretion in handling confidential material is unblemished" (*id.* at 45a),[35] will be required to sift through private documents.[36]

---

[35] Appellant suggests (Br. 174-177), but does not expressly argue, that this finding by the district court is clearly erroneous. It is not. The finding is amply supported by the record (*e.g.*, A. 232-235, 245-246, 264, 266-267, 346-347), and appellant cites no record evidence of any past abuses of confidentiality by archivists. Indeed, Dr. Herman Kahn, upon whom appellant relies (Br. 31-32), testified at the hearings on an alternative bill to the Act:

> [S]ince 1945 the papers of the Presidents have become the property of the Government immediately upon the President's leaving the White House and it has been the responsibility of the appropriate officials of the Government to see that no one lays hands on them who might do them harm. I think that responsibility has been very faithfully carried out.

Hearings on H.R. 16902 and Related Legislation before the Subcommittee on Printing of the Committee on House Administration, 93d Cong., 2d Sess. 97 (1974).

[36] Appellant argues that this sifting violates the Fourth Amendment (Br. 147-164, 173-174). This argument overlooks the fact that the materials always have been, and still are, in the lawful possession of the United States. They never were seized from appellant within the meaning of the Fourth

BLEED THROUGH

53

Finally, as is the case with appellant's other argu-
ments, more particularized claims can be made once
the regulations have become effective and initial de-

---

Amendment. *Couch* v. *United States*, 409 U.S. 322, 335-336.
Accordingly, appellant's effort to analogize the Act to a gen-
eral warrant (Br. 147-152) is mistaken, and his reliance upon
*Sanford* v. *Texas*, 379 U.S. 476, erroneous. Moreover, the
proscription of general warrants would not in any event ex-
tend to a governmental assertion of a possessory interest sub-
ject to the safeguard of just compensation.

Appellant contends that, if the materials were in his hands,
the government could not obtain all of them by subpoena (Br.
151-152). This might well be so, but in light of the special
public interest that affected the materials at their creation
and the fact that most of them were generated by government
employees, the Fourth Amendment standards of reasonable-
ness that apply to subpoenas served upon private persons
would not apply: there should be no need to establish reason-
ableness before personnel of the Executive Branch may exam-
ine documents created by the Executive Branch itself. Ordi-
narily the Self-Incrimination Clause of the Fifth Amendment
would be the most important safeguard against intruding
subpoenas, but it would apply only when the act of produc-
tion was itself a testimonial act. See *Fisher* v. *United States*,
*supra*. The Self-Incrimination Clause does not apply to ap-
pellant's materials, however, because he has been pardoned
for all crimes he may have committed as President, and the
materials therefore cannot incriminate him.

Furthermore, neither the Fourth nor the Fifth Amendment
prevents officials of the government from seizing and search-
ing through documents to find that which they seek. *Andresen*
v. *Maryland*, No. 74-1646, decided June 29, 1976 (upholding
a comprehensive examination of an attorney's files to find
papers related to a specified fraudulent transaction). Appel-
lant observes that the inspection under the Act is not a search
for evidence of a particular crime, but that does not help him.
Searches can be conducted to find out whether crimes (or civil
violations of regulations) have occurred in the first place. See
*United States* v. *Biswell*, 406 U.S. 311. In *Biswell* the Court

**JA128**

54

terminations are made with respect to what is private and what is public. "Objections [appellant] now presses might be mooted by regulations that protect the very rights whose infringement he now alleges; hypothetical horrors paraded before us as abstract possibilities might never come to pass * * *" (J.S. App. 21a). There will be time enough for further consideration of appellant's privacy claims if it should become clear that the archivists are abusing their offices, or if the Administrator should designate as "public" any category of materials that appellant believes are "private."

---

upheld a warrantless entry upon private property to make an inspection of business records and inventory to determine whether the proprietor was complying with a federal statute; contrary to appellant's suggestion (Br. 163), that thorough inspection of the sole proprietor's records and storeroom was neither "modest" nor "impersonal." See also *Colonnade Catering Corp.* v. *United States*, 397 U.S. 72; *Wyman* v. *James*, 400 U.S. 309. The decisions in *Biswell*, *Colonnade* and *Wyman* were based upon the special relationship between the government and the premises visited. In the instant case there is an even stronger relationship between the government and the papers inspected: with only minor exceptions, they are government documents, created with federal money. Thus even if they had not been held in the possession of the Executive Branch, they could constitutionally have been searched by Executive Branch officials in order to secure and preserve those materials of value and legitimate concern to the government. *A fortiori* they are subject to such search when voluntarily left in the custody of the Executive Branch.

BLEED THROUGH

**JA129**

55

### E. The Act Does Not Abridge The Freedoms Of Speech And Association

The arguments demonstrating that the Act does not invade appellant's privacy also demonstrate that it does not abridge his freedoms of speech and association. The district court therefore properly rejected appellant's First Amendment contentions (J.S. App. 89a-93a). "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley* v. *Valeo, supra,* 424 U.S. at 64. This Court has recognized, however, that "particularly when the 'free functioning of our national institutions' is involved," the need for disclosure may outweigh the First Amendment interests. *Id.* at 66, quoting from *Communist Party* v. *Subversive Activities Control Board,* 367 U.S. 1, 97.

Appellant's conversations and documents were not those of a private citizen. His interest in speech is affected by his status as a public servant (*Civil Service Commission* v. *Letter Carriers,* 413 U.S. 548), and the cases upon which he relies (Br. 164-173) therefore apply here, if at all,[37] with substantially diminished force. Moreover, as we have discussed, the Act will allow public access only to those mate-

---

[37] Indeed, many of the cases upon which appellant relies involve governmental restrictions upon or prohibition of public expression. See, *e.g., Cox* v. *Louisiana,* 379 U.S. 536; *Lovell* v. *Griffin,* 303 U.S. 444. No such restriction or prohibition is involved here.

**JA130**

56

rials related to "Watergate" or having general historical significance.[38]

The initial screening of all the materials by disinterested archivists does not infringe appellant's First Amendment rights. The private knowledge of the archivists will pertain only to past events, and that knowledge should not deter appellant from expressing himself in the future concerning public issues; it could not prevent other individuals from associating with appellant (J.S. App. 92a-93a). Nor should such a mere screening chill the discussions of public servants in the current or future administrations: the privilege against disclosure of confidential communications, which comes into play only after the archivists' initial review, is sufficient to protect against any chilling effect on future intra-governmental communications.

---

[38] Appellant argues (Br. 121-130) that the Act is "overbroad" because it will entail publication of other matters as well. But it is far too early for this Court to pass upon that contention. The regulations eventually promulgated, and judicial review of those regulations and the decisions made under them, can narrow the effect of the statute and avert improper disclosures. Such narrowing constructions and administrative practices were relied upon in cases like *Parker* v. *Levy*, 417 U.S. 733, and *Civil Service Commission* v. *Letter Carriers, supra*, to save statutes against claims of overbreadth. Similarly, in *Buckley* v. *Valeo, supra*, 424 U.S. at 64-74, the Court concluded that although a broad disclosure requirement might on some occasions inhibit speech and association, such claims must be resolved case-by-case rather than in one blunderbuss attack. And so it is here; if disclosure of particular materials or classes of materials would have a particular adverse effect upon appellant's interests, such questions can be resolved when and if they arise.

BLEED THROUGH

**JA131**

57

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

> DANIEL M. FRIEDMAN,
> *Acting Solicitor General.*
>
> BARBARA ALLEN BABCOCK,
> *Acting Assistant Attorney General.*
>
> FRANK H. EASTERBROOK,
> *Assistant to the Solicitor General.*
>
> IRWIN GOLDBLOOM,
> *Deputy Assistant Attorney General.*
>
> ROBERT E. KOPP,
> ANTHONY J. STEINMEYER,
> *Attorneys.*

MARCH 1977.

☆ U. S. GOVERNMENT PRINTING OFFICE: 1977    229896    71

**JA132**

# Exhibit C

JA133

 AXIOS



A message from Uber

Gavin Newsom joins episode 2 of The Axios with Axios' Alex Thompson. Watch now.

Apr 1, 2026 – Politics & Policy

# Exclusive: Trump's DOJ says he's not required to turn over official records

Alex Isenstadt

Add Axios on Google

Add Axios as your preferred source to see more of our stories on Google.



JA134

President Trump takes a question from a reporter in the Oval Office on Tuesday. Photo: Brendan Smialowski /AFP via Getty Images

President Trump's Justice Department has concluded that a federal law requiring presidential records to be turned over to the government is unconstitutional, a senior White House official tells Axios.

**Why it matters:** The finding is an indication Trump will be reluctant to give all of his official records to the National Archives at the end of his term, as presidents have done for nearly a half-century under the Presidential Records Act of 1978.

- The law, passed in the post-Watergate era as a hedge against government corruption, states that every official record regarding a president's decisions or policies belongs to the U.S. government, not the president.

**Trump has shown** that he disagrees with the law.

- When he left office in 2021 after his first term, he kept many official documents — including some classified materials.

- He was indicted by President Biden's Justice Department for doing so and allegedly trying to hide them from federal investigators. The case was dropped after Trump was re-elected in 2024.

**What they're saying:** The Trump Justice Department's legal counsel concluded that the Presidential Records Act is "exceeds Congress' powers ... at the expense of the constitutional independence and autonomy of the executive branch," according to the White House official.

- "Congress does not have the power to compel an entire branch of government to create and save every single possible piece of paper," the official added.

**JA135**

**The White House has not** been destroying documents, the official said.

- Trump has instructed White House employees to preserve their records for "historical value, the administrative record of policy decisions and actions, litigation needs, and to explain past actions and guide future ones," the official said.

- Employees' emails and electronic documents are not being deleted.

- "Congress has always been able to obtain information from the executive branch via the give and take of the negotiation process," the White House official says. "President Trump will continue to do just that."

**The background:** When a president leaves office, the Presidential Records Act requires the White House to send all official records to the National Archives and Records Administration (NARA).

Ad





**JA136**

- NARA makes the records available to the public several years after an administration.

**Flashback:** Trump has had several run-ins with the Presidential Records Act.

- During his first term, he tore up some documents that had to be taped together by his staff.

- The 37-count indictment Trump faced for allegedly mishandling classified documents included images of boxes of records that were stored in a bathroom at his Mar-a-Lago estate.

**What's next:** Any move by Trump to retain classified documents when he leaves office in 2029 is likely to draw legal challenges, particularly if Democrats control either the House or Senate then.

- The White House is weighing next steps and plans to discuss with NARA how to proceed moving forward, the official said.

- It's unclear whether the administration will try to get Congress to overturn or change the Presidential Records Act, or will challenge it in court.

**Go deeper:** Final report from Trump's classified documents case blocked by judge



Add Axios on Google

JA137

Ad

▷  ⟲  🔇  00:15 / 00:15          ⚙  🖼  ⤢

# What to read next



Mar 25, 2026

Raskin says he has "damning" memo on Trump classified docs case

Go deeper (2 min. read)  ⟶



Mar 6, 2026

Behind the Curtain: Trump's power play

Go deeper (2 min. read)  ⟶

**JA138**

Ad

00:15 / 00:15

Mar 2, 2026



**DOJ drops cases against law firms targeted in Trump orders**

Go deeper (1 min. read)  ⟶

Apr 3, 2026



**Washington sues Trump over vote-by-mail restrictions**

Go deeper (1 min. read)  ⟶



Mar 8, 2026

## Trump says he'll stop signing bills until voter ID act passes

[Go deeper (1 min. read)  →](#)

# Smarter, faster on what matters.

[ Explore Axios Newsletters ]

| | | |
|---|---|---|
| About Axios | Newsletters | Privacy policy |
| Advertise with us | Axios Live | Terms of use |
| Careers | Axios HQ | Your Privacy Choices ☑✕ |
| Contact us | | |

Axios Media Inc., 2026

**JA140**

# Exhibit D



# PRESIDENTIAL RECORDS ACT OF 1978

B  1,123,714

## HEARINGS

BEFORE A

## SUBCOMMITTEE OF THE COMMITTEE ON GOVERNMENT OPERATIONS HOUSE OF REPRESENTATIVES

NINETY-FIFTH CONGRESS

SECOND SESSION

ON

## H.R. 10998 and Related Bills

TO AMEND THE FREEDOM OF INFORMATION ACT TO INSURE PUBLIC ACCESS TO THE OFFICIAL PAPERS OF THE PRESIDENT, AND FOR OTHER PURPOSES

FEBRUARY 23, 28; MARCH 2 AND 7, 1978

Printed for the use of the Committee on Government Operations

"BUHR STORAGE"

Y4.G74/7:P92/5

The University of Michigan Reference

UNIVERSITY OF MICHIGAN LIBRARIES

SEP 18 1979

DEPOSITED BY THE UNITED STATES OF AMERICA

108

PREPARED STATEMENT OF LAWRENCE A. HAMMOND, DEPUTY ASSISTANT ATTORNEY
GENERAL, OFFICE OF LEGAL COUNSEL, U.S. DEPARTMENT OF JUSTICE

Mr. Chairman and Members of the Committee:

I appreciate this opportunity to present for your consideration the views of the Department of Justice on the constitutional questions raised by H.R. 10998, the "Presidential Papers Act of 1978." I would like to preface my remarks in much the same way that Judge Carl McGowan did in his opinion for the three-judge District Court in Nixon v. Administrator, 408 F. Supp. 321, aff'd, 97 S. Ct. 2777 (1977). He acknowledged that there must necessarily be an important difference between the role of a court in reviewing a statutory enactment which has not yet been implemented and in reviewing the application of that law to the precise facts of individual cases. 408 F. Supp. at 336. He quoted, as I would like to, from the Supreme Court's opinion in Watson v. Buck, 313 U.S. 387 (1944) where the Court warned against making judgments about statutory enactments in advance of their application:

> Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon hypothetical case.

Digitized by Google

JA143

109

That admonition of restraint should apply with even greater force when one is asked to comment on the constitutionality of a bill that has no accompanying legislative history to guide the reader through the several quite serious and important constitutional interests affected by the proposed legislation. With these considerations in mind, we have approached the review of H.R. 10998 with an eye toward identifying those matters that deserve clarification in order to avoid what might be serious constitutional problems in the ultimate application of the statute, and to identify those few problems which, in the Department's view, would call into question the constitutionality of this legislation prior to its application to particular cases. Although, as the following analysis of the bill will indicate, we believe that congressional intent with regard to certain aspects of the bill should be clarified and certain modifications adopted, it is our conclusion that the subject matter of this bill is well within the province of Congress, that it deals with matters appropriate for congressional concern, and that its underlying purposes may constitutionally be achieved.

Digitized by Google

**JA144**

110

The bill has two principal aspects: (1) it would reserve to the United States ownership and control of defined Presidential records; and (2) it would allow public access to such records, under procedures modeled on those contained in the Freedom of Information Act, immediately upon a President's departure from office and the completion of necessary archival processing. I will discuss each of these aspects in turn.

I.

Government Ownership of Presidential Records

The reservation and retention of complete ownership, possession, and control of "Presidential records" in the United States marks a significant departure from past practice. Traditionally, Presidents have been regarded as possessing a property right in their papers, 1/ although a governmental interest in the regulation and disposition of such materials has also been recognized. 2/ The Supreme Court has expressly reserved judgment on the question whether, under existing law, legal title to such materials lies in

---

1/ See 43 Op. Att'y Gen. No. 1 (Sept. 6, 1974).

2/ See Folsom v. Marsh, 9 Fed. Cas. No. 4,901, pp. 342, 347 (1841).

Digitized by Google

**JA145**

111

the President. 3/  Since H.R. 10998 would have only pro-
spective effect, however, that question would be avoided.
Instead the issue becomes whether Congress may properly
declare the records of future Presidents to be government
property.

It is well established that the work product of govern-
ment employees prepared at the direction of their employer
or in the course of their duties is government property. 4/
Should Congress choose to extend this principle to cover
records prepared or received by the President in the course
of his duties, no substantial separation of powers problems
would, in our view, be raised.

---

3/  Nixon v. Administrator of General Services, 97 S. Ct.
2777, 2791 n. 8 (1972).

4/  See Solomons v. United States, 137 U.S. 342 (1890);
Scherr v. Universal Match Corp., 417 F.2d 497 (2d Cir. 1969),
cert. denied, 397 U.S. 936 (1970): Public Affairs Associates,
Inc. v. Rickover, 268 F. Supp. 444 (D.D.C. 1967); United
States v. First Trust Co. of St. Paul, 251 F.2d 686 (8th
Cir. 1958); Sawyer v. Crowell Publishing Co., 46 F. Supp.
471 (SDNY 1942), aff'd, 142 F.2d 497 (2d Cir.), cert. denied,
323 U.S. 735 (1944).

JA146

112

The Supreme Court's opinion in Nixon v. Administrator makes clear that it is within the appropriate ambit of Congress' power to legislate with respect to the preservation of the historically valuable papers of the Chief Executive. 97 S. Ct. at 2808. Mr. Justice Powell's separate concurrence in that case makes the same point at somewhat greater length and concludes that Congress' power in this area is "unquestionable." Id. at 2818. We think it follows that, at least insofar as declaring the President's official papers to be public property is concerned, Congress' action is not subject to serious challenge.

The Supreme Court, has, however, indicated that the mere fact that an individual is under government employ at the time he produces intellectual property such as an invention does not automatically transfer to the government title or interest in such property. 5/ Congress' power to declare Presidential papers to be government property is in this way limited. To the extent that the term "Presidential records" is too broadly defined to include papers that are

_____

5/  Solomons v. United States, 138 U.S. at 346.

Digitized by Google

**JA147**

purely private in nature, two questions are raised: (1) may Congress, pursuant to its police power, take a President's personal property for public purposes; and (2) if so, what just compensation must be paid. These issues were left for further consideration in _Nixon_ v. _Administrator_; only Justice White, concurring, expressed the view that former President Nixon's personal papers could not be taken, even if compensation were paid, merely because they were of historical value. 6/

We do not believe that the lines drawn by either H.R. 10998 or H.R. 11001 between "Presidential" and "private" records would on their face present serious problems of this sort. Significantly, both bills adopt what we think is a sensitive and sensible approach, leaving solely to the President and his personal staff the division of documents and records between those that are personal and private and those that arise in the course of conducting

---

6/  97 S. Ct. at 2813.

Digitized by Google

**JA148**

114

his official duties. 7/ Thus, should a judicial challenge at some time be raised, it is more than likely that this aspect of the proposed legislation would be upheld.

The bill also endeavors to distinguish between Presidential papers and materials having to do with his participation in political affairs. While the bill does acknowledge the existence of interests protected here by the First Amendment, we question whether its scope is sufficient to avoid serious constitutional question. As we read the bill only matters that concern a President's "personal participation" would be entitled to protection. In order to perform his role as head of his national political party, the President, it seems reasonable to assume, may well receive considerable

---

7/ We retain a mild preference for the language on this matter in H.R. 11001, which requires that nonprivate papers are those that "relate to" the performance by the President of particular official functions. That language may be thought to establish a narrower definition than the language of H.R. 10998, which places in the public domain all matters that arise "in the course of conducting" his official functions. Because the Presidency is a full-time job in the broadest sense, it might be argued that virtually everything the President receives comes to him in the course of his official duties.

Digitized by Google

JA149

115

information and material that relate to partisan political
matters but which only in the most attenuated sense involve
his "personal participation." Such materials, while of
historical interest, would not seem to fall within the
realm of the President's official duties or even ceremonial
functions insofar as his political role has traditionally
been, and continues to be, distinguishable from his role
as party leader. Significantly, moreover, his right to
receive such information is as firmly grounded in the First
Amendment as are the other associational aspects of the
President's political role. His political advisers, for
instance, may wish to inform him of the status of congressional
election campaigns throughout the country with the knowledge,
of course, that he might participate personally in only a
very few of them. In the absence of a demonstrated "compelling
public need" for such information, it may well not properly
be the subject of free public access. See Nixon v. Administrator,
97 S. Ct. at 2802.

Digitized by Google

**JA150**

## II.

### Access Under a Modified Freedom of Information Act

The access provisions of H.R. 10998 focus both on internal procedures that touch on the President's management and control over his Office and on standards for disclosure. I will address first those several procedural provisions. The bill requires the President or his personal staff on a regular basis to segregate his official from his personal papers. He is also instructed by section 2(b)(3) of the bill to implement "records management controls" and to take steps to assure his deliberations and activities are "adequately recorded" and "appropriately maintained." Section 2(c) allows the President to dispose of those papers which he deems to be of no value, but it requires him first to obtain the approval of the Archivist and to publish a "disposition schedule" in the Federal Register in advance of any disposal.

These requirements raise -- as do any congressionally imposed duties on the internal management of the Executive Branch -- a constitutional separation of powers question. Applying the Supreme Court's now familiar analysis, which

Digitized by Google

**JA151**

is rooted in Mr. Justice Jackson's concurrence in Youngstown
Sheet & Tube v. Sawyer, 343 U.S. 579, 634 (1952), and which
was embraced and elaborated on by the Court in United States v.
Nixon, 418 U.S. 683, 711-12 (1974), and in Nixon v. Administra-
tor, 97 S. Ct. at 2790, there is little question, first, that
Congress may legislate in this area. The cases leave no
life in the argument that the Executive Branch's internal
operation is immune from any form of regulation by Congress. 8/
It is equally clear, however, that absent a showing of some
"overriding need" legislation in this area cannot stand if
it "prevents the Executive Branch from accomplishing its
constitutionally assigned functions." Nixon v. Administrator

---

8/ Given the acceptance by the Supreme Court of Justice Jack-
son's analysis, we think it necessary to mention another
possible way in which courts might approach the separation of
powers questions under this bill. The constitutional propriety
of congressional enactments calling for public access may
vary depending upon whether it touches those Article II
functions which belong, by textual commitment, exclusively
to the Executive Branch, such as the pardon power and the
power to receive ambassadors. Since Congress plays no role
under the Constitution in these areas, a court might hold that
no amount of recordkeeping and public access regulation is
appropriate here. We do not, however, regard this as a matter
of great significance since the functions that are exclusively
Executive in nature are the small portion of the Chief Execu-
tive's duties.

Digitized by Google

JA152

118

97 S. Ct. at 2790. The proper inquiry then with respect to these procedural and recordkeeping requirements is whether they carry a potential for undue disruption of the functioning of the Executive Branch.

Removed as we are from the inner workings of the President's Office, we in the Department of Justice are not in a position to tell this subcommittee whether H.R. 10998's segregating, recordkeeping, and disposal provisions can be carried out without undue interference. We would be inclined to agree with the testimony before this subcommittee of President Ford's former Counsel, Philip Buchen, that, if read broadly, these provisions could substantially disrupt the functioning of the President's Office. See Statement of Philip W. Buchen, at 5-7. On the other hand, the several provisions in question would appear to leave considerable discretion to the President to decide, based upon his own standards of good management, whether his papers are being generated and maintained in an "adequate" and "appropriate" fashion. Moreover, we think it relevant that each of these functions is to be performed by persons within the Executive

Digitized by Google

Branch and that, as we read the bill, they will not be subjected to review or on-going regulation by any other Branch of government. See Nixon v. Administrator, 97 S. Ct. at 2789; and 2819 (Mr. Justice Powell's separate concurrence).

In order, however, to avoid constitutional confrontations of the sort that might arise under these procedural provisions, we might suggest the inclusion of language similar to that now found in the Executive Order regulating intelligence activities. E.O. 12036 specifies that the Executive will make certain documents, reports, and summaries available to Congress and the disclosures contemplated there are broad ones. There is, however, an introductory admonition that disclosure must be "consistent with applicable authorities and duties, including those conferred by the Constitution upon the Executive and Legislative Branches." E.O. 12036, § 3-4, We understand that this language was acceptable to the Senate and House Intelligence Committees, and we would think it appropriate for Congress to include similar language to assist the President in carrying out the several record-keeping and related requirements of this bill.

Digitized by Google

**JA154**

There is a second procedural aspect to H.R. 10998, which raises similar separation of powers questions, and which in our view may be troublesome. Section 3, which would add a new subsection (f)(5) to 5 U.S.C. § 552 of the Freedom of Information Act, would allow a sitting President to gain access to the Presidential papers of a preceding President only after complying with certain prefatory requirements. If the particular papers in question are ones not generally available to the public the President must, acting through his counsel, identify "with specificity" the documents required and must state that such documents are "not otherwise available." These things must be done in advance of disclosure, they must be done in writing, and the former President or his representative must be also informed in writing.

Again, we have no way of knowing whether in actual application this provision would prove disruptive of legitimate Executive functions. It may well be that there are very few cases in which documents necessary to the President's current activities will be found only in the papers of his predecessor. Yet particular cases can certainly be

Digitized by Google

envi ioned in which the President needs to review documents, knows generally that they are among the former President's papers, but cannot either identify them with precision or assure the Archivist that those documents might not be available elsewhere in the Executive Branch. While in some respects a provision of this sort would prove helpful to the President's performance of his Article II functions, 9/ the several procedural restrictions do raise serious questions. These concerns might be alleviated by minor modifications, such as changing the specificity provision to require "so much specificity as is reasonably possible," and altering the availability provision to read "not otherwise known to be reasonably available."

The remaining access provisions of the bill establish the mechanism for making Presidential papers available for public scrutiny. The bill contemplates that access will be granted to all Presidential papers excepting only those that fall within certain specified categories, viz. properly

---

9/  See the statement of the Solicitor General in his brief in Nixon v. Administrator, which is excerpted and discussed in Mr. Justice Powell's separate concurrence, 97 S. Ct. a t 2819.

Digitized by Google

**JA156**

122

classified information, information relating to Executive Branch appointments, information restricted from disclosure by statute, information presented to the President in confidence "the disclosure of which could reasonably be expected to damage the foreign affairs of the United States or interfere detrimentally with the current affairs of the Government," and information which would have an unwarranted impact upon the privacy of any person. We assume that these categories were drafted with an eye toward preserving the essence of the privilege articulated in the Supreme Court's recent decisions while balancing those considerations which favor wide public access to Presidential papers. In assessing whether the bill satisfactorily preserves the Executive's constitutional role, two questions must, in our view, be addressed: (1) who is to participate in and control the decisionmaking process with respect to particular releases; and (2) does this formulation of categories include all the necessary aspects of the President's privilege.

On the first question we note that the Archivist is the party instructed to make the decisions respecting release.

Digitized by Google

JA157

123

While the bill does not so specify, it can be fairly assumed -- indeed must be assumed -- that in performing this function he will be guided by the President then in Office. The Archivist is an appointee of the Administrator of the General Services Administration (44 U.S.C. § 2102). The Administrator is himself a Presidential appointee who occupies a position within the Executive Branch and who serves at the pleasure of the President just as do other heads of Executive departments and agencies. (40 U.S.C. § 751(b)). As is true of all other duties performed by these officials, they are ultimately responsible to the President and the President may instruct them in the performance of their duties. No constitutional issues arise as a result of that relationship so long as the President does not give instructions inconsistent with constitutional or appropriate statutory prohibitions. Thus, in performing the responsibilities outlined in H.R. 10998, the Archivist would, we assume, represent the Chief Executive and would perform under his direction the constitutional functions devolving upon the incumbent President discussed in Nixon v. Administrator

34-424 0 - 79 - 9

Digitized by Google

**JA158**

124

and in United States v. Nixon.

A greater problem arises, however, with respect to the role contemplated by the bill for the former President in preserving the papers of his Administration. The bill suggests that, while the Archivist "may consult" with former Presidents, he is under no requirement to do so. We think that on this issue the bill is squarely at odds with the Supreme Court's opinion in Nixon v. Administrator. The Court there directly acknowledged that a former President does have a continuing, and constitutionally based, interest in preserving the confidentiality of privileged communications which he received during his service in Office. 97 S. Ct. at 2793. The Court, and the separate opinions of Justices Blackmun and Powell as well, repeatedly emphasized that the Presidential Recordings and Materials Preservation Act carefully preserved the opportunity to protect and assert "any legally or consti-tutionally based right or privilege." Id. at 2790; 2814 (Mr. Justice Blackmun); 2816-17 (Mr. Justice Powell). The Act achieved this end by providing that regulations be promul-gated which would take into account the need for notice and

Digitized by Google

**JA159**

an opportunity to object in each case to the former President.
Although the Court found it unnecessary to decide the public
access issues, we think it plain that in light of the Court's
repeated emphasis on this aspect of the statute, without
this provision the Act would ultimately be declared unconsti-
tutional. Likewise, we do not think the present bill will
survive constitutional scrutiny unless it is amended to
provide a similar case-by-case screening mechanism. 10/

The need for a provision allowing the former President

---

10/  We do not think that this defect is overcome by the fact
that the sitting President retains the authority to exert
the privileges of the Executive Branch. Obviously, as the
Court in the Nixon Papers case explained, if the present
and former President disagree over the propriety of a particu-
lar disclosure, the judgment of the incumbent, because he
will ordinarily be in the best position to assess the conse-
quences of disclosure, will be entitled to great weight. 97 S.
Ct. at 2793. Nonetheless, the central point remains:  a
President cannot offer any assurance to his advisers that
their counsel will be received in confidence unless his ability
personally to raise the privilege survives his Administration.
The Solicitor General so argued in that case and the Court
embraced his reasoning in toto. Id.  In this connection it
may be well also to remember the point that Justice Blackmun
felt constrained to add:  the transition from one President
to another, or from one political party to another in the
White House, should not be allowed to disrupt the preservation
of Presidential privilege. Id. at 2814.

Digitized by Google

**JA160**

to have a role in the public access process applied also with respect to release of material that is of a partisan political nature. As we have stated in the foregoing section of this testimony, the present language of the bill does not cover adequately the President's First Amendment political speech and associational rights. Even if the provision were drawn more liberally, however, we think that some provision would nonetheless be required allowing the former President to assert any First Amendment rights against disclosure on a case-by-case basis. Again, we read the Court in Nixon v. Administrator, 97 S. Ct. at 2802, as clearly acknowledging the need for such an opportunity.

Assuming that the bill is modified to incorporate these necessary provisions for notice and an opportunity to question intended disclosures, we may address the second issue whether the categories of excludible material are coterminous with the responsibility of the Executive Branch to protect against disclosures that might prove detrimental to the public interest. We focus first on the exclusion of information of a confidential nature. In one important respect the provision is too narrowly drawn. It protects from disclosure

Digitized by Google

**JA161**

127

only those confidential communications made _personally_ to the President, or made _personally_ by the President. Insofar as this language would be read to exclude the communications of, and advisory materials received by, the close personal assistants to the Presidents, we think it cannot stand. 11/ It has long been understood that the privilege for confidential communications extends beyond the person of the President to those who serve as his advisers. This understanding has been based on the same practical considerations that led the Court in _Gravel_ v. _United States_, 408 U.S. 606, 617 (1972), to conclude that a Senator's legislative aide, who served as his "alter ego" in accomplishing critical tasks which the Senator could not himself perform, was entitled to protection under the provisions of the Speech and Debate Clause. We need not dwell on the point, except to say that we think the courts have acknowledged that for the so-called

---

11/ By its terms, the bill applies to all documentary materials "made or received . . . by the President, his immediate staff, or a unit or individual of the Executive Office of the President . . ." § 2(e)(2). It must be assumed that much material of a confidential nature would fall within this definition but which would not be received "personally" by the President.

Digitized by Google

**JA162**

128

"presumptive privilege" to be meaningful it must extend beyond the President personally to those who serve under and advise him. 12/ See United States v. Nixon, 418 U.S. at 682 ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions . . . ."); Nixon v. Administrator, 97 S. Ct. at 2792 n. 10 (acknowledging the "legitimate governmental interest in the confidentiality of communications between high government officials, e.g., those who advise the President"); Nixon v. Sampson, 389 F. Supp. 107, 150 n. 112 (D.D.C. 1975).

There is a second issue that arises with respect to the confidentiality section of the bill. The provision might be read to allow the nondisclosure of confidential communications only where disclosure would cause some direct and immediately

---

12/ To say that the privilege extends to advisers of the President does not mean that any Executive Branch employee may assert that privilege. As I am sure this subcommittee is aware, at least insofar as congressional requests for documents are concerned, it has for many years now been the announced practice of the Executive Branch to limit the invocation of the privilege personally to the President. See e.g., Memorandum for the Heads of Executive Departments and Agencies, dated March 24, 1969 (known as the "Nixon Memorandum").

Digitized by Google

**JA163**

cognizable harm and that it does not allow for consideration of the more generalized chilling effect that flows from the loss of assurances of confidentiality within the Executive Branch. As we read the pertinent cases it is clear that the privilege for confidential communications has a presumptive application even where nondisclosure could not be based on the "more particularized" privilege for "military, diplomatic, or sensitive national security secrets." United States v. Nixon, 418 U.S. at 706; Nixon v. Administrator, 97 S. Ct. at 2792. It may well be that this apparent shortcoming in the bill can be corrected if the last phrase of subparagraph (D) is read expansively. That is, if the Archivist could read "interfere detrimentally with the current affairs of the Government" to allow a finding that loss of confidentiality generally was intended to be there comprehended, this provision would probably cover the privilege adequately. If the provision is not to be read in this fashion we think courts would conclude -- even without the facts of a particular case before them -- that this bill cuts into the necessary area of confidentiality and cannot be sustained.

Digitized by Google

**JA164**

It must be remembered that such communications are pre-sumptively privileged. A statute which stands the presumption on its head, making all such communications available in the absence of a showing of direct and immediate damage or inter-ference would intrude upon what the Supreme Court has defined to be the scope of Presidential privilege. Quite to the contrary, the showing of some substantial need for disclosure is required of those who would override the presumption against disclosure. See Senate Select Comm. v. Nixon, 498 F.2d 725, 730-31 (D.C. Cir. 1974).

Finally, the bill's five-part list of grounds for non-disclosure suffers from what we regard as possibly an over-riding defect. Stated simply, we doubt that it is reasonably possible to set forth and preserve in a legislative catalogue all the privileges necessary to the functioning of the Presi-dent. Two examples might be cited. First, we see no provision for the nondisclosure of investigatory materials arising in the course of law enforcement activities. Second, there is no mention of a privilege against the disclosure of the identity of informants. Both privileges are well recognized, and we assume the subcommittee will agree that

Digitized by Google

131

their preservation is important. Both privileges -- which by the way have their origins as common law "evidentiary" privileges and enjoy an existence apart from what we usually regard as a "Presidential" privilege -- are rooted in the notion that the public interest in furthering effective, and fair, law enforcement requires their preservation.

Our point here is that we doubt that any very specific and restrictive listing of this sort will prove sufficient to cover all of the accepted -- and important -- grounds for a Presidential declination to disclose portions of his papers. 13/ Furthermore, it must be recognized that the law with respect to the types of privileges addressed by this legislation is constantly developing as courts tackle issues arising in particular cases. In passing the "Presidential Recordings and Materials Preservation Act," we think Congress recognized these facts. The approach adopted there is one that recommends itself: the statute simply

---

13/ Among the other sorts of information now protected under the Freedom of Information Act is material that may constitute a trade secret.

Digitized by Google

**JA166**

instructed the Administrator of GSA to draft appropriate regulations which would take into account all of the relevant factors both in favor of and against disclosure and which specifically would protect "any party's opportunity to assert any legally or constitutionally based right or privilege." 44 U.S.C. 2107. We think that a similar provision is desirable, and may well prove essential, to prevent a subsequent judicial ruling that the law is constitutionally flawed.

In contrast to the approach taken by H.R. 10998, that adopted by the majority of the National Study Commission and embodied in H.R. 11001, would allow outgoing or incumbent Presidents to restrict access to selected poritions of their papers for up to 15 years. This proposal has much to recommend it. By precluding all unessential disclosures for a reasonable period, the chilling effect that could result from case-by-case debates on exemptions under the FOIA would be avoided. This compromise, allowing for passage of time, would seem to reduce the impact of a concern over breached confidences. Moreover, allowing for historical distance

Digitized by Google

**JA167**

between the events underlying the President's documents and their disclosure, would, we think, improve the likelihood of meaningful access. Although effectively reducing the disruption of the Executive Branch functions caused by the fear of immediate disclosure of confidential advice, and the resulting problem with regard to constitutional principles of separation of powers, the H.R. 11001 approach falls short of what we think the Constitution requires in one respect. The proposal provides no opportunity for an assertion of the Presidential privilege should that become necessary at some time more than 15 years after a President leaves office. If the 15-year proposal could be modified to provide some reasonable mechanism for assertion of the privilege in appropriate cases, there is reason to believe that courts might well conclude that a balance struck in this way would both satisfy Congress' legitimate desire to assure greater access to information and preserve the essential viability of the presumptive privilege for confidential communications.

I hope that these comments prove helpful to the sub-committee.

DOJ-1975-60

Digitized by Google

**JA168**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-03657 |

### DECLARATION OF SARAH WEICKSEL

1.      I, Sarah Weicksel, am the Executive Director of the American Historical Association (AHA). I have served in this role since July 1, 2025, having previously served as AHA's director of research and publications.

2.      In addition to my role at the AHA, I currently serve on the National Archives and Records Administration's (NARA) Federal Freedom of Information Act Advisory Board.

3.      I am a professional historian (PhD, University of Chicago). I am an expert in nineteenth century United States history, with an emphasis on the American Civil War. I have done extensive research using governmental records held in the collections of the National Archives.

4.      AHA is a nonprofit organization headquartered in Washington, D.C. It was founded in 1884 and incorporated by Congress in 1889 "for the promotion of historical studies, the collection and preservation of historical manuscripts and for kindred purposes in the interest of American history and of history in America." AHA's mission is to enhance the

**JA169**

work of historians, including by promoting professional standards and ethics, innovative scholarship and teaching, academic freedom, and international collaboration. Central to this mission is the preservation of historical documents, including Presidential records.

5.      AHA is the largest membership association of historians in the world, with over 10,200 members. AHA serves historians in a wide variety of professions and represents every historical era and geographical area.

6.      AHA and many of its members have a unique interest in presidential records and have previously pursued legal action to enforce the PRA. *See, e.g.*, *Am. Hist. Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995); *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 516 F. Supp. 2d 90 (D.D.C. 2007).

7.      AHA's members include historians, researchers, and educators who routinely seek and use Presidential records covered by the PRA as part of their academic research and educational work. Such members include Matthew Connelly, Professor of History and Vice Dean for AI Initiatives in Arts and Sciences at Columbia University; Natalia Mehlman Petrzela, Professor of History at The New School; Timothy Naftali, Senior Research Scholar in the Faculty of International and Public Affairs at Columbia University; and Kathryn Brownell, Professor of History at Purdue University.

8.      AHA and its members regularly request and make use of presidential and vice presidential records. These records are cited in many books, publications, and other forms of historical scholarship, and are the basis for historians' research in many fields of study. Presidential records are crucial for historians who study the history of the military, foreign relations, and the federal government. Historians also use presidential records to understand decisions and policies related to topics including, but not limited to, immigration, labor

**JA170**

relations, religion, science and technology, business and economics, and a myriad of other subjects. Without these records, future generations of historians will not have access to the complete documentation of our nation's history.

9. The AHA supports historical offices in federal agencies, some of which make extensive use of presidential records. The Foreign Relations Authorization Act, for example, includes a statute that requires an AHA-nominated representative be appointed to the Advisory Committee on Historical Diplomatic Documentation. 22. U.S.C. § 4356(a)(3)(B). The Advisory Committee reviews historical records, advises, and makes recommendations to the Office of the Historian and Foreign Service Institute concerning the *Foreign Relations of the United States* documentary series (FRUS). This vital committee provides crucial support for the continuous work of publishing the Congressionally-mandated *FRUS* series by monitoring the overall compilation and editorial process of the series, and advising on all aspects of the preparation and declassification of the series. The Advisory Committee also reviews the declassification procedures of the Department of State and all guidelines used in the declassification process, as provided in Public Law 102-138.

10. The Office of the Historian and the Historical Advisory Committee at the US Department of State use presidential records in the *FRUS* series. The *FRUS*, which began in 1861 under President Lincoln, presents the official documentary record of major US foreign policy decisions and significant diplomatic activity. The Historical Office of the Secretary of Defense publishes a Secretaries of Defense Historical Series that uses presidential records for its monographs on military history and strategy. Presidential records are essential to understanding the history of US foreign relations and the military and equipping current and

**JA171**

future diplomatic and military leaders with the comprehensive information and resources they need to deal with conflicts and missions.

11.    The AHA has hosted events on presidential records, including online webinars. The AHA hosted a 2023 webinar on the Presidential Records Act and a 2021 webinar on Preserving Records: Archives and Presidential Transitions.  Presentations drawn from research in presidential records are regularly presented at the AHA's annual meeting, the largest gathering of historians in the world. Prior to the grant funding's termination, the AHA was selected to host a National Endowment for the Humanities Institute for Higher Education Faculty, which would have made extensive use of presidential records to examine the history of US environmental policy.

12.    AHA is well aware of the perils of failing to preserve and make available historical information about the functioning of the federal government. In 1908, the Council of the AHA "pointed out that the lack of provisions for the 'orderly keeping of these public documents' made them 'unavailable for historical work.'" In 1910, having found that many governmental records from the previous century had been lost or destroyed, AHA petitioned Congress to construct a "national archive depository, where the records of the Government may be concentrated, properly cared for, and preserved."[1] These records, AHA asserted, were both "muniments of our national advancement" and "material which historians must use in order to ascertain the truth." The resulting institution became the National Archives and Records Administration.

13.    AHA's members rely on Presidential records to explore and reveal the functioning of every aspect of the executive branch—from policy consideration to policy

---

[1] First Annual Report of the Archivist of the United States, 1934-1935, https://perma.cc/HS62-USWD.

**JA172**

implementation. AHA's members use Presidential records preserved and made public under the PRA for the purposes Congress intended in enacting the PRA, including producing historical scholarship, teaching, and museum work. Records made accessible under the PRA also enable AHA members to serve as expert witnesses.

14.     If Presidential records are not preserved and made publicly accessible as the PRA requires, AHA and its members will be directly injured. AHA's members will be unable to access key historical documents upon which they rely for their research and writing. Without this documentation, they would be forced to rely upon second-hand reports that lack the credibility of primary sources. Failure to properly preserve records will impoverish the historical discipline more broadly, inhibiting research and teaching in high schools, colleges, museums, and other public venues. A complete and comprehensive historical record is necessary for understanding our nation's history.

15.     AHA members will lose access to information that would create the historical record of presidential activities, and that would help to educate the public about that history. AHA members would be left with an incomplete historical record by which to professionally research, produce scholarship on, and teach U.S. history. Once lost, this information is irretrievable, causing AHA and its members to lose access to the documents and other materials essential to understanding, and learning from, our past.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 13, 2026, in Washington, DC.

_Sarah Weicksel_
_____

Sarah Weicksel
Executive Director,
American Historical Association

**JA173**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 26-cv-01169 |

### DECLARATION OF ELIZABETH MARX IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Elizabeth Marx, hereby declare as follows:

1. I am Deputy Executive Director at American Oversight, a plaintiff in the above-captioned litigation. I use the name Elizabeth Hempowicz professionally. I submit this Declaration in support of Plaintiff's Motion for a Preliminary Injunction. The facts set forth in this Declaration are true and of my own personal knowledge and/or a review of American Oversight's business records.

2. American Oversight is a is a nonpartisan, non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code and incorporated under the laws of the District of Columbia. It is committed to promoting transparency in government, educating the public about government activities, and ensuring the accountability of government officials.

3. Through research and requests made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (FOIA), American Oversight uses the information it gathers, and its

**JA174**

analysis of that information, to educate the public about the activities and operations of the federal government through reports, published analyses, press releases and other media.

4.     In service of its mission to educate the public about operations and activities of the government, American Oversight has previously submitted FOIA requests to the National Archives and Records Administration (NARA) for presidential records from past presidential administrations that eventually became subject to FOIA by operation of the Presidential Records Act (PRA).

5.     As one example, in 2019, upon learning of a reported short list of potential Supreme Court nominees, American Oversight submitted multiple FOIA requests for presidential records related to three individuals on that short list who had served in the White House under President George W. Bush, including Joan Larsen (internal tracking number NARA-19-0258), Don Willett (internal tracking number NARA-19-0268), and Neomi Rao (internal tracking number NAARA-19-0261). Attached as Exhibits A-C are true and accurate copies of those requests.

6.     American Oversight has also submitted FOIA requests for records from President Trump's first administration.

7.     Before those records became available under FOIA, American Oversight launched a document preservation initiative to ensure that presidential records (and federal agency records) from President Trump's first term were properly preserved.

8.     Specifically, in December 2020, the organization filed FOIA requests with numerous federal agencies seeking communications between top agency officials and the White House, to ensure records of at least some White House officials' communications would be properly preserved pursuant to FOIA and the Federal Records Act.

1
**JA175**

9.    Then, on January 20, 2026, American Oversight submitted multiple requests to NARA seeking records from President Trump's first administration.

10.    The first request, bearing American Oversight internal tracking number NARA-26-0108, seeks records reflecting external email communications sent by or on behalf of Senior Advisor for Policy Stephen Miller. Attached as Exhibit D is a true and accurate copy of that request.

11.    The second request, bearing American Oversight internal tracking number NARA-26-0109, seeks records reflecting external email communications sent by or on behalf of Director of Social Media Dan Scavino. Attached as Exhibit E is a true and accurate copy of that request.

12.    The third request, bearing American Oversight internal tracking number NARA-26-0110, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Jared Kushner. Attached as Exhibit F is a true and accurate copy of that request.

13.    The fourth request, bearing American Oversight internal tracking number NARA-26-0111, seeks records reflecting external email communications sent by or on behalf of Domestic Policy Council Director Brooke Rollins. Attached as Exhibit G is a true and accurate copy of that request.

14.    The fifth request, bearing American Oversight internal tracking number NARA-26-0112, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Ivanka Trump. Attached as Exhibit H is a true and accurate copy of that request.

2
**JA176**

15. American Oversight is waiting for NARA to issue final determinations or provide responsive records for each of the above five requests.

16. American Oversight is actively planning to submit additional FOIA requests to NARA for records from President Trump's first administration.

17. American Oversight generally disseminates to the public the records it receives in response to FOIA requests on its website.

18. If NARA does not fully process FOIA requests for Presidential records, American Oversight will be unable to disseminate to the public the non-exempt records it would otherwise be entitled to under FOIA.

19. If NARA does not preserve records from former presidential administrations, including President Trump's first administration, American Oversight will permanently be deprived of information that it seeks and intends to seek through FOIA requests to NARA.

20. If individuals and entities that are subject to the Presidential Records Act fail to preserve records as required by the PRA, the records will be lost and American Oversight will not be able to obtain records it has a right to access under the PRA and FOIA.

21. If NARA and individuals and entities subject to the PRA fail to preserve presidential records, American Oversight will be irreparably harmed because the records will be lost forever, and the organization will lose its opportunity to fulfill its mission to educate the public about the operations of the government reflected in those records.

22. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 14, 2026                                    Respectfully submitted,


                                                         */s/ Elizabeth Marx*
                                                         ELIZABETH MARX

3

**JA177**

# EXHIBIT A

# AMERICAN OVERSIGHT

February 22, 2019

**VIA ELECTRONIC MAIL**

Chief, Special Access and FOIA Staff (RD-F)
8601 Adelphi Road, Room 5500
College Park, MD 20740
E-mail: specialaccess_foia@nara.gov

George W. Bush Presidential Library and
Museum
c/o FOIA Coordinator
2943 SMU Blvd.
Dallas, TX 75205
E-mail: gwbush.library@nara.gov

**Re: Freedom of Information Act Request**

Dear Chief and FOIA Coordinator:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Presidential Records Act (PRA), 44 U.S.C. § 2201 *et seq.*, and the implementing regulations of the National Archives and Records Administration (NARA), 36 C.F.R. Part 1250, American Oversight makes the following request for records of NARA and the George W. Bush Presidential Library and Museum (GWB Library).

**Requested Records**

American Oversight requests that the GWB Library provide access to the following records within twenty business days:

> All records of the White House Counsel's Office referencing or relating to former Deputy Assistant Attorney General Joan Larsen.
>
> This request includes, but is not limited to, correspondence (including memoranda, letters, or emails) to or from Ms. Larsen, or on which she is carbon copied or blind carbon copied, and attachments to such correspondence.
>
> Please provide all records from January 1, 2002, to December 31, 2003.

Under the FOIA Improvement Act of 2016, agencies must adopt a presumption of disclosure, withholding information "only if . . . disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law."[1] If it is your position that any portion of the requested records is exempt from disclosure, American Oversight requests that you provide an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415

---

[1] FOIA Improvement Act of 2016 § 2 (Pub. L. No. 114–185).

 1030 15th Street NW, Suite B255, Washington, DC 20005  |  AmericanOversight.org

**JA179**

U.S. 977 (1974). As you are aware, a *Vaughn* index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA."[2] Moreover, the *Vaughn* index "must describe *each* document or portion thereof withheld, and for *each* withholding it must discuss the consequences of disclosing the sought-after information."[3] Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"[4]

In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.[5] Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a *Vaughn* index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

To ensure that this request is properly construed, that searches are conducted in an adequate but efficient manner, and that extraneous costs are not incurred, American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and NARA can decrease the likelihood of costly and time-consuming litigation in the future.

## Fees

American Oversight recognizes that NARA does not grant fee waivers for reproduction of archival records or Presidential records subject to FOIA regulations[6] under the authority of 44 U.S.C. § 2116, which allows the Archivist to "charge a fee set to recover the costs for making or authenticating copies or reproductions" of such records. However, NARA regulations state that no search fees will be charged for such records.[7] **Consequently, American Oversight expects that only reproduction fees will be incurred by this request. If NARA believes reproduction fees may exceed $250, please contact American Oversight immediately.**

## Conclusion

We share a common mission to promote transparency in government. American Oversight looks forward to working with NARA on this request. If you do not understand any part of this request,

---

[2] *Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

[3] *King v. U.S. Dep't of Justice*, 830 F.2d 210, 223–24 (D.C. Cir. 1987) (emphases in original).

[4] *Id.* at 224 (citing *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).

[5] *Mead Data Central*, 566 F.2d at 261.

[6] 36 C.F.R. § 1250.51(a); *see also* 36 C.F.R. § 1250.6(d) ("FOIA applies to [Presidential] records five years after the President and Vice President leave office.").

[7] 36 C.F.R. § 1250.51(b).

NARA-19-0258

have any questions, or foresee any problems in fully releasing the requested records, please contact Katherine Anthony at foia@americanoversight.org or 202.897.3918.

Sincerely,

Austin Evers
Executive Director
American Oversight

NARA-19-0258

# EXHIBIT B

# AMERICAN OVERSIGHT

February 22, 2019

**VIA ELECTRONIC MAIL**

| | |
|---|---|
| Chief, Special Access and FOIA Staff (RD-F) | George W. Bush Presidential Library and |
| 8601 Adelphi Road, Room 5500 | Museum |
| College Park, MD 20740 | c/o FOIA Coordinator |
| Telephone: (301) 837-3190 | 2943 SMU Blvd. |
| FAX (301) 837-1864 | Dallas, TX 75205 |
| E-mail: specialaccess_foia@nara.gov | gwbush.library@nara.gov |

**Re: Freedom of Information Act Request**

Dear Chief and FOIA Coordinator:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Presidential Records Act (PRA), 44 U.S.C. § 2201 *et seq.*, and the implementing regulations of the National Archives and Records Administration (NARA), 36 C.F.R. Part 1250, American Oversight makes the following request for records of NARA and the George W. Bush Presidential Library and Museum (GWB Library).

**Requested Records**

American Oversight requests that the GWB Library provide access to the following records within twenty business days:

> The following records related to Don Willett, former Special Assistant to the President and Director of Law and Policy for the White House Office of Faith-Based and Community Initiatives:
>
> - All content from the Don Willett General Files within the Faith-Based and Community Initiatives records;[1] and
> - All content from the David Kuo Subject Files within the Faith-Based and Community Initiatives records.[2]

---

[1] *See* George W. Bush Presidential Library and Museum, *Finding Aid: Faith-Based and Community Initiative, Office of: Don Willett – General Files*, 2001-2002, *available at* https://www.georgewbushlibrary.smu.edu/en/Research/Finding-Aids/~/media/30D94137C9CD48ADA6D1295F290B8E43.ashx.

[2] *See* George W. Bush Presidential Library and Museum, *Finding Aid: Faith-Based and Community Initiative, Office of: David Kuo – Subject Files*, 2001-2003, *available at*


1030 15th Street NW, Suite B255, Washington, DC 20005  |  AmericanOversight.org

**JA183**

Under the FOIA Improvement Act of 2016, agencies must adopt a presumption of disclosure, withholding information "only if . . . disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law."[3] If it is your position that any portion of the requested records is exempt from disclosure, American Oversight requests that you provide an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). As you are aware, a *Vaughn* index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA."[4] Moreover, the *Vaughn* index "must describe *each* document or portion thereof withheld, and for *each* withholding it must discuss the consequences of disclosing the sought-after information."[5] Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"[6]

In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.[7] Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a *Vaughn* index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

To ensure that this request is properly construed, that searches are conducted in an adequate but efficient manner, and that extraneous costs are not incurred, American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and NARA can decrease the likelihood of costly and time-consuming litigation in the future.

<u>Fees</u>

American Oversight recognizes that NARA does not grant fee waivers for reproduction of archival records and Presidential records subject to FOIA regulations[8] under the authority of 44 U.S.C. § 2116, which allows the Archivist to "charge a fee set to recover the costs for making or authenticating copies or reproductions" of such records. However, NARA regulations state that no

---

https://www.georgewbushlibrary.smu.edu/en/Research/Finding-Aids/~/media/57524E899EA64261A640C0DBDCAA05D6.pdf.

[3] FOIA Improvement Act of 2016 § 2 (Pub. L. No. 114–185).

[4] *Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

[5] *King v. U.S. Dep't of Justice*, 830 F.2d 210, 223–24 (D.C. Cir. 1987) (emphasis in original).

[6] *Id.* at 224 (citing *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).

[7] *Mead Data Central*, 566 F.2d at 261.

[8] 36 C.F.R. § 1250.51(a); *see also* 36 C.F.R. § 1250.6(d) ("FOIA applies to [Presidential] records five years after the President and Vice President leave office.").

**JA184**

NARA-19-0268

search fees will be charged for such records.[9] **Consequently, American Oversight expects that only reproduction fees will be incurred by this request. If NARA believes reproduction fees may exceed $250 please contact American Oversight immediately.**

<u>Conclusion</u>

We share a common mission to promote transparency in government. American Oversight looks forward to working with NARA on this request. If you do not understand any part of this request, have any questions, or foresee any problems in fully releasing the requested records, please contact Beth France at foia@americanoversight.org or 202.897.2465.


                    Sincerely,


                    Austin Evers
                    Executive Director
                    American Oversight

---

[9] 36 C.F.R. § 1250.51(b).

NARA-19-0268

# EXHIBIT C



February 22, 2019

<u>VIA ELECTRONIC MAIL</u>

Chief, Special Access and FOIA Staff (RD-F)
8601 Adelphi Road, Room 5500
College Park, MD 20740
E-mail: specialaccess_foia@nara.gov

George W. Bush Presidential Library and
Museum
c/o FOIA Coordinator
2943 SMU Blvd.
Dallas, TX 75205
gwbush.library@nara.gov

Re: Expedited Freedom of Information Act Request

Dear Chief and FOIA Coordinator:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Presidential Records Act (PRA), 44 U.S.C. § 2201 *et seq.*, and the implementing regulations of the National Archives and Records Administration (NARA), 36 C.F.R. Part 1250, American Oversight makes the following request for records of NARA and the George W. Bush Presidential Library and Museum (GWB Library).

<u>Requested Records</u>

American Oversight requests that the GWB Library provide access to the following records within twenty business days:

Any records of Neomi Rao, former Associate Counsel and Special Assistant to President George W. Bush, not already available on the GWB Library website,[1] including:

- Correspondence (including memoranda, letters, or emails) to or from Ms. Rao, or on which she was carbon copied or blind carbon copied, and attachments to such correspondence; and
- Records maintained by Ms. Rao in the course of her work for the White House Counsel's Office and/or as Special Assistant to the President, including memoranda

---

[1] Specifically, we note that records from Ms. Rao's staff files related to Brett Kavanaugh are available on the GWB Library's website. *See Records on Brett M. Kavanaugh*, George W. Bush Presidential Library and Museum, https://www.georgewbushlibrary.smu.edu/Research/Digital-Library/BrettMKavanaughRecords. American Oversight does not seek these records through this FOIA request.

 1030 15th Street NW, Suite B255, Washington, DC 20005  |  AmericanOversight.org

**JA187**

to file, notes, meeting agendas, meeting summaries, or materials distributed in connection with meetings.

Please provide all records from March 1, 2005, through July 31, 2006.

Under the FOIA Improvement Act of 2016, agencies must adopt a presumption of disclosure, withholding information "only if . . . disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law."[2] If it is your position that any portion of the requested records is exempt from disclosure, American Oversight requests that you provide an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). As you are aware, a *Vaughn* index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA."[3] Moreover, the *Vaughn* index "must describe *each* document or portion thereof withheld, and for *each* withholding it must discuss the consequences of disclosing the sought-after information."[4] Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"[5]

In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.[6] Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a *Vaughn* index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

To ensure that this request is properly construed, that searches are conducted in an adequate but efficient manner, and that extraneous costs are not incurred, American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and NARA can decrease the likelihood of costly and time-consuming litigation in the future.

<u>Fees</u>

American Oversight recognizes that NARA does not grant fee waivers for reproduction of archival records or Presidential records subject to FOIA regulations[7] under the authority of 44 U.S.C. §

---

[2] FOIA Improvement Act of 2016 § 2 (Pub. L. No. 114–185).

[3] *Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

[4] *King v. U.S. Dep't of Justice*, 830 F.2d 210, 223–24 (D.C. Cir. 1987) (emphases in original).

[5] *Id.* at 224 (citing *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).

[6] *Mead Data Central*, 566 F.2d at 261.

[7] 36 C.F.R. § 1250.51(a); *see also* 36 C.F.R. § 1250.6(d) ("FOIA applies to [Presidential] records five years after the President and Vice President leave office.").

NARA-19-0261

2116, which allows the Archivist to "charge a fee set to recover the costs for making or authenticating copies or reproductions" of such records. However, NARA regulations state that no search fees will be charged for such records.[8] **Consequently, American Oversight expects that only reproduction fees will be incurred by this request. If NARA believes reproduction fees may exceed $250, please contact American Oversight immediately.**

Conclusion

We share a common mission to promote transparency in government. American Oversight looks forward to working with NARA on this request. If you do not understand any part of this request, have any questions, or foresee any problems in fully releasing the requested records, please contact Katherine Anthony at foia@americanoversight.org or 202.897.3918.

Sincerely,

Austin Evers
Executive Director
American Oversight

---

[8] 36 C.F.R. § 1250.51(b).

NARA-19-0261

# EXHIBIT D



January 20, 2026

**VIA EMAIL**

National Archives and Records Administration
Archival Operations Division – Donald J. Trump Presidential Library
8601 Adelphi Rd.
College Park, MD 20740
trump.library@nara.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

During President Trump's first term in office, White House officials faced significant allegations of corruption and other conflicts of interest.[1] American Oversight seeks records with the potential to shed light on this matter.

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> All email communications (including emails, complete email chains, calendar invitations, and attachments thereto) <u>sent by</u> Senior Advisor for Policy Stephen Miller, or anyone communicating on his behalf, such as an assistant or scheduler, to any email address ending in .com, .co, .us, .net, .org, .mail, .edu, .law, .legal, .ch, .me, .group, .vc, or .io.
>
> In an effort to accommodate your office and reduce the number of potentially responsive records to be processed and produced, American Oversight has limited this request to emails <u>sent</u> by Mr. Miller. To be clear, however, American Oversight's request encompasses complete email chains, including all preceding messages in a chain to which Mr. Miller responded. This means that any message Mr. Miller during the specified time frame to any email address ending in any of the domains listed above is responsive to this request, and all sent and received messages in that chain should be produced.

---

[1] *See, e.g.*, Jim Lardner, *Mapping Corruption: Donald Trump's Executive Branch*, Am. Prospect, Apr. 9, 2020, https://prospect.org/2020/04/09/mapping-corruption-donald-trump-executive-branch/.

**Please provide all responsive records from January 20, 2017, through January 20, 2021.**

<u>Fee Waiver Standard</u>

American Oversight recognizes that NARA does not grant fee waivers for archival records. *See* 5 U.S.C. § 552(a)(4)(A)(iv) (fee waiver provisions not superseded by other, specific statutes setting fee levels of specific categories of records); 44 U.S.C. § 2116(c) (providing for fees for archival records). However, to the extent your agency is willing to exercise its discretion to grant a waiver of fees, American Oversight meets the relevant standards under 5 U.S.C. § 552(a)(4)(A)(iii). The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[2] The public has a significant interest in the allegations of corruption and conflicts of interest from President Trump's first term.[3] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including whether and to what extent non-government entities and individuals influenced White House decisions during the first Trump Administration. American Oversight is committed to transparency and makes the responses agencies provide to its FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[4] In fact, as a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the release of the information requested is not in American Oversight's commercial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[5]

---

[2] 5 U.S.C. § 552(a)(4)(A)(iii).

[3] *See supra* note 1.

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] American Oversight currently has approximately 16,000 followers on Facebook and 94,200 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 16, 2026); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 16, 2026).

- 2 -

**JA192**

NARA-26-0108

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[6] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[7] posting records and editorial content about the federal government's response to the COVID-19 pandemic;[8] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump Administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[9] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[10] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[11]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

---

[6] *See generally Our Latest*, American Oversight, https://www.americanoversight.org/blog.

[7] *The Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[8] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[9] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Audit the Wall: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://americanoversight.org/audit-the-wall-no-plans-funding-or-timeline-and-no-wall/.

[10] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.documentcloud.org/documents/25544090-doj-records-relating-to-solicitor-general-noel-franciscos-recusal-american-oversight; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[11] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

NARA-26-0108

**JA193**

- ▪ Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics. For instance, if the request seeks "communications," please search all locations likely to contain communications, including relevant hard-copy files, correspondence files, appropriate locations on hard drives and shared drives, emails, text messages or other direct messaging systems (such as iMessage, WhatsApp, Signal, or X (formerly Twitter) direct messages), voicemail messages, instant messaging systems such as Lync or ICQ, and shared messages systems such as Slack.

- ▪ In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind.

- ▪ Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- ▪ Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to FOIA.[12]

- ▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[12] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

- 4 -

NARA-26-0108

**JA194**

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Jessica Jensen at foia@americanoversight.org or (276) 293-9853 ext. 1033. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Jessica Jensen*
Jessica Jensen
on behalf of
American Oversight

- 5 -

**JA195**

NARA-26-0108

# EXHIBIT E



January 20, 2026

**VIA EMAIL**

National Archives and Records Administration
Archival Operations Division – Donald J. Trump Presidential Library
8601 Adelphi Rd.
College Park, MD 20740
trump.library@nara.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

During President Trump's first term in office, White House officials faced significant allegations of corruption and other conflicts of interest.[1] American Oversight seeks records with the potential to shed light on this matter.

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> All email communications (including emails, complete email chains, calendar invitations, and attachments thereto) <u>sent by</u> Director of Social Media Dan Scavino, or anyone communicating on his behalf, such as an assistant or scheduler, to any email address ending in .com, .co, .us, .net, .org, .mail, .edu, .law, .legal, .ch, .me, .group, .vc, or .io.

> In an effort to accommodate your office and reduce the number of potentially responsive records to be processed and produced, American Oversight has limited this request to emails <u>sent</u> by Mr. Scavino. To be clear, however, American Oversight's request encompasses complete email chains, including all preceding messages in a chain to which Mr. Scavino responded. This means that any message Mr. Scavino during the specified time frame to any email address ending in any of the domains listed above is responsive to this request, and all sent and received messages in that chain should be produced.

---

[1] *See, e.g.*, Jim Lardner, *Mapping Corruption: Donald Trump's Executive Branch*, Am. Prospect, Apr. 9, 2020, https://prospect.org/2020/04/09/mapping-corruption-donald-trump-executive-branch/.

**Please provide all responsive records from January 20, 2017, through January 20, 2021.**

<u>Fee Waiver Standard</u>

American Oversight recognizes that NARA does not grant fee waivers for archival records. *See* 5 U.S.C. § 552(a)(4)(A)(iv) (fee waiver provisions not superseded by other, specific statutes setting fee levels of specific categories of records); 44 U.S.C. § 2116(c) (providing for fees for archival records). However, to the extent your agency is willing to exercise its discretion to grant a waiver of fees, American Oversight meets the relevant standards under 5 U.S.C. § 552(a)(4)(A)(iii). The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[2] The public has a significant interest in the allegations of corruption and conflicts of interest from President Trump's first term.[3] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including whether and to what extent non-government entities and individuals influenced White House decisions during the first Trump Administration. American Oversight is committed to transparency and makes the responses agencies provide to its FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[4] In fact, as a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the release of the information requested is not in American Oversight's commercial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[5]

---

[2] 5 U.S.C. § 552(a)(4)(A)(iii).

[3] *See supra* note 1.

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] American Oversight currently has approximately 16,000 followers on Facebook and 94,200 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 16, 2026); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 16, 2026).

- 2 -

**JA198**

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[6] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[7] posting records and editorial content about the federal government's response to the COVID-19 pandemic;[8] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump Administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[9] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[10] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[11]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

---

[6] *See generally Our Latest*, American Oversight, https://www.americanoversight.org/blog.

[7] *The Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[8] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[9] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Audit the Wall: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://americanoversight.org/audit-the-wall-no-plans-funding-or-timeline-and-no-wall/.

[10] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.documentcloud.org/documents/25544090-doj-records-relating-to-solicitor-general-noel-franciscos-recusal-american-oversight; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[11] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

- 3 -

**JA199**

- Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics. For instance, if the request seeks "communications," please search all locations likely to contain communications, including relevant hard-copy files, correspondence files, appropriate locations on hard drives and shared drives, emails, text messages or other direct messaging systems (such as iMessage, WhatsApp, Signal, or X (formerly Twitter) direct messages), voicemail messages, instant messaging systems such as Lync or ICQ, and shared messages systems such as Slack.

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to FOIA.[12]

- In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[12] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

- 4 -

**JA200**

NARA-26-0109

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Jessica Jensen at foia@americanoversight.org or (276) 293-9853 ext. 1033. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Jessica Jensen*
Jessica Jensen
on behalf of
American Oversight

- 5 -

**JA201**

NARA-26-0109

# EXHIBIT F

# AMERICAN OVERSIGHT

January 20, 2026

**VIA EMAIL**

National Archives and Records Administration
Archival Operations Division – Donald J. Trump Presidential Library
8601 Adelphi Rd.
College Park, MD 20740
trump.library@nara.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

During President Trump's first term in office, White House officials faced significant allegations of corruption and other conflicts of interest.[1] American Oversight seeks records with the potential to shed light on this matter.

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> All email communications (including emails, complete email chains, calendar invitations, and attachments thereto) <u>sent by</u> Senior Advisor Jared Kushner, or anyone communicating on his behalf, such as an assistant or scheduler, to any email address ending in .com, .co, .us, .net, .org, .mail, .edu, .law, .legal, .ch, .me, .group, .vc, or .io.
>
> In an effort to accommodate your office and reduce the number of potentially responsive records to be processed and produced, American Oversight has limited this request to emails <u>sent</u> by Mr. Kushner. To be clear, however, American Oversight's request encompasses complete email chains, including all preceding messages in a chain to which Mr. Kushner responded. This means that any message Mr. Kushner during the specified time frame to any email address ending in any of the domains listed above is responsive to this request, and all sent and received messages in that chain should be produced.

---

[1] *See, e.g.*, Jim Lardner, *Mapping Corruption: Donald Trump's Executive Branch*, Am. Prospect, Apr. 9, 2020, https://prospect.org/2020/04/09/mapping-corruption-donald-trump-executive-branch/.

1030 15th Street NW, Suite B255, Washington, DC 20005   |   AmericanOversight.org

**JA203**

**Please provide all responsive records from January 20, 2017, through January 20, 2021.**

<u>Fee Waiver Standard</u>

American Oversight recognizes that NARA does not grant fee waivers for archival records. *See* 5 U.S.C. § 552(a)(4)(A)(iv) (fee waiver provisions not superseded by other, specific statutes setting fee levels of specific categories of records); 44 U.S.C. § 2116(c) (providing for fees for archival records). However, to the extent your agency is willing to exercise its discretion to grant a waiver of fees, American Oversight meets the relevant standards under 5 U.S.C. § 552(a)(4)(A)(iii). The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[2] The public has a significant interest in the allegations of corruption and conflicts of interest from President Trump's first term.[3] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including whether and to what extent non-government entities and individuals influenced White House decisions during the first Trump Administration. American Oversight is committed to transparency and makes the responses agencies provide to its FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[4] In fact, as a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the release of the information requested is not in American Oversight's commercial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[5]

---

[2] 5 U.S.C. § 552(a)(4)(A)(iii).

[3] *See supra* note 1.

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] American Oversight currently has approximately 16,000 followers on Facebook and 94,200 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 16, 2026); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 16, 2026).

- 2 -

**JA204**

NARA-26-0110

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[6] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[7] posting records and editorial content about the federal government's response to the COVID-19 pandemic;[8] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump Administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[9] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[10] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[11]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

---

[6] *See generally Our Latest*, American Oversight, https://www.americanoversight.org/blog.

[7] *The Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[8] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[9] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Audit the Wall: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://americanoversight.org/audit-the-wall-no-plans-funding-or-timeline-and-no-wall/.

[10] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.documentcloud.org/documents/25544090-doj-records-relating-to-solicitor-general-noel-franciscos-recusal-american-oversight; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[11] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

NARA-26-0110

**JA205**

▪ Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics. For instance, if the request seeks "communications," please search all locations likely to contain communications, including relevant hard-copy files, correspondence files, appropriate locations on hard drives and shared drives, emails, text messages or other direct messaging systems (such as iMessage, WhatsApp, Signal, or X (formerly Twitter) direct messages), voicemail messages, instant messaging systems such as Lync or ICQ, and shared messages systems such as Slack.

▪ In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind.

▪ Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

▪ Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to FOIA.[12]

▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[12] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

- 4 -

NARA-26-0110

**JA206**

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Jessica Jensen at foia@americanoversight.org or (276) 293-9853 ext. 1033. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Jessica Jensen*
Jessica Jensen
on behalf of
American Oversight

- 5 -

**JA207**

NARA-26-0110

# EXHIBIT G

# AMERICAN OVERSIGHT

January 20, 2026

**VIA EMAIL**

National Archives and Records Administration
Archival Operations Division – Donald J. Trump Presidential Library
8601 Adelphi Rd.
College Park, MD 20740
trump.library@nara.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

During President Trump's first term in office, White House officials faced significant allegations of corruption and other conflicts of interest.[1] American Oversight seeks records with the potential to shed light on this matter.

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> All email communications (including emails, complete email chains, calendar invitations, and attachments thereto) <u>sent by</u> Domestic Policy Council Director Brooke Rollins, or anyone communicating on her behalf, such as an assistant or scheduler, to any email address ending in .com, .co, .us, .net, .org, .mail, .edu, .law, .legal, .ch, .me, .group, .vc, or .io.

> In an effort to accommodate your office and reduce the number of potentially responsive records to be processed and produced, American Oversight has limited this request to emails <u>sent</u> by Ms. Rollins. To be clear, however, American Oversight's request encompasses complete email chains, including all preceding messages in a chain to which Ms. Rollins responded. This means that any message Ms. Rollins during the specified time frame to any email address ending in any of the domains listed above is responsive to this request, and all sent and received messages in that chain should be produced.

---

[1] *See, e.g.*, Jim Lardner, *Mapping Corruption: Donald Trump's Executive Branch*, Am. Prospect, Apr. 9, 2020, https://prospect.org/2020/04/09/mapping-corruption-donald-trump-executive-branch/.

**Please provide all responsive records from January 20, 2017, through January 20, 2021.**

<u>Fee Waiver Standard</u>

American Oversight recognizes that NARA does not grant fee waivers for archival records. *See* 5 U.S.C. § 552(a)(4)(A)(iv) (fee waiver provisions not superseded by other, specific statutes setting fee levels of specific categories of records); 44 U.S.C. § 2116(c) (providing for fees for archival records). However, to the extent your agency is willing to exercise its discretion to grant a waiver of fees, American Oversight meets the relevant standards under 5 U.S.C. § 552(a)(4)(A)(iii). The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[2] The public has a significant interest in the allegations of corruption and conflicts of interest from President Trump's first term.[3] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including whether and to what extent non-government entities and individuals influenced White House decisions during the first Trump Administration. American Oversight is committed to transparency and makes the responses agencies provide to its FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[4] In fact, as a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the release of the information requested is not in American Oversight's commercial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[5]

---

[2] 5 U.S.C. § 552(a)(4)(A)(iii).

[3] *See supra* note 1.

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] American Oversight currently has approximately 16,000 followers on Facebook and 94,200 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 16, 2026); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 16, 2026).

- 2 -

**JA210**

NARA-26-0111

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[6] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[7] posting records and editorial content about the federal government's response to the COVID-19 pandemic;[8] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump Administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[9] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[10] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[11]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

---

[6] *See generally Our Latest*, American Oversight, https://www.americanoversight.org/blog.

[7] *The Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[8] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[9] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Audit the Wall: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://americanoversight.org/audit-the-wall-no-plans-funding-or-timeline-and-no-wall/.

[10] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.documentcloud.org/documents/25544090-doj-records-relating-to-solicitor-general-noel-franciscos-recusal-american-oversight; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[11] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

NARA-26-0111

**JA211**

- ▪ Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics. For instance, if the request seeks "communications," please search all locations likely to contain communications, including relevant hard-copy files, correspondence files, appropriate locations on hard drives and shared drives, emails, text messages or other direct messaging systems (such as iMessage, WhatsApp, Signal, or X (formerly Twitter) direct messages), voicemail messages, instant messaging systems such as Lync or ICQ, and shared messages systems such as Slack.

- ▪ In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind.

- ▪ Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- ▪ Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to FOIA.[12]

- ▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[12] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

- 4 -

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Jessica Jensen at foia@americanoversight.org or (276) 293-9853 ext. 1033. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

                                        Sincerely,

                                        */s/ Jessica Jensen*
                                        Jessica Jensen
                                        on behalf of
                                        American Oversight

- 5 -

**JA213**

NARA-26-0111

# EXHIBIT H

JA214

# AMERICAN OVERSIGHT

January 20, 2026

**VIA EMAIL**

National Archives and Records Administration
Archival Operations Division – Donald J. Trump Presidential Library
8601 Adelphi Rd.
College Park, MD 20740
trump.library@nara.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

During President Trump's first term in office, White House officials faced significant allegations of corruption and other conflicts of interest.[1] American Oversight seeks records with the potential to shed light on this matter.

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> All email communications (including emails, complete email chains, calendar invitations, and attachments thereto) <u>sent by</u> Senior Advisor Ivanka Trump, or anyone communicating on her behalf, such as an assistant or scheduler, to any email address ending in .com, .co, .us, .net, .org, .mail, .edu, .law, .legal, .ch, .me, .group, .vc, or .io.

> In an effort to accommodate your office and reduce the number of potentially responsive records to be processed and produced, American Oversight has limited this request to emails <u>sent</u> by Ms. Trump. To be clear, however, American Oversight's request encompasses complete email chains, including all preceding messages in a chain to which Ms. Trump responded. This means that any message Ms. Trump during the specified time frame to any email address ending in any of the domains listed above is responsive to this request, and all sent and received messages in that chain should be produced.

---

[1] *See, e.g.,* Jim Lardner, *Mapping Corruption: Donald Trump's Executive Branch*, Am. Prospect, Apr. 9, 2020, https://prospect.org/2020/04/09/mapping-corruption-donald-trump-executive-branch/.

**Please provide all responsive records from January 20, 2017, through January 20, 2021.**

<u>Fee Waiver Standard</u>

American Oversight recognizes that NARA does not grant fee waivers for archival records. *See* 5 U.S.C. § 552(a)(4)(A)(iv) (fee waiver provisions not superseded by other, specific statutes setting fee levels of specific categories of records); 44 U.S.C. § 2116(c) (providing for fees for archival records). However, to the extent your agency is willing to exercise its discretion to grant a waiver of fees, American Oversight meets the relevant standards under 5 U.S.C. § 552(a)(4)(A)(iii). The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[2] The public has a significant interest in the allegations of corruption and conflicts of interest from President Trump's first term.[3] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including whether and to what extent non-government entities and individuals influenced White House decisions during the first Trump Administration. American Oversight is committed to transparency and makes the responses agencies provide to its FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[4] In fact, as a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the release of the information requested is not in American Oversight's commercial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[5]

---

[2] 5 U.S.C. § 552(a)(4)(A)(iii).

[3] *See supra* note 1.

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] American Oversight currently has approximately 16,000 followers on Facebook and 94,200 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 16, 2026); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 16, 2026).

- 2 -

**JA216**

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[6] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[7] posting records and editorial content about the federal government's response to the COVID-19 pandemic;[8] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump Administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[9] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[10] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[11]

Accordingly, American Oversight qualifies for a fee waiver.

**<u>Guidance Regarding the Search & Processing of Requested Records</u>**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

---

[6] *See generally Our Latest*, American Oversight, https://www.americanoversight.org/blog.
[7] *The Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.
[8] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.
[9] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Audit the Wall: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://americanoversight.org/audit-the-wall-no-plans-funding-or-timeline-and-no-wall/.
[10] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.documentcloud.org/documents/25544090-doj-records-relating-to-solicitor-general-noel-franciscos-recusal-american-oversight; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.
[11] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

- 3 -

NARA-26-0112

- ▪ Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics. For instance, if the request seeks "communications," please search all locations likely to contain communications, including relevant hard-copy files, correspondence files, appropriate locations on hard drives and shared drives, emails, text messages or other direct messaging systems (such as iMessage, WhatsApp, Signal, or X (formerly Twitter) direct messages), voicemail messages, instant messaging systems such as Lync or ICQ, and shared messages systems such as Slack.

- ▪ In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind.

- ▪ Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- ▪ Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to FOIA.[12]

- ▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[12] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

- 4 -

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Jessica Jensen at foia@americanoversight.org or (276) 293-9853 ext. 1033. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Jessica Jensen*
Jessica Jensen
on behalf of
American Oversight

- 5 -

NARA-26-0112

**JA219**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-03657 |

## DECLARATION OF MATTHEW CONNELLY

1.    I, Matthew Connelly, am a professor of history at Columbia University.

2.    I first became a member of the American Historical Association (AHA) in the 1990s, and became a lifetime member in 2019.

3.    My scholarship focuses on diplomatic and military history, government secrecy, and the exercise of executive power. I have authored three books that rely substantially on Presidential records. *A Diplomatic Revolution: Algeria's Fight for Independence and the Origins of the Cold War* (Oxford University Press, 2002), drew extensively on records held at the Dwight D. Eisenhower Presidential Library in Abilene, Kansas, and the John F. Kennedy Presidential Library in Boston, Massachusetts. My second book, *Fatal Misconception: The Struggle to Control World Population* (Harvard University Press, 2008), required research across multiple Presidential Libraries, including the Johnson, Nixon, Ford, Carter, and Reagan Presidential Libraries. My third book, *The Declassification Engine: What History Reveals About America's Top Secrets* (Pantheon, 2023), examined the system by

**JA220**

which the executive branch creates and classifies records, and uses national security information to justify and expand presidential power. That project required intensive use of materials from the Kennedy, Johnson, Ford, Carter, and Reagan Presidential Libraries. I have also published articles in peer-reviewed journals that rely on Presidential records. Over more than thirty years of research, Presidential and other executive branch records have been foundational to virtually every major project I have undertaken. As the National Archives takes custody of additional Presidential records, including records of the current administration, I plan to use them in my scholarship, as I have throughout my career.

4.      I am currently making extensive use of the records of former Presidents in new research on the history of expert predictions of catastrophic global risk. It requires access to records documenting how American administrations since the mid-twentieth century received, evaluated, and acted upon warnings about threats ranging from nuclear war to pandemic disease to environmental collapse. This research depends on my continued ability to access materials held at Presidential Libraries, and use FOIA and MDRs to obtain currently classified records. Any curtailment of access to Presidential records would directly and materially harm my ability to complete this book, which is under contract with Random House.

5.      For more than a decade, I have also conducted data science research on classification and declassification of national security information. I direct the History Lab at Columbia University, which I founded as a research center dedicated to developing computational tools and methods for processing and analyzing large volumes of sensitive materials. This work has been supported by more than $5.5 million in competitive federal and foundation grants, including awards from the National Science Foundation, the National

**JA221**

Endowment for the Humanities, the Intelligence Advanced Research Projects Agency, the National Historical Publications and Records Commission, the American Council of Learned Societies, the MacArthur Foundation, and the Arcadia Fund. A central focus of this research has been developing machine learning and large language model tools capable of identifying sensitive information within government records in order to expedite the declassification and public release of information that no longer imperils national security. More specifically, my current research with colleagues in computer science and statistics depends on the use of a large collection of digitized records from the Carter Presidential Library.

6.      I have drawn on this work in public advocacy to support continued access to Presidential and executive branch records. I have served on the AHA's National Archives Review Committee since 2020, chaired the Society for Historians of American Foreign Relations Task Force on Advocacy from 2019 to 2023, and was also board secretary of the National Coalition for History. I have therefore learned from many colleagues not only in the historical profession but also adjacent fields like political science and national security law about the critical need to protect and expand public access to executive branch records. I have written on these issues in the *New York Times*, the *Los Angeles Times*, and *Time*, and have also consulted with members of Congress and the Public Interest Declassification Board. All of this work has required showing how the responsible management of sensitive government information and the timely release of historical records are complementary rather than competing goals. And all of that is now directly threatened by the administration's actions at issue in this case.

7.      Finally, as director of History Lab, I have also organized training workshops to teach scholars and archivists how to deploy data science tools to better process and access

**JA222**

digital and digitized records. I frequently use Presidential and other executive branch records to demonstrate both the challenges and opportunities. These records are not just uniquely important. The long history of presidential records management since the Franklin Delano Roosevelt administration also serves to demonstrate best practices in the collection, preservation, and dissemination of historical materials. People who have benefitted from this training include archivists and records managers responsible for sensitive and vitally important collections, such as at the National Archives in College Park, and the Special Operations Command at MacDill Air Force Base, Florida. Restrictions on access could therefore harm not only my own research, and the possibility of having an informed public discussion of policy on balancing democratic accountability and national security, but the development of the next generation of historians and archivists.

8.    My long study of Presidential records makes clear that they cannot be the property of the officials who created them. They belong to the public, because citizens cannot otherwise hold their leaders to account. When Presidential records are withheld indefinitely, or made inaccessible, it becomes impossible to reconstruct what officials did in the name of the people who elected them. And if our government is not accountable even in the court of history, it is accountable to no one. The costs of that loss — diminished public confidence in political institutions, the proliferation of conspiracy theories, and the deepening inability of citizens to evaluate or even understand critical policy choices — are incalculable.

9.    The historical record also shows, repeatedly, that when officials shield themselves from scrutiny, systemic vulnerabilities multiply. Those officials who are most intent on monopolizing the power to decide what to reveal to the public are very often concealing the rot of incompetence. With no prospect of ever analyzing their actions, they can continue

deceiving citizens while failing to defend us from our foes. Researchers who study Presidential records perform an essential function in our republic: they identify the patterns of institutional failure, concealed from contemporaries, and make an example of those who have betrayed their constitutional responsibilities.

10.    Finally, withholding records from the public makes it easier to destroy them. Destroying historical records is the worst form of evasion, rendering information unknown and unknowable by any living being. As the Czech novelist Milan Kundera wrote, "The struggle of man against power is the struggle of memory against forgetting." That struggle is an unequal one. When the most powerful people make it impossible even to ask for an account of their decisionmaking, this truly is the end of history.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 12, 2026 in Brightwaters New York.

Matthew Connelly
Professor of History

**JA224**

Docusign Envelope ID: F32699EF-F5B9-8E14-8295-AF845D3BCBB3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL
ASSOCIATION, *et al.*,

> *Plaintiffs*,

v.

DONALD TRUMP, in his official capacity
as President of the United States and in his
personal capacity, *et al.*,

> *Defendants*.

Case No. 25-cv-03657

## DECLARATION OF TIMOTHY J. NAFTALI

1.  I, Timothy J. Naftali, am a Senior Research Scholar at Columbia University's School of International and Public Affairs

2.  I have been a member of the American Historical Association (AHA) since 2020.

3.  Much of my professional career would not have been possible without presidential records. They have fueled a lot of my scholarship, informed my teaching and been a focal point of my work in government. Early in my career I co-authored an international history of the Cuban Missile Crisis, which would not have been the same without materials from the John F. Kennedy library, especially the Kennedy tapes. My later works drew even more heavily upon presidential materials: a history of US counterterrorism policy; a biography of George H. W. Bush and two books of annotated transcripts of the Kennedy tapes. Between 2006 and 2011, I had the privilege and honor of serving as, initially, the director of the Nixon Presidential Materials Project and, then, as the first director of the Richard Nixon Presidential Library and Museum. My time at the National Archives informed my understanding of the importance of

**JA225**

Docusign Envelope ID: F32699EF-F5B9-8E14-8295-AF845D3BCBB3

Case 1:26-cv-01169-BAH    Document 13-10    Filed 04/14/26    Page 2 of 3
USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 231 of 450

how we preserve presidential records and how much our approach to them since the Watergate era has served the goal of civic literacy. Now, at Columbia, I teach courses on the evolution of the modern presidency and on policymakers and the intelligence community. The complexities, the tradeoffs, and the internal politics of presidential decisions could not be understood relying solely on public statements and tweets.

4.    I am currently completing a presidential biography of John F. Kennedy that will draw not only upon the records of the Kennedy Library but also from presidential materials in the Dwight D. Eisenhower and Gerald R. Ford Libraries, the latter because of its holdings of the Commission on CIA Activities within the United States (Rockefeller Commission). In the course of researching the Kennedy presidency I have encountered gaps in the record—either missing tape recordings of meetings from the critical summer of 1963 or of documents—likely the result of the fact that the Kennedy presidential collection is a legacy of the Deed of Gift era where presidents or their legatees could legally remove or destroy presidential records at will [I have no reason to believe the National Archives is responsible for these gaps]. I have written articles about the first and second Trump administrations as well as the Obama and Biden administrations and intend to keep writing about past, current and future presidents for as long as possible.

5.    Should the Courts annul the Presidential Records Act, the ripple effects will hurt not only the understanding of one President. Until April 30, 2025, I served on the Department of State's Advisory Committee on Historical Diplomatic Documentation. As described in our public meetings, State Department Historians are currently working on or about to begin volumes of the authoritative *Foreign Relations of the United States* [FRUS] series for four presidencies, Ronald Reagan, George H. W. Bush, and William J. Clinton, and George W. Bush.

**JA226**

These presidencies all have Presidential Records Act collections. My ability—and more importantly that of thousands of scholars and countless members of the interested public—to make sense of the foreign policy decision-making of our government since 1981 in books, articles, online and in the classroom, would be immediately affected if the public ownership, and by definition, the accessibility of those records were suddenly called into question, let alone revoked. I intend to continue to write articles and books on recent presidents, including the current occupant of the White House, using Presidential Records. Once the current President's term ends and the National Archives assumes legal custody of his records, I intend to make use those records as permitted under the Presidential Records Act. If those records are not preserved now, however, they may be irretrievably lost to research scholars such as myself. The Presidential Records Act inspires confidence in official transparency by establishing a legal chain of preservation and custody for presidential records. Recent presidential records may continue to remain classified for several decades, but the public can rest assured that they won't be destroyed. It may take time, but having confidence in being able to reconstruct some of the most difficult decisions faced by a White House is essential to fostering faith in democratic institutions and in ensuring public understanding of what our elected leaders do on our behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 13, 2026 in Budapest, Hungary

DocuSigned by:

8040872BD86C46B...

Timothy J. Naftali

JA227

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL
ASSOCIATION, *et al.*,

      *Plaintiffs,*

    v.

DONALD TRUMP, in his official capacity
as President of the United States and in his
personal capacity, *et al.*,

      *Defendants.*

Case No. 25-cv-03657

**DECLARATION OF KATHRYN CRAMER BROWNELL**

1.    I, Kathryn Cramer Brownell, am a professor of history at Purdue University, and I provide this declaration in my capacity as an individual scholar and not on behalf of the university.

2.    I began my membership in the American Historical Association (AHA) as a graduate student in 2010 and I remain an active member today.

3.    I am a historian of modern America, with a particular research expertise in the intersection of media and presidential politics. I am the author of three books, all of which extensively and expansively use presidential records. My first book *Showbiz Politics: Hollywood in American Political Life* (University of North Carolina Press, 2014), explores the rise of the celebrity presidency and the process by which Hollywood styles, structures, and personalities emerged as a defining feature of politics. In this book, I use records from six presidential libraries—Herbert Hoover, Franklin Roosevelt, Harry Truman, Dwight Eisenhower, John Kennedy, and Richard Nixon—to study shifts in campaign strategies and political party

**JA228**

operations as well as relationships between individuals in Hollywood and members of presidential administrations. This archival work has allowed me to uncover and assess how film industry leaders transformed the organization and style of national campaigns in both parties, thus influencing policymaking and awakening politicians and voters to a new type of political communication grounded in the entertainment industry. My second book, *24/7 Politics: Cable Television and the Fragmenting of America from Watergate to Fox News,* (Princeton University Press, 2023) extends my inquiry into the intersection of media and presidential politics by asking how ideas about television's growing power influenced governance. The book uses records from five presidential libraries—Lyndon Johnson, Richard Nixon, Gerald Ford, Jimmy Carter, and Ronald Reagan—to examine regulatory debates over the structure and use of cable television from the 1960s through the 1980s.

4.     Most recently, my forthcoming textbook from Routledge Press, *A History of the Modern American Presidency,* compiles not just my own primary research from presidential archives but also a range of scholarship from other historians and political scientists who have also used presidential records. This textbook encourages students to study how the presidency intersects with local politics, economic developments, interest groups, technological changes, bureaucrats, members of Congress, and the foreign policy establishment. In developing this textbook and a "Recasting American Presidential History in the Classroom" teaching guide published online through the Miller Center for Public Affairs at the University of Virginia, I use a range of presidential records—including written materials, audio recordings, and photographs—to help students explore the varied operations of the American presidency and the functioning of democratic institutions more broadly.

2

**JA229**

5.      As a scholar and teacher, I will continue to rely on presidential records for my work in the future. For my fourth book project, I have already begun to compile archival research at the Ronald Reagan Presidential Library and I plan to expand my research for this project into records at the George H.W. Bush, William Clinton, and George W. Bush presidential libraries in the near future. Loss of access to presidential records would significantly harm my ability to provide the most nuanced, expansive, and accurate historical assessment of modern American political history in my publications and in my teaching.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 13, 2026 in West Lafayette, Indiana.

Kathryn Cramer Brownell

Docusign Envelope ID: 5CDBE143-72A3-8773-80DE-8B8418B41509

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL
ASSOCIATION, *et al.*,

*Plaintiffs*,

v.

DONALD TRUMP, in his official capacity
as President of the United States and in his
personal capacity, *et al.*,

*Defendants*.

Case No. 25-cv-03657

## DECLARATION OF NATALIA MEHLMAN ETR ELA

1. I, Natalia Mehlman Petr ela, am a Professor of History at The New School.

2. I have been a member of the American Historical Association (AHA) since 2009, and currently serve on its Academic Freedom Committee.

3. I am a historian of political culture in the United States. I am the author of two books, *lassroo ars ang age Se and the a ing of odern Politi al lt re* (Oxford University Press, 2015) and *Fit ation he ains and Pains of eri a s er ise session* (University of Chicago Press, 2023) and I am at work on two more, one about the educational culture wars and a second on the history of eastern Long Island. I have recently been named both a Carnegie Fellow and a National Endowment for the Humanities Public Scholar, and I contribute frequently to a broad range of media outlets, both for scholarly and popular audiences. I am not a presidential historian, but I still rely on presidential records a reality that underscores how crucial these resources are to scholars across the discipline of history (and surely, others). In *lassroo ars* and in my ongoing work about the culture

**JA231**

Docusign Envelope ID: 5CDBE143-72A3-8773-80DE-8B8418B41509

wars that convulse both K-12 and university education, for example, I examine many presidential statements and policies that have shaped educational policy, practice, and discourse in the United States. The ability to access and research the kinds of documents now preserved under the Presidential Records Act is vital to this research—including the development of presidential statements and correspondence the President receives.

4.      In this vein of research, I just contributed the chapter on education to a new volume of essays by historians offering a first assessment of Joseph Biden's administration (*he Presiden   of ose h R.   iden    First   istori al   ssess ent*, Princeton University Press, 2026). As records from the Biden presidency become available, I anticipate further research in this area.

5.       In *Fit   ation*  the records of the Eisenhower and Kennedy administrations were especially important, given these two presidents were architects of the presidential councils on fitness that transformed American approaches to exercise. Across both my work in the histories of education and fitness in this country, presidential records play an important role in capturing public opinion in the pre-digital era, given so many Americans, including children, wrote letters to the president. For those of us writing about the history of youth, these records are especially crucial, because evidence of young people's experience is particularly ephemeral.

6.      I am currently at work on two books, one about the school culture wars since the 1830s until today, and a second on the history of eastern Long Island. Both of these involve documents that would fall under the purview of presidential records, particularly various multiple infrastructural policies and educational decisions and statements.

**JA232**

Docusign Envelope ID: 5CDBE143-72A3-8773-80DE-8B8418B41509

Case 1:26-cv-01169-BAH    Document 13-12    Filed 04/14/26    Page 3 of 3
USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 238 of 450

7.      I hope this statement shows that even I, who am not a presidential historian, consider the availability of presidential records vital to my work. The damage that would be done to historians who specifically work on the presidency is incalculable. Exploring and analy ing the president's relationship to any number of issues, through the archival record, is often one of the most important ways that historians begin to understand the national and federal dimensions of a wide range of concerns. Losing access to these sources would be a major blow to the historical profession, and to our collective understanding of the United States, past and present.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2026 in New ork City.

┌─ DocuSigned by:

*Natalia Mehlman Petrzela*

└─ 2DF200C004344A3...

Natalia Mehlman Petr ela
Professor of History, The New School

**JA233**

# Exhibit A

<u>**Memorandum**</u>

**Date:** April 2, 2026

**From:** David Alan Warrington, Assistant to the President and Counsel to the President

**Re:** <u>Records Retention Policy After Office of Legal Counsel Finding that the Presidential Records Act is Unconstitutional</u>

The Presidential Records Act ("PRA") purports to require the President to preserve all documentary material related to the performance of the President's constitutional, statutory, or other official or ceremonial duties. The 1978 law is a significant departure from historical practice. For 200 years the presidency existed without the legislative branch invading the rights of the executive branch. Instead, presidential records were considered property of the President. Reacting to President Nixon's resignation and the Watergate scandal, Congress chose a path never before or since enacted – a law compelling the creation, retention, and disclosure of presidential records.

Because Congress never had the Article I power to regulate the President's records in the manner contemplated by the PRA, the Office of White House Counsel asked the Department of Justice's Office of Legal Counsel ("OLC") to review the constitutionality of the PRA. OLC concluded that the PRA is unconstitutional for two reasons: it exceeds Congress's enumerated and implied powers, and it aggrandizes Congress at the expense of the constitutional independence and autonomy of the President.

The purpose of this memorandum is to provide guidance on how the EOP will preserve records in light of OLC's determination.

Staff should carefully review this guidance to ensure that they are appropriately saving presidential records. This guidance applies to both classified and unclassified materials. Components are free to retain the records retention policies developed under the PRA.

**JA235**

## Records Policy

**Records Generally.**  The National Archives and Records Administration states that federal records are information made or received in connection with the transaction of public business.  Even in the absence of the PRA, EOP staff should preserve any material related to the performance of their duties.  Records may be relevant to ongoing or future litigation, and thus may be subject to other legal preservation requirements.  The medium of the material does not matter – printed, electronic, or hand-written materials are considered records and should be saved if they are related to the performance of EOP staff duties.

**Records Custody.**  The Office of White House Counsel will coordinate regarding the ownership and storage of records.  EOP staff do not have any ownership of records created or obtained in the performance of their duties.  When leaving EOP employment, EOP staff may not take any records.

**Electronic Records.**  As a matter of prudence, the electronic records of EOP employees will be preserved.  This includes both emails and any electronic records saved.  EOP staff should conduct all work-related communications via your official EOP email account.  Materials created or edited by EOP staff should be saved on your EOP laptop or the EOP network.  Staff cannot permanently delete emails or materials saved to an EOP laptop or the EOP network.

**Paper Records.**  EOP staff should preserve paper records necessary to the performance of their duties.  Extra copies of material do not need to be saved.  EOP staff is encouraged to routinely file any paper records with the Office of Records Management (askORM@who.eop.gov).

**Personal Records.**  EOP staff are not required to preserve personal documents that do not relate to their duties.

**Text Messaging.**  Under the PRA, no presidential administration required EOP staff to transcribe phone calls, meetings, or informal discussions, even though the broad and unconstitutional text of the PRA certainly suggests that this would be required.  Complying with such a requirement would be immensely time consuming and costly.  Similarly, as text messaging becomes more akin to speaking every day, preserving all text messages would create an enormous technological burden while chilling the ability of presidential advisors to provide candid advice.  Text messages should only be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere.  Furthermore, staff is encouraged to ensure that any decision-making, government

**JA236**

action, or unique information is memorialized in a more accessible format, such as an email or memorandum.  Text messages reflecting personal conversations, workplace gossip, ministerial tasks or other workplace minutiae (e.g., "call me", "what room for the meeting", "there is a typo in the first line of the memo") do not need to be preserved.  For example:

 

Staff unsure of whether a text message should be preserved should contact the Office of White House Counsel.

**Duty to Preserve.**  EOP staff should ensure that both electronic and paper records are preserved.  Staff should avoid using personal devices for government business whenever possible as the conduct of government business on personal devices has the potential to require the examination of personal devices in litigation or in response to congressional oversight requests.  As described above, text messages that are the sole record of official decision-making, government action, or unique information should either be stored on an EOP system as soon as possible or memorialized in an email or memorandum.

**Training**.  The Office of White House Counsel will conduct __mandatory__ records trainings. Staff should make every effort to participate.

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN HISTORICAL ASSOCIATION;
AMERICAN OVERSIGHT,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*,

Defendants.

Case No. 1:26-cv-01169-JDB

**DECLARATION OF KATE DILLON MCCLURE**

I, Kate Dillon McClure, under 28 U.S.C. § 1746, hereby declare and state as follows:

1.     I am the Director of the Archival Operations Division in the Office of Presidential Libraries at the National Archives and Records Administration (NARA) and have held this position since May of 2024. Prior to becoming the Director, I served as Acting Director of the White House Liaison Division and an archivist in the Presidential Library system since 1996.  In those positions I was responsible for working with modern Presidential records administered under the Presidential Records Act (PRA), 44 U.S.C. §§ 2201-2209. I hold a Bachelor of Arts degree in English and History from the University of Pittsburgh and a Master of Arts and a Master of Library Science from the University of Maryland.

2.     The statements contained in this declaration are based upon my personal knowledge, upon information furnished to me in the course of my official duties, and upon conclusions and determinations reached and made in accordance therewith.

**JA239**

3.    I submit this declaration in relation to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Stay, to be filed in the above-captioned litigation.

4.    NARA is continuing to preserve all Presidential records in its custody and plans to continue processing requests for access to such records. For example, NARA released Presidential records on April 2, 9, and 15, 2026, in response to Freedom of Information Act requests.

5.    NARA maintains custody of records of President Trump's 45th Presidential administration that were transferred by President Trump to NARA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2026.

_____
Kate Dillon McClure
Director
Archival Operations Division
Office of Presidential Libraries
National Archives and Records Administration
Washington, DC 20408

2

**JA240**

# Exhibit E

**THE WHITE HOUSE**

WASHINGTON

February 22, 2017

MEMORANDUM FOR ALL PERSONNEL

THROUGH:   DONALD F. McGAHN II
Counsel to the President

FROM:   STEFAN C. PASSANTINO
Deputy Counsel to the President, Compliance and Ethics

SCOTT F. GAST
Senior Associate Counsel to the President

JAMES D. SCHULTZ
Senior Associate Counsel to the President

SUBJECT:   Presidential Records Act Obligations

## Purpose

To remind all personnel of their obligation to preserve and maintain presidential records, as required by the Presidential Records Act ("PRA").

## Discussion

The PRA requires that the Administration take steps "to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained."  This memorandum outlines what materials constitute "presidential records" and what steps you must take to ensure their preservation.

*What Are Presidential Records?*

"Presidential records" are broadly defined as "documentary materials . . . created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President,[1] in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  Presidential records include material in both paper and electronic form.

---

[1] The PRA applies to the following Executive Office of the President ("EOP") entities:   White House Office, Office of the Vice President, Council of Economic Advisors, Executive Residence, Office of Administration, Office of Policy Development (DPC and NEC), National Security Council, President's Commission on White House Fellows, and President's Intelligence Advisory Board.

**JA242**

Some materials that are considered presidential records include:

- Memos, letters, notes, emails, faxes, reports, and other written communications sent to or received from others, including materials sent to or received from persons outside government;

- Drafts, marked-up edits, or comments that are circulated or shown to others;

- Notes or minutes of meetings that are circulated or shown to others;

- Meeting minutes, memos to file, notes, drafts, and similar documents that are created or saved for the purpose of accurately documenting the activities or deliberations of the Administration, even if such materials are not circulated or shown to others;

- PowerPoint presentations, audio recordings, photos, and video footage;

- Emails, chats, and other electronic communications that are created or received in the course of conducting activities related to the performance of the President's duties, but that are sent from or received on non-official accounts; and

- Transition materials, but only if they are used in the course of official government business.

Purely personal records that do not relate to or have an effect upon the carrying out of the President's official duties do not need to be preserved.  Similarly, political records need not be preserved unless they relate to or have a direct effect upon the President's official duties.  Finally, certain materials that lack historic value are not covered by the PRA – for example, notes, drafts, and similar documents that are not circulated or that are not created or saved for the purpose of documenting the activities or deliberations of the Administration.

*What Steps Should Be Taken to Preserve Presidential Records?*

**Paper Records**.  You should preserve hard-copy presidential records in organized files.  To the extent practicable, you should categorize materials as presidential records when they are created or received.  You should file presidential records separately from other material.  Paper records are typically collected at the end of your White House service, but may be collected at an earlier point by contacting the White House Office of Records Management ("WHORM").  Any records collected by WHORM remain available to the staff member who provided them.

**Electronic Records**.  You must preserve electronic communications that are presidential records.  **You are required to conduct all work-related communications on your official EOP email account**, except in emergency circumstances when you cannot access the EOP system and must accomplish time sensitive work.  Emails and attachments sent to and from your EOP account are automatically archived.

**JA243**

JA244

*If you ever send or receive email that qualifies as a presidential record using any other account, you **must** preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days.* After preserving the email, you must delete it from the non-EOP account. ***Any employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties.***

The same rules apply to other forms of electronic communication, including text messages. ***You should not use instant messaging systems, social networks, or other internet-based means of electronic communication to conduct official business without the approval of the Office of the White House Counsel.*** If you ever generate or receive presidential records on such platforms, you must preserve them by sending them to your EOP email account via a screenshot or other means. After preserving the communications, you must delete them from the non-EOP platform.

Electronic documents that qualify as presidential records and only exist in electronic format must be saved on your network drive or regularly synchronized to it. You must archive files that you are no longer using; you must not delete them. Your network drive will be captured upon your departure from the EOP, which will secure any presidential records you have saved.

At all times, please keep in mind that presidential records are the property of the United States. You may not dispose of presidential records. When you leave EOP employment, you may not take any presidential records with you. You also may not take copies of any presidential records without prior authorization from the Counsel's office. The willful destruction or concealment of federal records is a federal crime punishable by fines and imprisonment.

Any questions about compliance with the Presidential Records Act may be directed to Stefan Passantino (b) (6) , Scott Gast (b) (6), or Jim Schultz (b) (6).

**JA244**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION et al.,<br>       Plaintiffs,<br><br>       v.<br><br>DONALD TRUMP et al.,<br>       Defendants. | **Civil Action No. 26-1169 (JDB)** |

**ORDER**

Upon consideration of [13] plaintiffs' motion for a preliminary injunction and stay, [19] the government's opposition, [22] plaintiffs' reply, the hearing on May 13, 2026, and the entire record herein, and for the reasons identified in the memorandum opinion issued on this date; it is hereby **ORDERED** that:

1. Plaintiffs' motion for a preliminary injunction and stay is **GRANTED IN PART** and **DENIED IN PART**;

2. Defendants except the President, the Vice President, NARA, the Archivist, DOJ, and the Attorney General (hereinafter, Enjoined Defendants)[1] are preliminarily **ENJOINED**, effective 9:00am on May 26, 2026, to:

---

[1] The Enjoined Defendants subject to this order are: the White House Office, Chief of Staff to the President Susie Wiles, Director of the Office of Records Management Philip Droege, the National Security Council, Executive Secretary of the National Security Council Catherine Keller, the Homeland Security Council, Homeland Security Advisor Stephen Miller, the Council on Economic Advisers, Chair of the Council of Economic Advisers Pierre Yared, the Executive Residence, White House Chief Usher Robert Downing, Chair of the Intelligence Advisory Board Devin Nunes, the Office of Administration, Director of the Office of Administration Joshua Fisher, the Office of the Vice President, Chief of Staff to the Vice President Jacob Reses, the U.S. DOGE Service, and Acting Administrator of the U.S. DOGE Service Amy Gleason.

a. Comply in full with the provisions of the Presidential Records Act, 44 U.S.C. §§ 2201-09;

b. Preserve and not destroy or delete presidential and vice presidential records as defined under the Presidential Records Act, 44 U.S.C. §§ 2201(2) and 2207, except insofar as records disposal is permitted in accordance with the procedures set out under 44 U.S.C. § 2203(c)-(e);

c. Ensure that covered employees, as defined in section 2209(c) of the Act, not create or send any presidential or vice presidential record using non-official electronic message accounts—including Signal, WhatsApp, and other text or instant messaging applications or platforms—unless they copy an official electronic messaging account when creating or transmitting the record or forward a complete copy of the record to an official account within 20 days of creating or transmitting the record, see 44 U.S.C. § 2209;

d. Establish or reestablish records retention policies to preserve and maintain presidential records in full compliance with the Presidential Records Act, see 44 U.S.C. § 2203(a);

3. Defendants shall transmit a copy of this order to covered employees, as defined in section 2209(c) of the Act, by not later than 9:00am on May 26, 2026;

4. Defendants shall file a notice with the Court by not later than May 28, 2026, describing the steps they have taken to comply with this order.

**SO ORDERED**.

_____/s/_____
JOHN D. BATES
United States District Judge

Date: <u>May 20, 2026</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION et al.,<br>        Plaintiffs,<br><br>        v.<br><br>DONALD TRUMP et al.,<br>        Defendants. | Civil Action No. 26-1169 (JDB) |
| FREEDOM OF THE PRESS FOUNDATION et al.,<br>        Plaintiffs,<br><br>        v.<br><br>DONALD TRUMP et al.,<br>        Defendants. | Civil Action No. 26-1402 (JDB) |

## <u>MEMORANDUM OPINION</u>

"Who controls the past controls the future; who controls the present controls the past."[1]

Perhaps with that lesson in mind, Congress enacted laws to ensure that government records are created, preserved, and made available to the public. Among those is the Presidential Records Act (Records Act), which mandates the preservation of materials related to the official responsibilities of the President. In so doing, the Act democratizes the history of an indispensable institution. Access to those records allows future Presidents to pick up where their predecessors left off, Congress to identify inefficiency and misfeasance, and the public to learn from the mistakes of the

---

[1] George Orwell, <u>1984</u> 37 (Penguin Classics 2000) (1949) (citation modified).

1

**JA248**

past.  Now, however, almost 50 years after its passage, the Executive Branch asserts that the Records Act is unconstitutional.

Two sets of plaintiffs have brought suit to challenge that assertion, seeking at this stage a preliminary injunction.  At the threshold, the government responds that plaintiffs lack standing because they have not been injured and that they lack a cause of action because review is precluded by the statutory scheme.  But plaintiffs have established a substantial risk that the government is no longer fully complying with the Records Act, at least with respect to three categories of records: electronic records created on personal rather than official devices, records created by the President or Vice President themselves, and records the President discards.  That risk amounts to informational injury for these plaintiffs because they have regularly sought access to presidential records under the Freedom of Information Act and plan to continue doing so.  And plaintiffs likely have a cause of action under the Constitution and to enjoin violations of federal law because the government—which has concluded that the Records Act is unconstitutional—is necessarily acting under its Article II powers rather than any statutory authority in promulgating new records guidance.

On the merits, the Records Act is likely constitutional.  It was validly enacted by Congress under the Property Clause because Congress may prospectively designate presidential records as federal property and then regulate that property.  And it is also a valid exercise of the Necessary and Proper Clause as it promotes the accountability and efficiency of Executive Branch operations. Moreover, it does not impermissibly intrude on any presidential prerogative, especially because Presidents—including President Trump in his first term—have complied without complaint for almost 50 years and the new guidance for the Executive Office of the President voluntarily imposes similar burdens to those the government now decries as unbearable.  Because the President must

2

**JA249**

"Take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, he must carry out the duties imposed by the Records Act.

The Records Act follows in a tradition, dating back to the Founding, of laws promoting integrity in public service. It is not the first, and it will not be the last. To adopt the government's position that the Act is unconstitutional would disable Congress and future Presidents from reflecting on experience, in defiance of the very words engraved on the National Archives Building in Washington: "What is past is prologue." See William Shakespeare, The Tempest act 2, sc. 1. And while the presidency is a singularly important institution, that gravity does not free it from modest constraint. Quite the opposite. Each branch of government derives its authority from the trust placed in it by the People, and Congress has validly determined that this Act helps to maintain that trust by shining some light on the activities of the President and his aides.

**Background**

### I.    Statutory Background

In the aftermath of Watergate, Congress battled former-President Nixon to prevent the destruction of tapes related to the investigation. Congress passed the Presidential Recordings and Materials Preservation Act (Preservation Act), Pub. L. No. 93-526, 88 Stat. 1695 (1974), which required that Nixon turn over those tapes to the National Archives and directed the Administrator of General Services to prepare those materials for public access. Nixon unsuccessfully challenged the Preservation Act as unconstitutional. See Nixon v. Adm'r of Gen. Servs., 433 U.S. 425 (1977). The following year, Congress enacted a broader statute to govern future presidencies. Presidential Records Act, Pub. L. No. 95-591, 92 Stat. 2523 (1978). By passing the Presidential Records Act, "Congress sought to establish the public ownership of presidential records and ensure the

3
**JA250**

preservation of presidential records for public access after the termination of a President's term in office."  Armstrong v. Bush (Armstrong I), 924 F.2d 282, 290 (D.C. Cir. 1991).

The Records Act governs the maintenance and preservation of information created or received by the President and Vice President or their staffs related to their official duties.  44 U.S.C. §§ 2201-09.  It establishes that presidential records are the property of the United States, not of the officeholder.  Id. § 2202.  The Act covers all "documentary materials"—which includes electronic records—created or received by the President or Vice President, their immediate staffs, and advisors within their offices, that are created as part of the carrying out of their constitutional, statutory, or other responsibilities.  Id. §§ 2201(1)-(2), 2207.  But the Act does not extend to material that is "purely private" or irrelevant to the President's official duties, such as journals and campaign information.  Id. § 2201(3).  And in 2014, Congress amended the Act to prohibit executive department personnel from using non-official electronic messaging accounts unless they take steps to ensure the conversation is preserved.  Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 10, 128 Stat. 2003, 2014-15.

During a President's term, he is "exclusively responsible for custody, control, and access to such Presidential records."  Id. § 2203(f).  In that capacity, he must "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of [his] constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained."  Id. § 2203(a).  That requirement, however, is not absolute.  The President may dispose of presidential records that lack "administrative, historical, informational, or evidentiary value," provided he first obtains the written views of the Archivist.  Id. § 2203(c).  If the Archivist "considers" that the records to be disposed of "may be of special interest to the Congress" or that consultation with Congress is "in

the public interest," then he "shall" notify Congress and the President must then wait at least 60 days before proceeding with disposal. Id. § 2203(d), (e). Once that clock has run, the President retains the authority to destroy the material. Armstrong I, 924 F.2d at 286.

Prior to his departure from office, the President must specify whether any of his records contain certain categories of information that justify restricting their disclosure. Those categories include national defense and foreign policy material, information related to appointments to federal office, trade secrets, confidential communications requesting or submitting advice, and personnel files that contain private information. 44 U.S.C. § 2204(a). If information falls into one of those categories, the President may prevent that information from being made public for up to twelve years. Id. Otherwise, presidential records are typically made available to the public under the Freedom of Information Act (FOIA) after no more than five years. See id. § 2204(b)-(c). During the intervening time, the Archivist assumes control over presidential records and may dispose of records that have "insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation." Id. § 2203(g)(1), (4). The Archivist may only disclose restricted records pursuant to a subpoena, to an incumbent President in furtherance of their official duties, to a congressional committee, or to the former President himself. Id. § 2205.

When the Archivist determines that it is time to make presidential records available, he must provide public notice of that determination to the former and current Presidents. Id. § 2208(a)(1). The Archivist must make those records available 60 days after transmitting the notices, unless either President extends the period by up to 30 additional days. Id. § 2208(a)(3). If the former President objects based on a claim of privilege, the Archivist must consult with the current President and determine whether the incumbent will uphold the asserted claim. Id. § 2208(c)(1). If the incumbent upholds the privilege claim, the Archivist must not make the

records in question available.  Id. § 2208(c)(2).  But if the incumbent does not uphold the privilege claim, the Archivist must make the records available ninety days after he received the privilege claim.  Id.  During that period, the former President may bring an action in the U.S. District Court for the District of Columbia asserting that the disclosure of the records in question violates a privilege.  Id. § 2204(e).

## II.    Factual and Procedural History

At the White House Counsel's request, the Department of Justice's (DOJ) Office of Legal Counsel (OLC) recently opined that the Records Act is unconstitutional because it exceeds Congress's powers and violates the separation of powers.  See Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr. 1, 2026) (slip op. at 1) (OLC Op.).  OLC examined four types of congressional power—oversight, document preservation, spending or appropriations, and assisting in the execution of the laws—and rejected each as a basis for the Act's constitutionality. See id. at 17-41.  In OLC's view, the Supreme Court's decision in Nixon v. Administrator is distinguishable because the Records Act's predecessor statute was narrower and addressed the extraordinary circumstances of the Watergate scandal.  Id. at 41-45.  As a fallback argument, OLC contends that Nixon v. Administrator was wrongly decided because it focused on Congress's regulation of statutorily-created agencies, which cannot support regulating the President's papers, and understated the intrusion and burden on the presidency.  Id. at 45-49.  Finally, OLC declared that the Act is inseverable because the invalid purpose of regulating presidential records pervades the statute and arguably unobjectionable provisions standing alone would not function as Congress intended.  Id. at 49-51.

The next day, White House Counsel David Warrington issued a memo to staff in the Executive Office of the President (EOP) "to provide guidance on how the EOP will preserve

records in light of OLC's determination."  Warrington Mem. 1, Civ. A. No. 26-1169, Dkt. 19-2

(2026 Records Guidance).  The 2026 Records Guidance states that "[e]ven in the absence of the

[Act], EOP staff should preserve any material related to the performance of their duties,"

explaining that the "medium of the material does not matter . . . ."  Id. at 2.  The memo continues:

"EOP staff may not take any records" when "leaving EOP employment," the "electronic records

of EOP employees will be preserved," "EOP staff should conduct all work-related communications

via [their] official EOP email account[s]," and "EOP staff should ensure that both electronic and

paper records are preserved."  Id. at 2-3.  The memo also instructs that "[s]taff cannot permanently

delete emails or materials saved to an EOP laptop or the EOP network."  Id. at 2.  As for text

messages, the Guidance instructs that they "should only be preserved when they are the sole record

of official decision-making, government action, or contain unique information not available

elsewhere."  Id.  The memo does not discuss disposal of records as provided under 44 U.S.C.

§ 2203(c)-(e).

Four days later, the American Historical Association (AHA) and American Oversight

(together, Historian-Oversight plaintiffs) sued a raft of federal defendants for violating the Records

Act and constitutional guarantees of the separation of powers.  The Historian-Oversight plaintiffs

seek nonstatutory review of the 2026 Records Guidance, assert Administrative Procedure Act

(APA) claims against the National Archives and Records Administration (NARA) and DOJ, and

request mandamus relief.  See Historian-Oversight Pls.' Compl. 36-44, Civ. A. No. 26-1169, Dkt.

1.[2]

---

[2] The Historian-Oversight plaintiffs sued 25 defendants: President Donald Trump, Vice President JD Vance, the White House Office, Chief of Staff to the President Susie Wiles, Director of the Office of Records Management Philip Droege, the National Security Council, Executive Secretary of the National Security Council Catherine Keller, the Homeland Security Council, Homeland Security Advisor Stephen Miller, the Council on Economic Advisers, Chair of the Council of Economic Advisers Pierre Yared, the Executive Residence, White House Chief Usher Robert

As relief, the Historian-Oversight plaintiffs seek declarations that the Act is constitutional, the OLC opinion is contrary to law, defendants remain bound by the Act, and NARA decisions not to comply with the Act are unlawful.  Id. at 45.  They also seek an injunction to prevent federal officials from relying on the OLC opinion and to require them to comply with their duties under the Act and disclose to the Court any instances of the President violating the Act.  Id.  Further, they seek to compel NARA under the APA to make presidential records publicly available as required by the Act and to set aside any NARA decisions not to comply with the Act.  Id.  Finally, in the alternative, they seek mandamus relief.  Id.

Eight days after bringing suit, the Historian-Oversight plaintiffs moved for a preliminary injunction and stay.  See Historian-Oversight Mem. in Supp. of Prelim. Inj., Civ. A. No. 26-1169, Dkt. 13-1 (Historian-Oversight PI Mem.).  The case was randomly reassigned the next day to the undersigned after another judge in this district rejected the Historian-Oversight plaintiffs' attempt to link the action to another pending case.  See Am. Hist. Ass'n v. Trump, --- F. Supp. 3d ---, 2026 WL 1024772 (D.D.C. Apr. 15, 2026).  Before this Court, defendants have opposed the Historian-Oversight plaintiffs' motion, Gov't's Opp'n to Historian-Oversight Pls., Civ. A. No. 26-1169, Dkt. 19, and plaintiffs have replied, Historian-Oversight Pls.' Reply, Civ. A. No. 26-1169, Dkt. 22.

Near the end of briefing in the Historian-Oversight case, Freedom of the Press Foundation (FPF) and Citizens for Responsibility and Ethics in Washington (CREW) (together, Press-CREW plaintiffs) also brought suit, seeking a preliminary injunction.  See Press-CREW Pls.' Compl., Civ. A. No. 26-1402, Dkt. 1; Press-CREW Pls.' Mem. in Supp. of Prelim. Inj., Civ. A. No. 26-1402,

---

Downing, Chair of the Intelligence Advisory Board Devin Nunes, the Office of Administration, Director of the Office of Administration Joshua Fisher, the Office of the Vice President, Chief of Staff to the Vice President Jacob Reses, the U.S. DOGE Service, Acting Administrator of the U.S. DOGE Service Amy Gleason, the DOJ, now former Attorney General Pam Bondi, the National Archives and Records Administration, and Acting Archivist of the United States Edward Forst.  Historian-Oversight Pls.' Compl. 1-3.

Dkt. 7-1 (Press-CREW PI Mem.).[3]  These plaintiffs, too, alleged violations of the Act and the separation of powers and sought nonstatutory review of the 2026 Records Guidance.  They also brought an APA claim, a FOIA claim, and a request for mandamus relief under 28 U.S.C. §§ 1361, 1651.  The government responded, Gov't's Opp'n to Press-CREW Pls., Civ. A. No. 26-1402, Dkt. 11, and plaintiffs replied, Press-CREW Pls.' Reply, Civ. A. No. 26-1402, Dkt. 12.  The Court held a consolidated hearing in both cases on May 13, 2026, and the preliminary injunction motions are now ripe for resolution.

## Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008).  To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  The balance of equities and public interest factors merge when the government is a party.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  The same factors govern a request for a stay under the APA.  Nw. Immigrant Rts. Project v. USCIS, 496 F. Supp. 3d 31, 45 (D.D.C. 2020).

## Analysis

At the threshold, plaintiffs may lack standing or a cause of action with respect to NARA, the Archivist, DOJ, and the Attorney General because they have identified neither present injury traceable to those defendants nor final agency action.  However, they likely have standing to bring their claims against the other defendants because they have established a substantial risk of non-

---

[3] The Press-CREW plaintiffs sued eight defendants: President Trump, Vice President Vance, Susie Wiles, and Edward Forst in their official capacities, and EOP, the Office of the Vice President, the White House Office, and NARA.  See Press-CREW Pls.' Compl. 1-2.

compliance with the Records Act caused by those defendants that would be redressable by the Court.  They also likely have causes of action under the Constitution and to enjoin violations of federal law because defendants necessarily are not acting under a statute—the Records Act—that they deem unconstitutional.

On the underlying merits, Congress likely has the authority to regulate presidential records under the Property Clause, which is not limited to real property, and under the Necessary and Proper Clause, which empowers Congress to structure the internal functions of the Executive Branch.  And the Act does not impose a constitutionally impermissible burden on the President. The likelihood of irreparable harm to plaintiffs and the balance of the equities also tip in favor of a preliminary injunction.  Finally, as to the scope of relief, even if the Court cannot preliminarily enjoin the President or Vice President, it can grant substantial relief through injunctions as to other defendants, and will do so.

## I.    Standing

To establish Article III standing, a plaintiff must show "injury in fact that is concrete, particularized, and actual or imminent," "that the injury was likely caused by the defendant," and "that the injury would likely be redressed by judicial relief."  TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  "[F]uture injuries" satisfy standing where the threat of harm is "certainly impending, or there is a substantial risk that the harm will occur."  Dep't of Com. v. New York, 588 U.S. 752, 767 (2019) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (SBA List)); see also N.Y. Republican State Comm. v. SEC, 927 F.3d 499, 504 (D.C. Cir. 2019) (explaining that SBA List "clarified" the imminence test from Clapper v. Amnesty International USA, 568 U.S. 398 (2013)).  Standing is "not dispensed in gross," so plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek."  TransUnion,

10
**JA257**

594 U.S. at 431. And plaintiffs bear the burden of demonstrating standing. Id. at 430-31. But to secure injunctive relief, "only one plaintiff need have standing." Hall v. D.C. Bd. of Elections, 141 F.4th 200, 209 (D.C. Cir. 2025).

Organizations like these plaintiffs "can assert standing in one of two ways," either "on its own behalf, as an organization, or on behalf of its members, as associational standing." Elec. Privacy Info. Ctr. v. Dep't of Com., 928 F.3d 95, 100 (D.C. Cir. 2019) (citation omitted). Where a plaintiff asserts informational injury, as here, the first path requires the plaintiff to show that "(1) it has been deprived of information that a statute requires the government to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." Campaign for Accountability v. DOJ, 155 F.4th 724, 733 (D.C. Cir. 2025) (quotation omitted); see also FEC v. Akins, 524 U.S. 11, 21 (1998).[4] The second path— called "associational standing"—requires the entity to show that (1) at least one of its members would have standing in their own right, (2) the interests the organization seeks to protect are germane to its purposes, and (3) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit. Pub. Emps. for Env't Resp. v. Zeldin, --- F.4th ---, 2026 WL 1191153, at *1 (D.C. Cir. May 1, 2026) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).[5]

---

[4] Outside of the informational injury context, "organizational standing" requires (1) that defendants' conduct "perceptibly impaired the organization's ability to provide services" and (2) that the organization "used its resources to counteract that harm." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation modified); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)). The D.C. Circuit has recently reiterated that these are two different lines of cases subject to distinct analyses. See Indep. Market Monitor for PJM v. FERC, 162 F.4th 1167, 1174 n.3 (D.C. Cir. 2025) (deeming informational injury argument forfeit); id. at 1175, 1177 (Edwards, J., concurring in the judgment) (agreeing but arguing that the majority nevertheless conflated organizational and informational standing).

[5] The third prong of associational standing is a prudential, not constitutional, requirement. United Food & Com. Workers Union Loc. 751 v. Brown Grp., 517 U.S. 544, 555 (1996).

A. *Injury in Fact*

Plaintiffs allege injury from ongoing failures to preserve or decisions to improperly dispose of records that they intend later to seek under FOIA, as provided for by the Act. See 44 U.S.C. § 2204(c) (providing for access to presidential records under FOIA); Campaign for Accountability, 155 F.4th at 733 (explaining that denial of records under FOIA constitutes informational injury sufficient to confer standing). Each plaintiff has submitted declarations that they or their members regularly use and intend to continue using presidential records, including from this presidential administration once those records become available.

In the Historian-Oversight case, AHA appears primarily to allege associational standing, providing four declarations of member historians who have used, are using, and intend to continue using presential records. See Decl. of Matthew Connelly ¶¶ 1-4, Civ. A. No. 26-1169, Dkt. 13-9 (stating that Connelly is a historian and member of AHA who has authored three books that rely on presidential records, who currently uses presidential records in new research, and who intends to continue using future records—including from this administration—as they become available under FOIA); Decl. of Timothy J. Naftali, Civ. A. No. 26-1169, Dkt. 13-10 (similar); Decl. of Kathryn Cramer Brownell, Civ. A. No. 26-1169, Dkt. 13-11 (similar); Decl. of Natalia Mehlman Petrzela, Civ. A. No. 26-1169, Dkt. 13-12 (similar); cf. Decl. of Sarah Weicksel ¶ 8, Civ. A. No. 26-1169, Dkt. 13-7 (stating that AHA itself "regularly request[s] and make[s] use of presidential records"). Setting aside for now the government's assertion that the 2026 Records Guidance complies with the Act, which the Court addresses below, AHA's declarations are enough to establish informational injury. For its part, American Oversight has provided a declaration that it routinely uses FOIA requests to obtain presidential records from NARA, including from the first Trump administration, and plans to submit additional FOIA requests for records pertaining to the

first Trump administration.  Decl. of Elizabeth Marx, Civ. A. No. 26-1169, Dkt. 13-8.  Although the American Oversight declaration does not expressly address the current or future administrations, it stands to reason that it will continue to request records of later administrations.  In any event, only one plaintiff need establish standing.  Hall, 141 F.4th at 209.

In the Press-CREW case, FPF declares that it has 15 pending FOIA requests to NARA for presidential records from President Trump's first term and that it intends to submit additional FOIA requests for presidential records from the first Trump administration, the Biden administration, the second Trump administration, and other administrations as they become available.  Decl. of Lauren Harper ¶¶ 7, 9, Civ. A. No. 26-1402, Dkt. 7-4.  And CREW declares that it has multiple FOIA requests for presidential records outstanding, including one for records from the first Trump administration, and that it likewise intends to continue submitting FOIA requests for presidential records from more recent and future administrations.  Decl. of Kavyan Farchadi ¶¶ 6, 9, Civ. A. No. 26-1402, Dkt. 7-2.  That is also enough to show informational injury.

The government disputes injury in fact, arguing that no defendant has taken action to harm plaintiffs because the 2026 Records Guidance "is consistent with the [Act's] preservation requirements."  Gov't's Opp'n to Historian-Oversight Pls. 13.  But "[t]he Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim."  Tanner-Brown v. Haaland, 105 F.4th 437, 445 (D.C. Cir. 2024) (quotation omitted).  And in the plaintiffs' telling, the 2026 Records Guidance conflicts with the Act at least in how it addresses (1) text or other instant message preservation, (2) presidentially- and vice presidentially-created records, and (3) disposal of records.  The government is therefore mistaken as to injury in fact except with respect to NARA and DOJ.

The 2026 Records Guidance establishes a procedure for the creation and preservation of presidential records by EOP staff.  See, e.g., 2026 Records Guidance 3 ("EOP staff should ensure that both electronic and paper records are preserved.").  Moreover, the Act gives the President considerable discretion on how to create, preserve, and maintain records.  See 44 U.S.C. § 2203(a) (requiring the President to "take all such steps as may be necessary" to ensure "adequate document[ation]" and that presidential records are "preserved and maintained").  And the D.C. Circuit has admonished courts not to engage in "micromanaging" of "the day-to-day operations of the President."  Citizens for Resp. and Ethics in Wash. v. Trump, 924 F.3d 602, 609 (D.C. Cir. 2019).

However, the 2026 Records Guidance's approach to text or other instant messaging, which is apparently becoming "akin to speaking every day," likely does not comply with the Records Act's preservation requirements.  See 2026 Records Guidance 2-3.[6]  That is so because the Guidance calls for preserving "only" those text messages that are "the sole record of official decision-making, government action, or contain unique information not available elsewhere."  Id. at 2.  And the Guidance "encourage[s]" staff to "memorialize[]" any "unique information" contained within a text message "in a more accessible format, such as an email or memorandum."  Id. at 2-3.

But in that event, almost no texts would ever be preserved because insofar as they include unique information they would be memorialized in an email or memorandum and so be marked for deletion thereafter as a non-unique record.  Indeed, the Press-CREW plaintiffs argue that the

---

[6] The parties dispute whether the 2026 Records Guidance covers instant messaging applications such as Signal or other electronic messaging platforms besides text messaging.  Contrast Oral Arg. Tr. 125:2-9 (plaintiffs' view that Signal is not covered under the Guidance) with Oral Arg. Tr. 90:10-92:24 (government's view that Signal and similar applications would be covered under the Guidance).  But even if those alternative applications and platforms are covered, the gap remains between the requirements under the Records Act and the 2026 Record Guidance.  Insofar as alternative applications and platforms are not covered, that gap is even greater.

Court should infer a default policy of deletion.  Press-CREW PI Mem. 14.  And the text of section 2209 of the Act nowhere provides for discretionary deletion or piecemeal preservation.  To the contrary, it requires that all text messages from non-official messaging accounts be copied to official accounts or forwarded to official accounts within 20 days of the record's creation or transmission.  See 44 U.S.C. § 2209(a) (prohibiting the creation or sending of a presidential record using a non-official electronic message account unless the message is copied or forwarded to an official account).[7]

The government argues that "informal conversations" and text messages "that contain no unique information" fall outside the Act's ambit because it is "implausible that Congress intended" to cover such communications, Gov't's Opp'n to Press-CREW Pls. 26-28, and because section 2209 must be read in the context of the discretion granted to the President in section 2203(a), Oral Arg. Tr. 88:2-20.  However, provided that material meets the statutory definition of a presidential record under section 2201(2), the plain text of section 2209 admits of no such exception.  And the "cardinal canon" of statutory interpretation is that Congress "says in a statute what it means and means in a statute what it says there."  Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (citations omitted).  The government's view that section 2209 imposes a "senseless and

---

[7] Plaintiffs also take issue with the 2026 Records Guidance instruction that text messages "reflecting personal conversations, workplace gossip, ministerial tasks or other workplace minutiae (e.g., 'call me,' 'what room for the meeting,' 'there is a typo in the first line of the memo') do not need to be preserved."  2026 Records Guidance 3; see also Press-CREW PI Mem. 13-14 & n.4.  Personal conversations and workplace gossip would typically be personal rather than presidential records.  See 44 U.S.C. § 2201(3).  But a "ministerial" act generally means one "that involves obedience to instructions or laws instead of discretion," Ministerial, Black's Law Dictionary (12th ed. 2024), and many records of non-discretionary tasks would be of historical or other value.  That said, under the canon of noscitur a sociis, associated words bear on one another's meaning, A. Scalia & B. Garner, Reading Law § 31, and this use of "ministerial" was preceded by "gossip" and followed by "minutiae."  And indeed there is likely some category of text messages that would not contain meaningful information.  To the extent that the term "ministerial tasks" under the Guidance signifies duties more substantive than minutiae, text messages reflecting such tasks would be presidential records under section 2201(2) that must be preserved under section 2209.

indiscriminate retention mandate" does not give this Court, OLC, or the White House license to override Congress's determination.  Gov't's Opp'n to Press-CREW Pls. 27.

Thus, under the 2026 Records Guidance, some presidential records could be communicated through non-official messaging accounts and not copied or forwarded to official accounts because the information was documented elsewhere, which would not comply with section 2209 of the Act.  Granted, the government has submitted a declaration from the Director of White House Information Technology stating that text messages sent from work phones are archived in a database and that the pre-OLC opinion records retention policy is being "maintained . . . with respect to EOP electronic records."  Decl. of Robert J. Eisenhauer ¶¶ 6-9, Civ. A. No. 26-1402, Dkt. 11-1.  Even so, this declaration does not speak to any text messages sent on personal phones.  By saying that staff "should avoid using personal devices for government business whenever possible," the Guidance necessarily contemplates some use of personal devices for government business.  2026 Records Guidance 3 (emphasis added).  And unlike under the Records Act, no provision is made to preserve such communications under the Guidance.

Moreover, the 2026 Records Guidance does not set out how the government intends to handle either the preservation of presidential records created by the President or Vice President themselves or the disposal of presidential records.[8]

The 2026 Records Guidance is only addressed to EOP staff and is silent as to records created by the President or Vice President.  But the definition of presidential records in the Act expressly includes records "created . . . by the President," so failure to properly preserve those

---

[8] Although plaintiffs appear less concerned at this preliminary injunction stage about the President's compliance with the Records Act's disposal provisions in section 2203(c)-(e), they remain highly concerned about possible deletion or destruction of (and thereby failure to preserve) records today.  Oral Arg. Tr. 54:3-56:23; 130:6-24.  Of course, in the absence of the Records Act, the President need not comply with the disposal notice provisions and so could order the destruction or deletion of presidential records at any point.

records would be a violation of the Act causing injury to plaintiffs. 44 U.S.C. § 2201(2); see also id. § 2207 ("Vice-Presidential records shall be subject to the provisions of this chapter in the same way as Presidential records."). As the government conceded at oral argument, presidential records created by the President on a personal device would typically have historical value but are not covered by the Guidance and would not automatically be preserved on EOP systems. Oral Arg. Tr. 73:10-74:20. True, there is a potential remedial issue noted below about the Court's power to enjoin the President or Vice President, but many records created by the President or Vice President are also transmitted to their aides, thereby triggering those aides' duties under the Act. And in any event, a redressability problem does not lessen the injury from failure to properly preserve records created by the President or Vice President.

The 2026 Records Guidance also does not address disposal except to instruct EOP staff not to delete emails or documents from EOP laptops or the EOP network. See 2026 Records Guidance 2. But the Act only permits disposal insofar as records "no longer have administrative, historical, informational, or evidentiary value." 44 U.S.C. § 2203(c). Even then, the President "may dispose" of such records only after he "obtains the views, in writing, of the Archivist concerning the proposed disposal" and "the Archivist states that [he] does not intend to take any action under subsection (e)" of section 2203. Id. In turn, subsection (e) requires the Archivist to "request the advice" of Congress where he considers that "these particular records may be of special interest to the Congress" or "consultation with the Congress regarding the disposal of these particular records is in the public interest." Id. § 2203(e). And in that event, the President must wait 60 calendar days before disposing of the records. Id. § 2203(d). There is no indication that the 2026 Records Guidance envisages such consultation before any destruction of records at the President's instruction. Indeed, at oral argument the government confirmed that the Guidance does not speak

17
**JA264**

to disposal and was unable to represent that the President would notify the Archivist before disposing of presidential records. Oral Arg. Tr. 85:24-87:24. That matters because the notification mechanism provides Congress with its "traditional means of voicing objection," including if necessary "by passing legislation to block the destruction of certain records." Armstrong I, 924 F.2d at 290 (quotation omitted).

In sum, plaintiffs have likely established a substantial risk of injury because the 2026 Records Guidance on text messages conflicts with section 2209 of the Records Act and because it is uncertain whether the government intends either to preserve records created by the President or Vice President themselves or to comply with section 2203(c) in disposing of records.[9]

However, plaintiffs have likely not established injury in fact with respect to NARA or DOJ. Regarding NARA, the Director of the Archival Operations Division in the Office of the Presidential Libraries at NARA has submitted a declaration stating that "NARA is continuing to preserve" presidential records in its custody, including from President Trump's first term. McClure Decl. ¶¶ 4-5, Civ. A. No. 26-1169, Dkt. 19-3. Granted, the NARA declaration does not address records disposal, and "[t]he Archivist is authorized to dispose" of presidential records that he "has appraised and determined to have insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation." 44 U.S.C. § 2203(g)(4). However, the first sense of the word "preserve" is to "keep safe from injury, harm, or destruction." Preserve, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/preserve (last visited May 12, 2026). Moreover, NARA has been processing FOIA requests for presidential

---

[9] The government halfheartedly points out that plaintiffs would not have access to records created today for at least eight years because presidential records may not generally be requested under FOIA until five years after the President's term ends. Gov't's Opp'n to Historian-Oversight Pls. 10 (citing 44 U.S.C. § 2204(b)(2)). But the substantial risk is of harm occurring now because the records must be created, preserved, and not disposed of today in order to be available several years later.

records since the OLC opinion and "plans to continue" doing so.  McClure Decl. ¶ 4.  Without more, it does not appear that NARA is deviating from its duties under the Records Act at this time.

In reply, the Historian-Oversight plaintiffs point out that NARA's declaration "does not deny that the OLC opinion is controlling on NARA, that NARA has adopted the opinion, or that NARA now treats its duties under the [Act] as discretionary rather than mandatory."  Historian-Oversight PI Mem. 9.  This demands too much.  For one, the D.C. Circuit has explained that "[e]ven though all OLC opinions are considered authoritative within the Executive Branch, the requesting agency does not necessarily adopt every opinion."  Campaign for Accountability, 155 F.4th at 738.  And even assuming that NARA adopted the OLC opinion, that does not require any change in NARA's policy regarding preservation of and access to presidential records from past administrations, and the declaration does not indicate any change from its formerly compliant policy.

The Historian-Oversight plaintiffs also point out in reply that the NARA declaration does not speak to presidential records not in its custody from President Trump's first term.  Historian-Oversight PI Mem. 9.  And the Records Act provides that NARA "shall assume responsibility for the custody, control, and preservation of, and access to" presidential records after a President's term in office and imposes an "affirmative duty to make such records available to the public as rapidly and completely as possible."  44 U.S.C. § 2203(g)(1).  So, the Historian-Oversight plaintiffs assert injury from NARA's failure to preserve those records.  But this theory of harm may be forfeit at this preliminary injunction stage because it was not raised until the reply brief.  See Twin Rivers Paper Co. v. SEC, 934 F.3d 607, 615 (D.C. Cir. 2019).  And even if properly preserved, it does not appear that NARA itself has enforcement authority to seek out presidential records unlawfully removed.  Under the Federal Records Act, the Archivist is limited to requesting

19
**JA266**

that the Attorney General take action or notifying Congress where the head of an agency failed to take action against unlawful removal.  44 U.S.C. § 3106.  There is no corresponding provision under the Presidential Records Act.  Moreover, to the extent that NARA has any collection duty, plaintiffs do not explain why NARA's inaction is suddenly harming them when these records have been known to be outside its custody for several years.  Thus, plaintiffs have likely not shown injury with respect to NARA.

A fortiori, it is not DOJ itself—which does not have any duties under the Act—that has injured plaintiffs.  Instead, EOP has done so by issuing the 2026 Records Guidance and no longer fully complying with the Records Act.  That may be why plaintiffs at oral argument made no mention of DOJ or the Attorney General as defendants.  Accordingly, plaintiffs likely lack standing to sue NARA and DOJ and no preliminary relief will be entered as to them.

*B.  Other Standing Elements*

Beyond injury in fact, plaintiffs also likely satisfy the other elements of Article III standing.  The government does not dispute that operating under the 2026 Records Guidance rather than the Records Act has caused any alleged injury or that enjoining defendants would redress that injury.  Nor could it.  Plainly, the alleged injury is traceable to the changes to document preservation from the 2026 Records Guidance.  And although courts generally may not "enjoin the President in the performance of his official duties"—which issue is discussed below both as to the President and Vice President—redressability only requires that the Court be able to provide "at least some of the relief" that plaintiffs seek.  Severino v. Biden, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (first quoting Franklin v. Massachusetts, 505 U.S. 788, 802 (1992) (plurality opinion); then quoting Collins v. Yellen, 594 U.S. 220, 243 (2021)).  But see Citizens for Resp. & Ethics in Wash. v. Trump, 438 F. Supp. 3d 54, 69 n.14 (D.D.C. 2020) (granting motion to dismiss mandamus suit seeking records

under the Act in the alternative for lack of redressability because courts lack the authority to enjoin the President).

AHA has also likely carried its burden on the remaining elements of associational standing. AHA has established germaneness because its mission is "to enhance the work of historians," including through "the preservation of historical documents" such as presidential records. Weicksel Decl. ¶ 4. And because this suit "raises a pure question of law" and does not "require the consideration of the individual circumstances of any aggrieved member of the organization," the third prong is also satisfied. Healthy Gulf v. Dep't of Interior, 152 F.4th 180, 191 (D.C. Cir. 2025); see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., 517 U.S. 544, 554 (1996) (explaining that suits for declaratory or injunctive relief but not damages generally satisfy associational standing's third prong).

## II.   Cause of Action/Reviewability

Both sets of plaintiffs assert four nonstatutory causes of action as well as causes of action under the APA, FOIA, and 28 U.S.C. § 1361.

In terms of nonstatutory causes of action, each set of plaintiffs brings an equitable cause of action to challenge executive action in excess of constitutional authority. Historian-Oversight Pls.' Compl. 36-40 (Count I); Press-CREW Pls.' Compl. 37-38 (Count IV); see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). Both also advance an equitable cause of action to enjoin federal officials from violating federal law. Historian-Oversight Pls.' Compl. 40-41 (Count II); Press-CREW Pls.' Compl. 33-35 (Count I); see also Armstrong v. Exceptional Child Ctr., 575 U.S. 320, 327-31 (2015). Next, each bring an ultra vires claim to challenge action taken in excess of statutory authority. Historian-Oversight Pls.' Compl. 41 (Count III); Press-CREW Pls.' Compl. 36-37 (Count III); see also Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 680-83 (2025). And

both plaintiff groups bring an action in the nature of mandamus against individual defendants. Historian-Oversight Pls.' Compl. 44 (Count VII); Press-CREW Pls.' Compl. 35-36 (Count II); see also Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 380-81, 390-91 (2004).

As to statutory causes of action, all plaintiffs bring APA claims—the Historian-Oversight plaintiffs against NARA and DOJ and the Press-CREW plaintiffs only against NARA. Historian-Oversight Pls.' Compl. 41-44 (Counts IV-VI); Press-CREW Pls.' Compl. 38-39 (Count V), see also 5 U.S.C. § 706. And the Press-CREW plaintiffs also bring a FOIA claim against NARA. Press-CREW Pls.' Compl. 39-40 (Count VI); see also Jud. Watch, Inc. v. DHS, 895 F.3d 770 (D.C. Cir. 2018).

Most importantly here, plaintiffs likely have an equitable constitutional cause of action under Youngstown (Historian-Oversight Count I and Press-CREW Count IV).[10] The government resists this conclusion, arguing that the dispute is statutory in nature, turning on whether the "2026 [Records Guidance] coheres with the statutory preservation requirements of the [Act]." Gov't's Opp'n to Historian-Oversight Pls. 22-23. Not so. The government has necessarily "disclaimed any statutory authority" for the 2026 Records Guidance, Dalton v. Specter, 511 U.S. 462, 473 (1994) (citing Youngstown, 343 U.S. at 585), because it has adopted OLC's position that the Records Act is unconstitutional, see 2026 Records Guidance 1 (explaining that White House Counsel requested the OLC opinion because "Congress never had the Article I power to regulate the President's records in the manner contemplated by the [Act]"). Indeed, at oral argument, the

---

[10] As explained above, plaintiffs likely lack standing to sue NARA, the Archivist, DOJ, and the Attorney General, but they also would lack a cause of action for related reasons. Regarding their APA claims, plaintiffs have not identified "final agency action" to enable review. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997). With respect to DOJ, although the OLC opinion is authoritative, it does not require agencies to take or refrain from taking any actions, so it is not an action "from which legal consequences will flow." Id. at 178 (citation modified). As to NARA, plaintiffs have not identified any action that the agency has taken following the OLC opinion to change its policies. For the same reason, the Press-CREW plaintiffs have failed to identify a new "policy or practice" to enable review under FOIA. Jud. Watch., 895 F.3d at 778.

government confirmed twice that the Guidance was issued under the President's inherent Article II authority and not under any statutory authority. Oral Arg. Tr. 79:24-80:13, 116:23-16. Hence, although the extent of de facto compliance with the Records Act is relevant to injury, the core question presented is constitutional: whether the executive has exceeded its inherent constitutional authority by adopting a policy incompatible with the express will of Congress.

In other words, and as in Youngstown, this case "involve[s] the conceded absence of any statutory authority, not a claim that the President acted in excess of such authority." Dalton, 511 U.S. at 473. And "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Youngstown, 343 U.S. at 637 (Jackson, J., concurring). "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution." Id. at 638. As icing on the cake, the government itself argues that the President has "conclusive and preclusive" power over presidential records, squarely placing this case within the Youngstown framework. Gov't's Opp'n to Historian-Oversight Pls. 36 (quoting Trump v. United States, 603 U.S. 593, 609 (2024)).

Finally, Global Health Council v. Trump, 153 F.4th 1 (D.C. Cir. 2025), is not to the contrary. There, the government did "not contest[] the constitutionality of the relevant statutes" and "disclaim[ed] any constitutional defense" on appeal, although it had briefly advanced such an argument below. Id. at 14-15 & n.9. As just explained, here, in contrast, OLC has opined that the Act is unconstitutional and the government has adopted that "authoritative" opinion in the 2026 Records Guidance. See Campaign for Accountability, 155 F.4th at 738; Exec. Order 14215 § 7, 90 Fed. Reg. 10447, 10448 (Feb. 25, 2025) (Attorney General opinions are "controlling").

For similar reasons, plaintiffs likely also have an equitable cause of action under Armstrong v. Exceptional Child Center. There, the Supreme Court observed that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327 (quotation omitted). As a result, where a statute implicitly precludes review, plaintiffs cannot circumvent that preclusion by relying on equity. Id. at 328. Plaintiffs lacked an equitable cause of action to enforce section 30(A) of the Medicaid Act in that case because Congress provided the "sole remedy" of withholding Medicaid funds and the provision was "judicially unadministrable" due to its "broad[] and [non-]specific" requirement to balance "efficiency, economy, and quality of care" against preventing "unnecessary utilization." Id.

Here, in contrast, Armstrong I and Armstrong v. EOP, 1 F.3d 1274, 1294 (D.C. Cir. 1993) (Armstrong II), establish that certain kinds of review involving the Records Act are implicitly precluded by the statutory scheme while others are not. On the one hand, in Armstrong I the D.C. Circuit observed that the Records Act evinces an "intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." 924 F.3d at 290. Accordingly, "judicial review of the President's management of admittedly presidential records is impliedly precluded by the [Records Act]." Armstrong II, 1 F.3d at 1292 (emphasis added) (citing Armstrong I, 924 F.2d at 289); see also id. at 1290 (explaining that the Records Act "delineates those records over which the President may exercise 'virtually complete control' during his term of office and the courts may not restrict that control by reviewing the President's recordkeeping practices and decisions." (quoting Armstrong I, 924 F.2d at 290-91)). On the other hand, in Armstrong II the D.C. Circuit clarified that "[t]he Armstrong I opinion does not stand for the unequivocal proposition that all decisions made pursuant to the [Records Act] are immune from judicial review." Id. at 1293 (emphasis added). Instead, "courts are accorded the power to

24
**JA271**

review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." Id. at 1290. Otherwise, the Records Act could be used as a "carte blanche to shield materials from the reach of the FOIA." Id. at 1292.

This case is more like Armstrong II than Armstrong I. Because the government's position is that the Records Act is unconstitutional, the decisions that it has made—namely issuing the 2026 Records Guidance—were not "pursuant to the [Records Act]." Armstrong II, 1 F.3d at 1293. And, in the government's view, Congress could not transform President Trump's private property into property of the United States, so these records are not "admittedly" the property of the United States either. Contrast Gov't's Opp'n to Press-CREW Pls. 36-37, with Armstrong II, 1 F.3d at 1292. As a result, this Court may review EOP's new "classification" of all presidential records as property of the President rather than as federal property. Armstrong II, 1 F.3d at 1294; see also 44 U.S.C. § 2202 (defining presidential records as federal property). The logic of Armstrong I simply does not apply when the government is not acting under the Records Act and does not believe that the Records Act has legal force. Contra Gov't's Opp'n to Press-CREW Pls. 14-21; Gov't's Opp'n to Historian-Oversight Pls. 18-22.

Accordingly, plaintiffs likely have equitable causes of action under both Youngstown and Exceptional Child Center.[11]

---

[11] Because plaintiffs have Youngstown and Exceptional Child Center causes of action, the Court need not reach their alternative theories of reviewability. The Court notes that, to the extent that defendants are violating "clear and mandatory" or "ministerial" duties, plaintiffs may have an ultra vires cause of action to challenge the 2026 Records Guidance as in excess of statutory authority or a similar cause of action for mandamus relief. See Glob. Health, 153 F.4th at 20 (ultra vires standard); Citizens for Resp. and Ethics in Wash., 924 F.3d at 606 (mandamus standard). However, those causes of action require that no alternative review be available, and here review is available under both Youngstown and Exceptional Child Center. And the Press-CREW plaintiffs also do not even press their mandamus claim at this preliminary stage. See Pls.' Mot. for Preliminary Inj. 1, Civ. A. No. 26-1402, Dkt. 7 (seeking relief only as to EOP defendants, not the President, Vice President, or Archivist). At oral argument, Historian-Oversight plaintiffs agreed that the Court need not reach the ultra vires or mandamus causes of action. Oral Arg. Tr. 121:19-122:5.

### III.    Underlying Merits

The government asserts that the 2026 Records Guidance and its actions pursuant to that guidance are lawful because the President has inherent authority to manage Executive Branch records.  But this is not a case where the President exercises executive power upon a blank slate— Congress has already legislated on the matter by enacting the Presidential Records Act.  As analyzed above in the discussion of standing, the 2026 Records Guidance likely does not comply with the Presidential Records Act.  And the Act does not provide a basis for the President to disregard its statutory requirements.

The Constitution obligates the President to "Take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  Hence, the President's inherent authority to manage records is only sufficient to justify the 2026 Records Guidance if Congress lacked the power to pass the Act or the President nevertheless has a constitutional basis to disregard it.[12]  Neither is likely true.

When Congress has expressly legislated contrary to the President's actions, his authority is "at its lowest ebb."  Youngstown, 343 U.S. at 637 (Jackson, J., concurring).  Here, Congress has not left the regulation of presidential records "an open field" but has "covered it" with "statutory policies inconsistent with" the 2026 Records Guidance.  Id. at 639.  The government cannot claim it operates in a zone of concurrent authority with the legislature where its current approach, derived from the OLC opinion, was not "necessitated or invited by failure of Congress to legislate upon the occasions, grounds and methods" for regulating presidential records.  Id.  The interbranch conflict in this case is direct and explicit.

---

[12] At oral argument, the government asserted that the President's inherent executive power to manage executive records automatically forecloses a separation of powers challenge.  Oral Arg. Tr. 118:5-13.  But Youngstown is clear that the mere presence of executive power over a subject is not dispositive.  Instead, as explained below, the President's assertion of executive power must be evaluated against any legitimate exercise of legislative authority to the contrary.  Youngstown, 343 U.S. at 638 (Jackson, J., concurring).

26
**JA273**

When the President acts in a manner contrary to a clear congressional mandate, "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id. at 637.  In such cases, courts may only uphold the executive action "by disabling the Congress from acting upon the subject"—in practical terms, by finding the law unconstitutional.  Id. at 637-38.  This may occur where the court concludes that Congress lacks the power to enact the law altogether, or determines that the legislation impermissibly interferes with a presidential power that is so "conclusive and preclusive" that it defies concurrent regulation. Id. at 638.

The government argues both here.  As an initial matter, it contends that Congress lacks any enumerated power to regulate presidential records.  Beyond that, the government believes that the Records Act impermissibly infringes on the President's Article II authority.  On both counts, it is likely mistaken.

*A. Enumerated Powers*

Our federal government is "one of enumerated powers." M'Culloch v. Maryland, 17 U.S. 316, 405 (1819).  Every law enacted by Congress must be traceable to "one or more of those powers."  United States v. Comstock, 560 U.S. 126, 133 (2010) (citation modified).  The Presidential Records Act is based on at least two: Congress's authority to regulate federal property under the Property Clause and its power to structure the operations of the federal government and promote the integrity of the Executive Branch under the Necessary and Proper Clause.  Notably, the OLC opinion on which the 2026 Records Guidance is founded mentions neither.

1. Property Clause

The Property Clause grants Congress the authority to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.  The government suggests that the Framers could not have meant to

include presidential records as government property because those records were treated as the President's private property until the Presidential Records Act.  The central question, therefore, is the meaning of the term "other Property."

The Court starts, as it must, with the text.  See N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 22-23 (2022).  The Property Clause provides that Congress may regulate "Territory or other Property" of the United States.  The word "Territory," as the Supreme Court explained in United States v. Gratiot, 39 U.S. 526, 537 (1840), means "land."  Land is "merely descriptive of one kind of property," and Congress "has the same power over it as over any other property belonging to the United States . . . ."  Id.  Put another way, Congress has the same regulatory authority over the government's real property as it has over its personal property.  Id.  The terms "Territory" and "Property" thus cover the waterfront of possible circumstances where Congress might need to legislate over the holdings of the United States.  Accordingly, "[t]he power of Congress to dispose of any kind of property belonging to the United States is vested in Congress without limitation."  Alabama v. Texas, 347 U.S. 272, 273 (1954) (emphasis added) (internal quotation omitted).

This understanding comports with common Founding-era definitions of property.  Prominent dictionaries from that time define "property" to mean the position occupied by the "highest" rightsholder in "Lands or Tenements, Goods, or Chattels."  Giles Jacob, A New Law Dictionary (The Savoy, Henry Lintot, 6th ed. 1750), cited by Rothgery v. Gillespie County, 554 U.S. 191, 221 (2008) (Thomas, J., dissenting); see also Richard Burn & Jonathan Burn, A New Law Dictionary (1792) (same), cited by NFIB v. Sebelius, 567 U.S. 519, 649 n.1 (2012) (Scalia, J., dissenting).  The import of those definitions is that the ratifying public would have understood

"property" to encompass both real and personal property.  If the Framers meant to depart from that

original public meaning, they would have done so explicitly.

This definition of "property" also comports with our understanding of the Fifth

Amendment's guarantee against deprivations of "property" without due process of law.  See

PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 82 n.6 (1980) ("Property rights in a physical

thing have been described as the rights to possess, use and dispose of it." (citation modified));

Sperry Corp. v. United States, 853 F.2d 904, 907 (Fed. Cir. 1988) ("The fifth amendment by its

terms applies to all private property, not only real property . . . ." (citation modified)); see generally

Akhil Reed Amar, Intratextualism, 112 Harv. L. Rev. 747, 788-95 (1999) (explaining that words

used in constitutional provisions often carry concordant meaning with the same words used

elsewhere).

What the text of the Property Clause establishes, decades of precedent confirm.  The

Supreme Court has construed the Property Clause to include any property in which the United

States holds a legitimate interest.  In Ashwander v. TVA, the Court deemed electrical energy

generated from facilities on federal land to be "property belonging to the United States" within the

meaning of the Clause.  297 U.S. 288, 333 (1936).  And in Kleppe v. New Mexico, the Court

reasoned that the Property Clause enabled Congress to regulate wild animals on federal land, in so

doing rejecting an interpretation of the Clause that would have cabined Congress's power to

merely make rules incidental to the protection and sale of federal land.  426 U.S. 529, 535-42

(1976); see also Wis. Cent. R.R. v. Price County, 133 U.S. 496, 504 (1890) (reasoning that states

could not levy taxes on federal "buildings and other property essential to the discharge of the

ordinary business of the national government" because the Property Clause preempted those

regulations).  Such applications of the Property Clause belie the claim that Congress's authority is

limited to real estate.[13]    And no party, nor the Court, has found any example of a law held

unconstitutional on the basis that it regulates government possessions beyond the scope of the

Property Clause.

This commonsense definition of property accords with historical understandings of the

Clause as well.  In his Commentaries on the Constitution, Joseph Story wrote that the Property

Clause "is not confined to the territory of the United States; but extends to 'other property

belonging to the United States.'"  3 Joseph Story, Commentaries on the Constitution § 1319; see

also District of Columbia v. Heller, 554 U.S. 570, 597 (2008) (citing Story as an authority for

interpretive guidance).  Lest there be any confusion, Story explained that Congress's authority

under the Clause "may be applied to the due regulation of all other personal and real property

rightfully belonging to the United States."  Id.  Far from indicating that the provision was the

subject of any interpretive debate, Story concluded that "it has been constantly understood" as

such, "and acted upon."  Id.

The government's main rejoinder is that "no one at the founding era" would have expected

that presidential records would be made property of the United States.  Gov't's Opp'n to Historian-

Oversight Pls. 39.  But that position impermissibly elevates the Framers' supposed hidden

intentions over the public meaning of the words that they drafted, and that the people ratified.  See

---

[13] The Supreme Court has departed from its mainline interpretation of the Property Clause in one infamous
case: Dred Scott v. Sandford, 60 U.S. 393 (1856).  There, Justice Taney reasoned that the Property Clause did not
allow the government to regulate the Missouri territory to abolish slavery in that jurisdiction because it only applied
to "territory which at that time belonged to, or was claimed by, the United States, and was within their boundaries as
settled by the treaty with Great Britain."  Id. at 432 (emphasis added); see also id. at 436 (arguing in dicta that "other
Property" similarly referred to property transferred to the new national government at ratification).  Of course, Dred
Scott's holding on slavery was overturned by the passage of the Thirteenth Amendment.  The Court has declined to
follow Dred Scott's limitation on the Property Clause ever since, such as in Kleppe.  Dred Scott's limitation on the
Property Clause is best understood as the Taney Court's aberrant departure from an otherwise uninterrupted line of
cases that apply the Clause to all federal property, written to justify the Court's since-repudiated holding on slavery.
Moreover, even Dred Scott did not depart from the Supreme Court's consistent understanding: "other property
necessarily, by every known rule of interpretation, must mean property of a different description from territory or
land."  60 U.S. at 439-40.

Reid v. Covert, 354 U.S. 1, 8 n.7 (1957) ("This Court has constantly reiterated that the language of the Constitution where clear and unambiguous must be given its plain evident meaning."); Lake County v. Rollins, 130 U.S. 662, 670 (1889) ("This intent is to be found in the instrument itself; and, when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.").

The Framers drafted the Constitution to be read and debated by the American public, and so used terms that they would understand. See Akhil Reed Amar, The Words That Made Us: America's Constitutional Conversation (2021); see also 3 Joseph Story, Commentaries on the Constitution § 451 ("[E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it."). And so, when interpreting the Constitution, judges must give effect to the "natural and common import of words" unless the language and structure of the provision in question makes doing so unreasonable. Sturges v. Crowninshield, 17 U.S. 122, 202-03 (1819). "It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." Id. at 202. And, as previously discussed, the ordinary meaning of "property" sweeps in both real and personal property.

The government notes that the Property Clause is located in Article IV, as opposed to Article I. But that does not change the meaning of its terms. The framers wrote Article I to establish Congress and enumerate its powers to legislate over subject-matter areas of national importance. Article IV serves a different purpose: it governs the relationship among the states and between the states and the federal government, unifying the new republic through a common set of guarantees and ensuring the national character of the federal government. Gillian E. Metzger,

Congress, Article IV, and Interstate Relations, 120 Harv. L. Rev. 1468, 1507-08 (2007) ("The Court has frequently emphasized the union-forging purpose of Article IV, describing it as animated by the purpose of making the states 'integral parts of a single nation' and as constituting 'an essential part of the Framers' conception of national identity and Union.'") (first citing Baker v. Gen. Motors Corp., 522 U.S. 222, 232 (1998); then citing California v. Superior Ct., 482 U.S. 400, 405 (1987)).  For example, it vests Congress with the authority to pass enabling legislation for the Full Faith and Credit Clause.  U.S. Const. art IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.").  It also provides that the United States shall guarantee every state a republican form of government and protect them from invasions.  Id. § 4.  The Property Clause is similar.  It establishes that the property held by the United States is uniquely federal and may be governed by Congress, not subject to conflicting laws passed by the state in which that property is located.  In other words, national property for a national government.

The government also argues that the Property Clause does not encompass governmental papers because the phrase "other property" appears alongside the word "territory," thereby limiting its applicability.[14]  See Gov't's Opp'n to Historian-Oversight Pls. 30 (citing Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001) ("A residual clause should itself be controlled and defined by reference to the category just before it." (citation modified)).  Specifically, it contends that a broad reading of "other property" runs afoul of the ejusdem generis canon, which provides that residual terms following a list should be limited by the nature of the items that precede them.  There

_____

[14] The government appeared to abandon this theory during oral argument.  Oral Arg. Tr. 109:2-7.  But because it was addressed in the government's briefs, the Court considers it here.  The government also does not provide a definition of "other property" that it believes comports with its reading of the Clause.

are a few issues with this analysis.  As an initial matter, as discussed above, that notion has already been rejected by the Supreme Court, which has applied the Clause more broadly than just to real property.  See Gratiot, 39 U.S. at 537; Ashwander, 297 U.S. at 331.

It also fails as an interpretive matter.  The ejusdem generis canon provides that "where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."  A. Scalia & B. Garner, Reading Law § 32.  But the Property Clause does not contain a list of "two or more things"—it only references territory before other property.  The requirement that a list contain multiple items is important because it provides the context that the final clause is meant to be cabined by the meaning of the previous provisions.  For example, consider a will that grants a decedent's "farm, field, lake, barn, house, and other property."  In that context, the residual clause could naturally be limited to real property.  But if the will merely bequeathed a decedent's "land and other property," then the same inference would not hold because the preceding clause does not establish a "readily identifiable genus" for the remaining term.  Id. n.32 (citing United Towns Elec. Co. v. Att'y Gen. for Newfoundland, [1939] 1 All. E.R. 423, 428 (P.C.) ("The mention of a single species does not constitute a genus." (citation modified)).

And there was good reason for the Framers to specify that Congress could legislate over both territory and personal property.  The Articles of Confederation did not expressly vest Congress with the authority to regulate the federal territories, and only used property to mean personal property.  Articles of Confederation art. IV (providing that certain "restrictions shall not extend so far as to prevent the removal of property imported into any state, to any other State, of which the Owner is an inhabitant; provided also that no imposition, duties or restriction shall be laid by any state, on the property of the united states, or either of them.").  So, if the Framers had

33
**JA280**

not expressly provided for Congress's power to regulate "territory," it would be far from obvious that federal territory would be governed by the same authorities as other federal property. And, of course, only vesting Congress with the power to regulate "territory" would leave unspoken the extent to which Congress could regulate other forms of federal property. To avoid confusion, expressly addressing both territory and other property was prudent. The most straightforward reading of the Clause, then, is that it means what it says.

The government's remaining argument is that even if the Property Clause allows Congress to regulate the government's personal property, it does not allow Congress to transform a president's records into government property. Presidential records began as the president's private property, the argument goes, and the Property Clause does not provide a basis for taking them. Accordingly, the Property Clause cannot justify section 2202 of the Records Act, which provides that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records." Here, too, the government is mistaken.

Congress may legislate to define and clarify its latent property interest in the work product of members of the United States government. To understand why, recall that "[b]ecause the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source" such as state or federal law. Ralls Corp. v. CFIUS, 758 F.3d 296, 315 (D.C. Cir. 2014) (citation modified). Those background principles create "mutually reinforcing understandings that" if "sufficiently well grounded" give rise to property interests. Nixon v. United States, 978 F.2d 1269, 1275 (D.C. Cir. 1992). Thus, the first question is whether the government has a property interest in presidential records.

It does.  The government generally holds a property interest in the materials created by government officials.  See Solomons v. United States, 137 U.S. 342 (1890).  In particular, it is well settled that records created by government employees are government property.[15]  United States v. Dean, 989 F.2d 1205, 1207-09 (D.C. Cir. 1993); United States v. First Trust Co. of St. Paul, 251 F.2d 686, 688 (8th Cir. 1958) ("Records of a government officer executed in the discharge of his official duties are public documents and ownership is in the United States" (citation modified)); Grosjean v. Bommarito, 302 F. App'x 430, 435 (6th Cir. 2008) ("[T]he actions of [the State of Michigan's] employees in their official capacities are made under color of state law and its property . . . is public property." (citation omitted)).

The government concedes that the materials typically used to make presidential records— such as "[p]aper and computers at the White House"—"are the property of the United States." Gov't's Opp'n to Historian-Oversight Pls. at 39.  And, more broadly, the government routinely restricts how officials can use the outputs they create while on government time, using government materials.[16]  For example, government employees cannot copyright materials created pursuant to their official duties.  Pub. Affs. Assocs., Inc. v. Rickover, 369 U.S. 111, 113 (1962).  The government's property interest in official records is deeply rooted and, even when not absolute,

---

[15] The Government agreed at oral argument that Executive Branch records outside the Executive Office of the President are property of the United States.  Oral Arg. Tr. 109:2-7.

[16] The government argues that Congress cannot direct how the President uses certain types of government property, such as by deploying an aircraft carrier to a particular region.  That is true, but because such a law would run afoul of constitutional constraints on Congress's authority that are external to the Property Clause, such as by infringing on the President's Commander-in-Chief authority.  For the same reason, Congress could not regulate federal property in a manner that discriminates on the basis of race without running afoul of the Fifth Amendment.  See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954).  But the existence of external constraints is not relevant for the question whether a law falls within Congress's enumerated powers, especially when the power in question is plenary.  See Alabama, 347 U.S. at 273; see also Gerald Gunther, Congressional Power to Curtail Federal Court Jurisdiction, 36 Stanford L. Rev. 895, 916 (1984) (explaining that Congress has considerable authority to shape the jurisdiction of federal courts but is nonetheless limited by external constraints imposed by other constitutional provisions).  The impact of the alleged external constraint in this case—the separation of powers—is discussed further below.

exists alongside whatever entitlements that other parties might have in that property. See Folsom v. Marsh, 9 F. Cas. 342, 347 (C.C.D. Mass. 1841) (Story, J.).

The Property Clause allows Congress to clarify and assert the federal government's property interests in cases where it possesses a legitimate entitlement. For example, Congress could "assume jurisdiction over highways within" national parks, but it might also decline to do so and leave regulation to the states. See Kleppe, 426 U.S. at 544. Similarly, in the absence of federal law, states may regulate wildlife on federal land. Id. But if Congress chooses to do so, it may assert its latent property interest in those wild animals by exerting ownership over or regulating them, thereby displacing contrary state law and practice. Id.

What of the long history of the President treating presidential records as his own? The government's latent entitlement to the work product of government officers allows Congress to prospectively clarify and define the government's property rights over presidential records. True, Congress did not act to take ownership of presidential records for much of our history. But Congress cannot surrender the legislative powers that the Constitution vests in it. See Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892) ("[C]ongress cannot delegate legislative power to the president."). After Watergate, Congress made the decision to regulate this category of its property. The Records Act thus established that, going forward, the federal government would retain full ownership rights in presidential records. 44 U.S.C. § 2202.[17] Hence, for almost 50 years, that has been the unchallenged rule. Congress is entitled to make that choice.

The government invokes the Supreme Court's recent decision in Tyler v. Hennepin County, 598 U.S. 631 (2023), to argue that Congress cannot redefine property rights by statute in

---

[17] It is important that the Records Act operates prospectively because it alters future Presidents' entitlements to their records before any property rights vest in them. See Nixon v. United States, 978 F.2d at 1284 (holding that former-President Nixon had a vested property right in his papers, and so was owed just compensation, but that the Records Act presents a separate question because it is prospective).

the face of historical practice. That is a stark misreading of the case. In Tyler, the Court held that a state "may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." Id. at 645. Simply put, this is an anticircumvention principle. States may not use their legislative power to strip individuals of vested rights and thereby take their property without just compensation. But that holding implicitly recognizes that governments do have the background authority to modify property rights through statutes outside the context of expropriation, particularly when the new law draws upon "traditional property law principles" and judicial "precedent[.]" Id. at 638; see also Andrus v. Allard, 444 U.S. 51, 64-67 (1979). Here, there is no concern that Congress has end-run the Takings Clause because the Records Act operates prospectively, so property rights never vest in an incumbent President at all. And, as previously discussed, the Act draws upon historical practice and precedent that recognizes the government's interest in the work product of government officers.[18]

In sum, the original public meaning of the text of the Constitution, canons of interpretation, Supreme Court precedent, general principles of property law, and almost 50 years of practice confirm that Congress has the enumerated power to regulate presidential records under the Property Clause.

---

[18] In the alternative, if the President did have an irreducible property interest in his papers, the conversion of those records into public property could be justified by the Takings Clause, which allows for the government to take private property for public use. The public use requirement is satisfied as "long as a taking has a conceivable public character; the means by which it will be attained is for Congress to determine." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 988 (1984) (citation modified). In Nixon v. Administrator, as discussed below, the Supreme Court explained that government ownership of presidential records has a "public character" insofar as it promotes accountability among Executive Branch personnel, gives incumbent Presidents the benefit of their predecessors' knowledge, and allows the public to learn about the history of the Executive Branch. 433 U.S. at 452-53. So, if the President had an irreducible property right in his records, then he would be owed just compensation, but Congress would nonetheless have authority to enact a law like the Records Act, just as it enacted the Preservation Act.

2. Necessary and Proper Clause

Congress is vested with the power to "make all Laws which shall be necessary and proper" to facilitate other legitimate legislative objectives. U.S. Const. art. I, § 8, cl. 18. Those objectives include not only Congress's "foregoing" enumerated powers but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Id. That latter provision provides Congress with the authority to enact "legislation affecting the internal operations of the national government." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir. 2003). In particular, Congress may legislate to facilitate the operations of the coordinate branches, "promote efficiency and integrity in the discharge of official duties," and prevent malfeasance among public servants. Ex parte Curtis, 106 U.S. 371, 373 (1882) (upholding restriction on political activity by Executive Branch employees); see also Nixon v. Administrator, 433 U.S. at 499 (Powell, J., concurring) (Congress has the "inherent power" to "preserve the departments and institutions of the general government from impairment or destruction" (citation modified)).

The Presidential Records Act falls squarely within Congress's authority to structure the internal operations of the national government. The Act is substantially related to several important operational objectives. Its predecessor statute served to "punish bribery and conflicts of interests," and "publicize corruption, maladministration, [and] inefficiency." Id. So does the Records Act. More broadly, the preservation of presidential records facilitates "efficiency . . . in the discharge of official duties," Ex parte Curtis, 106 U.S. at 373, by ensuring that future Presidents and Executive Branch personnel are not "dependent on the happenstance or the whim of a prior President when [they] seek[] access to records of past decisions that define or channel current decisions," Nixon v. Administrator, 433 U.S. at 452.

The government's arguments to the contrary are unavailing. The government initially argues that the Necessary and Proper Clause only enables Congress to legislate pursuant to specific enumerated powers. Gov't's Opp'n to Historian-Oversight Pls. 35. That ignores the second half of the Necessary and Proper Clause. The case the government cites for its narrow reading of the Necessary and Proper Clause only analyzes whether a law is constitutional under the "foregoing powers" provision. Id. (citing United States v. Comstock, 560 U.S. 126, 134 (2010)). And of course, laws passed pursuant to the foregoing powers provision must be "rationally related" to an Article I, Section 8 enumerated power. Comstock, 560 U.S. at 134. But in any event, here plaintiffs rely on the second part of the Necessary and Proper Clause. That provision provides independent legal authority to enact "legislation affecting the internal operations of the national government," O'Bryan, 349 F.3d at 401, including the regulation of the "officers and employees of the United States," Ex parte Curtis, 106 U.S. at 372. Put another way, such laws are necessary and proper to enable the other branches to execute their constitutional responsibilities.

This latter provision is seldom litigated but deeply rooted. See M'Culloch, 17 U.S. at 325 (situating Congress's power to create a national bank in the Necessary and Proper Clause, inter alia, to "assist the operations of the government"). Congress has used its authority over structuring internal governmental functions to pass laws related to executing judicial orders and setting terms for borrowing credit. See Bank of the United States v. Halstead, 23 U.S. (10 Wheat.) 51, 53-54 (1825) (upholding the power to legislate to "carry into complete effect the judgments of the Courts"); Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 22-23 (1825) (upholding delegation of the power to prescribe rules of judicial procedure); United States v. Fisher, 6 U.S. (2 Cranch) 358, 396 (1805) (Marshall, C.J.) (upholding a policy giving the United States a preference over other creditors). In Ex parte Curtis, the Court upheld a law prohibiting members of the Executive Branch

from requesting or providing money for political purposes as necessary and proper to promote accountability to the general public and improve Executive Branch operations by instilling discipline and removing incentives to retain unproductive employees. 106 U.S. at 374-75. Far from being an outlier, the law in Ex parte Curtis was animated by the "same principle" as laws that regulated executive officer conduct tracing back to 1789. Id. at 372. And Congress continues to pass legislation to structure the federal government, promote efficiency, and deter bad actors. For instance, the Hatch Act, 5 U.S.C. §§ 7321-7326, prohibits political advocacy by government officials, and the Paperwork Reduction Act, 44 U.S.C. §§ 3501-3521, sets out a process for Executive Branch review of agency actions and establishes the Office of Information and Regulatory Affairs. The Presidential Records Act is in keeping with that tradition.

The government's remaining argument is that even if the Necessary and Proper Clause allows Congress to pass laws related to government operations, "this power does not authorize Congress to interfere with the President's execution of his Article II powers." Gov't's Opp'n to Historian-Oversight Pls. 45. That argument presupposes that the government prevails on its separation of powers claim that the Records Act impermissibly infringes on core executive powers. That is not the case, as the Court will now explain.

Accordingly, the Necessary and Proper Clause likely provides an independent basis for the Presidential Records Act. The Act appropriately regulates internal government operations to promote integrity among Executive Branch members and enable future presidents to carry out their constitutional functions.[19]

---

[19] The government has suggested that if Congress has the enumerated power to pass a law regulating presidential records, it could also pass a law regulating Supreme Court records. Perhaps. But that issue is not before the Court today. The Court only notes that such a law would be subject to a distinct separation of powers inquiry, because that analysis requires consideration of the specific interests and burdens implicated by the particular challenged provision. See Trump v. Mazars USA, LLP, 591 U.S. 848, 869 (2020) (explaining that courts must analyze

B. *Separation of Powers*

The government next argues that even if Congress has the authority to enact the Presidential Records Act, the law impermissibly encroaches on the President's executive power for two reasons. First, in the government's view, the Act chills the President's advisors from offering candid advice for fear that records of their positions will later be disclosed. Second, the government contends that the law burdens White House personnel with tedious record-keeping duties that impede them from carrying out various responsibilities to aid the President in executing other laws. Neither argument is persuasive.

Again, recall the operative principles. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ." Youngstown, 343 U.S. at 637 (Jackson, J., concurring). For the President to prevail in such a circumstance, his claim to power must be "so conclusive and preclusive" that it displaces congressional authority to pass contrary legislation in that arena. Id. at 637-38. That means that here the President must show that control over presidential records "is within his domain and beyond control by Congress." Id. at 640.

To assess whether Congress has intruded into the President's exclusive domain, "courts must perform a careful analysis" of the separation of powers principles at stake, considering the unique positions of the President and Congress, and their traditional ways of conducting government. Trump v. Mazars USA, LLP, 591 U.S. 848, 869 (2020) (citing Youngstown, 343 U.S. at 610 (Frankfurter, J., concurring)). For example, in Nixon v. Administrator the Court

_____

separation of powers questions based on the specific contours of the challenged law and how it entangles the branches of government). In the judicial context, courts would have to consider implications of a disclosure provision based on the life tenure of federal judges, the multimember nature of the Supreme Court, and the potential impact of disclosure on due process. And, of course, the fact that Congress might pass other, unrelated legislation to regulate government records in the future does not bear on its power to pass the law at issue here.

41
**JA288**

considered the extent to which the Preservation Act "prevent[ed] the Executive Branch from accomplishing its constitutionally assigned functions," and reasoned that if the law posed such an imposition, the Court would also have to evaluate whether "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U.S. at 443.

The Court more recently evaluated a President's claim that congressional action intruded on executive power in Mazars. 591 U.S. at 869. In that case, the Court considered the permissibility of congressional subpoenas for the sitting President's personal financial records. It evaluated the asserted legislative justification for obtaining the records, the evidence that the subpoenas served that purpose, and the degree to which those subpoenas burdened the President. Id. at 869-71. The Court also considered whether the subpoenas were narrowly drafted, because broadly drafted demands for evidence might evince Congress's intent to aggrandize itself at the expense of the President rather than serve some legitimate legislative purpose. Id. at 870.

The parties disagree about how Nixon v. Administrator and Trump v. Mazars bear on this case. Plaintiffs contend that Nixon controls the separation of powers analysis here, and that the Supreme Court's blessing of the Preservation Act straightforwardly applies to the Records Act. The government argues that the Supreme Court's skepticism toward legislative subpoenas targeted at the President's personal records in Mazars stands for a broader hostility toward congressional action aimed at exposing presidential materials. Both cases are relevant insofar as they outline the legal standards relevant for interbranch disputes and, broadly speaking, which interests and burdens are cognizable and how they should be weighed. But neither case controls because the Records Act presents a distinct statutory scheme that implicates interests and distributes burdens differently than either its predecessor statute or a targeted legislative subpoena.

Nixon is highly informative where issues relevant to the Preservation Act reappear in the Records Act context.  For example, the statutes similarly enable judicial review and preserve the President's ability to challenge public disclosure of records by invoking executive privilege.  But the statutes also differ in important respects.  The Records Act, unlike the Preservation Act, operates prospectively and is not a direct remedial measure aimed at preventing the imminent destruction of a specific President's records following recognized malfeasance involving those records.  Those differences implicate how courts must balance the separation of powers interests at issue.  After all, the Nixon Court did not hold that a records disclosure statute could never violate the separation of powers, only that the statutory scheme in the Preservation Act did not.

Mazars is even less on point. There, the Supreme Court only concluded that the legislative subpoenas in question implicated the separation of powers, without determining how each factor panned out.  And Mazars involved Congress's implied investigative powers; it focused on the lack of authority to issue legislative subpoenas without any discernable legislative purpose.  That discussion is not relevant here because Congress has independent, enumerated authority to enact the Records Act under the Property Clause and the Necessary and Proper Clause, without relying on any implied authority.  That said, Mazars remains relevant for determining which separation of powers factors are implicated by congressional demands for executive information.

Following the Supreme Court's lead from both Nixon and Mazars, this Court will consider Congress's purpose in enacting the Records Act, whether the intrusion imposed by the Act is reasonably tailored to its legislative goal, and the extent to which it prevents the President from fulfilling his constitutionally assigned duties.

The Records Act serves several legitimate legislative purposes.  As the Supreme Court has noted, Congress's ability to regulate federal property is "without limitation."  Gratiot, 39 U.S. at

537. Under that authority, Congress acts at the apex of its power and may preserve presidential records for any purpose not otherwise prohibited by the Constitution. Thus, the Act is "adequately justified" by the need to "establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." Nixon v. Administrator, 433 U.S. at 452 (citation modified).

Beyond that, the Presidential Records Act also serves the legitimate goal of promoting efficiency and accountability in the Executive Branch. See Ex parte Curtis, 106 U.S. at 373. Congress reasonably believed that, after Watergate, additional safeguards were necessary to ensure that Executive Branch personnel behaved with discipline and integrity. Finally, the Records Act protects effective transitions of power and our republican form of government by ensuring incumbent Presidents may pick up where their predecessors left off. "Congress could legitimately conclude that" the prior system—where incumbent presidents and the public were dependent on the good will and charity of their predecessors—was "unstable and ripe for change." Nixon v. Administrator, 433 U.S. at 452 n.15.

More broadly, nothing suggests that Congress is using the Records Act to aggrandize itself at the expense of the President. The Act does not grant Congress new powers, like a line-item veto, see INS v. Chadha, 462 U.S. 919 (1983), or prevent the President from exercising control over an executive agency, see Seila Law, LLC v. CFPB, 591 U.S. 197 (2020). Congress does not gain any structural advantage over the President by dint of the requirements imposed by the Act. Nor is this a case like Mazars where Congress can arguably use the records at issue to expose the President's sensitive personal materials to his public embarrassment. Simply put, there is no reason to doubt that Congress enacted the Records Act for legitimate legislative purposes.

44
**JA291**

The Records Act is also narrowly drafted. There is no substitute for collecting presidential records that would achieve the aforementioned purposes of the Act. See Nixon v. Administrator, 433 U.S. at 452 n.15 (observing that Congress "could legitimately conclude" that the voluntary practices that preceded the Preservation Act were "unstable"). Indeed, the Records Act focuses on material that is essential to carrying out the statutory scheme. Like the Preservation Act, the Records Act appropriately carves out personal records from collection. Id. at 454. The Records Act also grants the President authority to dispose of records that lack "administrative, historical, informational, or evidentiary value" upon obtaining the views of the Archivist (an Executive Branch officer). 44 U.S.C. § 2203(c). And the President has unreviewable discretion to make those determinations. Armstrong I, 924 F.2d at 290. Hence, the careful construction of the statute demonstrates that the law only reaches materials that are genuinely necessary to achieve valid legislative purposes.

And the strain that the Records Act imposes on the President's ability to receive advice is minor. The government's mere invocation of "chilling" is not enough to render a law unconstitutional. While the President is in office, he is "exclusively responsible for the custody, control, and access" to records. 44 U.S.C. § 2203(f). The Supreme Court has recognized that "it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress or some outside agency" take responsibility of the records. Nixon v. Administrator, 433 U.S. at 444. In this respect, the Records Act is highly similar to the Preservation Act, which the Supreme Court concluded was not "unduly disruptive" of Executive Branch activities. Id. at 445.

The government argues that the true danger is the chilling that flows from the Records Act's public disclosure provisions. Oral Arg. Tr. 103:4-7. But the Supreme Court has held that

an "absolute barrier to all outside disclosure is not practically or constitutionally necessary." Nixon v. Administrator, 433 U.S. at 450. The Court reasoned that the Preservation Act provided a "limited" period of confidentiality, which was "subject to erosion over time," and that period was nonetheless sufficient to enable the "candid communication of views by Presidential advisers." Id. at 451. So too here.

The Records Act is carefully crafted to minimize the likelihood of a present imposition on candor. Records are sequestered for five years after the President leaves office, and the President may extend that period to 12 years in certain circumstances. The sequestration provision ensures that any records of an advisor giving the President unpopular advice will not become public until long after the salience of the issue has faded. And, crucially, the Act preserves the outgoing President's ability to assert presidential privilege in federal court against disclosure. 44 U.S.C. § 2204(e). The availability of judicial review ensures that the President will always receive the constitutionally required amount of protection from the disclosure of sensitive information. Under the ambit of such protections, it is difficult to imagine that advisors would shrink from offering the President their honest opinions on matters of national importance.

Finally, the government has not demonstrated that the Records Act creates an intolerable administrative burden. To prevail on this claim, the government must show that the law is "unduly disruptive" of Executive Branch activities. Nixon v. Administrator, 433 U.S. at 445. And the Supreme Court has emphasized that the standard for demonstrating such a burden is high because "there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." Id. (citing, inter alia, FOIA and the Privacy Act). Here, the government has not provided any evidence about the resources it expends to comply with the Records Act, merely asserting that the law "necessarily impede[s]" the President from

support he might otherwise receive.  Gov't's Opp'n to Historian-Oversight Pls. 32.  Such a bald assertion cannot suffice.  And even if the government provided such evidence, it is unclear that the expenditure of resources for statutory compliance is cognizable as a "burden" in the separation of powers analysis.[20]  The Constitution commands the President to "Take Care that the Laws be faithfully executed"—the Records Act is one such law.  Otherwise, the President could claim a separation of powers burden whenever he had to execute a substantial statutory mandate that he opposed.

History and Executive Branch practice likewise suggest that the Records Act does not substantially impede Executive Branch administration.  During the passage of the Records Act, OLC testified before Congress that the law posed "no substantial separation of powers problems . . . ."  Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations, 95th Cong. 87, 89 (1978).  And for nearly 50 years, every President—including President Trump in his first term—has complied with the Records Act, negotiating records disclosure within its framework.  None has challenged its facial constitutionality as too burdensome on the presidency.  Even today, the government purports to abide for the most part with the Records Act, which belies the claim that the burden of compliance is intolerable.  Such acquiescence is not dispositive, but it is illuminating.  See Mazars, 591 U.S. at 869 (citing Youngstown, 343 U.S. at 610 (Frankfurter, J., concurring)).  It suggests that the post-Watergate settlement reflected in the Records Act adequately protects the President's interests without imposing unacceptable burdens.

---

[20] At oral argument, the Government could not identify any cases to suggest that the administrative burden of executing an otherwise valid statute could constitute a separation of powers violation.  Oral Arg. Tr. 104:3-14.

47
**JA294**

In sum, the relevant separation of powers principles all indicate that the Presidential Records Act is likely constitutional. The Act serves a legitimate legislative purpose, is carefully crafted to those ends, and does not impose a substantial burden on Executive Branch activities. Accordingly, it likely does not impermissibly encroach upon the President's authority.

Because Congress has the enumerated power to regulate presidential records, and because the Presidential Records Act does not unduly tread on core executive power, the law is likely constitutional. The President is not free to disregard valid laws. His actions doing so, therefore, are in excess of his constitutional authority and in violation of federal law, so plaintiffs are likely to succeed on the merits of their claims.

## IV.    Other Winter Factors

Recall that a plaintiff seeking a preliminary injunction must show not only a likelihood of success on the merits but also "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. Plaintiffs have carried their burden on these factors as well.

Unpreserved or improperly destroyed documents are "lost forever to history," and therefore injury from failure to preserve presidential records or the unlawful destruction of those records would be irreparable. Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 29 (D.D.C. 2025) (quoting Armstrong I, 924 F.2d at 288); see also Am. First Legal Found. v. Becerra, Civ. A. No. 24-1092, 2024 WL 3741402, at *14 (D.D.C. Aug. 9, 2024) (same); Historian-Oversight PI Mem. 38-39 (collecting cases); Press-CREW PI Mem. 32-33 (same). For example, text messages that are deleted from personal devices under the 2026 Records Guidance because staffers memorialized the substance of the discussion in a memorandum or email likely cannot be recovered. Moreover,

48
**JA295**

individual staffers may not be able to accurately identify which conversations or details are worth preserving, risking the loss of documentary materials that may in fact have considerable value to historians or other interested parties entitled to access those materials under FOIA in the future.

The government disputes that plaintiffs are irreparably harmed by the 2026 Records Guidance primarily by arguing that the Guidance conforms to the Act. See Gov't's Opp'n to Historian-Oversight Pls. 9-12. However, the Court has already determined in its standing analysis that plaintiffs have carried their burden as to the imminence of their injury by showing a substantial risk that defendants are currently or soon will be failing to adequately preserve records as required by the Records Act. And "Damocles's sword does not have to actually fall on [plaintiffs] before the court will issue an injunction." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016). As noted above, in this preliminary injunction posture plaintiffs are focused on ensuring record preservation rather than the President's compliance with the disposal notice requirements of section 2203(c)-(e), but plaintiffs raise valid concerns about EOP staff deletion of records insofar as that represents a failure to preserve records. See Oral Arg. Tr. 54:3-56:23; 130:6-24. Such deletion would be irreparable because plaintiffs who ultimately prevail on the merits would not be able to subsequently recover those records. The government makes no argument that records deleted today would be recoverable at a later date.

In sum, plaintiffs have carried their burden as to irreparable harm at this preliminary injunction stage. They have shown a substantial risk of current or imminent non-preservation or deletion of electronic messages created or sent on non-official accounts, of non-preservation or deletion of presidential records created by or sent to the President or Vice President themselves, and, secondarily, of records disposal without following the requirements of section 2203(c)-(e).

As to the public interest and balance of equities, recall that these merge when the government is a party. Nken, 556 U.S. at 435. And as the D.C. Circuit has explained, there is "generally no public interest in the perpetuation of unlawful agency action." League of Women Voters, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." Id. (citation modified). That is no less true here with respect to unlawful actions by EOP and the individual federal officer defendants.

Moreover, as also just explained, the government suffers only minimal (if any) harm from complying with the Records Act. It has complied with the Act without complaint for almost 50 years, including during the first Trump administration and the first year of the current one. Even now, it is willing to voluntarily impose on itself similar—it would say equivalent—requirements, and hence burdens, under the 2026 Records Guidance. Finally, the public at large has a great interest in learning "what their [President] is up to." NARA v. Favish, 541 U.S. 157, 171 (2004) (citation modified). Indeed, that is precisely the purpose of the Records Act.

Insofar as the government has emphasized the harm from disclosure requirements after the President's term in office, Oral Arg. Tr. 97:4-103:16, such disclosure would not take place for another eight or more years. In other words, the harm that the government most fears would not materialize for close to another decade. Granted, the government's theory of burden is about chilling candid advice today, but again it has not complained before in nearly half a century, and any harm from later disclosure would be mitigated if the government ultimately prevails on the merits in this case. Moreover, as discussed in the context of the separation of powers burden imposed by the Records Act, the statute contains ample safeguards to ensure presidential control over records while the President is in office and grants judicial review of any constitutional

challenges he might bring to specific disclosure decisions. These guardrails blunt any assertion of harm by the President. As a result, the balance of equities tips quite strongly in plaintiffs' favor— the irreparable harm on plaintiffs' side of the ledger alongside the public's interest in the Executive Branch following the law outweighs the government's asserted interests in its inherent executive prerogatives.

Fortunately, the country has not had another Watergate scandal since President Nixon, which suggests that the sunshine disinfectant of the Records Act is working as intended. And in any event, it is not for this Court, OLC, or the White House to second guess Congress's lawful determination—made pursuant to at least two different enumerated powers—that citizens ought eventually to have access to these records of presidential activities carried out in their name. Therefore, the other <u>Winter</u> factors also weigh in favor of a preliminary injunction.

## V.    Scope of Relief

Because plaintiffs have shown an entitlement to a preliminary injunction, the final task for the Court is to determine the appropriate scope of relief. <u>See</u> Historian-Oversight Pls.' Compl. 45; Press-CREW Compl. 40-41. As discussed above, the Court will deny relief as to the NARA, Archivist, DOJ, and Attorney General defendants for likely lack of standing or a cause of action.

The government also disputes whether the Court has the authority to enjoin the President or Vice President. Gov't's Opp'n to Historian-Oversight Pls. 44-45. "A court generally may not 'enjoin the President in the performance of his official duties.'" <u>Severino v. Biden</u>, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (quoting <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 802 (1992) (plurality opinion)). Granted, "<u>Franklin</u> left open a narrow potential exception for injunctions that require the President to perform a purely ministerial duty over which he has no discretion." <u>Id.</u> (quotation

omitted).  But the D.C. Circuit has "never attempted to exercise power to order the President to perform a ministerial duty."  Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996).

The Historian-Oversight plaintiffs point out the narrow exception under Franklin, but promptly pivot, offering that the Court "may enjoin the President's subordinates."  Historian-Oversight Pls.' Reply 25 (citing Swan, 100 F.3d at 978).  Following that invitation, the Court will not enjoin the President.  And the Court also finds unadministrable and overly intrusive the Historian-Oversight plaintiffs' request to enjoin individual defendants besides the President "to disclose to the Court any known instances in which the President destroys, converts for personal use, or otherwise fails to maintain Presidential records as required by the [Act]."  Historian-Oversight Pls.' Compl. 45.  However, as explained above, records created by the President and transmitted or transferred to EOP staff would still trigger those staff members' duties under the Act.

Whether the court has the authority to enjoin the Vice President appears to be a question of first impression, although the Historian-Oversight plaintiffs do identify one case in this district in which a judge entered a preliminary injunction against the Vice President in a Records Act case before later denying relief on the merits.  See Citizens for Resp. & Ethics in Wash. v. Cheney, 577 F. Supp. 2d 328, 330-31 (D.D.C. 2008) (entering preliminary injunction); Citizens for Resp. & Ethics in Wash. v. Cheney, 593 F. Supp. 2d 194, 233 (D.D.C. 2009) (vacating preliminary injunction).

The government argues that the same separation of powers concerns apply to the Vice President as the President because both are constitutionally- rather than statutorily-created positions.  Gov't's Opp'n to Historian-Oversight Pls. 45.  And at oral argument the government relied on Cheney v. U.S. Dist. Ct. in support.  See Oral Arg. Tr. 94:2-96:11.  There, the Supreme

Court vacated the D.C. Circuit's refusal to issue a writ of mandamus to block discovery orders directed at the Vice President and his staff.  542 U.S. at 391-92.  In doing so, it reiterated the President's "unique position in the constitutional scheme" and held that similar "separation-of-powers considerations should inform" courts in evaluating a mandamus petition involving the Vice President.  Id. at 381-82 (quotation omitted).  In this Court's view, it need not at this time wade into the thicket of whether it has the authority to enjoin the Vice President because it can enjoin the Vice President's subordinates and thereby provide most of the preliminary relief that plaintiffs seek.  See Swan, 100 F.3d at 978-79.

Therefore, the Court will enjoin the remaining federal defendants besides the President and Vice President to comply with the Records Act and not rely on the OLC opinion and the 2026 Records Guidance.[21]

## CONCLUSION

For the foregoing reasons, the Court grants both sets of plaintiffs' motions for a preliminary injunction except as to the President and Vice President, NARA, the Archivist, DOJ, and the Attorney General.  The Court denies the Historian-Oversight plaintiffs' motion for a stay.  Separate orders will issue in each case to accompany this opinion.[22]

---

[21] The Court finds it premature to enjoin President Trump in his personal capacity from violating the Records Act after he leaves office.  Although plaintiffs have established imminent injury with respect to current violations of the Act by defendants, it is far less clear what President Trump will do with respect to his obligations under the Act when leaving office in almost three years.

[22] The Court will also not stay its orders pending appeal.  In deciding whether to grant a stay, courts consider (1) whether the applicant has made a strong showing of likelihood of success on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether a stay will substantially injure the other parties, and (4) the public interest.  Nken, 556 U.S. at 434.  The first two factors are the most important.  Id.  Of course, the burden for any stay request is now on the government as the applicant.  The government cannot demonstrate a strong showing of likelihood of success on the merits because plaintiffs have already established their likelihood of success on the merits.  That failure is an "arguably fatal flaw."  Citizens for Resp. & Ethics in Wash. v. FEC, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (citation omitted).  And plaintiffs have shown substantial injury from ongoing or imminent noncompliance with the Records Act.  Granted, infringement on Executive Branch functioning may be irreparable if the government ultimately prevails on appeal.  See, e.g., Dellinger v. Bessent, No. 25-5052, 2025 WL 887518, at *3 (D.C. Cir. Mar. 10, 2025).  But the actual (or even likely) injury to the government is not great, for the reasons the Court has explained.  And the

/s/
JOHN D. BATES
United States District Judge


Date: <u>May 20, 2026</u>

---

public interest also tips against a stay for the reasons just explained.  Therefore, on balance the stay factors weigh against granting this "extraordinary relief."  <u>Citizens for Resp. & Ethics in Wash.</u>, 904 F.3d at 1017.  The Court will also not issue an administrative stay of its orders because the orders already provide that the government has six days before compliance is required.

54
**JA301**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN HISTORICAL ASSOCIATION;
AMERICAN OVERSIGHT,

   Plaintiffs,

  v.

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*,

   Defendants.

Case No. 1:26-cv-01169-JDB

**NOTICE OF COMPLIANCE**

Defendants hereby file this notice of compliance with the Court's preliminary injunction order, ECF No. 23. The Court required that this notice be filed by May 28, 2026, and "describ[e] the steps [Defendants] have taken to comply with this order." *See* Order ¶ 4. Defendants accordingly state as follows:

1. On May 25, 2026, an email was sent to all EOP staff on behalf of the White House Counsel attaching the Court's orders in the two Presidential Records Act (PRA) cases pending before this Court, consistent with paragraph 3 of the orders. A copy of the email and its attachments is attached to this notice as **Exhibit A**.

2. The email accurately conveyed the terms of the Court's orders and EOP staff's preservation obligations under those orders. *See* Exhibit A. Specifically, the email recited the specific terms of the orders, clarified that the "April 2, 2026, records preservation memorandum does not apply," and stated that "staff must comply with the Presidential Records Act." *Id.* The email also attached as "[a]dditional guidance" the 2017 memorandum issued by former White House Counsel Donald F. McGahn II regarding compliance with the PRA. *Id.*

**JA302**

3.       Defendants have thus fully complied with the Court's orders, including paragraph 2(a) of the orders, requiring Defendants to "[c]omply in full with the provisions of the Presidential Records Act, 44 U.S.C. §§ 2201-09." Defendants understand paragraph 2 of the Court's orders to require a reinstatement of the *status quo ante*, under which Defendants treat the Presidential Records Act as binding upon them and establish records policies informed by that treatment. Indeed, an injunction to simply follow a set of statutory commands without any more specificity as to the "act or acts restrained or required" would be contrary to the requirement that the "terms" of an injunction be stated "specifically" and with "reasonable detail." Fed. R. Civ. P. 65(d)(1)(B)-(C). A more expansive reading of paragraph 2 would also contradict the Court's approach to standing in its opinion, *see* Mem. Op. at 10–21, ECF No. 24, and to basic principles of Article III jurisdiction more generally.

4.       Defendants also do not understand the order to mandate ongoing judicial supervision of EOP staff's day-to-day actions in complying with the PRA and related policies. Such a reading of the Court's order has no basis in the Court's reasoning as to the availability of an equitable cause of action in this case. *See* Mem. Op. at 21–25. And it would squarely conflict with *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991), and *CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019), which collectively do not permit claims regarding day-to-day compliance with the PRA by individual EOP staff. The Court's opinion nowhere indicates this was the Court's intention.

5.       Defendants reserve their right to seek appellate relief as to the order.

2

**JA303**

JA304

Dated: May 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

JOHN BAILEY
Counsel to the Assistant Attorney General

*/s/ Winston Shi*
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
WINSTON G. SHI (NY Bar No. 5747068)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 880-0387
Email: winston.g.shi@usdoj.gov

*Counsel for the United States*

# Exhibit A

| | |
|---|---|
| **From:** | White House Management Office |
| **To:** | White House Management Office |
| **Subject:** | Notice for EOP PRA Components |
| **Date:** | Monday, May 25, 2026 8:26:15 PM |
| **Attachments:** | AHA FPF Opinion.pdf |
| | Memo to WH Staff Re Presidential Records Act (Trump, 02-22-17)_redacted (1) (4).pdf |
| | FPF Order.pdf |
| | AHA Order.pdf |

Good Evening EOP Staff,

On May 20, the United States District Court for the District of Columbia issued orders enjoining certain components of the Executive Office of the President to comply with the Presidential Records Act. The Court's orders and opinion are attached. The orders require Enjoined Defendants to:

1. Comply in full with the provisions of the Presidential Records Act, 44 U.S.C. §§ 2201-09. You may view the Act at this link.

2. Preserve and not destroy or delete presidential and vice presidential records as defined under the Presidential Records Act, 44 U.S.C. §§ 2201(2) and 2207, except insofar as records disposal is permitted in accordance with the procedures set out under 44 U.S.C. § 2203(c)-(e).

3. Ensure that covered employees, as defined in section 2209(c) of the Act, not create or send any presidential or vice presidential record using non-official electronic message accounts—including Signal, WhatsApp, and other text or instant messaging applications or platforms—unless they copy an official electronic messaging account when creating or transmitting the record or forward a complete copy of the record to an official account within 20 days of creating or transmitting the record, see 44 U.S.C. § 2209.

4. Establish or reestablish records retention policies to preserve and maintain presidential records in full compliance with the Presidential Records Act, see 44 U.S.C. § 2203(a).

We intend to appeal these orders, a copy of which are attached. Until you receive further guidance, the April 2, 2026, records preservation memorandum does not apply and staff must comply with the Presidential Records Act.

As discussed during records training, "Presidential records" are broadly defined as "documentary materials . . . created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." Presidential records include material in both paper and electronic form.

Presidential records are not limited to just communications sent using EOP systems. They can and do include qualifying communications sent on personal devices, including emails, text, and signal chats.

Staff *must not* use personal devices to engage in government business. If you do send or receive communications that qualify as a presidential record using any other account, you must preserve it by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days.

**JA306**

Finally, the Presidential Records Act case should remind everyone that the work of the White House is often subject to litigation. There is an independent obligation to preserve records relating to litigation. The best way to do so is to only use EOP accounts for work-related communications and to quickly save any communications on non-EOP accounts on official systems.

Additional guidance is also available in the attached 2017 memorandum. For any questions on what is a "Presidential Record," what needs to be preserved, or any other aspect of this email, please contact ████ ████ in the Office of White House Counsel at ██████████.

Thank you,
David A. Warrington
Assistant to the President
Counsel to the President

**JA307**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AMERICAN HISTORICAL ASSOCIATION, *et al.*,

        Plaintiffs,

        v.

DONALD TRUMP, in his official capacity as President of the United States, *et al.*,

        Defendants.

Case No. 1:26-cv-01169-JDB

---

**DEFENDANTS' NOTICE OF APPEAL**

Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order, ECF No. 23, and Memorandum Opinion, ECF No. 24, issued on May 20, 2026, and from all orders antecedent to such order and opinion and thus incorporated therein.

**JA308**

Dated: June 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

JOHN BAILEY
Counsel to the Assistant Attorney General

*/s/ James Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
WINSTON G. SHI (NY Bar No. 5747068)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-0543
Email: James.R.Powers@usdoj.gov

*Counsel for the United States*

2

**JA309**

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


AMERICAN HISTORICAL ASSOCIATION,
et al.,
                                      Civil Action
            Plaintiffs,               No. 1:26-cv-01169-JDB

      vs.                             May 13, 2026
                                      10:00 a.m.
DONALD J. TRUMP, et al.,

            Defendants.               Washington, D.C.
_____


FREEDOM OF THE PRESS FOUNDATION,
et al.,
                                      Civil Action
            Plaintiffs,               No. 1:26-cv-01402-JDB

      vs.                             May 13, 2026
                                      10:00 a.m.
DONALD J. TRUMP, et al.,

            Defendants,               Washington, D.C.
_____



         TRANSCRIPT OF THE PRELIMINARY INJUNCTION HEARING
               BEFORE THE HONORABLE JOHN D. BATES
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff        Daniel F. Jacobson, Esq.
American Historical      JACOBSON LAWYERS GROUP, PLLC
Association:             5100 Wisconsin Ave. NW
                         Suite 301
                         Washington, DC 20016

For the Plaintiff        Jonathan Maier,Esq.
Freedom of the           CITIZENS FOR RESPONSIBILITY
Press Foundation:        AND ETHICS IN WASHINGTON
                         1331 F Street NW
                         Washington, DC 20004


               --APPEARANCES CONTINUED--
```

**JA310**

(Appearances Continued)


For the Defendants:        James R. Powers, Esq.
                           U.S. DEPARTMENT OF JUSTICE
                           Federal Programs Branch, Civil Division
                           1100 L Street NW
                           Room 11218
                           Washington, DC 20005

Court Reporter:            Stacy Johns, RPR, RCR
                           Official Court Reporter


    Proceedings recorded by mechanical stenography, transcript
         produced by computer-aided transcription

**JA311**

**P R O C E E D I N G S**

DEPUTY CLERK:  Good morning, Your Honor.

Please be reminded that all persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording and rebroadcasting of court proceedings, including those held by telephone or video conference.

Violation of these prohibitions may result in sanctions, including remote -- removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge.  Please see standing order 24-31, issued on September 18th, 2024.

Your Honor, we are on the record in Civil Case 28- -- I'm sorry, 26-1169, American Historical Association, et al. versus Trump, et al., as well as Civil Case 26-1402, Freedom of the Press Foundation versus Trump, et al.

Starting with plaintiff's counsel in 26-1169, please approach the podium and state your appearance for the record.

MR. JACOBSON:  Good morning, Your Honor.  May it please the Court.  Daniel Jacobson for the plaintiffs in American Historical Association, et al.  At counsel table, I'm joined by my colleagues Lynn Eisenberg, Laurie Stark and John Robinson.

THE COURT:  Who will be presenting argument?

**JA312**

MR. JACOBSON:  I will be for us.  Thank you, Your Honor.

MR. MAIER:  Good morning, Your Honor.  I'm Jonathan Maier, representing Freedom of the Press Foundation and CREW.  And just in answer to Your Honor's question, my colleague and I will be splitting the argument today, and he'll describe the breakdown.  Thank you.

DEPUTY CLERK:  Plaintiffs in 26-1402, please approach the podium and state your appearance.

MR. MAIER:  I'm sorry, ma'am.  That's me, Jonathan Maier, for Freedom of the Press Foundation and CREW.  Thank you.

MR. POWERS:  Good morning, Your Honor.  Jim Powers on behalf of the United States in both cases.  I'll be speaking.  With me at counsel table is John Bailey and Winston Shi from the Department of Justice and Kathryn Ardizzone from the NARA office of general counsel.

THE COURT:  Good morning to all of you.  So we're here on two motions for preliminary injunction.  The cases have not been formally consolidated but the argument on the two motions has been consolidated, I think with everyone's agreement, because the issues are virtually identical in the two cases.  Maybe some differences in terms of the particular plaintiffs for standing or other reasons, but for the most part, they're overlapping arguments.

Have the plaintiffs -- are the plaintiffs in each case going to present all the issues, or have you decided to split the issues in some way?  And if you have decided to split them, why don't you let me know in advance how that's split.

MR. JACOBSON:  Yes, Your Honor.  Thank you.

THE COURT:  And you always have to use the microphone for the benefit of the court reporter and everyone who will hope to read the transcript of the proceedings.

MR. JACOBSON:  Thank you, Your Honor.

THE COURT:  Tilt that microphone up for you a little bit.  There you go.

MR. JACOBSON:  Is that better?  Thank you, Your Honor. Yes.  So I will be speaking first and planning on covering the full range of issues, but leaving the details of the text messaging issue, the in-the-weeds details of that, to Mr. Maier from CREW because that is the main focus of their motion.

I'm sure Mr. Maier will also address any issues relating to their standing and irreparable harm specific to their plaintiffs.  And then I think any other issues that are sort of still lingering.  But I plan on trying to touch on all the relevant issues first in my presentation.

THE COURT:  All right.  Well, if I ask a question that one of you thinks is better directed to the other, feel free to say so, but not to totally avoid answering it.

MR. JACOBSON:  Understood, Your Honor.

**JA314**

THE COURT:  All right.  I thought what I envision is maybe 25 minutes per lawyer on the plaintiff's side and 40 minutes or so for the government to respond.  I think that's fairly -- pretty fair allocation of time.  But I don't hold the clock in a case like this, and if I take up a lot of time with questions, I understand that you may need a little more time.  But that's what my vision of the time breakdown is, with the plaintiffs reserving a couple of minutes for rebuttal.

I'm going to start out a little differently than we usually start out.  I want to talk about the facts generally.  And let me stress, I want to talk about the facts, not each side's interpretation of or even spin on the facts.  I want to just make sure we have a fairly common understanding of what the facts are, so that we don't spend a lot of time this morning with back and forth about, oh, no, it says this or it says that.

So with respect to physical records and electronic records created by EOP, Executive Office of the President and staff, but not including the text message or other similar messaging issue, the Presidential Records Act essentially says that:  The President shall take all steps necessary to assure that the activities, deliberations, decisions and policies that reflect the performance of the President's official duties are adequately documented, and that such records are preserved and maintained as presidential records.

**JA315**

And there's also the second provision in 44 U.S.C. Section 2203.  That was A.  And B says that:  Documentary materials  -- and "documentary" as defined in the statute always includes electronic -- documentary materials produced or received by the President, the President's staff or persons in the EOP that have a function to advise or assist the President shall be categorized as presidential records or personal records upon their creation and filed separately.

And those same provisions apply with respect to physical records and electronic records, with the exception that there is a separate provision subsequently enacted in 2209(a) for electronic records that's more relevant to the text messaging issue.

The 2026 guidance -- that's the term that I use for the memo from White House Counsel Warrington says that EOP staff should preserve any material related to the performance of their duties and do not have any ownership of records created or obtained in the performance of their duties.  And that as a matter of prudence, electronic records of EOP employees will be preserved and staff should conduct all work-related communications via official EOP email accounts and cannot permanently delete emails or materials saved to an EOP laptop or the EOP network.

There's also a declaration from Mr. Eisenhower that establishes that messages on EOP devices, so the official

**JA316**

devices, are being preserved.

Is that a fair -- anybody need to correct that as a representation of what the Presidential Records Act requires and what the guidance says?  Again, I don't want any argument with respect to it.  I just want to know if anyone feels that that's inaccurate in terms of what the competing, if you will, messages are from the Presidential Records Act and the guidance.  And again, I will say that the guidance itself is only directed to EOP staff.

MR. JACOBSON:  I would have one addition, Your Honor.

THE COURT:  From the plaintiff?  Always come up to the lecturn, please.

MR. JACOBSON:  Yes.  Putting aside the text messages issue, as you mentioned, the only addition that I would make is that in the Warrington guidance under paper records -- this is on Page 2 of the policy -- it says EOP staff should preserve paper records necessary to the performance of their official duties.  So I don't want to add any spin.  I would just note that it uses the word "necessary" there in the guidance.

THE COURT:  All right.

MR. JACOBSON:  Thank you.

MR. MAIER:  And Your Honor, along the same lines, one additional provision that I think is significant is --

THE COURT:  Can you speak up and not speak down.

MR. MAIER:  I'm sorry.  Along the same lines, one

**JA317**

additional provision in "duty to preserve," which is on the last page.  Staff should avoid using customers --

THE COURT:  Last page of the guidance?

MR. MAIER:  Yes, of the 2026 guidance.  And it says, Staff should avoid using personal devices for government business whenever possible, as the conduct of government business on personal devices has the potential to require the examination of personal devices in litigation or in response to congressional oversight requests.  Thank you.

MR. POWERS:  Your Honor, the only thing I would add is the reference in the Warrington guidance or policy to components are free to retain the records retention policies developed under the PRA.  I would just note that is also part of the document.

THE COURT:  All right.  With respect to NARA, the NARA Declaration indicates that NARA is continuing to preserve all presidential records in its custody and plans to continue processing requests for access to such records.  It uses the word "preserve" and it only speaks of preserving those records which it has or subsequently receives.

Any disagreement on what the representations with respect to NARA are?

MR. JACOBSON:  Not from us, Your Honor.

MR. POWERS:  No, Your Honor.

THE COURT:  All right.  Then moving on, let's just

**JA318**

talk for a moment about the text messages issue.  Text messages -- and by "text messages" I'm not limiting it to the formal term "text."  I mean text messages or other similar electronic messaging.  And this is with respect to text messages on non-official devices, whether it be through one app or process or another.

The Presidential Records Act in 2209(a) says that the President, the Vice President or a covered employee may not create or send a presidential or vice presidential record using a non-official electronic message account, unless at the time of creation, it's copied to an official electronic messaging account or within 20 days a complete copy of the message is forwarded to an official electronic messaging account.

The guidance with respect to text messaging and similar messaging notes that preserving all text messages would create an enormous technological burden and states that text messages should only be preserved when they are the sole record of official decision making, government action or contain unique information not available elsewhere.  And its staff should avoid using -- should avoid using personal devices for government business whenever possible.

The Eisenhower Declaration, as I said, also indicates that messages on EOP devices, those are official devices, are being preserved, and as to non-official devices, the definition of presidential record, it is noted, excludes informal

**JA319**

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 325 of 450

conversations and messages with no unique information because -- I don't want to get into argument, but because, as noted, it's implausible that Congress meant otherwise.

So is that a fair portrayal of the comparison between the Presidential Records Act and the 2026 guidance and/or the additional record evidence through the Eisenhower Declaration?

MR. JACOBSON:  Thank you, Your Honor.  Just two additional notes.  The very last line of Page 2 of the 2026 guidance leading to the top of three.

THE COURT:  Very last line of what?

MR. JACOBSON:  Page 2 of the Warrington guidance.

THE COURT:  In the text messages section?

MR. JACOBSON:  Yes.  That starts with "furthermore." It says that staff is encouraged to ensure that any decision making, government action or unique information is memorialized in a more accessible format, such as an email or memorandum.

So our understanding of that is --

THE COURT:  It says what it says.  I don't want your argument.  Save that.

MR. JACOBSON:  Understood, Your Honor.

THE COURT:  I'll welcome it and look forward to hearing it, but save it.

MR. JACOBSON:  And then the only other thing I'll note on 2209 itself in the statute is that subsection (b) provides for penalties for employees who violate (a).

**JA320**

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 326 of 450

THE COURT:  There are penalty provisions.

MR. JACOBSON:  Yes.  Thank you.

THE COURT:  From the government?

MR. POWERS:  Without getting into any argument, just noting that our view is that the 2209 provision needs to be read in concert with 2203(a)'s general obligation to the President to establish recordkeeping systems.

THE COURT:  All right.  And then next, let me just talk about the subject of records created by the President or the Vice President.

If we look at the definitional section in 2201(2), which defines presidential records, it defines it as meaning documentary materials.  Again, the prior definition includes electronic as well as physical paper materials.

Documentary materials or any reasonably segregable portion thereof, created or received by the President, President's immediate staff or someone in the EOP whose function is to advise or assist the President in the course of conducting activities which relate to or have an effect upon official duties.

And then 2207 makes the other provisions of the Presidential Records Act applicable to the Vice President and the vice presidential records.

In the guidance, there's no discussion specifically of this subject, nor is there anything further in the record for

**JA321**

declarations, I believe.  And the guidance is, as I said, limited specifically to EOP staff.  And factually, I take it that -- at least it's represented, so I don't want to go too far, but the representation in the papers is that the government was unwilling to commit that the President and Vice President will comply with PRA's, the Presidential Record Act's, requirement.  That's the representation by the plaintiffs.  I don't have any independent knowledge of that.

So have I gotten any of that wrong from the plaintiff's perspective?

MR. JACOBSON:  No, Your Honor.

MR. MAIER:  (Shakes head in the negative.)

THE COURT:  From the government's perspective?

MR. POWERS:  I think without getting into arguments, no, I don't think so.

THE COURT:  All right.  And then lastly and perhaps more complexly, the question of records disposal, which is covered in Section 2203(c), (d) and (e) of the Presidential Records Act.

And there it is.  The following is stated:  For the incumbent president, the President may dispose of presidential records that no longer have administrative, historical, informational or evidentiary value if the President obtains the views in writing of the archivist and the archivist states that the archivist does not intend to take any action under

subsection (e), that I'll get to in a moment.

Under subsection (d), if the archivist notifies the President that the archivist does intend to take action, then the President may dispose of presidential records if copies of the disposal schedule are submitted to appropriate congressional committees at least 60 days before any scheduled disposal.

And under (e), the archivist must or shall request the advice of certain committees of Congress. I think there are four of them. With respect to any proposed disposal of presidential records, whenever the archivist considers that the records are of special interest to Congress or consultation with Congress may be in the public interest.

But 2026 guidance issued after the OLC opinion, one day after the OLC opinion, states that EOP staff should preserve material related to the performance of their duties, may not take any records when they leave employment. Electronic records will be preserved as a matter of prudence. Staff cannot delete emails or materials saved to an EOP laptop or the EOP network and should preserve paper records relevant to performance of duties and should ensure that both electronic and paper records are preserved.

There's nothing in the guidance that sets out anything with respect to compliance with these provisions of the Presidential Records Act in 2203(c) through (e), and that's in

**JA323**

contrast, for example, to the guidance -- the 2017 guidance during the first Trump administration, which specifically says to staff that you are required to conduct all work-related communications on your official EOP email account, and then sets out that if anything is ever done on any other account that qualifies as a presidential record, you must follow the provisions of the Presidential Record Act.

You must preserve the email by copying it to your official EOP email account or by forwarding it within 20 days to that account. And that applies also to electronic communications, including text messages.

So have I gotten that essentially correct with respect to records disposal? There are other provisions that may relate to records disposal. For example, there's a provision relating to the archivist, but that's not what I'm focused on right now.

MR. JACOBSON: Yes, Your Honor.

MR. POWERS: I think we'd have disputes about the relevance of 2203(c) through (e) to the present motions, but Your Honor has accurately quoted them.

THE COURT: All right. Now I want to turn it over to you. And we'll hear first from each representative of the plaintiffs in the two cases, and start by introducing yourself again, so the reporter gets the right name. And as I said, I'm anticipating around 25 minutes, but don't hold me to it. And I

**JA324**

won't hold you to it either.

MR. JACOBSON:  Thank you.  And may it please the Court.  Again, Daniel Jacobson for plaintiffs, American Historical Association and American Oversight.

Fifty years ago, Your Honor, Congress enacted the PRA to prospectively make clear that official records created by future presidents, vice presidents and their staff within the EOP are official government property that must be preserved during the President's time in office, must be kept within the executive branch at the National Archives after the President's time in office, at which point they would be available to all three branches of government for official government duties, as well as eventually made available public.

THE COURT:  Of course, roughly 200 years prior to that, given that this is the 250th anniversary of the country, presidential records were viewed as the personal property of the President.

MR. JACOBSON:  I think it was sort of just taken as accepted at the time, yes.  Congress did not legislate one way or another on the subject.  That's correct, Your Honor.

There was a history of some presidents donating their records as a matter of grace to a presidential library.  There was the Presidential Libraries Act that well preceded the PRA.  But as our declarants, including Mr. Naftali, the historian, talk about, there's a lot of gaps in those records pre-PRA.

**JA325**

He talks about in the Kennedy tapes from JFK administration that he found a lot of gaps because it was, just as a matter of discretion, up to the President, the former President, which records to give and which not to give.

For 45 years -- the act took effect in 1981 -- presidents of both parties have at least attempted to comply with the PRA.  There's never been a claim that it's disabled the presidency from functioning.  I think history would bear out that it certainly has not disabled the presidency from functioning.

And there's never, until now, been any suggestion that the PRA is unconstitutional.  Far from it.  The Office of Legal Counsel testified at the legislative hearings for the PRA that there was, quote, no serious question that Congress had the authority to enact the PRA and its regulation of materials.

This, of course, came to a crashing halt on April 1st, last month, when OLC, at the specific request of the White House counsel, issued an opinion declaring the PRA unconstitutional, quote, in its entirety.

THE COURT:  OLC has changed its mind in other contexts, hasn't it?

MR. JACOBSON:  It certainly has, Your Honor.  And the change in position is not binding as a legal matter in any way.  It just speaks to the contemporaneous understanding at the time that this was not even treated as a serious question.  And of

**JA326**

course, OLC zealously guards presidential prerogatives and is not afraid to express those views.  And so the fact that it didn't see a serious question is just, you know, atmospherically probative.

But, Your Honor, I'd like to just turn straight to the heart of the merits here, unless Your Honor prefers I proceed in any different order on the issues, and tackle exactly why it is so clearly erroneous that the PRA is unconstitutional.

The OLC opinion --

THE COURT:  You want to get right to the merits.  When I hear from the government, I'm sure they're going to say, well, let's not go to the merits quite so quickly.

MR. JACOBSON:  Yes, Your Honor.  I understand we have a lot of issues.  I'm happy to start with any of them.  I just think, you know, hanging over all of this is the -- I'll generously say flimsy constitutional analysis in the OLC opinion that gives two reasons why this law is purportedly unconstitutional.

First, they say that Congress had no authority under its enumerated or implied powers to enact it.  And second, they say that it unconstitutionally infringes or burdens the President's autonomy and independence.

THE COURT:  That's also a constitutional argument, a separation of powers argument.

MR. JACOBSON:  Yeah.  And it's a separation of powers

**JA327**

argument.  That's wrong as a matter of first principles, as I'll get to in a moment.  But fortunately for us here, the Supreme Court's already decided this issue.

The Nixon v. GSA case is just on point.  If you go through it -- and we did this in our complaint and our brief -- you know, argument by argument, they rejected every single argument that the OLC opinion makes now.

THE COURT:  It's on point in a sense, but it deals with a different statute.

MR. JACOBSON:  It deals with a different statute.  But what's most relevant here is that the arguments Nixon chose to press at the Supreme Court were not specific to the terms of the Preservation Act.  They were not specific to the fact that he was a former president or anything about Watergate.  He chose --

THE COURT:  Some of the arguments were, but some of the arguments were not.

MR. JACOBSON:  Sure.  When I say they weren't, I'm talking about the separation of powers and privilege.  Certainly, the bill of attainder arguments and privacy arguments were specific to him.

But the separation of powers and privilege arguments he made were about the purported unconstitutionality of that law as applied to any president and Congress regulating the records of an incumbent president, and he said it would violate

the separation of powers.  The Supreme Court said, no, it doesn't.

He said Congress lacks the authority to enact this law.  The Supreme Court said, no, Congress has authority to regulate presidential materials.

Nixon said that, This would unduly burden the President and be disruptive.  Those exact words.  The Supreme Court said, no, it would not unduly burden the President or be disruptive.

Nixon said this will chill communications.  Supreme Court said, no, it won't.

Each and every one of those arguments is the OLC opinion.  The OLC opinion basically comes straight out of the dissents in that case.

The government's broader argument that Nixon v. GSA was specific to Watergate and the former president's situation is belied by the fact that the standard that the Supreme Court laid out for its entire separation of powers analysis was, quote, focused on the extent to which the act prevents the executive branch from accomplishing its constitutionally-assigned functions.

That standard would have made no sense if the analysis was specific to Nixon, because he wasn't in office at the time.

THE COURT:  Your point is that Nixon v. Administrator or Nixon v. GSA has meaning beyond the context in which the

**JA329**

case occurred and in which the relevant statute was developed. But there's no question that, but for Watergate, there probably would not have been that statute and it might not, therefore, have been the case. So you can't totally divorce them.

MR. JACOBSON: Of course, as a but-for causation matter, I won't disagree with Your Honor. But in terms of a matter of precedent, binding precedent, as we documented in our briefs, there were 21 paragraphs of analysis in the separation of powers and privilege sections, 21 paragraphs.

Twenty of those 21 paragraphs apply directly to the PRA and to the arguments that defendants make now. There was a single paragraph that described Nixon-specific circumstances that described, quote, other interests behind the law that were beyond what the Court had already described as adequate interests.

And so if you look at the decision and its reasoning -- and the Supreme Court has made clear recently that its reasoning is binding precedent, not just its judgment -- it is directly on point here, Your Honor.

THE COURT: So on the separation of powers issue, Nixon v. GSA explored the burden question with respect to that statute. What's your exploration of the burden question with respect to the Presidential Records Act?

MR. JACOBSON: In terms of how it's different or just in general on the burden question?

THE COURT: How it's different or the same.

MR. JACOBSON: So just putting aside Nixon v. GSA for a second and analyzing the burden question anew for the PRA, specifically, you know, the defendants -- the OLC opinion candidly admits that the PRA imposes really no burden at all on the President himself while he's in office.

The only concrete burden that opinion cites in the OLC opinion is that it's burdensome for the White House counsel's office to have to advise staff on how to comply with the PRA. And advising White House staff on how to comply with the law is the White House counsel's office job. That's not a constitutionally-cognizable burden.

In their briefs, defendants don't cite that, and instead, it just gestures to speculative burdens. This might chill communications. This may, you know, make people -- prevent the President from receiving his best possible advice.

But we don't have to speculate here, Your Honor. We're not writing on a blank state. We have 45 years of history to go on here. And it's just quite jarring that they don't cite a single concrete example in the last 45 years where the PRA has had any of these burdensome effects that they claim.

They don't cite any example of when, you know, they can say during the first Trump administration or now that anyone's withheld candid advice from the President or that the

**JA331**

President has somehow been inhibited in accomplishing his functions.  It just hasn't happened.

And so we don't need to speculate here.  The burden is on the party claiming a law is unconstitutional, and they just come nowhere close to meeting that argument.

THE COURT:  Courts assess burdens all the time without necessarily having a specific instance of burden in mind. Particularly when you're talking about burdens on the President or another aspect of the federal government.  It's often assessed in a general sense rather than in a, oh, this employee had to do this sense.

MR. JACOBSON:  I would have several responses to that, Your Honor.  One is that most of the time Courts are doing this, it's in the context of something new, some new requirements, some new requests for documents.  It's not where the executive branch, out of nowhere, says, actually, this law that's been in place for 50 years is unconstitutional.  Just nobody ever noticed it.  And here are some arguments about how it could be burdensome.  We do have history here to go from.

The second thing I would say, Your Honor, is just putting all of that aside and looking just at the text of the law, all it requires during the President's time in office is that records be preserved.  That's it.

There's analogies in the government's papers to Congress, you know, directing how to deploy an aircraft carrier

and things like that.  Nothing in the law says here's what the president must do with the records, or the staff must do with the records, how they must use records, where they must record records.

It just says you got to preserve records during the time in office, and at the end of the administration, you have got to give them to NARA.  That's it.  There's no burden at all there.

The burden, you know, is one of compliance in terms of, you know, telling staff what they have to do.  But that's not a constitutionally-cognizable burden.

Turning to the first argument, unless Your Honor --

THE COURT:  The authority question?

MR. JACOBSON:  The authority question, yes, Your Honor.

There are multiple, multiple independent sources of constitutional authority for Congress to regulate.

THE COURT:  Multiple means two or three.

MR. JACOBSON:  Yeah, I shouldn't have said "multiple" twice.  That's a bit meta, Your Honor.  There's a single multiple sources of authority for Congress to enact these laws. And the notion that, just stepping back, that Congress doesn't have a legitimate interest in preserving government records for history just on its face doesn't pass the smell test.

But just drilling down on the specific sources of

**JA333**

authority, we cite the property clause from Article IV, which gives Congress, the Supreme Court has said, essentially plenary authority to regulate government property. The government and the Supreme Court held in the Ashwander case about 90 years ago that that is not limited to territory, in the first part of the clause. It's not limited to real property. They quoted just a story for the proposition that it includes --

THE COURT: You think Ashwander is your best case for the property clause applying beyond land to other property?

MR. JACOBSON: It's the best Supreme Court case, I would say, Your Honor. There's certainly lower Court decisions since then that have extended.

THE COURT: They're rarely as good as Supreme Court cases.

MR. JACOBSON: They're rarely as good.

THE COURT: As far as being authoritative.

MR. JACOBSON: The Supreme Court hasn't addressed the property clause since 1975, I think, in the Kleppe case. So it's not an issue that comes up quite frequently. You know, the Kleppe case did deal with lands, but they talked more broadly about what they describe as almost a police power over property.

THE COURT: So to begin, the government makes an argument that the property clause begs the question that -- focusing on the property clause -- begs the question by

**JA334**

assuming that Congress has the power in the first place to make presidential records the property of the United States.  What's your response to that?

MR. JACOBSON:  Yeah.  So I think the key thing here is that the PRA -- unlike the Preservation Act for Nixon, the PRA was prospective only.  It did not make anything government property in which any president had any sort of vested claim of the property interest in those records.  It applied only to records of a future president starting in 1981, so after the 1980 election.

And it declared in advance that records that the President and his team created in the course of discharging their official duties that reflected their official business, conducted using taxpayer dollars on government property, that those are government property, and Congress -- that is well within Congress's power to regulate government property.

The power to regulate government property inherently has to come with the power to declare something to be government property.  Otherwise, how could Congress have regulated this as government property?

And so it's not just us saying this.  It's quite striking that the OLC opinion did not address the property clause, given that the solicitor general in Nixon v. GSA.

THE COURT:  Maybe it was just an oversight.

MR. JACOBSON:  Well, they certainly cited other things

**JA335**

from Nixon v. GSA, and to not -- I won't speculate as to why, but it was the sole source of authority that Nixon v. GSA, the solicitor general's brief cited in that case.  And it's clearly applicable.

THE COURT:  So it's also the case that the property clause doesn't appear in Article I.

MR. JACOBSON:  Sure.

THE COURT:  Where one would expect such authorities for the legislative branch to be found, but rather appears in Article IV.  Does that mean that it's just talking about federal rather than state authority over U.S. property, and that's all that it's doing is just saying, oh, it's the federal government, not the state?

MR. JACOBSON:  I'm sorry, I'm not sure I understand Your Honor's question if it's federal versus state.

THE COURT:  Article IV is more focused on the federal/state relations.

MR. JACOBSON:  Sure.  Sure.

THE COURT:  Why isn't that all that the property clause is really speaking to is the federal/state relations, and that the federal authority is there with respect to property, not state authority?

MR. JACOBSON:  I think the Ashwander case answers that question.  I don't believe that was a question of federal versus state authority.  That was just a question of the

**JA336**

government, how it could regulate and sell or dispose of electric energy and other personal property within its possession on federal land.  And so the case law just doesn't bear out that distinction.

I would also note, Your Honor, and this isn't quite -- I don't think it's perfectly responsive to Your Honor's question, but the D.C. Circuit in the Don't Tear it Down case from 1980 held that the property clause is an independent source of authority for Congress to act.  So it's not in Article I, but it's still a source of authority for Congress to take action.

And certainly you could also pair the property clause with the necessary and proper clause, which give Congress the authority to make all laws necessary and proper to the carrying out of all powers under the Constitution.

THE COURT:  So do you have any limiting principle with respect to the property clause?  You talk about it as being -- and the cases have mentioned that it is plenary.  But is there any limiting principle that applies here, or does the property clause mean that Congress can do whatever it chooses to do with whatever federal property or United States property there is, including the aircraft carriers and the hypotheticals that people like to throw up?

MR. JACOBSON:  Yes, Your Honor.  I think the limiting principle is just one we could take from Nixon v. GSA, which is

**JA337**

that where Congress is regulating property held or created by the other two coordinate branches of government, they can't prevent that branch from accomplishing its constitutionally-assigned functions.

So if Congress said that the President, any time he's writing a document, has to, you know, have a live stream of it on the Internet so everyone can watch, that would certainly inhibit his accomplishing his functions.  And so that is a standard that comes from a Supreme Court case, and that, I think, is readily applicable.

THE COURT:  You'd say that the limiting principle is that other constitutional provisions, external constitutional provisions in that they're not in the property clause, place some limitations on what Congress can do under the property clause?  For instance, it can't do something that would violate provisions of the Bill of Rights.

MR. JACOBSON:  Right.  Exactly.

THE COURT:  Or maybe it can't do something that would violate the commander-in-chief clause.

MR. JACOBSON:  Exactly.  They couldn't, you know, bootstrap their property clause authority, just like they couldn't their appropriations clause authority or other authorities relating to Congress's regulation of the executive branch to actually compel the substantive decisions or Article II actions or Article III actions.

**JA338**

They couldn't pass a law that says, you know, the judiciary can't use computers unless they're going to affirm the judgment below. And then they're, you know, regulating the actual substantive decision making of the coordinate branches of government.

THE COURT: Could Congress, cheered on by the Senators from Virginia, direct that all aircraft carriers be located in Norfolk, Virginia?

MR. JACOBSON: In terms of the location of the property itself?

THE COURT: Yeah.

MR. JACOBSON: I think if the President has a reasonable argument that that would inhibit his commander-in-chief authority, which I'm guessing he would, because there's things going on in the world other than in Norfolk, Virginia, with apologies to the senators, that that would meet the test I gave out from Nixon v. GSA about preventing the executive branch from accomplishing its constitutionally-assigned functions.

But as we mentioned, the analog here is, you know, Congress can tell the President you can't incinerate that aircraft carrier while it still exists and you can't take it to make it your personal yacht after your administration ends. That's really all the PRA does in this context.

THE COURT: What about a law Congress passed as an

**JA339**

amendment to the Presidential Records Act that required the immediate disclosure upon creation of all presidential records?

MR. JACOBSON: Yes, Your Honor. I think that would certainly -- there's a good chance that would be on the wrong side of the line of the test that I gave of inhibiting the President from carrying out his constitutional functions if he can't undertake any deliberative process. I mean, certainly executive privilege issues would be paramount there if there's realtime disclosure of records. And even if it's not privileged records.

I think that's a good point to emphasize how the PRA bends over backwards to be accommodating to a president and a former president. Nothing gets disclosed at all during a president's term of office. Even after it goes to NARA, nothing really can be disclosed until five years later. And in reality, it's 12 years later, because every recent president has designated all emails as under the 12-year category. And then even at 12 years, the former president gets to object before any disclosure.

Your Honor, I would like to touch briefly on the necessary and proper clause, which is an independent source of authority. Obviously, the first subclause is what gets most of the attention in the case law. But there's the second and third as well, which gives Congress the authority to make necessary and proper laws to carry out all other powers of the

government of the United States, and given to any officer or department thereof.  I think I'm mangling the word slightly.

But the government says OLC has this new standard it gives -- which seems to be invented -- that under that, Congress can only enact laws that facilitate rather than hinder or regulate the other branches' exercise of power.

But even if we just take that as the standard, the PRA clearly meets that.  It helps all three branches of government in carrying out their constitutional responsibilities.  And the government doesn't really dispute that.  The PRA, as the Supreme Court noted in Nixon for the --

THE COURT:  How is it helping the incumbent president to carry out his or her responsibilities?

MR. JACOBSON:  It's helping the future incumbent presidents.  It's helping the office of the presidency.

THE COURT:  But the present incumbent president.

MR. JACOBSON:  Well, the incumbent president, as a person, is just a person.  The office of the presidency is the constitutional office, and it's helping that office.  Because future presidents need and quite often do, especially in the national security space, go back and consult records of prior presidents through the PRA.  That is the most common type of request under the PRA, is for national security and diplomatic records.

It also, of course, helps the judiciary when it needs

**JA341**

access to records in its truth-seeking function in civil or criminal cases.  And it helps Congress as well.  And I don't think the government seriously disputes that it helps all three branches in that regard.  So that alone makes this law a proper exercise of Congress's authority.

THE COURT:  Under the necessary and proper clause, could Congress create an inspector general for the executive office of the president?

MR. JACOBSON:  I'm laughing, Your Honor, because I previously worked in the executive office of the president, and I believe was there when we opposed such a law.

THE COURT:  You served in the executive office of the president?

MR. JACOBSON:  I did, Your Honor, in several capacities, including as a lawyer regarding PRA issues.  So it's an issue near and dear to my heart.

I think that issue is just not really relevant here, I would say, to whether Congress can just require preservation internal entrusted to the President during the President's time in office.

THE COURT:  I'm not sure I understood you.  Did you say my hypothetical was not really relevant?

MR. JACOBSON:  Sorry.  Of course, it's relevant, Your Honor.  I would say it's not -- it's extraordinarily relevant. I would say it's just -- this is not -- that is not analogous

to the PRA, where there's no sort of external monitor or even internal monitor, right.

2203, which I'll get to in a moment the clause that Armstrong 1 focused on about entrusting this to the President to carry out. This is -- they are respecting the President's prerogative to manage the EOP during his time in office.

Turning to the 2026 policy, and having saved my spin previously, I'll use this now as my opportunity to give our take on the 2026 policy issue the day after the OLC opinion.

There's three glaring issues with the policy that we mentioned in our reply brief. First, as Your Honor noted, it says nothing about the President and the Vice President and their records and their duties, and there's nothing -- no indication that they have been advised to even should --

THE COURT: Do you think that's unusual? Do you think that the guidance issued usually by the White House counsel with respect to records retention, creation and even disposal, do you think it generally is directed to the President?

MR. JACOBSON: It is not, Your Honor. But what's unusual here is that this is in the backdrop of the OLC just having said this entire law is unconstitutional. And so defendants are proffering this policy affirmatively to say, oh, no, no, no, we're still complying with or acting consistently with the PRA, despite having just said it's a dead letter.

So that's why it's pertinent that it doesn't mention

**JA343**

the President, because the law doesn't exist in their view and there's nothing else in the record that shows that there's any record retention guidance to the President or the Vice President at all.

THE COURT:  So your point would be, yes, there's nothing in the guidance and maybe that's not unusual.  But the key here is that the government has not come forward with anything indicating that the Presidential Records Act, that they have concluded as unconstitutional, would be applied with respect to the President's records?

MR. JACOBSON:  Exactly, Your Honor.  And as Your Honor noted, before filing our preliminary injunction in an effort to maybe stave off the need to seek a permanent injunction, we asked the government:  Will you just stipulate that for the course of this case that the President and the Vice President would continue to act consistently with the PRA?  And they would not stipulate to that.  And there was no sort of middle ground offered.  It was just a blanket no.

So that's the first point, Your Honor, about the President and the Vice President.

The second with respect to the policy, and maybe most fundamentally, is that the policy on its face treats the entire PRA as a dead letter and inoperative, and it replaces the PRA with this -- and its legal mandates with this kind of discretionary, voluntary preservation scheme that is even only

partial within that scheme.

The entire document speaks of what staff should or should not do or encouraged to do.  Your Honor noted the contrast of that with prior policies, like the McGahn memo, that speaks in the requisite must.  And there is a world of difference between being subject to legal mandates under a law, which, as I noted, carries real penalties for staff, versus a document that's just, you know, you should do this maybe and doesn't carry any legal mandates with it.

And in this regard, this case is actually a more extreme version of what happened in the American Historical Association v. Peterson case, relating to President George H.W. Bush's records there.

There, George H.W. Bush entered into agreement with NARA, I think on his last day in office, that said that, notwithstanding the PRA, President Bush would retain, quote, legal custody and control -- or maybe legal control is what it said, over all of his White House's records.

And the American Historical Association sued, as they have now.  And in the course of that litigation there were various representations made to the District Court that, oh, despite this MOU, we promise -- you know, we put in a letter that we're going to keep acting in accordance with the PRA.

And the District Court said that's not nearly good enough here.  Replacing a legal obligation and having an

agreement in place that is contrary to the law is very different than just making these kind of promises, pinky swears that you'll keep preserving some records.

And here, we don't even have a full promise to preserve all records, for the reasons we mentioned with the President, as I'll talk about in a moment with the text messages. So it doesn't -- the suggestion that that policy somehow moots out the case, it does the opposite. It says the PRA is gone. There are no longer any legal obligations under the PRA.

THE COURT: So this is relevant to both injury with respect to standing and injury with respect to irreparable harm?

MR. JACOBSON: Yes.

THE COURT: So why does this matter? Why does it matter? What if the guidance is generally the same as the Presidential Records Act but not in all specifics? Why does that really matter? Why does that create a cognizable injury both for purposes of standing and for purposes of the irreparable harm analysis?

MR. JACOBSON: Yes, Your Honor. I'm happy to answer that. In answering that, I'll bracket to the side the issue of the President and the Vice President, right, who are not subject to this document. And I'll bracket aside the issue of the text messages, which I'll talk about in a moment.

**JA346**

THE COURT: You don't want to talk about text messages. You're going to leave that to Mr. Maier.

MR. JACOBSON: I'll touch on it at a high level and then leave the details to Mr. Maier. The one thing I would say about text messages -- and this is not to filibuster, answering Your Honor's question -- is that there you have the White House counsel actually affirmatively telling staff not to preserve records that are presidential records.

It says text messages should only be preserved if they meet this newly-invented criteria of being the sole record of official decision making. And even then they tell staff not to preserve them. They say, instead, you're encouraged to create this new email or memo to file, this new sanitized record that you can create with an eye towards it being disclosed one day.

And so you have the White House counsel specifically telling staff not to preserve their Signal messages, their WhatsApp messages, their text messages on their personal phone.

But I'd like to answer -- unless Your Honor had a question on that -- your other question, just more generally about why does this matter. I think this is an area where the presumption of regularity actually works in our favor quite strongly.

If you have a law in place like the PRA and staff are told that this is a law and they have legal duties to comply with it, we need to assume they'll comply with that law. If

**JA347**

you tell staff you actually don't have any legal duties at all, none of this is legally required, it's just a bunch of shoulds, that it's up to you to decide, it is not only reasonable, but I think we have to assume that there is going to be a giant delta in terms of what records are preserved.

THE COURT:  So you think the staff, told by the White House counsel, you should do X, is not going to do X?

MR. JACOBSON:  I think if you tell staff, on the one hand, you must do X and if you don't, you're subject to criminal or administrative penalties because there's a law that requires it, versus you tell staff, you should do X but there is no law that says this is in the absence of the PRA, absolutely.

Staff would say, well, I'm not legally required to do that.  This is just "shoulds."  And there's a reason they chose those words, right?  They chose to change the language from "mandatory" to "shoulds."  And even within the "shoulds," there's discretion.

It says, "Wherever possible, encourage."  On the paper records, as I mentioned, it says "Only paper records necessary to your duties."

Taking a step back, this entire enterprise of declaring the PRA unconstitutional was not some academic exercise, right, where they're going to still act exactly in accord with the PRA and they just wanted to make it clear they

think this law is unconstitutional.  They did this, and they issued a new policy right after for a reason.

I'd like to touch briefly on the NARA issue.

THE COURT:  On what issue?

MR. JACOBSON:  NARA, the archives issue.  We noted in our brief that the declaration is carefully worded.  And I think everyone agreed that --

THE COURT:  I expect all declarations to be carefully worded.

MR. JACOBSON:  It's carefully worded in one specific regard.

THE COURT:  That's what lawyers are for.

MR. JACOBSON:  Indeed, Your Honor.  It only is relating to documents in NARA's physical custody.  And as we pointed to in another case in the District of Maryland, I believe it's the Legal Eagle case, NARA has made clear that they don't know the whereabouts of records that President Trump never turned over after his first term in office.  They are making no efforts to collect those documents, like the ones that were at Mar-a-Lago.  Even though the PRA quite clearly imposes a responsibility on them to take --

THE COURT:  But what is NARA doing or not doing today, given the declaration, that requires emergency preliminary injunctive relief with respect to NARA?

MR. JACOBSON:  I think that in terms of just for the

**JA349**

PI purposes, the big issue is they're not collecting those records, that they are not in their custody.

THE COURT: I'm sorry, they're not --

MR. JACOBSON: We know that there is a very, very historically important set of records that exist from the Trump Administration that NARA does not have physical custody of, and they are not treating it as their responsibility to collect those records and make sure they're not destroyed.

THE COURT: So you think it's the failure of NARA to collect records that's the problem for a preliminary injunction?

MR. JACOBSON: To preserve the records, absolutely. That's their main job under the --

THE COURT: Preserve and collect are two different things. Preserve means preserve what's in your possession. Collect means go out and get.

MR. JACOBSON: Yes, Your Honor. It's both of their duty under the PRA. And as of right now, NARA's position seems to be that they are under no legal obligation or duty at all to take custody of those records and deposit those records in the archives.

And for all we know, tomorrow they could be given back to the former President. They could be put in a burn bag. We have no idea. But the point is, they don't think it's their legal duty to do that, and those are very, very important

historical records that our clients will use professionally in the future, and they won't be able to if they're destroyed tomorrow or the week after.

THE COURT: That's only a problem if those records then will disappear or be disposed of without going through the archives.

MR. JACOBSON: Correct, Your Honor. If there was some sort of stipulation that those records will be preserved somewhere in the federal government's custody, won't be destroyed, then I think that would alleviate the need for preliminary relief as to NARA specifically.

THE COURT: And if the provisions of the Presidential Records Act were in place, that would give the protection you're talking about with respect to those records?

MR. JACOBSON: It would make clear that it's NARA's legal duty, yes, Your Honor. And we can then see how they respond to that.

But in terms of what we're asking for, we're asking that they be enjoined to treat the PRA as binding on them and that they have to comply with their duties. How they choose to do that is something that they have some matter of discretion over.

And I'll just note, the last bit on NARA, is that the government's brief admits that NARA has adopted the OLC's view that the PRA no longer exists and is unconstitutional. It says

quite clearly that NARA --

THE COURT:  That's what the internal requirements of the federal executive branch really say has to be done, right?

MR. JACOBSON:  Well, and in particular --

THE COURT:  I suppose it doesn't have to be done.  An agency has to adopt an OLC opinion.

MR. JACOBSON:  There's case law, right, exactly, that final agency action occurs by that agency when it adopts an OLC opinion and it affects legal rights or obligations.  And that's the case here.

I mean, they say in their brief, which NARA is a party on, that NARA is preserving the records as a matter of discretion, not as a matter of legal duty under the PRA.  And we noted there's an executive order from President Trump specifically that says every executive branch official has to comply with the Attorney General's legal opinions, and OLC is acting through delegated authority from the Attorney General.

THE COURT:  Are you going to talk about any subject other than the merits, or is everything else left to your --

MR. JACOBSON:  No.  I wanted to touch on the Armstrong 1 and 2 issue of availability of cause of action and of judicial review and answer any questions Your Honor has about a cause of action or standing for my clients.  I know I've been going for quite a while, if that's okay, Your Honor.

The Armstrong line of cases that preclude review over

certain categories, certain types of claims regarding PRA --

THE COURT:  The Armstrong line, you're talking about the three Armstrong cases or the two Armstrong --

MR. JACOBSON:  I'm sorry, this has tripped me up too. The Armstrong, the ones in 1991 and 1993 from the D.C. Circuit, not the Supreme Court's Armstrong case, with I think it's called Exceptional Child Care with respect to sort of inherent equitable authority, which we do cite in that context.

So the D.C. Circuit's Armstrong case is 1 and 2. Armstrong 1 finds that the PRA itself, and, specifically, Section 2203(a) that gives the President both authority and discretion about how to implement the PRA says:  Shall take all such steps as may be necessary, that that impliedly precludes claims over day-to-day decisions over records, creation, management and disposal.  Those are the three key terms as Armstrong 2 talks about it.

That line of cases simply just has no bearing here at all, as I'll talk about.  But even if it did, this case would clearly fall on the permissible Armstrong 2 side of the line.

It has no bearing here at all because the defendant's view, and they're acting on that view, is that the PRA doesn't exist anymore.  There is no Section 2203(a).  The President is not, doesn't think he needs to, and is disclaiming that he needs to take all steps that shall be necessary to comply with the PRA's creation, management, disposal --

THE COURT: That distinguishes the Supreme Court's Armstrong versus Environmental case because there the statute, the Medicare Act, was in place and creating the limitations. Whereas here, the statute, Presidential Records Act, from the defendant's perspective is not in place because it's unconstitutional.

MR. JACOBSON: Exactly. So Armstrong, the Exceptional Child Care, Supreme Court's Armstrong, speaks to --

THE COURT: I said Environmental. Exceptional.

MR. JACOBSON: Speaks to there's this general equitable power of Courts to enjoin ongoing violations of law by federal officials. And the exception to that is where you have this implied or expressed preclusion.

So because there's no -- there's no nothing to preclude here. The thing that would be doing the precluding is the PRA, and the PRA doesn't exist, according to them. So it's just paradoxical.

And this filters down to where the defendants start talking about how Congress constructed this carefully balanced scheme and we must be respectful of Congress's choices, which they've eliminated the entire statutory scheme.

Preclusion as a matter of Congressional intent, there is no chance that Congress would have said yes, we intend for 2203(a) to preclude claims against the President's disregard and declaring unconstitutional the entire PRA, including

2203(a). It just doesn't make any sense.

THE COURT: But if you assume, for the moment, that the Armstrong line, the two D.C. Circuit cases apply, why does your case fit more within Armstrong 2 than Armstrong 1? Armstrong 1 basically says if there's a decision that these six text messages are not presidential records by the White House, that that would not be subject to judicial review.

MR. JACOBSON: Right.

THE COURT: But Armstrong 2 may say -- does it or does it not -- that if there's a categorical decision or a classification decision that some category is not subject to presidential records considerations, then that may be reviewable. Where is that line? And where do you fit on that line?

MR. JACOBSON: We fit at the extreme -- most extreme sort of Armstrong 2 reviewable side of that line. Because as you mentioned, that line is drawn as decisions over what to classify as a presidential record in the first place, you know, classification policies and decisions. Those are reviewable. The day-to-day management decisions over this record or that record or, you know, did you really admonish staff enough? Those are on the Armstrong 1 side of the line.

And here, what we have is effectively a decision to classify every single document as a personal record of the President and not as a presidential record. This is a

**JA355**

classification decision that nothing is a presidential record under the PRA.

And defendants don't outright state this in their briefs, but I think it's pretty clear from the OLC opinion that their view is that all of these records are now personal property of the President. And so that is a classification decision of the most extreme variety, but is still a classification decision as to what is and what is not a record that falls under the PRA's dictates.

And so if you do -- if the Court does apply that framework or, in the alternative, to the first reason I gave, this case very clearly falls on that side of the line. You also have as a sub-matter that's certainly the classification decisions over entire categories of text messages that Mr. Maier will speak about is also within Armstrong 2.

THE COURT: Perhaps I should address this question to Mr. Maier, just because the name of the case. But the CREW versus Trump case in the D.C. Circuit, which is 924 F.3d, under that case, judicial review over Presidential Records Act decisions is substantially limited when the White House, the Executive Office of the President policy is attempting to comply with the requirements of the Presidential Records Act.

So if the guidance that has been issued does attempt to place the White House in substantial compliance with the provisions of the Presidential Records Act, even though

voluntary, not because the act is constitutional, why doesn't that bar judicial review as well?

MR. JACOBSON: I think, first of all, this policy doesn't. But putting that aside. You know, let's say they changed everything from a "should" to a "must," which, again, is not the record we have, but let's say they did. The last caveat that Your Honor gave that it's not doing it, it's not classifying records as presidential records under 2201(2), subject to all of the PRA's legal mandates.

The case Your Honor is referencing was a case where the guidance did do that and it complied fully with the PRA and the question was just whether, though, that was being implemented properly.

So here with the backdrop of them having to clear the entire PRA unconstitutional and null and void, no guidance can cure that fact to take us because they're not treating anything as subject to the PRA.

I would also point Your Honor to -- again, the Peterson case involving the American Historical Association has a good discussion of this issue. And also the CREW v. Cheney case, I believe from Judge Kollar-Kotelly, that said that, similarly, sort of vice presidential policies on what is and what is not a presidential record were reviewable by the Court.

Unless Your Honor has any further questions on cause of action issues or standing, I'm happy to turn things over to

**JA357**

Mr. Maier.

THE COURT: I'll hear from Mr. Maier. Thank you.

MR. JACOBSON: Thank you, Your Honor.

MR. MAIER: Thank you, Your Honor. And may it please the Court. I am Jonathan Maier for Freedom of the Press Foundation and CREW.

Your Honor, you laid out the scenario that we're operating within here very clearly at the outset when you described the difference between essentially documents that are on EOP systems and presidential records that are not on EOP systems. And I want to put a very fine point on the -- what I'll call bucket one. Which is, conversely, the records that are not already on EOP systems that are only subject to the 2026 guidance.

In reference to kind of the question that you just asked my colleague, this very clearly is not an effort, the 2026 guidance, to comply with the PRA. As my colleague noted, it expressly is premised on, quote, the absence of the PRA.

And I think that in the absence of the PRA's mandatory provisions and in contradiction of them, the 2026 guidance can really only be understood as an effort to preserve the President's interests that, at this point in this litigation, is being presented as not a PRA-compliance policy but somehow an equivalent to the PRA that eliminates the irreparable harm that the plaintiff might have suffered here.

And I think it's really important for the Court to kind of conceptually consider that perspective in light of, as Your Honor just discussed, CREW versus Trump and the Court's grant of discretion with respect to PRA compliance. This is PRA non-compliance that they are now trying to draw equivalence to.

With respect to the text message provisions, specifically, I think it's very important to understand that if it is being followed today, and defendants say that it is, it is not only permitting presidential records not to be retained, it's actually instructing presidential records not to be retained.

Not to belabor what we spoke of earlier in terms of kind of the nuts and bolts in the specific text here, but very clearly, the text message provision states that EOP staff should only retain text messages if they are, quote, the sole record of official decision making, government action, or contain unique information not available elsewhere.

We already talked about and I'll speak some more about the term "should only" and its implications as a suggestion that records should not be retained. But in the record, we have the declaration of Professor Jason Barron, who is a expert in this, who worked at NARA for 30 years.

And he explains that not only is that statute -- is that provision unworkable in the sense that individual EOP

**JA359**

employees are not going to be in a position to make calls about what's unique, what's a sole record of potential action, but the example that the 2026 guidance provides of a text message exchange where someone -- an unnamed employee texts another employee about a presidential decision, and then is permitted to delete that email -- or excuse me, that text message because it has been transmitted and kind of memorialized in email is a direct violation of the PRA and would be considered so in any iteration and in any administration.

Worse, I think outside of that permissive language is the --

THE COURT:  The problem with respect to text messages, given what the guidance that has been put out says, is there a problem with respect to text messages that are on official devices, on EOP devices?  Or is it just a problem with respect to text messages -- and I'll just use the term text messages, not to the exclusion of similar messaging.  Is there a problem with respect to text messages only that are on non-official devices?

MR. MAIER:  I think it depends on how we define "problem."  The Eisenhower Declaration does say that if text messages are sent on official devices where text messaging is enabled -- and Signal, they talk about that that might fit in there as well -- that those are being preserved.

So as a matter of preservation today, taking the

**JA360**

Eisenhower Declaration as true, those text messages are being preserved.

The problem, and this is something we've been speaking about, is that in the absence of the PRA, the preservation system described in the Eisenhower Declaration exists only at the pleasure of the President and it can be revoked at any time.

And I don't think that -- while the Eisenhower Declaration says that he has been instructed --

THE COURT:  You want me to enter a preliminary injunction -- assuming that the Eisenhower Declaration and the 2026 Warrington guidance were essentially the same as the Presidential Records Act, you would want me to enter a preliminary injunction because there's a fear that they will not do what they say they're doing?

MR. MAIER:  I think that if they were the same, it would be structurally the same, the exact same requirements. There would be a closer call.  Though, I don't think that's true.

I think that we would have to consider the fact that -- the fact that EOP and the White House have gone out of the way to generate this OLC opinion and adopt the view that the entirety of the PRA is unconstitutional, reverting ownership back to the President, eliminating categorization requirements, eliminating any transfer to NARA.

I think, given the circumstances, there are cases that would suggest that that is sufficient because of the risk that the documents would be lost.  Though, clearly, we're not in that instance.

But if Your Honor's question is, is the mere fact that the defendants are saying the PRA no longer applies sufficient for a PI?  I think it comes down to the circumstances, and I think the circumstances here of outright rejection essentially overnight of the PRA and an announcement to EOP personnel the next day that the PRA is a dead letter.  Here's what we're doing instead, and it's all prudential.  Does give rise immediately to that concern.  But that scenario doesn't apply also, obviously, to the 2026 guidance as it's written.

As I was saying, the text message provision in particular says that texts should only be preserved in those two circumstances where I was speaking.  But even within that, if they are unique, if they are the only record of presidential action or action that would be covered by the PRA, it also says that staff should -- are encouraged -- I want to make sure I get the text right.  That staff, excuse me, need not save records that are unique and are the sole record of action, essentially, if they're unimportant enough, without any standard whatsoever as to how they are supposed to determine whether a particular presidential record constitutes what the guidance calls minutia or ministerial action.

And we make this point in our brief.  That the instruction to staff that they need not maintain records referring to ministerial action is an enormous problem by kind of common usage, by definition, by how it's been used in cases. Ministerial actions are ones that reflect official actions. They are the ones that someone is legally obligated to execute.

And the guidance says, even if it's unique, even it's the only record, if it's ministerial --

THE COURT:  So you think historians are interested in ministerial actions not as much, but perhaps significantly interested in ministerial actions the same way they're interested in more discretionary actions?

MR. MAIER:  So I would assume that historians would be interested, certainly, in knowing who pushed the button, who made the call, how was a official action executed, whether it was sanctified.  Right?  If a text message on a private phone is the only record of saying, yes, the government may take this action, they would certainly be interested in it.

But our clients, Freedom of the Press Foundation and CREW, have different priorities than historians do.  We are, as organizations, as CREW is and as FPF is, focused on accountability, focused on transparency.  So there isn't a line to be drawn in terms of our injury or our priorities with respect to whether something is important or not.

And more than that, the PRA doesn't draw that

distinction.  The PRA definition of presidential records doesn't say you can not retain records -- sole records of official acts as long as it's not important.  It just doesn't say that.

THE COURT:  So is your concern both creation and preservation and disposal?  Or it is only one of those?  Where does your concern lie?

MR. MAIER:  Sure.  I think starting with creation, it is an inevitability that records are going to be created off of government systems.  That is -- 2209, in its inception, is a recognition by Congress that non-official electronic messaging devices and accounts were being used.  NARA recognized it in 2015, that email was being supplanted by instant messaging, essentially.

And the entire premise of the 2026 guidance is that we're operating in a universe that is outside of the official EOP systems that Mr. Eisenhower's declaration applies.

So I, and our organization's, I'm sure, are concerned that official records are being created on people's phones.  But that's not really what we're here for.  What we're here for is to make sure that 2209, that says if you decide to conduct government business on your personal device, you need to provide complete copies, has to be followed.

So with respect to disposal, things like that, that's not what we're concerned with today.  We're concerned with the

**JA364**

fact that, by the explicit terms of the 2026 guidance, text messages don't have to be retained and, in fact, it says that they should not be retained in specific circumstances, including even when records are unique, sole records of government action.

THE COURT:  So why are you not concerned about disposal?  Absent the Presidential Records Act and given the -- if you say that the guidance is the totality of the instruction to White House staff, why couldn't the chief of staff say, all right, anybody who has anything that's on their personal emails or text messages that relates to government business, please delete it and destroy it now?

MR. MAIER:  Why would that be problematic?

THE COURT:  Why aren't you concerned?

MR. MAIER:  Excuse me, I'm sorry.  I don't think I answered your question specifically.  We are extremely concerned about deletion.  That is the problem here, that the PRA establishes the parameters by which, as Your Honor discussed earlier --

THE COURT:  The PRA does two things.  It, number one, says those text messages, upon creation, need to be preserved --

MR. MAIER:  Yes.

THE COURT:  -- by either immediately copying them to an official account or within 20 days doing so.

**JA365**

MR. MAIER:  Yes.

THE COURT:  And then, in the other provisions, the 2203 provisions, says, if these are going to be disposed of, here's how it has to be done.

MR. MAIER:  Certainly.  And to put a very fine point --

THE COURT:  And neither of those things are contained or addressed within the guidance that's been issued.

MR. MAIER:  Precisely.  The PRA forbids destruction or discarding, as the statute uses, of presidential records except after the President has made a certain determination.

When I say we're not concerned with it, I mean this motion and the 2026 guidance doesn't pertain to the President's ability, once records are properly preserved, to make the determinations that he is going to make with respect to whether to discard them.

The problem is -- the enormous problem is the PRA gives no one but the President the authority to make that decision.  So in your hypothetical, if the chief of staff said, as of right now, I am instructing you to delete everything, that would be a direct violation of the PRA.

So we are certainly concerned with and primarily concerned with the destruction of these records, because that is essentially what the 2026 guidance requires.

And there's another provision here --

**JA366**

THE COURT: If there were a box of documents that had been created over the course of the last year, not text messages, just a box of documents. And the chief of staff decided, well, let's get rid of that box of documents, and because the PRA, the Presidential Records Act, is not constitutional, we don't have to follow that process. So here's a different process to use to destroy and dispose of those documents, is there anything in any guidance that you're aware of that would prevent the chief of staff from doing that?

MR. MAIER: Yes. It's PRA -- it's Section 44 U.S.C. 22 --

THE COURT: I know the PRA would, but I said is there anything in guidance, current guidance, absent the PRA, that would prevent that?

MR. MAIER: That would prevent -- no, Your Honor. And that's because --

THE COURT: Under the PRA, you have to go through a process that involves the archivist and Congress.

MR. MAIER: Yes. Just to take a step back where I was going, 2202 establishes that such records shall be administered in accordance with the provisions. So any guidance that would not adhere to that is a violation of the PRA.

The 2026 guidance, again, because it has no mandatory obligations with respect to preservation, that would permit someone to take the action that you're talking about.

**JA367**

So that's a larger point that I was going to get to in a moment, which is this use of "should" in quite literally every affirmative obligation with respect to preservation establishes a discretionary, not a mandatory, obligation.

I think there are a lot of ways to substantiate that. Amongst them, we're looking at the rest of the 2026 guidance itself, which uses mandatory language in two places, when it forbids the deletion of emails and records from EOP systems, and when it forbids EOP staff from essentially taking presidential records home.

That's the first. The second one, as Your Honor already discussed, is the White House guidance on the PRA from the first Trump administration, which unequivocally used mandatory language throughout, with, again, an exception that -- or recognition that non-official accounts are going to be used, right. So it said that they shouldn't be used when possible -- or sorry, when impossible.

THE COURT: For both injury, in fact, for purposes of standing and irreparable harm for purposes of the preliminary injunction test, there are concepts of imminence and substantiality that apply.

How do I assess that? What do I use to assess whether there is sufficient injury for purposes of standing and sufficient injury for purposes of irreparable harm? How do I assess the imminent risk of non-preservation or the imminent

risk of disposal?

MR. MAIER: Sure. From a functional standpoint, you can evaluate it from the face of the 2026 guidance because it does not require preservation, and as we've been discussing, it actually encourages non-preservation.

So this is not some of the cases that Courts have passed on, such as CREW versus Cheney. CREW versus Cheney is, I think, the most accurate one. But American First versus Becerra, the Peterson case and others where the Court has said -- and Office of Administration, CREW versus Office of Administration of another -- is there's been a policy shift that both now and potentially later might lead to destruction.

This is a case where the policy in operation as of April 2nd specifically called for non-preservation of documents. So with respect to kind of the imminence prong, that is certainly already satisfied.

And I think America First versus -- Legal versus Becerra from last -- from 2024, excuse me, is a good example. There, the plaintiffs were saying that there was a policy at CDC not to retain the federal records, in that case, of lower level employees, that they were being deleted at the time. And the Court recognized that irreparable harm was established because they were being deleted then, and they would likely be deleted later.

That's the same as CREW versus Cheney. This is the

2008 iteration of CREW versus Cheney, where Judge Kollar-Kotelly issued a preliminary injunction against OVP, when OVP adopted a more narrow definition of vice presidential record than the PRA permitted, essentially saying we are construing it only to mean documents created in the course of the Vice President's essentially enumerated or assigned executive duties.

And the Court there recognized that meant that documents -- if that was being implemented, documents were being miscategorized then and would be lost irreparably at the end --

THE COURT: If I concluded that the 2026 guidance and associated declarations was -- I'll use the term "substantially similar" or "almost the same" as what is required under the Presidential Records Act, would your clients still be suffering an injury?

MR. MAIER: Yes, we would still be suffering irreparable harm.

THE COURT: So how much deviation from the Presidential Records Act is enough to be the kind of injury that gives standing and should be of concern to the Court?

MR. MAIER: Sure. With respect to that question, there is no standard of deviation from the law that needs to be -- there's no threshold required for irreparable harm.

The cases say time and again -- and defendants don't

**JA370**

dispute this -- that the deletion of federal records or presidential records or any government record that's required to be preserved and might be available to our clients and those situated like them, the deletion of any of them as a matter of policy or a matter of fact gives rise to irreparable harm.

THE COURT:  You don't know as a matter of fact that there is a deletion of anything, do you?

MR. MAIER:  I don't think we can say as a matter of fact that we are aware of any.  I will say --

THE COURT:  But you think that as a matter of policy -- or your interpretation would be that as a matter of policy, there's a what?  A substantial risk of deletion?

MR. MAIER:  That there is a virtual likelihood of deletion.

Something that you haven't touched on yet but was kind of --

THE COURT:  Usually people say "virtual certainty." You choose "virtual likelihood."

MR. MAIER:  If I said "virtual likelihood," I mean "virtual certainty."  Thank you.

But Your Honor asked my colleague earlier about kind of the adoption of the OLC opinion and the implications of that.  But one thing I also want to touch on is that by executive order issued last year, which we cite in our brief, executive branch officials are bound to follow the legal

**JA371**

opinions of the DOJ, which is what the OLC opinion is, and the President as they conduct their business.

So if the Court's concerned about whether it can draw a substantial-enough likelihood or a virtual certainty that records will be discarded, if you take the OLC opinion that says the PRA is a dead letter, every aspect of it violates the Constitution, every aspect of it unlawfully infringes on the autonomy of the President. And then the 2026 guidance that says: You don't need to preserve anything, you shouldn't preserve some things, and the executive order, I find it kind of a beggar's belief that an individual EOP staff will make the decision that: I know OLC says this, I know the President says this, I know I'm bound to follow it, I know the guidance says I shouldn't keep these things, but I'm going to.

So I think that there is a virtual certainty that records will be destroyed. And to be very clear, while I cited a couple of cases where the Court made a determination that, in operation, that was also an inevitable outcome, that isn't the standard that applies to irreparable harm.

As Your Honor noted, it's the question of imminence, right. And here it is certainly, if not, already in place, there's an imminent risk that the thousand EOP staff who are following this guidance will follow it and will start deleting text messages for one reason or another, as described in the 2026 guidance.

**JA372**

And there's a provision of it that I want to make sure isn't lost in the shuffle here that I think is perhaps the best example of the guidance requiring the deletion of documents.

So if we start from the premise that text messages only need to be preserved if they are unique in the sole record of government action, which is what the guidance says, further down at the bottom of Page 2, it also encourages staff to memorialize their text messages in some other more accessible form, such as email or a memorandum.

That in and of itself is a violation of the PRA. 2209 requires complete copies of electronic communications to be copied onto servers, onto government systems. It doesn't allow anyone to say, here's my presidential record, I'm going to memorialize what I think needs to be memorialized, I'm going to create an email and then delete that record.

And I think the problem with that is not only that it's just an absolute clear violation of 2209, but it's becoming this self-fulfilling provision where it says don't retain -- or you should not retain text messages unless they are unique but, also, you should be creating records that make them not unique.

So I think just by simple operation of the policy itself, it inexorably leads to the result that text messages are going to be deleted.

And I want to just make one other important point with

respect to something Your Honor spoke of earlier where we're talking about text messages without really knowing what they mean because the 2026 guidance doesn't say what they mean.

It's not clear, and I don't think it's reasonable to believe that a person reading the 2026 guidance would take "text message" to mean every other form of electronic communication outside of email.

Email provisions are addressed separately in the 2026 guidance in the electronic records provision. But even the opposition brief in this case doesn't seem to understand where anything else falls. At different times it says, well, there's no problem with non-email, non-text communication, such as instant messages, voice memos, anything else, because that electronic records provision, which explicitly only applies to emails and records already on the system or the text message provision.

THE COURT: So you think there's a problem with the guidance comparing it to the Presidential Records Act in that the Act speaks more broadly than text for non-official. In other words, what's not on the EOP system. The Act speaks more broadly of electronic messaging and includes more than text messages, but that the guidance, when it speaks of that subject, only talks about text messages?

MR. MAIER: Yes. That 2209 is very explicit in its phrasing. It says "electronic communications."

**JA374**

The year after that provision was enacted in 2014 and 2015, NARA issued guidance with respect to complying with it that made it clear that the electronic provision -- the electronic communications provision in 2209 applied to emails, text messages, instant messaging and essentially all other forms of electronic communication where information is exchanged.

In the first Trump administration, the White House counsel's guidance did the same thing. It didn't say you must preserve emails and texts. It said, You must preserve emails, texts, instant messaging, and again, the entire list of communications there.

But my other point is that the defendants themselves -- if this 2026 guidance is supposed to be an equivalent to the PRA, the electronic records provision doesn't contain the exceptions that I've been describing in the text message provision. They apply substantively different suggestions for when documents should be retained. And the opposition says that somehow both of those provisions apply to every electronic communication that isn't a text or an email.

So if the Court is concerned about the likelihood that this guidance will lead to non-preservation of records, that's certainly another brick in the wall establishing that that's the case.

THE COURT: Are you -- what other subjects are you

going to be addressing?

MR. MAIER:  So the only other one I want to talk about briefly is judicial review.

THE COURT:  Is what?

MR. MAIER:  Judicial review in Armstrong 2.

I think that just I agree with everything that my colleague said with respect to this being all the way to the side of Armstrong 2 permitting judicial review.  But I think it's also helpful to kind of conceptualize how Armstrong 2 reasons out its conclusion and why it's not so limited as defendants say.

And I think the key to understanding it is the understanding that the scope of the implied judicial review there was connected to the separation of powers balance that was struck by Congress when it passed the PRA in trying to balance the public interest served by the Act and not interfering with the President's autonomy in any way.

And it explicitly, as we describe in our brief, explains that that is the balance that was being struck and that's the balance that Armstrong 1 struck.

So there, if the concern of Armstrong 2 was that Congress struck this balance and the defendant's guidance disturbed it by essentially allowing the President to use the PRA, as the Court referred to it as carte blanche, to conceal records, and that in and of itself disturbed the constitutional

**JA376**

balance, certainly the 2026 guidance also does so.

Because not only does it make the Presidential Records Act a carte blanche for the President to say, you can't review anything here because that may have been talking about FOIA versus the PRA, but all of these presidential records that will be subject to FOIA down the road and are subject to congressional disclosure are no longer available to you because there are no presidential records, because they are all the personal property of the President.

That introduces a much larger disturbance to the separation and balance of powers that's described in Armstrong 2 than that case presented.

I think it's important to remember that while Armstrong 1 and Armstrong 2 were both decided within the context of a claim about a policy that unlawfully differentiated or failed to differentiate them between the PRA and the Federal Records Act, the PRA isn't just a statute to delineate between federal records that are FOIAble now and presidential records that can't be FOIAed until later.

It also establishes public ownership.  It establishes outright preservation and categorization requirements.  And it makes presidential records that are preserved available to incumbent presidents when needed and they're otherwise unavailable and to Congress when they're needed and otherwise unavailable.

**JA377**

So trying to cabin Armstrong 1 and 2 as standing for the proposition that judicial review is only available to discern whether records are subject to the Federal Records Act in FOIA or the PRA ignores the entire structure of the PRA.

THE COURT:  On the cause of action question, you got the Armstrong claim, if you will.  You've got a Youngstown claim that I have not heard mentioned specifically here today.  You've got mandamus, you've got ultra vires, you've got even some APA -- let's call it -- claims.  Let's set those last three aside for the moment.

Are the two claims that you're pressing most strongly an Armstrong-type equitable claim and a Youngstown claim?

MR. MAIER:  I think that -- yes.  I think the -- so I'll take them one at a time, taking the equitable cause of action, generally, and specifically, because I think it bears on your question, the ultra vires piece of this.

I think that's correct.  I think it's important, as we talk about the ultra vires cause of action, to say that Armstrong 2, if we're doing it within the context of Armstrong 2, provides a greater basis for judicial review here and within the context of that claim even than it did in Armstrong 2.

THE COURT:  Well, if I think that Armstrong 2, if you will, provides a basis for judicial review, and perhaps Youngstown a direct constitutional claim does as well.  Then is

**JA378**

there any reason in this preliminary injunction context to grapple with mandamus, ultra vires or APA?

All of those claims, to some extent, are premised on the unavailability of some other form of relief.

MR. MAIER: Yeah. And the answer to that is no. I'll let my colleague speak to --

THE COURT: He's not going to have another chance except in rebuttal.

MR. MAIER: Sure. But he might not agree with what I'm saying here.

But we're not pressing a mandamus claim. We're not pressing an APA claim. We have equitable cause of action, ultra vires and separation of powers.

But to answer your question, no. Armstrong would permit all of them because it's all based on the outright rejection of the PRA's mandates, which are in and of themselves and attempt to balance the separation of powers.

And I think the cases that discuss this are helpful. And I think one, certainly, is Judge Kollar-Kotelly's decision in CREW versus Cheney in 2009, where the Court determined that it had judicial review over the OVP's, Office of Vice President's, artificial narrowing of the definition of vice presidential records.

The Court said that it borders on the absurd that Congress would enact the PRA with the definitions that it has

but not allow judicial review of a definition that's inconsistent with it. Right? That it established a definition; it put requirements on the vice presidency and the Vice President himself. It doesn't make any sense that Armstrong 1 or Armstrong 2 would bar judicial review of an effort just to redefine the statute.

And I think the same thing adheres in AHA versus Peterson, which my colleague spoke about. Which is there, the executive branch, in the form of NARA and the office of the EOP and the President just made a side deal. They just entered a memorandum of understanding that transferred presidential records to the possession of the President. And there, the Court also determined the same thing.

So regardless of the nature of the claim, if the question is, does the PRA preclude judicial review of challenges to guidance that bears on the balance struck? The answer is yes.

And as my colleague also noted, this is, even if one were to take a narrow reading of Armstrong 2, a quintessential categorization case, right. If the question in Armstrong 2 is: What's FRA and what's PRA? This one is: What's PRA, and what is nothing? What is just a personal record, even outside of the definition of a personal record in the PRA? Because --

THE COURT: The last question before I let Mr. Powers take the lectern. The government would have looming over this

discussion the question of, okay, well, if the Presidential Records Act is constitutional, in other words, if Congress can require the executive branch, i.e., the President, under the statute to preserve, maintain and not destroy its records, why can't Congress do the same with respect to the courts and particularly the Supreme Court?

And the government wants me to be worried about that on behalf of the Supreme Court and the rest of the judiciary.

What's your response?

MR. MAIER:  I think my response is that it is a question for a different day under a different set of circumstances.

I think that the reason I kind of highlight the circumstances is there's a question of totally detached separation of powers and what Congress's conception of them might be.  But that's not the world that we're in.

The world that we're in is Congress, in 1978, analyzing in the wake of what had happened, its relationship and whether it was time to exercise its authority to regulate presidential records and create a system there.

I don't think there's anything apples to apples whatsoever about what has happened and how it's been documented in the Solicitor General's opinion way back then that this was a proper exercise of authority by Congress.  So I think it's, frankly, a red herring that the Court doesn't need to --

THE COURT:  So you think it's apples to oranges?

MR. MAIER:  Yes.  Except in the most detached sense that you can always say, if Congress can require the executive to take some action, what about the courts?  And I don't think that's an open question.

THE COURT:  All right.

MR. MAIER:  Thank you.

THE COURT:  Thank you.

Mr. Powers.

MR. POWERS:  Good morning or almost good afternoon, Your Honor.  May it please the Court.  Jim Powers on behalf of the United States.

At the risk of fulfilling the Court's joke earlier, I would like to start with the facts, if I could, briefly, because I think that's important to set the stage for what's actually at stake for purposes of decision on today's motion.

As the Court, I think, essentially elucidated with its opening remarks, there's very little dispute as to the vast majority, in my view, of the records at issue in this case. With respect to electronic records on EOP systems, and that includes EOP-issued telephones, that all the records on those systems are being preserved.  That is what is in the Eisenhower Declaration, and that is what the record in this case is.

And, of course, with the realities of 21st century workplaces, that is going to be the vast majority of

**JA382**

presidential records.  Those are being preserved.  I don't think there's any serious showing of irreparable harm as to those.

THE COURT:  They're being preserved by virtue of the directive in the guidance to EOP staff?

MR. POWERS:  Correct.

THE COURT:  And the declaration of Mr. Eisenhower?

MR. POWERS:  Right.  The practices --

THE COURT:  That doesn't speak to records of the President and his immediate staff or the Vice President and his immediate staff, correct?

MR. POWERS:  I would disagree with that.  It certainly speaks to individuals in the White House office who are on EOP systems.  And I think, as a practical matter, the President's and the Vice President's records are going to be handled in general by staff.  Additionally -- and all those individuals are subject to both the policy and also to the IT practices that are specified.

THE COURT:  So the EOP staff that is the subject of the Warrington guidance includes everyone in the entire White House complex, with the exception of the President and the Vice President?  Everyone?

MR. POWERS:  That is my understanding.  I would say that the policy is -- was issued by a subordinate of the President.  It is a policy that is issued on behalf of the

President.  So I don't think it's quite right to say that it doesn't impact the President.  It represents the President's views, obviously, because it is issued by one of his subordinates on his behalf, necessarily.

THE COURT:  So what does the Warrington guidance say with respect to a text message that the President sends on a personal device, not an EOP device, to someone outside of the White House?

In other words, not to someone else who would have requirements under the guidance in terms of preservation but sends to someone outside of the White House, saying, what do you think about doing X, Y, Z with respect to domestic economic policy?  Or what do you think about doing X, Y, Z with respect to our conflict with Iran?  Sent by the President, outside of the government, on a -- through a text message, if you will.

What does the guidance say with respect to that?  And where does it say that?

MR. POWERS:  I think as to -- in the hypothetical that the President has a personal phone, uses the personal phone to send such a message, I don't think the 2026 policy specifically speaks to that circumstance.

THE COURT:  But the Presidential Records Act does, doesn't it?

MR. POWERS:  The Presidential Records Act requires that the President take steps to adequately document the

**JA384**

execution of his duties.

THE COURT:  So that's a difference, right?

MR. POWERS:  I think that ultimately the -- any difference is made consistent with the fact that under 2203(a), the President is given enormous discretion as to recordkeeping measures.  I'm not aware of any basis to say that there are such records that are being created and not preserved.

And, again, what 2203(a) requires is not that every last document or message in the White House be preserved.  It requires that the President has discretion and is obligated to exercise the discretion to see that the duties of the presidency are adequately documented, and that those records --

THE COURT:  The hypothetical I gave is of a document that would have some historical relevance.

MR. POWERS:  Sure.  And I think then, also, while it is also sort of a -- certainly an interesting hypothetical, it is not relevant to what this Court can review under the PRA, under the Armstrong line of cases.  I'm happy to get into that issue in more depth.

But I think that the question of what the President in his person -- his personal decisions regarding records creation, disposition, that really sits at the heartland of what the PRA precludes from judicial review under the Armstrong cases.

THE COURT:  So if someone on the EOP staff has a

similar communication on a personal device, not an EOP official device, either outside of or to another EOP staff member on her or his personal device, speaking of, here are the options as I understand it for what we want to do, and my sense is we should do X.

And there's a response from the other individual saying, well, my sense is maybe we should do Y. And let's make both those recommendations and see what happens. And there's an ultimate email from someone else that says, we received many recommendations, and we decided to do this.

What does the guidance say with respect to those communications between the two staff members offline; they're not on official devices? Under the PRA, those would have to be on official devices. In other words, even if the non-official device was used, they would have to be copied to an official device; that's what the PRA requires.

That's not what the guidance requires. The guidance simply says, hey, you should use official devices. But if someone doesn't, what happens? That's not preserved, is it?

MR. POWERS: I would disagree with that.

THE COURT: What makes that preserved? What requires that to be preserved?

MR. POWERS: What the Court has described is a substantive conversation regarding decision making in the White House, advice to the President. My understanding of the text

messaging provision of the 2026 policy is that it requires the preservation of such messages.

THE COURT:  Because it's unique information?

MR. POWERS:  And because it's substantive and it, I think, also falls within the umbrella of the broader preservation requirement at the outset of the policy, which is that EOP staff should preserve any material related to the poor performance of their duties.

And so I think that the question of whether those staff members would adhere to that, we certainly believe that this policy represents a requirement for EOP staff to undertake the preservation measures reflected in it.  But the question of whether those staff would, in fact, carry out that obligation is something that Armstrong does not allow for judicial review of.

THE COURT:  Here's what I want to understand.  If the White House was of the view that, okay, we should continue to conduct our records responsibilities consistent with the Presidential Records Act, even though we think it's unconstitutional, the guidance issued would simply be that.  Let's continue to conduct our responsibilities consistent with the Presidential Records Act, and here are those requirements.  Similar to what was set out in 2017 in the first Trump administration.

That's not what they did.  It's not what they did.

**JA387**

They did something that must have been intended to be different from the requirements of the Presidential Records Act.  But you would say that it's not different?  It's the same?  Why didn't they just say that then?

MR. POWERS:  Well, I think the President and the White House counsel are certainly entitled to draft a policy like this using language that they believe is appropriate.

THE COURT:  Sure.  And you're entitled to interpret it but, ultimately, my interpretation is probably more important than your interpretation.

MR. POWERS:  Entirely understood.  I agree with that.

But if I could continue, Your Honor.

THE COURT:  Please.

MR. POWERS:  With respect to the text message piece, our view is that it represents a reasonable and appropriate application of 2203(a) and the requirement that the President undertake appropriate steps to document the activities of the presidency and to preserve those records.

So I think that in that respect, it perhaps is different in terms of the language that is used, but ultimately, in our view, it is compliant with and consistent with the obligation of 2203(a) to preserve those records.

THE COURT:  All right.  Please proceed.

MR. POWERS:  So I guess, I was stressing at the outset the matter of the Eisenhower Declaration, the fact that the

2026 policy requires, as a blanket general matter, the preservation of records related to EOP duties.  That includes hard copy documents or highlighted in the document, as well as electronic files.

It seems to me that any claim about whether EOP employees are going to comply with that policy is something that the CREW versus Trump case from the D.C. Circuit in 2019, for example, precludes.  And so, ultimately, it appears to me that the parties' dispute is really only joined as to the text messaging issue in particular.

That any broader dispute about preservation with respect to electronic records on EOP systems or other kinds of documents at the White House is a dispute ultimately about compliance and about the extent to which the 2026 policy is worded.

THE COURT:  It's not in compliance with the Presidential Records Act because the judgment of the executive branch is that it is unconstitutional.  Therefore, it's not. We're not really saying that it's an issue of compliance with the Presidential Records Act.  Instead, its compliance with the guidance.

MR. POWERS:  Right.  But my point is that the plaintiff has made a claim that the executive -- that the President and NARA and EOP, et cetera, are violating the Presidential Records Act.  The Presidential Records Act

**JA389**

establishes various obligations and duties. And as far as the PI today, the thing we're here about is simply the preservation aspect.

And so what the Court is called upon to do is to adjudge the alleged conduct that determine whether there's irreparable injury, things of that nature.

And so the point I'm making is simply that with respect to irreparable injury, first and foremost, as to that vast swath of records, I don't see that there's any actual dispute that warrants the intervention of the Court at this time.

I don't think it warrants it either with the text messages, but I think that that's sort of a discrete, separate issue from the vast majority and lion's share of presidential records. And so I just stress that --

THE COURT: Because the guidance is close enough to the Presidential Records Act?

MR. POWERS: In our view, it's consistent with it.

THE COURT: What's the authority, by the way, under which the guidance was issued?

MR. POWERS: Well, the guidance does not specify, but I take it that it is inherent to the operation of the office of President.

THE COURT: So it's normal Article II authority of the President with respect to the operation of the executive office

and, in particular, the presidency?

MR. POWERS:  Correct.  Consistent with the 200 years of history of presidents --

THE COURT:  It's not statutory issuance under the Presidential Records Act, because it, of course, in the view of the White House is unconstitutional.  So that's not the basis for the authority of issuing the guidance.

MR. POWERS:  I think that's fair.  Now, I think that -- and I think this gets to -- perhaps part of this line of questioning starts to get at this idea of whether there's some incoherence or -- to our paradoxical nature to our argument regarding Armstrong.  And I'm happy to engage with that briefly, if you'd like.

THE COURT:  You're up.  You're going to get to what you're going to get to and when.

MR. POWERS:  Sure.  Understood.  I think, ultimately, the plaintiffs here are bringing claims that we are failing to comply with the statute, the Presidential Records Act.

And so plaintiffs have to take the statute as it is, as it's been interpreted by the D.C. Circuit.  And so the Presidential Records Act includes the various provisions that establish the requirements of preservation and disclosure and so on, and it also includes an applied implied preclusion of judicial review.

And so I don't understand this case to be a case about

**JA391**

sort of a Youngstown case, where there's sort of uncertainty about whether, in the absence of statutory authority, President Truman had the authority to seize the steel mills.

I think it's undoubted that, as a constitutional matter, the President has the authority to organize his papers, to organize the White House office, things of that nature.

The question is whether the defendants are complying with the statute. And as far as that question goes, the Court needs to consider that statute in concert with how it has been defined by the D.C. Circuit, and that includes the preclusion of judicial review as to the vast majority of decisions regarding recordkeeping and disposition and things of that nature.

THE COURT: And that argument, you believe, would mean that there's no Armstrong avenue to judicial review and that there's no Youngstown Avenue to judicial review?

MR. POWERS: Correct. I think just looking at the face of the complaint, that it's really not accurate to say that these are Youngstown-type claims. We think that they're really Dalton-type versus Specter-type claims. They are claims regarding the alleged non-compliance with a statute.

The fact that the President has asserted and that the defendant's position is the PRA is unconstitutional does not render them somehow constitutional claims. The plaintiff is saying that we are --

**JA392**

THE COURT: It's not non-compliant. Isn't it rejection of?

MR. POWERS: I don't think that the sort of subjective view or the legal position is what's relevant for purposes of the dispute here. What's relevant is the requirements that the statute imposes and the conduct undertaken, and how it's judged against those requirements.

The sort of subjective views of the executive branch with respect to the basis for its actions is not what's relevant. What's relevant is the fact that records are being preserved, and that's what the PI is about, is preservation of records.

THE COURT: So the decision not to follow the Presidential Records Act would not be subject to review, in your view? The decision through the OLC but adopted by the White House that the Presidential Records Act is unconstitutional and, therefore, will not be followed would never be subject to judicial review?

MR. POWERS: I don't think I need to make that level of blanket statement for purposes --

THE COURT: How would it be subject to judicial review, if not through this process? It wouldn't be subject to judicial review on a particular decision not to preserve a particular record. That would get closer to Armstrong 1, wouldn't it? So how would it be subject to judicial review, in

**JA393**

your view?

MR. POWERS: I think, ultimately, the question is, what has the plaintiff shown as to the actions that have been taken? Have those actions invaded an irreparable -- caused an injury that is irreparable to the plaintiffs?

THE COURT: Well, that's the preliminary injunction standard. I'm talking about subject to judicial review. How would it be subject to judicial review under your view? This President and succeeding presidents, if they chose to, could simply ignore the Presidential Records Act, not do anything consistent with the Presidential Records Act, and it would never be subject to judicial review. Isn't that your position that you're articulating?

MR. POWERS: I think that Armstrong 1 lays out a very --

THE COURT: Whether that judicial review would mean that the plaintiffs are successful is a different question.

MR. POWERS: Sure.

THE COURT: That's the merits question. But your position seems to be that you never can get to the merits. There's no vehicle by which the executive branch, specifically the White House and the President, have decided not to comply with. Because it's unconstitutional, the Presidential Records Act. That could never get reviewed in the courts, in your view. Or at least you can't identify for me any means that it

would get reviewed.

MR. POWERS:  I think what I would say is that, under Armstrong, any such review would be extremely narrow and would certainly not be on the circumstances presented here, where, in our view, the records that the PRA requires to be preserved are being preserved.

THE COURT:  What's the review that would be narrow and not on the circumstances here?  What is it that you think would enable judicial review of this question?

MR. POWERS:  I'm really not in a position to speculate about that.  I mean, we recognize that there are certain kinds of non-statutory review that -- that ultra vires review, for example, can be available in extremely narrow circumstances. It's not a ready kind of end-run around the statutory preclusion of review.

But if a plaintiff were to be able to show the kind of very particularized circumstances that meet the test for ultra vires review, perhaps they could obtain relief in some circumstances there.

Now, I think the PRA is pretty ill-fit for that kind of review, because the PRA does not impose a sort of ministerial duty on the President.  It imposes, I think, a discretion-laden duty to see that the activities of the presidency are adequately documented and that the records of that are preserved.

And so I think it would be a hard road to hoe.  But I think that sort of non-statutory review is probably the best that a plaintiff could do.  I think that Armstrong leaves very little.

I will note, Armstrong 2 does recognize that, as a matter of vindicating the FRA and the FOIA, there is a limited role in evaluating whether guidelines are essentially taking records from, let's say, the FOIA, FRA bucket and putting them into the PRA bucket, and thereby shielding them from the FOIA.

And Armstrong 2 reasoned that that is sort of consistent with Congress's decision in the PRA to, first of all, keep those universes separate and to accord the President enormous discretion with respect to PRA records, but not to capture within that and not to give the President an ability to essentially take the records of ordinary federal agencies and turn them into presidential records.

THE COURT:  All right.  So I don't want to beat a nearly dead horse here.  So we'll move on.

The guidance does not specifically address how the White House will go about disposing of records after the records are collected, whatever is preserved and collected.

Is there a policy now in effect for that process?  The Presidential Records Act has a pretty explicit policy -- or requirement.  It's not a policy.  It's a requirement -- in terms of involvement of the archivist and of Congress.

**JA396**

So what is the current policy as of April 2nd with respect to the disposal of records in the White House?

MR. POWERS: So I think --

THE COURT: And where is that found in the record?

MR. POWERS: With respect to the record, I think that the 2026 policy is the current policy. It does not speak to disposition. It speaks to the retention and maintenance of the records. So it does not authorize a separate disposition. I think --

THE COURT: But the 2017 policy in the first Trump administration did specifically speak to disposal. And it required that the provisions of the PRA be followed. But now the guidance does not do that. So one would assume there's an intentional difference.

MR. POWERS: I think -- look, we are essentially a month after the issuance of this policy, and --

THE COURT: You were able to issue the policy one day of the OLC opinion.

MR. POWERS: I understand. My point is simply that the immediate issue, it would appear, was the matter of preservation and that the 2026 policy regards the matter of preservation.

I'm not in a position to speculate about further policies that may be issued regarding disposition, but one could readily see --

**JA397**

THE COURT: The record is what the record is.

MR. POWERS: -- different action taken in the future. And the record is what it is, and the policy does not itself just authorize disposition. It's a preservation --

THE COURT: You can give no representation that the Executive Office of the President intends to notify the archivist before any records are disposed of?

MR. POWERS: I'm not in a position to make that representation. I can represent to the Court that if there was going to be a change to the 2026 policy or --

THE COURT: Change in the 2026 guidance?

MR. POWERS: Sure. Then I certainly would --

THE COURT: Which is silent on this question.

MR. POWERS: During the pendency of this case, I would notify the Court of that change. But no, I'm not in a position to represent how disposition will be handled. And it's also not an issue, I will add, at the risk of belaboring the point, on the motions for preliminary injunction, which are about preservation.

So I guess, if I could also speak to the issue of irreparable harm in the context of the text messages.

Again, so I guess to start with, our view is that the text messaging provision is consistent with 2203(a), which, again, requires that the President take necessary actions as may be necessary to adequately document the presidency.

**JA398**

Now, I recognize that 2209 says what it says. 2209 is also tethered to the definition of presidential record. It does not say preserve every single document or electronic message on an EOP employee's personal device.

It says preserve presidential records in this -- or actually, it says don't send presidential records on personal devices. If you do, here's what you should do.

In our view, 2209 needs to be read in concert with 2203(a). The ultimate obligation that the statute imposes is one on the President to have this -- to undertake this measure and effort to adequately document and preserve records of the presidency.

And so I think our view is that the text messaging piece of the policy should be adjudged in -- consistent with 2203(a)'s reference to that.

THE COURT: As to text messages both on official devices and on non-official devices?

MR. POWERS: Correct. Now, of course, we have a lot --

THE COURT: As to non-official devices, there's a specific provision, 2209(a), that speaks to -- under the Presidential Records Act that speaks to what has to happen. That doesn't exist in the guidance.

MR. POWERS: Yes. In our view, 2203(a) is read in concert with 2209. And it requires that the President

**JA399**

undertake measures to adequately document and preserve records. And in our view of the 2026 policy, it's consistent with and complies with that portion of the PRA, and, thereby, necessarily complies with 2209 as well.

But even as to -- let's say there's a delta where plaintiffs make much of the kinds of messages that the 2026 policy indicates need not be preserved. And they say that there's irreparable injury in and of itself as to those -- any messages like that that are lost.

I think we would dispute that text messages that say "Call me or," you know, "What room is the meeting?" That there is irreparable injury for the plaintiffs in those kinds of very kind of minute --

THE COURT: I think that's fair. There's some category of text messages that would not contain meaningful information.

MR. POWERS: And so --

THE COURT: But there's also a category that would.

MR. POWERS: Right. And the policy requires that that kind of meaningful information be preserved, and the question of whether the policy is worded in a way that is likely to be complied with, whether employees are -- should be made aware of potential penalties if they don't comply with it, these are the sort of management of the White House kind of questions that are squarely precluded by CREW versus Trump, for example.

If I could also briefly discuss the scope of relief issue because I think we haven't really touched on that much. And it dovetails with what I've been discussing when it comes to where irreparable harm has clearly not been shown --

THE COURT: By the way, does what the guidance says about text messaging include all forms of such electronic messaging? The use of Signal, for example, or any form of electronic messaging? Or is it, as stated in the guidance, only text messages that are being discussed as to policy?

MR. POWERS: So with respect to the text messaging section, it only uses the term "text messaging." It doesn't describe particular platforms.

I want to be clear that at the outset we have sort of an initial -- at the records generally portion, a general requirement to preserve records related to EOP duties.

There's an electronic records piece. And so insofar as there's -- I don't think there's any delta with respect to any kind of platform. It's either subject to the general requirement to preserve records related to EOP duties or it's subject to this sort of permission and policy regarding text messages in particular.

I see -- the screenshots here, I think to any reasonable observer, would indicate that it's principally going towards iMessage and messaging platforms on the Android operating system, things of that nature.

**JA401**

But I think, ultimately, there's not, in our view, any kind of platform or message that is sort of outside the boundaries of this policy.  That all would be captured by the general requirement to preserve records related to EOP duties.

THE COURT:  All right.

MR. POWERS:  But I just -- I want --

THE COURT:  Some provisions are specific as to text messages.

MR. POWERS:  Undoubtedly.  We certainly don't dispute that.

But I want to stress the importance of any relief in this case, again, should be tailored very specifically to where the actual dispute is and where there is -- I think that it would be inconsistent with both Article III and with equitable principles to issue some kind of relief requiring that the President and that the White House sort of comply with the PRA writ large.

And I think that gets also to the kinds of problems that Armstrong 1 really highlighted.  That at that point then, the Court is sort of being ensnared in acting as a monitor, an ongoing monitor of White House recordkeeping.  And whereas Armstrong 1 makes very clear that the President is given great discretion under the PRA with respect to recordkeeping, creation, disposition, decisions.

THE COURT:  So just a follow-up on the point that I

**JA402**

raised a minute ago.  Under the guidance, 2026 guidance, does that guidance either authorize or forbid EOP staff to use disappearing message apps, like Signal?  And if it either authorizes or forbids, where is that in the guidance?

MR. POWERS:  I don't think it specifically speaks to that kind of messaging platform.  I think a couple of things are relevant, though.  First, it does require that messages, text messages, or more generally, electronic records and all records related to EOP duties be preserved.

With respect to text messages, it depends on the substantive nature of them.  And so I think insofar as staff are using, on a non-official phone -- because, again, official phones are different.  Even Signal on the official phones is captured regardless of how auto-deletion settings are calibrated.

If they're using a platform like Signal on a private phone, then they would be obligated under this policy to retain messages that are substantive, that are non-duplicative, things of that nature.

And so insofar as the Court has some concern that individual employees would fail to adhere to that guideline, that is really exactly the issue that the CREW versus Trump D.C. Circuit case was about.  It was about those kinds of non-official messaging platforms, and the Court -- the Circuit did not wade into that matter.

**JA403**

And I think, ultimately, the Court, at a minimum, should not issue any relief directly against the President or the Vice President. There's been questions, discussion of whether the policy applies to the President, things of that nature.

But again, the Supreme Court has repeatedly stated in Mississippi versus Johnson, Franklin versus Massachusetts, that the President is not amenable to equitable relief -- or to injunctive relief in the exercise of his discretionary duties. And our view, the PRA undoubtedly --

THE COURT: So what's the rationale behind that?

MR. POWERS: I think it's a separation of powers rationale. There's sort of a concern about the confrontation between the branches of government to -- for individual judges to sort of issue relief against the President and then sort of any follow-on proceedings that would be required regarding that.

THE COURT: Because of the uniqueness of the President and the responsibilities of the President?

MR. POWERS: Yes. And that he is a constitutional officer who sits at the head of the executive branch.

And I think a similar -- while we certainly recognize that the Vice President has not been sort of specifically addressed in those cases --

THE COURT: That is not the same as the President.

**JA404**

MR. POWERS:  No.  But he is a constitutional officer as well.  He's also the head of the Senate, under the Constitution.

THE COURT:  Senators are constitutional officers.

MR. POWERS:  Yes, yes, understood.  But this is sort of in his -- in the conduct of his official duties.  And I think there would also be -- it would be quite problematic to issue relief against senators, for example, regarding how they're conducting their official duties.

THE COURT:  Let's not go there.

MR. POWERS:  They're separate speech or debate issues of course.  But I think that the point being that this is -- it's judicial relief against a constitutional officer from a coordinate branch of government.

THE COURT:  Really, would an injunction against the Vice President really interfere with the constitutional responsibilities set out in Article II or elsewhere in the Constitution, that the President and through the President the executive branch had?  How would it really interfere with those?

MR. POWERS:  Well, I think, first of all, as sort of a categorical matter, it invades --

THE COURT:  The Vice President doesn't have many constitutional responsibilities.

MR. POWERS:  He does have them, though, and he -- and

**JA405**

USCA Case #26-5185    Document #2183052    Filed: 07/13/2026    Page 411 of 450

I think it also invades the autonomy of the Office of Vice President. And I think, in general, it -- I think it also sort of --

THE COURT: That rationale could be used to say that any senior official in the White House, an injunction with respect to them would invade the responsibilities.

MR. POWERS: Fair enough.

THE COURT: I dare say the White House counsel and the -- this is meant as no insult to the Vice President, but the White House counsel and the chief of staff perhaps have more direct relationship and involvement on some levels with exercising the responsibilities of the President.

MR. POWERS: And what I would say is that the Cheney versus U.S. District Court case from the mid-2000s establishes that, even as to the Vice President, there is significant deference and concern about judicial invasions of the autonomy and confidentiality of the Office of Vice President --

THE COURT: That's the one case that has said the Vice President can't be enjoined?

MR. POWERS: Well, I think that case is specifically --

THE COURT: I'm not sure it even said that.

MR. POWERS: I wasn't putting it before the Court for that proposition.

THE COURT: There is no case that says that the Vice

**JA406**

President can't be enjoined.

MR. POWERS: I'm not familiar with one, but I think it's consistent with the way that the Cheney case discussed -- and we have a lot of overlapping case names in this litigation. But the Cheney versus U.S. District Court case discussed the autonomy of the Office of the Vice President.

I think that the broader issue, and the Court highlights -- well, perhaps the chief of staff also has a particularly high station, things of that nature.

I think that really goes to why Armstrong requires and sort of identify it in the PRA, that this is a matter for political contestation among the branches, that the judicial review is not something that's appropriate pursuant to private enforcement, because it requires the Court to become ensnared in these kinds of disputes.

I mean, if the Court were to issue an injunction and then there's some dispute about how it's been complied with or things of that nature, where we're suddenly going down the road of discovery of the White House, perhaps, things of this nature, I think these are the kinds of concerns and problems that are why the PRA accords the President -- attempts to accord the President a great deal of discretion with respect to his records while in office.

THE COURT: Let's talk about burdens and harms for a second. What's the actual burden on the defendants, the

**JA407**

executive branch, from an injunction that requires compliance with the Presidential Records Act, compared with what they're currently doing, let's say, voluntarily?  What's the actual burden?  What are the specifics of burden that you're worried about?

MR. POWERS:  So I think that the issue of enjoining the President or enjoining the White House --

THE COURT:  That's just an abstract concept.  I'm talking about real burdens.

MR. POWERS:  I think those are very real and concrete, but I will sort of set them aside as having been discussed already.

Look, I think that the PRA's preservation regime -- because we recognize that, obviously, we are preserving records in a manner, in our view, that complies with the PRA.  But the PRA's preservation regime is part and parcel of its disclosure regime.  That's also what gives plaintiffs standing to bring this claim, is the fact that under the PRA, records preserved will at some point be disclosed pursuant to the authorities of the PRA.

THE COURT:  That's the future.  That's not current burdens and harms that are really of great concern with respect to the motions now before me.

MR. POWERS:  Again --

THE COURT:  Something that happens 12 years from now

is not something I'm particularly interested in.

MR. POWERS:  Sure.  But my point is just that that perhaps in some ways goes more to the merits, and I'm happy to get into the merits soon.

THE COURT:  The problem you have, it seems to me, is on the one hand, you're arguing that the guidance that you're following is substantially equivalent to the Presidential Records Act.  And on the other hand, you're arguing that following the Presidential Records Act would be extremely burdensome to the presidency.

I don't see how those fit together.  It wouldn't be any more burdensome than what you're voluntarily doing, unless you can give me some specifics as to how it would be more burdensome.

MR. POWERS:  And so there we are getting into the merits, and so I do feel like I do have to engage again with that point that I was just making.  That under the PRA, the preservation obligation is sort of inherently tied and part and parcel of the disclosure obligation.

And as OLC has identified in its memo, the disclosure regime of the statute imposes significant concerns regarding a chill on presidential advisors and on the candor and --

THE COURT:  That was analyzed, to some extent, in a different context in Nixon versus GSA, and the Supreme Court concluded that the burden was not substantial.

**JA409**

MR. POWERS:  And we would say that the case is distinguishable because of the fact that the case involved a former president's records --

THE COURT:  But they were talking in many sections about future presidents, as well.  Yes, it did involve a former president.  There's no question.  But they were speaking on many of these issues, including constitutional issues, about the presidency moving forward, not just about a former president.

MR. POWERS:  I understand.  But, again, ultimately, the Court was confronted with a particular statute.  That statute involved a retrospective document preservation and disclosure regime.

I think it was also tied throughout its terms to the particulars of the Watergate scandal and the needs of the Watergate special prosecution force.  And so I think that those are key distinguishing factors, regardless of the sort of more expansive language that is used at times in the opinion.

We certainly don't dispute the opinion says what it says.  We've acknowledged those things in our papers.  But we think it's distinguishable --

THE COURT:  So the only burden you're identifying to me with respect to something specific is the burden that you think is associated with 2203 in terms of record disposal?

MR. POWERS:  I'm not sure.  I don't think I said that.

**JA410**

It might -- so with respect to the first burden identified before we started talking was the matter of the chill on presidential advice because of the disclosure regime.

THE COURT:  I don't understand how that's any different under the guidance than it is under the Presidential Records Act.  So I was asking for specifics in terms of what makes it more burdensome to follow, short term on a preliminary injunction, the Presidential Records Act, than to follow the guidance that you've been -- that you've implemented.  What specifically are burdens that are faced that should be of concern to the Court?

MR. POWERS:  I think the burdens relate to the involvement of the judiciary in sort of White House recordkeeping, decision making, and the fact that there will surely be -- notwithstanding our best efforts and my best effort as an officer of the court, there will surely be subsequent disputes and discussions about compliance and things of this nature.  And I think that will just create a needless separation of powers dispute.

THE COURT:  There's a burden that you think exists that the past at least 10 presidential administrations, including this President, in the first term that this President served, did not complain about?

MR. POWERS:  I think whether people have complained overtly and made public statements is not the question.  The

**JA411**

question is, looking structurally at the nature of the statute, at the nature of the need for the President to have autonomy and confidentiality with respect to his office, I think that is -- we're sort of blending different concepts, but with respect to that merits piece, I think that that's sort of the relevant decision point.

I will note, we would not sort of disclaim the burden on White House staff with respect to compliance. Plaintiff makes much of the idea that, well, it's the White House counsel's job to advise on how to comply with the law.

But the point is that the more that White House staff are devoting their energies to screenshotting text messages or forwarding emails and things of this nature, the more the White House counsel is spending on PRA compliance issues, the less time they're spending on other matters that are more directly relevant, in our view, to executing the laws of the United States. And that is the nature of the burden issue.

THE COURT: Are you really saying that a lot more time is spent on compliance issues with respect to the PRA by the White House counsel? Is that something that you're able to document in any way?

MR. POWERS: I'm not --

THE COURT: This case would indicate that the White House counsel is absorbed much more with respect to these records issues by virtue of this case, but that's -- I'll set

**JA412**

that aside.

MR. POWERS: I'm not sort of able to document, and I'm not making a representation about the sort of quantity or the quantum of time spent.

The point is that -- and on the merits, as OLC has explained, there is not sort of a clear congressional authority to do this, and that cannot sustain the law --

THE COURT: What is it in the guidance that alleviates any burden from complying with the Presidential Records Act? What specifically in the guidance, either in what it says or doesn't say, alleviates the burdens you're concerned about?

MR. POWERS: I think that -- look, first of all, the fact that the Eisenhower Declaration, the White House information technology system allows for preservation of records without separate efforts by White House employees --

THE COURT: I'm sorry, what are you pointing to that alleviates the burden?

MR. POWERS: My point is that with respect to the preservation of electronic records on official systems, it does not require sort of distinct efforts by individual employees. It is something that is automated on the back end. And so...

THE COURT: That could be true under the Presidential Records Act as well as the guidance, right?

MR. POWERS: Yes. But, again, the Presidential Records Act encompasses the disclosure piece of the regime that

**JA413**

I think is -- heightens the kinds of chill and discretion kind of -- or confidentiality issues.

THE COURT: The chilling from the disclosure regime is what you're concerned about. And the guidance does not impose any disclosure regime that would thereby chill the free flow of guidance to the President?

MR. POWERS: Yeah. We have not developed the record on how the White House will approach the matter of disclosure in the future. We're here on a PI proceeding. We've developed the record with respect to the issue of preservation, which is what the plaintiffs have put at issue in the papers here.

THE COURT: I understand.

MR. POWERS: And so I will also note that, with respect to the text messaging piece, obviously, we do think that there is burden on employees in sort of copying over these messages, things of this nature.

Now, we recognize in the policy that certain kinds of messages should be preserved, as a matter of prudence and as a matter of policy, but that preserving every single last message about when is the meeting going to happen and things of that nature could impose, I think, unnecessary burdens on White House employees.

THE COURT: So do you have any case that you'd like me to refer to for a separation of powers-type violation that is based on the administrative burden of complying with the law?

**JA414**

I don't mean the -- you know, that imposes a prohibitive effect on the President, but I mean the actual administrative burden?

Do you have any case that says there's a separation of powers violation that is based on the administrative burden of complying with the law?

MR. POWERS:  I think that we would -- I don't know that I can cite to you a case that specifically addresses that. I think we would cite more generally to the cases on laws that regulate a coordinate branch of government, and thereby --

THE COURT:  There are a lot of laws like that, that regulate a coordinate branch of government.

MR. POWERS:  Yes.

THE COURT:  The Hatch Act, for one.

MR. POWERS:  Understood.  But the point is that when those kinds of laws exist and when they have the potential to burden a coordinate branch of government, that there needs to be an overriding need for that law that's expressed in one of Congress's powers.  And so that is why OLC determined that the PRA was not consistent with the separation of powers.

THE COURT:  So why did the -- why did OLC -- you're probably going to say you don't know, and I understand that. But it is curious, why did OLC not address the property clause?

MR. POWERS:  I am not in a position to discuss the deliberative considerations at OLC as to how they --

THE COURT:  What's your position with respect to the

property clause?  Because you did address it.  What's your position with respect to the property clause?

MR. POWERS:  Yes.  I think our chief position is that it begs the question of whether or not Congress can redesignate and designate presidential records as property of the United States.  And our view is that, consistent with 200 years of history and tradition, presidential records are private property of the President.

That is also consistent with the current treatment of Supreme Court justices' records, as well as the records of members of Congress.  And so I think that that is the primary issue with the property clause.

I think, also, the fact that -- the property clause does not indicate that it is sort of itself a substantial basis for Congress to regulate a coordinate branch.

Again, where it sits in the Constitution, as your questions earlier highlighted, it's predominantly, in our view --

THE COURT:  It's been interpreted by the Supreme Court to apply beyond real estate.  The Supreme Court, on a couple of occasions, not a lot, there's not a lot of law on it, but on a couple of occasions, including the Ashwander case, has said that the term "property" in property clause -- it is called the property clause -- it is inclusive.  It includes more than just real property.

**JA416**

Do you disagree with the Supreme Court's conclusion on that?

MR. POWERS:  I don't dispute those cases.  My point is simply that there's the kind of -- the major questions doctrine talks about the idea that Congress doesn't hide -- or legal documents don't hide kind of big rules in mouse holes and things of that nature, and that where the property clause sits and its terms do not indicate a sort of separate and expansive authority to regulate the other branches of the government as to sort of core parts of their operations, their autonomy, their confidentiality.

THE COURT:  And necessary and proper clause in conjunction with the property clause certainly includes more of what you're referring to.

MR. POWERS:  And in our view, the necessary and proper clause does not succeed here --

THE COURT:  Does not go beyond the specific provisions of Article I, Section 8?

MR. POWERS:  I don't think that's quite what we would say.  But the point is that where the necessary and proper clause is invoked, it needs to be -- it cannot be invoked for the purpose of burdening or impairing another branch of government.

And again, if this was the understanding of how this --

**JA417**

THE COURT:  I don't think it's fair to say that Congress, in passing the Presidential Records Act, was trying to impair the functioning of the presidency.

MR. POWERS:  I certainly wouldn't speak to the intent or the sort of subjective view of what Congress was trying to do.  My point is just that in its outcome, in the laws that they did pass in its text, it does -- as OLC has found, it has those potential concerns, and those are sufficient to require us to have to search and review in Congress's authorities for a justification from the statute, which you'll come up empty on. And I think that's the basic argument there.

I would like to address the point about NARA and their sort of purported obligation to reach out and obtain documents. First of all, while that was mentioned in the reply brief, that's not relief that the preliminary injunction before the Court seeks.  It hasn't been a claim that's been clearly stated in any way in this case.

I will also note that, under 701(a)(2) of the APA, the matter of whether NARA will take enforcement action to obtain any particular record is a matter committed to its discretion by law.  And so I don't think there's really any basis for the Court to enter any relief requiring NARA to obtain any particular record.

I don't think we're in a position to say what those particular records are.  As I understand it, they're in the

**JA418**

possession of the President in his personal capacity.  So I'm not sure I could say much more than that.

But I think as a general matter, as far as that claim goes, it's not been properly presented to the Court.  In any event, it's precluded from enforcement by the APA.

THE COURT:  Let me just return to the property close for a second to make sure I understand your argument with respect to the meaning of the words.  Do you agree or concede that "other property" means -- includes records created by government employees?

MR. POWERS:  So I think that the justification for, for example, treating government records of the executive branch as federal property may be justified under the necessary and proper clause, perhaps into the property clause, I'm not sure.  We're not disputing the constitutionality of the FRA or the FOIA or things of that nature.

There's also no history and tradition of --

THE COURT:  So you're agreeing that "other property" includes documents and records created by government employees, including employees within the executive office of the President?

MR. POWERS:  What I would agree to is that, first of all, binding Supreme Court precedent establishes that "other property" can include personal property and non-realty, and that, also, there is law establishing that records of

**JA419**

government agencies are public property and that those provisions, we do not dispute their constitutionality.

The particular source of the constitutionality, I don't think I've developed a firm position about. And so I don't think I'm in a position to concede anything as to that.

I will also note, just as a matter of historical record, the first Congress passed a law that regulated the recordkeeping of the Departments of War, Treasury and State. It did not regulate the recordkeeping of a president.

So this tradition of treating federal records as distinct from presidential records goes back to the very founding of this country, and it continued unbroken, essentially, for the first 200 years.

THE COURT: So you think that other property and the property clause includes government records but not presidential records?

MR. POWERS: Again, I don't think I've taken a position on that.

THE COURT: Well, I'm asking you to.

MR. POWERS: I'm really not sure about that. That hasn't been something that we've briefed. My point is that we do not dispute --

THE COURT: I understand that there hasn't been a lot of briefing and, indeed, the OLC opinion doesn't touch at all the property clause. But that seems to be a major authority

**JA420**

that the plaintiffs are relying on to support the constitutionality of the Presidential Records Act.

If I reach the merits, I'll have to grapple with that. I'm asking for your help.

MR. POWERS:  Understood, Your Honor.  And I think the best I can say standing before you here today is that we do not dispute that it's appropriate for Congress to pass the Federal Records Act to establish that records of executive branch agencies are property of the United States.  And that's distinct and supported by history, that there would be a distinction between presidential records and federal records.

THE COURT:  So you would say that perhaps Congress can't extend a more traditional principle of government records, government property being subject to legislative activity by Congress that doesn't extend to presidential records?

MR. POWERS:  Right.  I guess I would dispute that it's sort of more traditional -- the position you just described is more traditional.  I mean, the founding of the country for the first 200 years of the country, the tradition was that the president's records --

THE COURT:  You're describing it as more traditional. The application of the proper clause to government records generally rather than the president.

MR. POWERS:  Understood.  Right.  I think.  But, yes,

**JA421**

our position is that because of the nature of Article II, the presidency, the relationship between the branches, that there is a distinction between Congress's attempts and the reality of the laws regarding federal records and its attempts to regulate the recordkeeping of the presidency.  Those are distinct issues, meaningfully, as a constitutional matter.

THE COURT:  On the necessary and proper clause, do you agree that that clause allows Congress to legislate in support, not just of the enumerated powers in Article I, Section 8, but also the other powers vested by the Constitution in the government of the United States or in any department or office thereof?

MR. POWERS:  Yes.  And the issue is that, in exercising that kind of authority under the necessary and proper clause, Congress cannot act in a manner that impairs the functioning or intrudes upon the autonomy of a coordinate branch, and that is where the issue sort of lies.

We certainly recognize that OLC recognized in its opinion that the Logan Act, for example, which goes to the foreign affairs power of the President, is constitutional in the view of the OLC because of it being a necessary and proper and essentially helpful, non-burdensome action by the Congress with respect to that power.

THE COURT:  So what's the best case you have for saying that this kind of provision would unconstitutionally --

"this kind of provision," meaning the Presidential Records Act -- would unconstitutionally interfere with the functioning of the presidency?

MR. POWERS: Excuse me. I believe Mazars, I think, really gets to these --

THE COURT: Mazars is pretty specific to not a legislative purpose but an implied purpose and only dealing with a pretty narrow, specific set of circumstances. Anything other than Mazars?

MR. POWERS: I think the other cases where the Court -- like, for example, we've cited Mistretta, we've cited language from Nixon versus GSA, cases about where Congress is impairing another branch. I think, also, it sort of courses in and out of Trump versus United States, which speaks to areas where the President has preclusive and conclusive authority.

It's in, for example, Trump versus Anderson, which goes to the questions of whether, as a separation of powers matter, we're going to be very concerned about not -- it's instances where an action has been taken that is sort of inconsistent with history and tradition, that history and tradition will be very relevant to constitutional interpretation, particularly in the separation of powers context.

THE COURT: So you mentioned conclusive and preclusive powers. What is the conclusive and preclusive power that the

**JA423**

President has here over these records?  I don't mean the general power to execute the laws.  I mean something specific.

It's not like the conclusive and preclusive power that officer removal or ambassador recognition, pardons are examples of.  What is the conclusive and preclusive power that the President has over these records?

MR. POWERS:  So the point I'm making is that it requires the preservation and ultimate disclosure of records that go to all of those powers that the Court just identified.  That I don't think -- I don't take it the point that we're making is that there's sort of a conclusive and preclusive power --

THE COURT:  So requiring the preservation and ultimately the disclosure.  And I understand, as you do, but the disclosure is subject to a lot of provision of the Presidential Records Act.  It doesn't just automatically occur and privileges can be asserted, et cetera, et cetera.

But requiring that preservation and disclosure would interfere, you think, with those conclusive and preclusive powers of the kind that I just mentioned, like the pardon power or the power to recognize ambassadors, that's what you say is the conclusive and preclusive power?  It's sort of that derivative -- it would -- records on any of those subjects, therefore, it would be an interference with that power.

MR. POWERS:  I think that's why the shill issue that

**JA424**

OLC identified is so salient, is because the records preservation and disclosure regime here covers everything, whether it sits at the very core of the President's authorities that are not subject to regulation by Congress or it sits at more attenuated bands.  It's a broad and blanket regime.

Now, I recognize, of course, that there are -- as the Court highlights, there are procedural mechanisms regarding the ultimate disclosure, that there's the windows of time in which disclosure cannot happen and that there's the ability to assert privilege.

I think we would still say that, look, the records will be disclosed absent a personal assertion of privilege by the former president or the incumbent president.  And if the incumbent president does not agree with the former president --

THE COURT:  In a lot of circumstances, the incumbent may agree with the former president.

MR. POWERS:  Yes.  That is certainly --

THE COURT:  Indeed, it's rare that we've seen historically over the last 50 years that there isn't agreement. You've been able to cite one instance, and that's the January 6th records, where President Biden, the incumbent president, did not agree with President Trump, the former president, as to non-disclosure of presidential records relating to the events of January 6th.  That's the only instance that you've mentioned.

**JA425**

MR. POWERS:  Right.  I think we have a broader kind of picture.  I think that the case law demonstrates that this has not been all peace and harmony with respect to the operation of this statute.  But, yes, with respect to the particular issue of a disagreement among an incumbent and the former president, that is the matter we put before the Court.

THE COURT:  And those were requested by Congress.  And that led to a judicial decision.

MR. POWERS:  Right.  And I think the question there was that the Courts were not willing to sort of intervene and essentially step in and overrule the current president's view of these things.  And so I think that's another problem that our OLC's opinion grapples with, is the fact that --

THE COURT:  That's a problem, but one has to step back and recognize that -- maybe you feel otherwise, and I don't mean you personally, but you representing your client.  But the Presidential Records Act and these privileges are for the benefit of the presidency and the public, not usually for the benefit of the individual who holds the office.

MR. POWERS:  Right.  And we're not saying that the 200-year tradition of presidential ownership of presidential records was some kind of perquisites or side benefit of the office.  It's incident to the autonomy and discretion of the office that the President maintains control of those records.

There's certainly a tradition, for example, of a

**JA426**

number of the pre-PRA presidents donating their records to historical societies or to presidential libraries, to the Library of Congress. The Presidential library system was established as a voluntary regime in the '50s, whereby, essentially, presidents would give their records in exchange for a congressionally-funded presidential library.

But ultimately, the question is, on what terms those kinds of disclosures are made and to what extent this is being imposed from the outside by a coordinate branch of the government, as opposed to something that is within the control of the president in question.

THE COURT: All right. What else would you like to address?

MR. POWERS: I think we've hit on most of the issues. I don't want to belabor the points in writing. So if there's any particular questions the Court would like to ask, I'm happy to engage further.

THE COURT: So does the government believe that it is taking action in terms of the -- I think you answered this already, but I'll return to it. That is taking any action with respect to the guidance that's been issued. In other words, what the government is currently doing with respect to presidential records, the government believe that it is taking that action under the Presidential Records Act?

MR. POWERS: No, I don't believe so. I think the --

**JA427**

THE COURT:  Taking it under the general Article II authorities and responsibilities of the President.

MR. POWERS:  I think that necessarily has to be the case, in the sense that the White House regards the Presidential Records Act as unconstitutional.  And so it is -- whether it's Article II or inherent authority to organize one's affairs --

THE COURT:  We'll call it Article II or inherent.

MR. POWERS:  Sure.  Something to that effect.  I think that that's the best understanding of what's the current state of affairs despite the PRA.

THE COURT:  If the plaintiffs argue that they're injured by that, if they can sustain, in this preliminary injunction context, an argument that they have suffered an injury from that, why wouldn't they have a Youngstown cause of action?

I have the protection of operating under a statute, because you're not operating under a statute, and you're operating under the Constitution.  So why wouldn't they have a Youngstown claim, a separation of powers-type claim, that they could proceed on?

I'm not saying they can win on, but they can proceed on, that they would have that cause of action and that would subject the action of the White House to judicial review.

MR. POWERS:  So there's a host of issues and I'll try

**JA428**

to hit them quickly.  So with respect to Youngstown, I think the question in that case is, principally, whether the Constitution itself provides the President any authority to seize the steel mills or to do anything in particular.

I don't think there could be any serious dispute that, just against a blank slate, the President has the authority to preserve records in a manner that's consistent with the 2026 policy, the PRA, et cetera.

And so then there's the question of whether or not there's some injury in the fact that the preservation is not pursuant to the PRA or that the records are not sort of -- in some sense don't have a file name or label affixed to them that says presidential records.  And I think that that's -- I don't think there's any basis for a statement of concrete injury or irreparable injury by that.

What the PRA requires is the preservation of presidential records, and presidential records, however defined, are being preserved.

THE COURT:  My question to you was on the assumption that they had been able to show injury.

MR. POWERS:  Right.

THE COURT:  I want you to avoid the problem of arguing the merits as a reason why -- the outcome of the merits as a reason why there's no standing or there's no cause of action.

MR. POWERS:  Right.

**JA429**

THE COURT:  I understand your argument on the merits and that is -- there's substance on each side of that question. But does the fact that you think you'll win on the merits mean that there's no standing?  And clearly the law is otherwise on that because you have to assume success on the merits as you analyze standing -- the Court has to.  And does it mean there's no cause of action to have that question reviewed?

MR. POWERS:  So I think we have to look to what is an Article III concrete injury that plaintiff can assert. Plaintiffs have asserted, as I understand it, essentially the argument that they are frequent requesters of records under the FOIA and under the PRA, and that they will ultimately be unable to obtain records if those records are disposed of improperly or not preserved --

THE COURT:  Not preserved.  The argument more, as you pointed out, is more not preserved, as the disposal is down the line.

MR. POWERS:  Right.  So if they're not preserved properly during the current presidency, that they would not ultimately be able to obtain those records.  And so, therefore, the way to -- whether or not that injury has been shown is ultimately a question of whether the records are being preserved.

And in our view, the facts show that they are being preserved and that that shows why there is not an Article III

**JA430**

injury, just as there's not an irreparable injury for purposes of this PI, which is about preservation and is asking the Court to enter an order requiring preservation that's essentially already happening.  It's essentially a follow-the-law injunction, which is not generally appropriate and certainly not when it involves the White House.

And so I think perhaps I'm getting into the merits some, but I think it's sort of necessarily the case.  But I don't think there's any distinct Article III cognizable interest in whether or not the White House regards itself as bound by the PRA.

That insofar as there's some concern about a sort of broader public policy kind of objection to that line of thinking, that's not something that is concrete or particularized to the plaintiffs.  That's a generalized grievance regarding a disagreement about how the government is operating.

THE COURT:  All right.  Anything you want to close with, Mr. Powers, before I give the plaintiffs a very brief opportunity on --

MR. POWERS:  I think we've said enough.  So thank you, Your Honor.

THE COURT:  Thank you.

Will I be hearing from only one of you or from two of you?

MR. MAIER:  Your Honor, I will be very brief, if you don't mind both of us.

THE COURT:  So I will be hearing from two of you. That means you're limited in your time, each of you.  You would be limited anyway, but you're more limited if two of you are going to speak in rebuttal.

MR. JACOBSON:  I will endeavor to be twice as brief than I otherwise would have.

I want to quickly touch on a few points, but then in conclusion address what I think was a new revelation from the government regarding the current status of the Mar-a-Lago records and how that relates to our NARA claim.  But just briefly on the other points.

Your Honor asked Mr. Maier about sort of what are our main causes of action and do you need to address ultra vires and mandamus --

THE COURT:  Your voice is trailing off.

MR. JACOBSON:  I apologize, Your Honor.

On the question you asked Mr. Maier about which are our sort of principal causes of action, they are the Armstrong v. Exceptional Child Care, equitable cause of action, and the Youngstown constitutional claim.  If Your Honor addresses those, there's no need to address mandamus or ultra vires, from at least our American Historical Association plaintiffs perspective.

And on the Youngstown cause of action, because I didn't have a chance to address it in my opening, very briefly, this case just fits to a T how Dalton and the D.C. Circuit's case from last year describe what is an available separation of powers claim, which is when there is a conceded absence of any statutory authority and the only defense raised for the executive branch's actions is a constitutional one.

And here, there is self-evidently a conceded absence of statutory authority to determine the entire PRA is unconstitutional and to act on the premise that the PRA no longer exists.

The government, today in its papers, want to frame this dispute as mainly this quibbling about statutory interpretation and does the guidance cover records that the PRA covers or not?  That is not what this case is.

This case is a case where the executive branch has just said this entire law is unconstitutional.  We're going to try treat it as a dead letter.  And then we're going to act differently based on that determination.  That's exactly what the Youngstown claim is for.

On irreparable harm, and just making this really precise, I think the colloquy with government counsel was helpful.  I think for our irreparable harm -- and they'll speak to the government's burden, but for our irreparable harm, it sounds like even if we treat the 2026 guidance as mandatory,

**JA433**

which it's not, even if we did so, there's sort of three big categories looming out there which the 2026 guidance does not speak to and which go directly to irreparable harm.

One is records of the President and the Vice President, as Your Honor mentioned in one of your hypotheticals. Sitting here today, there's absolutely no indicia at all that the President has been told to, is certainly not under any legal obligation to preserve his records. Obviously, the President's own records are of the greatest historical significance.

THE COURT: This situation is different than past contexts. For instance, in 2017, the guidance from then White House counsel McCain -- McGahn did not address disposal.

But here, that issue was specifically posed by the decision to follow the OLC opinion that the PRA is unconstitutional, and, therefore, it's an obligation that the government has to explain what its position is with respect to disposal?

MR. JACOBSON: Exactly, Your Honor. This goes back to the presumption of regularity. If there is a law in place that imposes legal duties on the President or his team, we need to presume that they will comply with those legal obligations. If the law does not impose any obligations, then that is out the window.

And so then the question is, what are they doing in

**JA434**

the absence of those legal obligations?  And there's just nothing in the guidance that speaks to the President's records at all.  As Your Honor mentioned, there's nothing in the guidance that speaks to destruction or disposal of records.

There is nothing that stops the President or the chief of staff or the White House counsel from after lunch today, saying, let's just throw away all the backup tapes of all the records or all the paper records go into a burn bag.  That presents imminent and irreparable harm because it could happen at any moment, and focus on the irreparable aspect of it.

THE COURT:  You get into a Clapper-type situation in terms of the harms.  If this, then this, then this.  Does it become too speculative?

MR. JACOBSON:  I don't think so, Your Honor.  There's also doctrines about, you know, people intend the natural consequences of their actions.  And the famous judge-friendly quotes that Chief Justice Roberts quotes too about, you know, judges are not required to be free of -- or to exhibit naivete, of which ordinary citizens are free.

Government has wiped the PRA off the books for a reason here and has issued this new guidance for a reason here.

And I also say, just point out, that I think I understood government counsel to say that even the text messages portion of this guidance does not apply to messaging applications like Signal, which are now the predominant means

by which people in sensitive positions are communicating on their personal phones.  And there's nothing in the guidance at all that therefore requires that any Signal messages be preserved.

I'll point to the fact that Page 3 of the guidance says:  Staff should avoid using personal devices for official business wherever possible.

No guidance on what that means.

So there's nothing sitting here today that even imposes this sort of milquetoast should preserve some things and also should not preserve other things.

With respect to the burden on the government.  I think, from the colloquy with Your Honor, that the government conceded that the PI that we're seeking here today, which speaks only to preservation and not disclosure, that that doesn't impose any burden at all on the government.

And so in the balancing of the equities, that is certainly highly relevant that there has been, effectively, a concession of no burden on the other side of the ledger here.

The last point I'd like to make, Your Honor, and this now gets to the Mar-a-Lago records, I think, if I understood correctly, but please correct me if I didn't understand correctly, that counsel said that those records have now been returned to the President in his -- President Trump in his personal capacity.

**JA436**

If that's the case, that's an enormous revelation relevant to our claims. That is, quite obviously, inconsistent with the PRA. The PRA requires that government records be deposited with NARA, that NARA takes custody of those records. There's no provision for the President in his personal capacity to have custody of his former administration's records, exclusive custody.

And so that crystallizes, really, irreparable harm as to NARA here, with our claims as to NARA, that there's nothing --

THE COURT: That's still irreparable harm that is somewhat speculative because it's just a fear that those records will be disposed of in some way.

MR. JACOBSON: Certainly, Your Honor, there is a --

THE COURT: In fact, he told me in a personal -- I put in quotation marks -- rather than an official capacity doesn't actually create any harm unless he does something with it.

MR. JACOBSON: Right. Although it's, of course, the case that the minute he does something with it, it's too late. There's no redressability to do anything about it, if that "doing something" is destroying those records.

The other thing I'll say now, Your Honor, just to flag it, but not prepared to do it today, is we do have claims in this case against Mr. Trump in his personal capacity, including his capacity as a former president. I know it's a little bit

**JA437**

confusing, but he is both a former president and a current president for PRA purposes.

THE COURT: Is that a claim that's relevant to the preliminary injunction --

MR. JACOBSON: So what I was going to say is, I think depending on the outcome of this or we need to confer, but we may be coming back soon seeking a new preliminary injunction against the former president to return those records to NARA, as the PRA would require.

Again, I'm not moving on that today, but I just wanted to flag that now, based on the revelation we just heard a few minutes ago.

THE COURT: I don't understand exactly what you mean. An injunction against the former president would be okay, notwithstanding the fact that he is the current president?

MR. JACOBSON: Yes, Your Honor. Just as the President in his personal capacity may be sued for civil damages in a way that he couldn't be in his --

THE COURT: That's a different concept. Personal capacity versus official capacity is one thing. Former president versus current president is a different thing. Former president is not necessarily personal capacity.

MR. JACOBSON: So I believe the words that government counsel used today was that he's holding them in his personal capacity. I think there is no official former president

**JA438**

capacity in the sense we're talking about right now. This is not some -- I don't know if there are any statutory duties on former presidents. They have an office and whatnot.

THE COURT: So what's your point? Is your point that I should be more comfortable entering an injunction with respect to the President because I can do so in his capacity as a former president, i.e., in his personal capacity?

MR. JACOBSON: No, Your Honor. Sorry if I've --

THE COURT: So what is your point?

MR. JACOBSON: -- confused the issues. One, that this underscores the need for relief in our current motion as to NARA, for them to comply with their legal duties.

And, two, again, just so Your Honor is not surprised if we follow a new motion later this week or something. I just wanted to flag that possibility.

THE COURT: All right.

MR. JACOBSON: Thank you, Your Honor.

THE COURT: Thank you, Mr. Jacobson.

Mr. Maier, very briefly.

MR. MAIER: Thank you, Your Honor.

THE COURT: You promised.

MR. MAIER: It will be even briefer than I expected.

First, with respect to the text message provision's application to non-text, non-email communications, I think that, while we agree that the 2026 guidance doesn't address any

**JA439**

of those things, if it does, I think it has to fall within the text message provision with all of its deficiencies.

And I point the Court to Page 25 of the opposition, where they say that where a non-official medium like text messaging is used, the text message provision applies.

I think that's consistent with another question that Your Honor had about the purpose of 2209 in the broader scheme of the PRA. We talked about this in our brief at Page 6.

I won't belabor the point other than to say that Congress asserted in the Senate report that we cite that 2209 is meant to ensure that electronic messages created on non-official systems by the President, by the Vice President and every other covered person is preserved, and it recognized the need for the metadata and kind of all of the other data associated with them to be preserved.

Basically, it was a recognition that modern electronic communications pose new problems, and it needs to be updated.

And then the last thing is on irreparable harm. I just want to reiterate that there's an unbroken line of cases that if records are required to be preserved by the FRA or the PRA, plaintiffs are able to file FOIA requests for them, and FPF and CREW are both repeat FOIA requesters. That the destruction of those records, no matter how unimportant they may seem at the time, is irreparable harm.

I just want to push back on that point.

**JA440**

THE COURT: I know that there's a merging of these concepts, but destruction is not the fundamental basis of your disposal. It's not the fundamental basis of your preliminary injunction request. Preservation is.

MR. MAIER: Sure. And I think the distinction I would just draw is preservation is -- because the Courts recognize that whether we call it deletion, when you don't save something on your phone, discarding, whatever it is -- the loss of records that are supposed --

THE COURT: I mean, what you're focused mainly on is different than what we normally think of in FOIA cases, et cetera, as being irreparable harm. And that is a known document being destroyed.

MR. MAIER: Yes.

THE COURT: And that's irreparable because you can't get it back.

Here, you're not really talking about that. You're talking about whether something is preserved at all.

MR. MAIER: Yes.

THE COURT: In other words, whether the document exists.

MR. MAIER: Not whether it exists, but once it is created, what happens to it. In other words, we're not --

THE COURT: Yes. Once it is created -- the electronic document, once it is created, in other words, the electronic

**JA441**

communication occurs, whether that is preserved in some form.

MR. MAIER: Precisely. In other words, the presidential record is created when it's created. And if it's not preserved, once it is lost, it's lost forever. That's what Armstrong has recognized. It's what Cheney versus -- or CREW versus Cheney has recognized.

And it doesn't turn on what might be important down the road or what FPF or CREW might request later.

THE COURT: Although the most common example that I've heard is a text message on non-official -- on a non-official device. And we don't know that that's not preserved. It might be preserved on that non-official device. It is not being preserved in accordance with the Presidential Records Act.

MR. MAIER: Yes. And more importantly, the 2026 guidance instructs EOP staff that they should not preserve them. Thank you.

THE COURT: Thank you, all.

MR. POWERS: I feel the need to just speak to the factual record here.

THE COURT: Mr. Powers, I feel the need to tell you: Go ahead, but very briefly.

MR. POWERS: Just the factual point regarding these boxes because plaintiff's counsel made a large point about it.

So my general understanding is that with respect to materials that were provided to NARA, those materials are with

NARA and are being preserved, consistent with the McClure declaration.

My understanding is that there are certain documents that NARA never saw, that were never in NARA's possession, that are with the President now.

And I just want to clarify, I certainly was not -- I don't think I'm making any news today, and I certainly I don't think I'm in a position to do so.

THE COURT: You're trying not to.

MR. POWERS: But I don't think I'm in a position to do so. With respect to NARA, NARA is preserving the records that it has received in the past and has not returned anything of that nature. That's all.

THE COURT: All right. Thank you, Mr. Powers.

And thank you, all. I appreciate the quality of your arguments. I appreciate your patience for as long as this has taken. But I appreciate the patience most of all of the court reporter and clerk, who have tolerated everything that has been said today.

And I will take everything into account, look this over and issue a decision as soon as I can. I don't think you should expect a decision this week, but I also think that I'll try to get it out as soon as possible. And I appreciate, again, the filings and the arguments here today.

Thank you, all.

**JA443**

(Proceedings concluded at 1:17 PM)

**JA444**

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

/s/ Stacy Johns                    Date: May 14, 2026

Stacy Johns, RPR, RCR
Official Court Reporter

**JA445**