ORAL ARGUMENT SCHEDULED OCTOBER 16, 2026

Nos. 26-5185, 26-5186 (consol.)

# In the United States Court of Appeals for the District of Columbia Circuit

AMERICAN HISTORICAL ASSOCIATION, *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

FREEDOM OF THE PRESS FOUNDATION, *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia

**BRIEF FOR APPELLEES**

Kelsi Brown Corkran
William Powell
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
GEORGETOWN LAW
*600 New Jersey Avenue, N.W.*
*Washington, DC 20001*
*(202) 661-6728*
*kbc74@georgetown.edu*

Jonathan E. Maier
Nikhel S. Sus
Lauren C. Bingham
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
*P.O. Box 14596*
*Washington, DC 20044*

*Counsel for Appellees in No. 26-5186*

Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
John Robinson
JACOBSON LAWYERS GROUP PLLC
*5100 Wisconsin Avenue, N.W., Suite 301*
*Washington, DC 20016*
*(301) 823-1148*
*dan@jacobsonlawyersgroup.com*

Loree Stark
Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
*1030 Fifteenth Street, N.W.*
*Washington, DC 20005*

*Counsel for Appellees in No. 26-5185*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1), Plaintiffs-Appellees certify as follows:

1. **Parties and amici.** All parties, intervenors, and amici appearing in this Court are listed in the Brief for Appellants.

2. **Rulings under review.** References to the rulings at issue appear in the Brief for Appellants.

3. **Related cases.** Plaintiffs-Appellees are unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

<u>*/s/ Kelsi Brown Corkran*</u>
Kelsi Brown Corkran

*Counsel for Appellees Freedom of the Press Foundation and Citizens for Responsibility and Ethics in Washington*

<u>*/s/ Daniel F. Jacobson*</u>
Daniel F. Jacobson

*Counsel for Appellees American Historical Association and American Oversight*

## TABLE OF CONTENTS


Certificate as to Parties, Rulings, and Related Cases ........ i

Table of Authorities ........ iv

Glossary ........ ix

Introduction ........ 1

Statement of the Issue ........ 4

Statement of the Case ........ 4

I. Historical and Statutory Background ........ 4

A. The Presidential Recordings and Materials Preservation Act ........ 4

B. The National Study Commission on Records and Documents of Federal Officials ........ 7

C. The Presidential Records Act ........ 9

D. The OLC Opinion and White House Guidance ........ 14

II. Procedural Background ........ 15

Summary of Argument ........ 22

Standard of Review ........ 26

Argument ........ 27

I. Defendants' Constitutional Challenge Falls Far Short of the Demanding Standard for Facial Invalidation of the Act. ........ 27

II. The Constitution Empowers Congress to Regulate the Preservation of Presidential Papers. ........ 30

A. The Property Clause ........ 30

B. The Necessary and Proper Clause ........ 36

III. The Records Act Does Not Violate the Separation of Powers. ........ 43

A. Congress crafted the Records Act to serve important legislative aims while carefully limiting intrusion on the Presidency ........ 47

B. *GSA* confirms that the Records Act is constitutional. ....................... 59

C. Defendants' remaining arguments lack merit. .................................. 61

Conclusion ........................................................................................ 64

Certificate of Compliance ................................................................... 66

Certificate of Service .......................................................................... 67

# TABLE OF AUTHORITIES

**Cases**

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ........ 63

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) ........ 17, 39

*Armstrong v. EOP*,
1 F.3d 1274 (D.C. Cir. 1993) ........ 17, 18

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015) ........ 17

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) ........ 31

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) ........ 29, 63

*Bucklew v. Precythe*,
587 U.S. 119 (2019) ........ 59

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) ........ 61, 62

*Clinton v. Jones*,
520 U.S. 681 (1997) ........ 44

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*,
45 F.4th 324 (D.C. Cir. 2022) ........ 27, 28

*CREW v. Off. of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ........ 10

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 17

*Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*,
642 F.2d 527 (D.C. Cir. 1980) ........ 30

*Ex parte Curtis*,
106 U.S. 371 (1882) ........ 19, 36, 37

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......... 2

*Folsom v. Marsh*,
9 F. Cas. 342 (C.C.D. Mass. 1841) .......... 32

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .......... 29

*Gonzales v. Raich*,
545 U.S. 1 (2005) .......... 47

*Hawaii Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984) .......... 41

*Heinemann v. United States*,
796 F.2d 451 (Fed. Cir. 1986) .......... 31

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .......... 26

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .......... 55

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) .......... 28

*Judicial Watch, Inc. v. DOJ*,
365 F.3d 1108 (D.C. Cir. 2004) .......... 55

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013) .......... 53

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) .......... 31

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 45

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .......... 42

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) .......... 4, 5, 6, 7, 19, 20, 24, 25, 37, 38, 40, 41, 42, 43, 44, 45, 50, 51, 54, 57, 58, 59, 60

*Nixon v. GSA*,
408 F. Supp. 321 (D.D.C. 1976) .......... 5, 38

*Nixon v. United States*,
978 F.2d 1269 (D.C. Cir. 1992) .......... 23, 33, 34, 41

*O'Bryan v. Bureau of Prisons*,
349 F.3d 399 (7th Cir. 2003) .......... 37

*Perez v. United States*,
402 U.S. 146 (1971) .......... 48

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020) .......... 27, 63

*Solomons v. United States*,
137 U.S. 342 (1890) .......... 19

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 2

*Trump v. Mazars*,
591 U.S. 848 (2020) .......... 20, 44, 45, 48, 61

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... 36, 64

*Trump v. Thompson*,
142 S. Ct. 680 (2022) .......... 40, 56

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) .......... 26, 55, 56, 62, 63

*Trump v. United States*,
603 U.S. 593 (2024) .......... 43, 53

*Tyler v. Hennepin County*,
598 U.S. 631 (2023) .......... 34, 35

*United States v. Gettysburg Elec. R. Co.*,
160 U.S. 668 (1896) .......... 41

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 48

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 27

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 27, 28

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .......... 37

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 17, 46, 47

**United States Constitution**

Article I
Section 1 .......... 45
Section 8, Clause 18 .......... 3, 18, 19, 22, 23, 26, 36, 37, 40, 41, 42, 64

Article II .......... 46

Article III .......... 16

Article IV, Section 3, Clause 2 .......... 3, 18, 22, 24, 26, 30, 33, 64

**Statutes**

26 U.S.C. § 6103(f)(1) .......... 28

44 U.S.C.
§ 2102 .......... 29
§ 2103(a) .......... 29
§ 2201(2) .......... 10, 11, 32, 34
§ 2201(3) .......... 33
§ 2202 .......... 10
§ 2203(c) .......... 51
§ 2203(f) .......... 11, 29
§ 2203(g)(1) .......... 11, 29
§ 2204(a) .......... 13, 51, 54
§ 2204(b)(2) .......... 12, 51, 54
§ 2204(c)(2) .......... 13
§ 2204(e) .......... 14, 52
§ 2205 .......... 12
§ 2205(2) .......... 12
§ 2205(2)(A) .......... 39
§ 2205(2)(B) .......... 38
§ 2205(2)(C) .......... 26, 29, 40, 62, 63, 64
§ 2205(3) .......... 11
§ 2206 .......... 13
§ 2208 .......... 52, 56

44 U.S.C. (continued)
§ 2208(a) ....................13
§ 2208(a)(3) ....................13
§ 2208(b) ....................13
§ 2208(c) ....................14
§ 2208(d) ....................13
§ 2209 ....................11
§§ 3315-3324 (1976) ....................48

Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003 ....................11

Presidential Recordings and Materials Preservation Act, Pub. L. No. 93-526, 88 Stat. 1695 (1974) ....................4, 7, 60

Presidential Records Act, Pub. L. No. 95-591, 92 Stat. 2523 (1978) ....................1

**Legislative Materials**

Final Report of the National Study Commission on Records and Documents of Federal Officials (1977) ....................8, 9, 49

H.R. Rep. No. 95-1487, pt. 1 (1978) ....................9, 10, 50, 54

*Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations*, 95th Cong. (1978) ....................57

*The Presidential Records Act of 1978—S. 3494: Hearing Before the S. Comm. on Governmental Affs.*, 95th Cong. (1978) ....................9, 49, 50, 54

**Executive Branch Materials**

*Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026) ....................14, 53, 58

Ltr. from David Warrington to Jim Byron, Senior Advisor to the Archivist, Dec. 15, 2025 ....................40

**Other Authorities**

Carl McGowan, *Presidents and Their Papers*, 68 Minn. L. Rev. 409 (1984) ....................48

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ....................31

## GLOSSARY

| | |
|---|---|
| AHA | American Historical Association |
| EOP | Executive Office of the President |
| FOIA | Freedom of Information Act |
| FPF | Freedom of the Press Foundation |
| GSA | Administrator of General Services |
| NARA | National Archives and Records Administration |
| NSC | National Security Council |
| OLC | Office of Legal Counsel |

## INTRODUCTION

The preservation of Presidential records is indispensable to effective and accountable government. It ensures continuity across administrations and enables the people to understand how power was exercised and to learn from that history. The Presidential Records Act ("Records Act"), Pub. L. No. 95-591, 92 Stat. 2523 (1978), secures these vital benefits while respecting presidential autonomy and confidentiality at every turn.

Under the Act, Presidential records remain at all times under Executive Branch control: The President exclusively controls the records while in office, and the National Archives assumes custody afterward. Most records are not made public until twelve years after an administration ends, and even then, the former President may assert privilege to prevent disclosure. A former President may also assert privilege to prevent Congress from accessing records. For nearly 50 years, the Act has facilitated the Executive Branch's work and preserved the Nation's history without any suggestion that the law impedes the functioning of the presidency.

Defendants would dismantle that system and relegate continuity of government to the whim of each President in power. In their view, the President

may destroy his Administration's records—including national security records—as he sees fit, or take the records with him for private use after leaving office, and Congress can do nothing about it.

To this end, at the request of the White House, the Office of Legal Counsel (OLC) declared the Act unconstitutional in its entirety. When Plaintiffs sued, Defendants refused to agree not to destroy records during the pendency of litigation. The district court thereafter entered a narrow preliminary injunction against White House officials (but not the President or Vice President) to comply with the Records Act while the case proceeds.

On appeal, Defendants abandon most of their arguments below. They do not challenge the district court's rulings that Plaintiffs likely have standing and can assert equitable causes of action, or that Defendants are likely disregarding the Act's mandates; nor do they offer any meaningful argument that the other injunction factors favor relief.[1] Instead, Defendants swing for the

[1] With the exception of standing, Defendants' failure to raise these issues on appeal means they are forfeited. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (cause of action is not jurisdictional). Regarding the non-merits injunction factors, Defendants address them solely in an unreasoned footnote, Defs.' Br. 47 n.5, and "an inchoate argument made only in a footnote is forfeited." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 n.2 (D.C. Cir. 2022). And as evident from Defendants' decision not to challenge Plaintiffs' standing on appeal, the district court's standing determination is plainly correct. *See* JA257-68.

fences, arguing only that the entire Act is facially unconstitutional. That audacious claim requires them to establish that the Act has no constitutional application in any circumstances, or to identify an unconstitutional provision that cannot be severed. They do neither, and that alone requires affirmance.

Defendants' appeal also fails on the merits. The Property Clause and the Necessary and Proper Clause each authorize Congress to prospectively assert public ownership over future Presidential records and to require preservation and calibrated access to promote continuity, integrity, and accountability.

On appeal, Defendants only briefly dispute Congress's enumerated power to enact the Records Act, focusing instead on their claim that the Act violates the separation of powers. But as the district court explained, every relevant consideration points to the Act's constitutionality: It serves important legislative purposes, it is tailored to serve those purposes while protecting presidential confidentiality and Executive Branch control over records, and it does not prevent the Executive Branch from accomplishing its constitutional functions. Indeed, despite the Act's 50-year history, Defendants fail to identify even a single real-world example substantiating their claim that the Act interferes with the presidency's functioning. Defendants instead rest on abstract concerns about chill and administrative burdens, all of which were rejected by

the Supreme Court when it upheld the Act's predecessor statute. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 452 (1977) ("*GSA*").

This Court should affirm the district court's holding that the Records Act likely is not facially unconstitutional.

## STATEMENT OF THE ISSUE

Whether the district court correctly held that Defendants' facial challenge to the constitutionality of the Presidential Records Act likely lacks merit.

## STATEMENT OF THE CASE

### I. Historical and Statutory Background

#### A. The Presidential Recordings and Materials Preservation Act

Following President Nixon's resignation, disputes arose regarding custody over and access to his official records. In response, Congress passed and President Ford signed into law the Presidential Recordings and Materials Preservation Act ("Preservation Act"), Pub. L. No. 93-526, 88 Stat. 1695 (1974).

The Preservation Act granted the United States permanent ownership and custody of President Nixon's White House records. It directed the Administrator of General Services to take custody of those records and promulgate

regulations to provide for (i) their orderly processing and screening by Executive Branch archivists; and (ii) public access to them, while respecting relevant Executive Branch privileges and interests. *See GSA*, 433 U.S. at 429.

Nixon immediately launched a facial challenge to the Preservation Act, alleging, among other things, that it violated the separation of powers and executive privilege. In a lengthy discussion of the legislative history of the Preservation Act that the Supreme Court subsequently endorsed, *GSA*, 433 U.S. at 452, the district court concluded that the Act was supported by at least two strong public interests, *Nixon v. GSA*, 408 F. Supp. 321, 346 (D.D.C. 1976). "First, and most broadly," it "serve[d] the national interest by preserving materials upon which historians must draw in order accurately to recount and to judge the political history of [the] time." *Id.* at 349. Second, "preservation of these materials [was] needed to ensure their availability for successive administrations engaged in policymaking." *Id.* at 350.

At the Supreme Court, Nixon premised his separation-of-powers and executive-privilege arguments on general notions of executive power in relation to a President's control of his records, rather than the particular facts of his presidency or the Preservation Act. *See* Brief for Appellant at 52-121, *GSA*, 433 U.S. 425 (No. 75-1605).

The Supreme Court affirmed the constitutionality of the Preservation Act based on foundational constitutional principles and not the particular exigencies of Watergate. *See GSA*, 433 U.S. at 441-45. The Court rejected the argument that "the Act's regulation of the disposition of Presidential materials … constitutes, without more, a violation of the separation of powers." *Id.* at 441. It was "highly relevant" to the separation-of-powers analysis that "the Act provides for custody of the materials in officials of the Executive Branch and that employees of that branch have access to the materials only 'for lawful Government use, subject to the (Administrator's) regulations.'" *Id.* at 443-44. And "although some of the materials may eventually be made available for public access, the Act expressly recognize[d] the need … to protect any party's opportunity to assert any legally or constitutionally based right or privilege." *Id.* at 444 (quotations omitted). The Court thus held that the Act was not "unduly disruptive of the Executive Branch." *Id.* at 444-45.

The Court also rejected Nixon's argument that the Preservation Act was unconstitutional because "the potential disclosure of communications given to [him] in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 449-

50. The Court concluded that the Act's safeguards were "adequate to preserve executive confidentiality." *Id.* at 450.

The Court further held that "adequate justifications [were] shown for this limited intrusion into executive confidentiality." *Id.* at 452. The record "clearly reveal[ed]" that "among other purposes, Congress acted to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." *Id.* at 452. The Court emphasized that "[a]n incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.*

### B. The National Study Commission on Records and Documents of Federal Officials

In the same legislation enacting the Preservation Act, Congress enacted the Public Documents Act, which established a National Study Commission on Records and Documents of Federal Officials. Pub. L. No. 93-526, tit. II, §§ 201-202, 88 Stat. at 1698-99. Congress charged the Commission with evaluating potential legislation on the proper "control, disposition, and preservation of records" created by Federal officials, including "whether the historical practice regarding the records and documents produced by or on behalf of Presi-

dents of the United States should be rejected or accepted." *Id.* § 202. The Commission was chaired by a former Attorney General and included members of Congress, a federal judge, and representatives of the White House, the Department of Justice, the Library of Congress, and the General Services Administration, among others. 88 Stat. at 1700.

Following public hearings across the country, the Commission issued a lengthy report laying out its recommendations. *See* Final Report of the National Study Commission on Records and Documents of Federal Officials (1977) ("Final Report"). As described in greater detail below, *see infra* pp. 48-50, the Commission concluded that "the systematic preservation of governmental records and documents is essential." Final Report 3.

The Commission proposed legislation to regulate preservation of and access to presidential records, balancing the President's ability to "receive candid and uninhibited advice" with ensuring "that activities, deliberations, decisions, and policies that reflect the performance of his constitutional and statutory duties are adequately recorded and maintained." *Id.* While the Commission recognized the historical practice of permitting individual Presidents to maintain ownership of their papers, it found that such practice was not based

on any determination that it was appropriate, but rather "by reason of the failure of the government to provide an alternative." *Id.*

### C. The Presidential Records Act

The Commission's work formed the foundation for the Records Act in 1978. *See The Presidential Records Act of 1978—S. 3494: Hearing Before the S. Comm. on Governmental Affs.*, 95th Cong. 2 (1978) ("*S. 3494 Hearing*"); H.R. Rep. No. 95-1487, pt. 1, at *8 & n.12 (1978) (invoking Commission's report).

Congress also relied heavily on the Court's reasoning in *GSA* in drafting the Records Act. The House Report explained that "although the [Preservation] Act concerned itself only with materials of the Nixon Administration, the Court's decision upholding the Act nonetheless established principles that would govern legislation dealing more broadly with control of and access to Presidential papers." *Id.* at *6. Congress thus structured the Records Act to align with the constitutional principles the Court had laid out. *See id.* at *6-7.

The Executive Branch agreed that *GSA* settled Congress's authority to regulate presidential papers in the manner of the Records Act. OLC testified during hearings on the Records Act that the power of Congress to regulate the President's official papers "is not subject to serious challenge." JA147.

Congress thus enacted the Records Act to permanently "establish the public ownership of records created by future presidents and their staffs" and "procedures governing the preservation and public availability of these records at the end of a Presidential administration." H.R. Rep. No. 95-1487, pt. 1 at *2.

Specifically, the Act provides: "The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of [the Act]." 44 U.S.C. § 2202. Such public ownership extends to the records of the President, Vice President, and "the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President." *Id.* § 2201(2). The latter category comprises hundreds of employees of the Executive Office of the President, including career civil servants engaged in "operational and administrative" tasks. *CREW v. Off. of Admin.*, 566 F.3d 219, 224 (D.C. Cir. 2009).

The Act defines "Presidential records" to reach only materials "created or received … in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The Act distinguishes

presidential records from "personal records," which include "diaries, journals, or other personal notes" of the President and records relating to electoral and unofficial activities. *Id.* In 2014, Congress unanimously amended the Records Act to ensure preservation of electronic records. Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003, 2006-07; *see* 44 U.S.C. § 2209.

Congress included numerous safeguards designed to protect the President's interests, including his autonomy while in office and his ability to receive candid, confidential advice. During a President's term, he "remain[s] exclusively responsible for custody, control, and access to … Presidential records." 44 U.S.C. § 2203(f). The Records Act does not allow public or congressional access to the records of an incumbent President.

Upon the end of an administration, the National Archives and Records Administration (NARA) "assume[s] responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(g)(1). The Records Act gives the former President access to his administration's records at any time, *id.* § 2205(3), and provides limited, carefully calibrated access to incumbent government officials, "subject to any rights, defenses, or privileges which the United States or any agency or person may

invoke," *id.* § 2205(2). Even in the absence of an applicable privilege, presidential records in NARA's custody are available within the government only: (1) to an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available"; (2) "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding"; and (3) to Congress "if such records contain information that is needed for the conduct of its business and that is not otherwise available." *Id.* § 2205.

The Records Act permits members of the public to request presidential records in NARA's possession through the Freedom of Information Act (FOIA), *id.* § 2204(b)(2), but it delays public access for years, and usually more than a decade, after a President leaves office. The earliest any presidential records are generally accessible to the public is five years after the President leaves office. *Id.* But the President may "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" in several broad categories of records, which include those reflecting advice from presidential advisors or its solicitation; materials relating to appointments to

federal office; documents marked as classified pursuant to an Executive Order; and personnel and medical files. *Id.* § 2204(a). In practice, recent Presidents have exercised this authority to preclude public access to eligible records for the maximum 12 years. *See Presidential Records Act*, Reagan Library, https://perma.cc/66G2-69D3.

Even once presidential records become subject to FOIA, "[n]othing in [the Act] shall be construed to … limit" the right of current and former Presidents to assert "any constitutionally-based privilege" over the records. 44 U.S.C. § 2204(c)(2). Before making any presidential record public, the Archivist must notify the incumbent President and the relevant former President. *Id.* § 2208(a); *see also id.* § 2206. The Archivist cannot make the relevant record public until 60 business days after that notice, which can be extended for another 30 business days by the incumbent or former President. *Id.* § 2208(a)(3). If the current or former President notifies the Archivist of a privilege assertion, the Archivist shall not release the record until the validity of that assertion is resolved. *Id.* §§ 2208(a)(3), 2208(b).

An incumbent President's assertion of privilege over a record blocks its release absent a final court order compelling disclosure. *Id.* § 2208(d). If a former President asserts privilege, the Archivist must consult with the current

President. *Id.* § 2208(c). If the current President does not uphold the assertion, the former President is provided a cause of action to sue to block release. *Id.* § 2204(e).

### D. The OLC Opinion and White House Guidance

For 45 years, no administration—including the first Trump Administration—questioned the Act's constitutionality. JA294.

That was until April 1, 2026, when OLC issued an opinion declaring the Act facially unconstitutional in its entirety because it purportedly "exceeds Congress's enumerated and implied powers" and "aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive." *See Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007, at *1 (Apr. 1, 2026) ("OLC Op."). OLC briefly attempted to distinguish the Records Act from the Supreme Court's decision upholding the Preservation Act in *GSA*, but OLC ultimately rested on its conclusion that *GSA* was "wrong." *Id.* at *30.

The next day, White House Counsel David Warrington issued guidance to Executive Office of the President (EOP) staff on actions they could take to preserve records "in the absence of the PRA," "in light of OLC's determination" that the Act is unconstitutional. JA235. The guidance was limited to

"staff" and made preserving records voluntary rather than mandatory. JA235-37.

Moreover, the guidance specifically encouraged staff *not* to preserve text messages, in direct contravention of the Act, providing instead that "[t]ext messages should only be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." JA236.

## II. Procedural Background

Five days after OLC issued its opinion, the American Historical Association (AHA) and American Oversight (together, "AHA Plaintiffs") sued, among others, the President, the Vice President, and various officials and offices in the Executive Office of the President asserting violations of the Records Act and constitutional separation of powers. JA254 n.2. Four days after the 2026 Records Guidance became public, Freedom of the Press Foundation (FPF) and Citizens for Responsibility and Ethics in Washington (together, "FPF Plaintiffs") filed a similar suit. JA255-56. Both sets of Plaintiffs sought preliminary injunctions that would ensure the preservation of records in accordance with the Records Act until the litigation is resolved. *Id.* After holding a consolidated hearing, the district court entered injunctive relief against all

EOP Defendants except for the President and Vice President. JA245-301, JA539-40.

The court determined that Plaintiffs likely have standing because they are repeat users of presidential records under the Records Act, and they adequately allege injury from the EOP Defendants' ongoing failures to preserve presidential records. JA259. AHA submitted declarations of member-historians who have used and intend to continue using presidential records in their scholarly work. *Id.* American Oversight and the FPF Plaintiffs each submitted declarations establishing that they routinely obtain presidential records via FOIA requests and that they intend to submit requests for records from the current Trump Administration when they become available. JA259-60. These attestations established that, in the absence of preliminary injunctive relief, Plaintiffs would suffer an informational injury traceable to the EOP Defendants' failure to preserve all presidential records as required by the Records Act. JA260-65. Because this injury would be redressed by an injunction requiring them to preserve the disputed records, Plaintiffs likely satisfied Article III's standing requirements. JA267.

The court next determined that Plaintiffs likely have two nonstatutory causes of action. First, Plaintiffs likely have an equitable cause of action to

challenge executive action exceeding constitutional authority. JA269-70. As in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "this case 'involves the conceded absence of any statutory authority, not a claim that the President acted in excess of such authority.'" JA270 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)) (cleaned up). Second, Plaintiffs likely have an equitable cause of action to enjoin federal officials from violating federal law as discussed in *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327-31 (2015). JA268-69.

The district court held that the Records Act does not impliedly preclude Plaintiffs from asserting their claims. This Court has held that the Records Act impliedly precludes certain claims over "the President's management of … presidential records" that are "admittedly" subject to the Act, JA271 (citing *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*")), because the Records Act entrusts day-to-day decisions on the "creation, management, and disposal" of presidential records to the President. *Armstrong v. EOP*, 1 F.3d 1274, 1292-93 (D.C. Cir. 1993) ("*Armstrong II*"). But "[t]he logic of *Armstrong I* simply does not apply when the government is not acting under the Records Act and does not believe that the Records Act has legal force." JA272.

The district court further explained that under *Armstrong II*, "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms" of the Act. JA271-72 (quoting *Armstrong II*, 1 F.3d at 1290, 1292) (emphasis omitted). This case falls into that category. JA272.

On the merits, the district court rejected the government's argument that the Act is facially unconstitutional. The court identified two enumerated powers that authorize Congress to regulate presidential records: "Congress's authority to regulate federal property under the Property Clause and its power to structure the operations of the federal government and promote the integrity of the Executive Branch under the Necessary and Proper Clause." JA274.

After establishing that the Property Clause empowers Congress to regulate both real and personal property, the court held that the Clause "allows Congress to clarify and assert the federal government's property interests in cases where it possesses a legitimate entitlement." JA275-77. The court explained that although Congress chose not to regulate presidential records until 1974, the government's "property interest in the materials created by govern-

ment officials" is "deeply rooted" and "well-settled." JA282 (citing, *e.g.*, *Solomons v. United States*, 137 U.S. 342 (1890)). Accordingly, the Property Clause allows "Congress to prospectively clarify and define the government's property rights over presidential records." JA283 & n.17.

Turning to the Necessary and Proper Clause, the court pointed to the latter portion of the Clause, which vests Congress with authority to "make all Laws which shall be necessary and proper" to carry out "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. This provision empowers Congress to "legislate to facilitate the operations of the coordinate branches, [and] 'promote efficiency and integrity in the discharge of official duties.'" JA285 (quoting *Ex parte Curtis*, 106 U.S. 371, 373 (1882)). The court held that the Records Act falls squarely within that authority, including "by ensuring that future Presidents and Executive Branch personnel are not 'dependent on [] happenstance or the whim of a prior President when they seek access to records of past decisions that define or channel current [governmental obligations].'" JA285 (quoting *GSA*, 433 U.S. at 452).

The district court next considered whether, despite Congress's authority to enact the Records Act, the law "impermissibly encroaches on the President's executive power." JA288. Considering both *GSA* and *Trump v. Mazars*, 591 U.S. 848 (2020), the court conducted this separation-of-powers inquiry by assessing "Congress's purpose in enacting the Records Act, whether the intrusion imposed by the Act is reasonably tailored to its legislative goal, and the extent to which it prevents the President from fulfilling his constitutionally assigned duties." JA290.

The court found that "the Records Act serves several legitimate legislative purposes," including preserving "materials for legitimate historical and governmental purposes," ensuring that "Executive Branch personnel behaved with discipline and integrity," and "protect[ing] effective transitions of power and our republican form of government by ensuring incumbent Presidents may pick up where their predecessors left off." JA290-91 (quotations omitted).

The court also found that the Records Act is properly tailored to achieve those goals: It "appropriately carves out personal records," gives the President vast discretion to "dispose of records that lack 'administrative, historical, informational, or evidentiary value,'" and "is carefully crafted to minimize the likelihood of a present imposition on candor." JA292-93.

The court concluded that the Records Act also does not unduly interfere with the President's fulfillment of his duties. Any strain the Act "imposes on the President's ability to receive advice is minor," given that the records are sequestered at NARA for years after the President leaves office. That "ensures that any records of an advisor giving the President unpopular advice will not become public until long after the salience of the issue has faded." JA293. The Act further ensures that the former President may assert presidential privilege in federal court to prevent disclosure of sensitive records, even after the sequestration period. *Id.* "The availability of judicial review ensures that the President will always receive the constitutionally required amount of protection from the disclosure of sensitive information." *Id.* The court also found that "the government has not provided any evidence" that the Act creates an intolerable administrative burden; to the contrary, for nearly 50 years, no president has objected to the validity of the Act. JA293-94.

Finally, the court determined that Plaintiffs satisfied the remaining preliminary-injunction factors. JA295-98. Noting uncertainty about its authority to enjoin the President or Vice President, the court excluded them from the injunction. JA299-300. The court granted preliminary injunctive relief against

all other named EOP Defendants (together, "Defendants"), requiring them to comply with the Records Act. JA245-47, 300, 539-40.

## SUMMARY OF ARGUMENT

**I.** Defendants' sole argument on appeal is that the Records Act is facially unconstitutional, a claim that requires Defendants to establish that every provision of the Act is unconstitutional in all applications or that an unconstitutional provision cannot be severed from the remainder of the Act. Because Defendants make no attempt to meet that standard, their appeal fails.

**II.** The district court correctly held that the Property Clause and the Necessary and Proper Clause each authorize Congress to enact the Presidential Records Act.

**A.** The Property Clause gives Congress plenary power to regulate any government property—real or personal. Defendants do not contend otherwise, nor do they dispute that Congress generally has authority under the Clause to prospectively assert or clarify federal ownership over property created or received by federal officials in carrying out their duties.

Defendants' sole argument regarding the Property Clause is that it does not permit Congress to convert private property to government property, and

that all once-and-future Presidents privately own their administrations' records. But Defendants' principal authority, *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992), refutes their theory. *Nixon* began from the settled proposition that "the Constitution does not create property interests," including for Presidents. *Id.* at 1275. The Court then emphasized that there were no "statutory … rules" governing ownership of Nixon's records while he was in office. *Id.* at 1276 n.18, 1284. It was only in this "absence" of statutory authority, that the Court looked to history and custom "at the time when [the Preservation Act] was passed" to determine ownership of Nixon's records. *Id.* When Congress enacted the Records Act in 1978, it established the statutory rules that were lacking for Nixon's records, and it did so prospectively before future Presidents had vested property interests in their records. Custom as of 1974 therefore no longer dictates the ownership question; the statutory scheme enacted 48 years ago does.

**B.** Congress independently had authority to enact the Records Act under the Necessary and Proper Clause. The Supreme Court has long held that Congress's power to make necessary and proper laws for the carrying out of "all other Powers vested by this Constitution in the Government," U.S. Const.

art. I, § 8, cl. 18, authorizes Congress to regulate the operations of the other branches to promote efficiency, integrity, and public accountability.

The Records Act promotes these interests and more. Like the Preservation Act, the Records Act vitally supports continuity of government and the interests of the presidency, by ensuring that future Presidents and Executive Branch personnel are not "dependent on happenstance or the whim of a prior President when [they] seek[] access to records of past decisions that define or channel current governmental obligations." *GSA*, 433 U.S. at 452. The Act also aids the other two branches of government in performing their constitutional duties and serves our democracy by preserving a historical record for the public to study and learn from. Defendants have no meaningful response to these plain interests underlying the Records Act.

**III.** Defendants argue that the Records Act violates the separation of powers regardless of whether Congress enacted it as an exercise of its enumerated powers. The district court correctly concluded that all relevant considerations indicate that the Act complies with the separation of powers.

**A.** The district court identified several important legislative purposes served by the Act, including those described above, and Congress engaged in

substantial and detailed fact-finding substantiating these interests. The Supreme Court recognized the validity of the Preservation Act's similar aims in *GSA*.

Defendants offer no meaningful argument that the Records Act is insufficiently tailored to achieve these purposes, nor do they point to any evidence that the Act prevents the President from fulfilling his constitutionally assigned duties. Defendants simply assert, without any substantiation, that the Act "may chill the President's advisors from offering candid or unpopular advice" and that it "impos[es] improper burdens on White House operations." Defs.' Br. 17. Not only have Defendants presented no evidence that such burdens have occurred over the last 45 years, but as the district court correctly concluded, the Act provides the President numerous protections that render any conceivable burden on the presidency minor. *GSA* confirms this conclusion: President Nixon raised almost identical separation-of-powers arguments, and the Supreme Court rejected Nixon's arguments for many of the same reasons that the district court gave for rejecting Defendants' arguments below.

**B.** Much of Defendants' separation-of-powers challenge focuses on a single provision, § 2205(2)(C), that makes presidential records available to

Congress after a President leaves office, subject to a former President's assertions of privilege. This Court has previously enforced § 2205(2)(C) without questioning its constitutionality, *see Trump v. Thompson*, 20 F.4th 10, 35-37 (D.C. Cir. 2021), and even if Defendants had identified a constitutional problem with § 2205(2)(C), they do not and could not show that this provision is inseverable from the remainder of the Act.

Finally, although Defendants decry the Records Act as inconsistent with historical presidential practice, Congress's decision not to exercise its enumerated authority for a period of time does not remove that enumerated power from the Constitution. Here, the Property Clause and the Necessary and Proper Clause give Congress authority to regulate presidential records, and Congress did not forfeit that authority by not using it before 1974.

## STANDARD OF REVIEW

The sole issue raised by Defendants on appeal is whether the district court correctly held that Defendants' facial challenge to the Presidential Records Act likely lacks merit. This is a legal conclusion subject to de novo review. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022) (laying out standard of review for preliminary injunctions).

## ARGUMENT

### I. Defendants' Constitutional Challenge Falls Far Short of the Demanding Standard for Facial Invalidation of the Act.

Defendants' only argument on appeal is that the Records Act is unconstitutional *in its entirety* and *on its face*. "This is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "If the statute is constitutional in at least one scenario, the facial challenge fails." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) ("*Ways & Means*") (quotations omitted). Defendants therefore must establish either that every provision of the Act is unconstitutional in all applications or that certain provisions are unconstitutional and cannot be severed from the remainder. *See id.*; *Seila L. LLC v. CFPB*, 591 U.S. 197, 233-34 (2020) (discussing severability). They establish neither.

This Court's decision in *Ways & Means* confirms that *Salerno*'s no-set-of-circumstances standard applies here. The case concerned a request from the Chairman of the House Committee on Ways and Means seeking documents from the Treasury Department related to Trump's tax returns under

26 U.S.C. § 6103(f)(1). *Ways & Means*, 45 F.4th at 328-29. As relevant here, Trump argued that § 6103(f)(1) was facially unconstitutional. *Id.* at 329.

This Court held that Trump's facial challenge failed because he had not "establish[ed] that no set of circumstances exists under which the [law] would be valid." *Id.* at 339 (quotations omitted). Trump had advocated for a more forgiving test in the separation-of-powers context, arguing the law was unconstitutionally overbroad. *Id.* But this Court rejected that argument, holding that *Salerno* governs facial challenges to laws that "regulate[] how the government interacts with itself." *Id.* at 340. The Records Act does exactly that.

Defendants make no effort to meet the *Salerno* standard for facial invalidation. Defendants do not argue that the Act "is unconstitutional in all of its applications." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1133 (D.C. Cir. 2017). They argue only that Congress went too far in particular respects, essentially conceding that the Act is likely constitutional in other applications. Indeed, Defendants accept that the Act serves Congress's legitimate interest in "ensuring presidential access" to records; they argue only the Act's "broad scope extends beyond" that interest. Defs.' Br. 45-46. Defendants likewise concede that Congress's legislative purposes "could have justified some requirements for some categories of records"; they argue only that those purposes do not

"justify stripping the President of control of *all* his papers." *Id.* at 30-31. And Defendants do not purport to identify any constitutional problem with many of the Act's provisions. For instance, Defendants identify no separation-of-powers defect in the Act's allocation of custody: Presidential records remain *within* the Executive Branch during and after a President's term in office. *See* 44 U.S.C. §§ 2102, 2103(a), 2203(f), (g)(1).

Nor do Defendants argue that any particular provision that is purportedly unconstitutional is inseverable from the remainder of the Act. Defendants focus on 44 U.S.C. § 2205(2)(C), which permits Congress to seek access to a former President's records in certain narrow circumstances. That provision is constitutional, *see infra* pp. 61-63, but regardless, Defendants do not present any argument that this provision is inseverable under governing severability standards, including the "strong presumption of severability." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) (plurality op.); *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotations omitted)).

Because Defendants do not even attempt—much less carry their heavy burden—to show that the Act is unconstitutional in every application or that a specific invalid provision is inseverable, their appeal fails.

## II. The Constitution Empowers Congress to Regulate the Preservation of Presidential Papers.

### A. The Property Clause

As the district court correctly held, "Congress has the enumerated power to regulate presidential records under the Property Clause." JA284. OLC overlooked this enumerated power, and on appeal now, Defendants barely dispute Congress's authority to enact the Records Act pursuant to this power.

**1.** The Property Clause provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. This Clause "provides a specific and independent constitutional basis for congressional action respecting federal property." *Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 535 n.73 (D.C. Cir. 1980).

Defendants do not dispute that the Clause grants Congress power to regulate both real and personal property. For good reason: The Supreme

Court has held that "other Property" subject to congressional regulation includes "all other personal … property rightfully belonging to the United States." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 331 (1936) (quoting Joseph Story, *Commentaries on the Constitution of the United States* §§ 1325, 1326 (1833)). Nor do Defendants dispute that the Property Clause grants Congress "complete power" over federal property "analogous to the police power of the several states." *Kleppe v. New Mexico*, 426 U.S. 529, 538-40 (1976) (quotations omitted); *see also Ashwander*, 297 U.S. at 336.

Most notably, Defendants do not dispute the district court's conclusion that "[t]he Property Clause allows Congress to clarify and assert the federal government's property interests in cases where it possesses a legitimate entitlement," JA283, so long as the property in question is not vested private property. *See* Defs.' Br. 43. That certainly is the case for property produced by federal officials in the course of their official duties. *Cf. Heinemann v. United States*, 796 F.2d 451, 455-56 & n.14 (Fed. Cir. 1986) (holding that Congress could authorize the Executive Branch to claim ownership of the future inventions of federal employees without implicating the Takings Clause).

With respect to records in particular, "it is well settled that records created by government employees are government property" by default. JA282

(citing cases). Long ago, Justice Story recognized "the right of the government … , from principles of public policy, to withhold [official records] from publication, or to give them publicity," "even against the will of the writers." *Folsom v. Marsh*, 9 F. Cas. 342, 347 (C.C.D. Mass. 1841) (Story, J.). "[F]rom the nature of the public service, or the character of the documents, embracing historical, military, or diplomatic information, it may be the right, and even the duty, of the government" to assert control over official records. *Id.*

The Property Clause therefore generally empowers Congress to assert ownership over, and regulate in a plenary manner, records created by federal officials in the course of their official work. Defendants do not dispute this general proposition.

And here, the Records Act covers only the sorts of official documents traditionally understood to be subject to regulation as government property. "Presidential records" include only records created or received by officials "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). And virtually all presidential records are created or received by taxpayer-funded officials, "on government

time, using government materials." JA282. The Act carves out "personal records," broadly defined, to ensure its scope is limited to those in which the government has an inherent interest. 44 U.S.C. § 2201(3).

**2.** Defendants' sole Property Clause argument is that all Presidents invariably privately own the records they produce, because that was the historical custom prior to Nixon, and the Property Clause "does not include the power to convert private property into public property." Defs.' Br. 43. Defendants rely on *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992), to establish private ownership of presidential records, but *Nixon* fatally undermines Defendants' case.

*Nixon* held that "it is settled law that the Constitution does not create property interests." *Id.* at 1275. In other words, the Constitution does not vest Presidents with any right to ownership of their records by virtue of their constitutional office. The Court further explained that when Nixon left office in 1974, there were "no directly controlling constitutional, statutory or common law requirements with respect to the presidential papers." *Id.* at 1276. It was only because of this "absence of constitutional, statutory or common law rules" that this Court looked to "history, custom and usage to determine the ownership of the Nixon papers." *Id.* at 1276 & n.18. That history, custom, and usage,

"*at the time when [the Preservation Act] was passed*," established that "President Nixon's presidential papers were exclusively the property of the President." *Id.* at 1284 (emphasis added).

All of this changed when, "[i]n 1978, Congress prospectively abolished presidential ownership of White House materials with the Presidential Records Act." *Id.* at 1277 n.19. As the district court explained below, the Records Act "operates prospectively because it alters future Presidents' entitlements to their records before any property rights vest in them." JA283 n.17. In 1978, no future President had vested property rights in records that might later be created in connection with "the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). And because "the Constitution does not create property interests," *Nixon*, 978 F.2d at 1275, Congress in 1978 was not intruding upon any constitutionally grounded right of future Presidents to own their official records.

In arguing that Congress may not prospectively define the property rights of future occupants of the presidency, Defendants rely on *Tyler v. Hennepin County*, 598 U.S. 631 (2023), *see* Defs.' Br. 44, but they present "a stark misreading of the case," JA284. *Tyler* concerned "[t]he principle that a government may not take more from a taxpayer than she owes." 598 U.S. at

639. There, a Minnesota law authorized the county not only to take ownership of a home whose owner had unpaid property taxes, but also to sell the house and keep the full sale amount, even if it exceeded the unpaid taxes. *See id.* at 635. The Court held that the County "could not use the toehold of the tax debt to confiscate more property than was due" by "purport[ing] to extinguish" the homeowner's property interest based on the tax debt, to evade the protections of the Takings Clause. *Id.* at 639.

But again, the Records Act does not "extinguish" any vested rights in private property. In *Tyler*, the plaintiff undisputedly owned the property, and the question was whether the county could keep "the excess value of *her* house" beyond her tax debt. 598 U.S. at 645 (emphasis added). Under the Records Act, in contrast, "property rights never vest in [a future] President at all." JA283.

Finally, the fact that Congress did not enact legislation asserting public ownership of presidential records until 1974 does not "liquidate and settle" the meaning of the Property Clause. Defs.' Br. 34. As Defendants themselves note, one branch's "acquiescence" to another branch's practice does not resolve questions of constitutional authority, for one branch "might have any number of political or practical reasons not to set up a constitutional conflict with a

coordinate branch." *Id.* at 41-42. Indeed, "[n]o branch may rely on adverse possession to claim power that the Constitution vests elsewhere." *Trump v. Slaughter*, 146 S. Ct. 2283, 2303-04 (2026). The fact that Congress waited to exercise its power over presidential records does not remove the Property Clause from the Constitution or alter its plain text.

### B. The Necessary and Proper Clause

**1.** Congress separately has authority to enact the Records Act pursuant to the Necessary and Proper Clause. That Clause provides Congress authority "[t]o make all Laws which shall be necessary and proper" for carrying out both its other enumerated Article I powers and, as relevant here, "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

The Supreme Court has long held that the latter provision, on its own force, provides "express authority [to] congress … to make all laws necessary and proper to carry into effect the powers that are delegated" to the other branches, including laws "to promote efficiency and integrity in the discharge of official duties." *Ex parte Curtis*, 106 U.S. at 373. In *Curtis*, the Court upheld Congress's authority under the Necessary and Proper Clause to enact a statute prohibiting federal employees from giving gifts to other federal employees

for political purposes. *Id.* at 371-74. The Court held that the "principle" underlying this law traced back to laws Congress enacted regulating federal employee conduct "in 1789 at the first session of the first congress." *Id.* at 372; *see also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (the Necessary and Proper Clause enables Congress to legislate on the judiciary's operations).

Today, it is well established that the Necessary and Proper Clause enables Congress to enact "legislation affecting the internal operations of the national government." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). In all manner of ways, "Congress continues to pass legislation to structure the federal government, promote efficiency, and deter bad actors." JA287. That includes, as *GSA* noted, numerous laws providing for "the regulation and mandatory disclosure of documents in the possession of the Executive Branch," including FOIA, the Privacy Act, the Government in the Sunshine Act, the Federal Records Act, "and a variety of other statutes." 433 U.S. at 445. "Such regulation of material generated in the Executive Branch has never been considered invalid as an invasion of its autonomy." *Id.*

The district court correctly concluded that the Records Act "is in keeping with that tradition" and "falls squarely within Congress's authority to structure the internal operations of the national government." JA285. The

Records Act not only promotes integrity and accountability among Executive Branch officials, but also directly aids all three branches of the federal government in executing their constitutional responsibilities.

First, the Records Act aids the presidency by ensuring that future Presidents can access archived presidential records that are necessary for the conduct of their official duties and are not otherwise available. 44 U.S.C. § 2205(2)(B). "Governmental programs and policies do not expire every four or eight years; the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." *Nixon*, 408 F. Supp. at 350; *see id*. at 351 n.41 (listing examples of Presidents requesting prior administration records).

Like the Preservation Act before it, the Records Act ensures that future Presidents and Executive Branch personnel are not "dependent on happenstance or the whim of a prior President when [they] seek[] access to records of past decisions that define or channel current governmental obligations." *GSA*, 433 U.S. at 452. Defendants themselves highlight that, before the Records Act, "[m]any Presidents destroyed vast quantities of their records." Defs.' Br. 7. Congress had ample reason to "rectify th[is] hit-or-miss approach." *GSA*, 433 U.S. at 452. Congress's interest was particularly acute

given the singular significance and breadth of issues with which each President must contend, including issues of national security, diplomacy, and public health and well-being.

Consider national security records. The Act applies to the National Security Council (NSC) and its hundreds of staff. *Armstrong I*, 924 F.2d at 286 n.2. Under Defendants' view, an outgoing President could order the destruction of all NSC records, leaving the incoming administration without ready access to information on ongoing counterterrorism programs or military operations. Or, because Defendants' view is that all presidential records belong to the President personally, the outgoing President could take all NSC records from his administration with him (including classified records), to use for personal purposes. Congress has clear interests in preventing that from happening.

The Records Act also facilitates the work of the federal courts by ensuring they have access to relevant evidence in any "civil or criminal investigation or proceeding." 44 U.S.C. § 2205(2)(A). Failing to preserve relevant records would deprive courts of evidence necessary to carry out their truth-seeking function—and to protect the rights of litigants.

The Records Act facilitates Congress's work by ensuring it can access archived presidential records when there is a strong legislative need and the information "is not otherwise available." *Id.* § 2205(2)(C). For instance, the Supreme Court denied a stay of enforcement of a request issued by the January 6th Committee pursuant to § 2205(2)(C). *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022). And the current Administration itself has facilitated congressional access to a former President's records under § 2205(2)(C), given "the importance of the[] congressional investigations." Ltr. from David Warrington to Jim Byron, Senior Advisor to the Archivist, Dec. 15, 2025, *available at* https://perma.cc/JN6S-GDAB.

The Records Act also promotes the public's strong interest in transparency and maintaining a historical record of Presidential activities—which itself promotes the effectiveness and efficiency of government operations. "[T]he American people's ability to reconstruct and come to terms with their history [should not] be truncated by an analysis of Presidential privilege that focuses only on the needs of the present." *GSA*, 433 U.S. at 452-53.

**2.** Notably, as the district court held, the Necessary and Proper Clause authorizes the Records Act even if Defendants are right that President Trump has a vested property interest in the records and the Property Clause does not

authorize classifying presidential records as government property. *See* JA284 n.18. That is because the Necessary and Proper Clause itself gives Congress authority to take ownership and control over Presidential records even if the President has a property interest in the records, so long as the Takings Clause is satisfied. *See id.* The Supreme Court has recognized for well over a century that the Necessary and Proper Clause permits Congress to condemn property "whenever it is necessary or appropriate to use the land in the execution of any of the powers granted to it by the constitution." *United States v. Gettysburg Elec. R. Co.*, 160 U.S. 668, 679 (1896). This power of eminent domain is "coterminous with the scope of a sovereign's police powers," and Congress's determination of an appropriate public use is subject to only "extremely narrow" review. *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) (quotations omitted).

The Supreme Court upheld Congress's authority to enact the Preservation Act while reserving Nixon's ownership claims. *GSA*, 433 U.S. at 445 & n.8, 481. This Court later held that the Act, although constitutional, took Nixon's private property, such that he was entitled to just compensation. *Nixon*, 978 F.2d at 1287. So even if Defendants are right that Presidents have a property right in their records, the President's recourse is to seek just compensation

for a taking, not to nullify the Records Act that permissibly provides for government ownership.

**3.** Defendants have little to say about the Necessary and Proper Clause. *See* Defs.' Br. 45-47. They do not deny that Congress may permissibly aid future Presidents in carrying out their duties, asserting instead that "the Executive Branch is in a far better position than the Judicial Branch to determine whether a statute helps or hinders its own operations." *Id.* at 45. But, of course, the determination that the Records Act would aid future administrations was made by *Congress* when it passed the Act, together with the *President* when he signed it into law. And while Defendants say "[t]he district court surmised" that preservation of presidential records would aid future administrations, *id.*, the relevant passage of the district court's opinion is quoting the *Supreme Court*. *See GSA*, 433 U.S. at 452. This Administration may have "reached the opposite conclusion," Defs.' Br. 45, but it does not get the last word, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Second, Defendants argue that "the Presidential Records Act is not 'plainly adapted' to improving executive efficiency because its broad scope extends beyond ensuring presidential access by mandating disclosure to the public and Congress." Defs.' Br. 45-46 (citations omitted). But no precedent limits

Congress to enacting laws that are necessary and proper *only* for "improving executive efficiency." Congress exercised its reasonable judgment that preservation and calibrated future access to presidential records is *also* necessary and proper for the integrity of the institution of the presidency, for aiding the other two branches in discharging their duties, and for citizens' interest in having a historical record of their government's activities.

**III. The Records Act Does Not Violate the Separation of Powers.**

Defendants' primary argument on appeal is that the Records Act violates the separation of powers regardless of whether Congress enacted it as an exercise of one of its enumerated powers. *See, e.g.,* Defs.' Br. 47. Although the Constitution contains "no separation of powers clause," "that doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers." *Trump v. United States*, 603 U.S. 593, 637-38 (2024) (quotations omitted). In enforcing that separation, the Supreme Court has not identified any single test that applies to every separation-of-powers question. Rather, separation-of-powers analysis depends on the context of the interbranch dispute.

As the district court recognized, by far the most relevant separation-of-powers precedent in the context of legislation pertaining to the preservation

and disclosure of presidential records is *GSA*. *See* JA290. In that case, the Supreme Court held that to "determin[e] whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." 433 U.S. at 443. "Only where the potential for disruption is present must [a court] then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Id.*; *see also Clinton v. Jones*, 520 U.S. 681, 701-02 (1997). Defendants appear to embrace this test, *see* Defs.' Br. 22-23, under which the Executive must show as a threshold matter that legislation prevents it "from accomplishing its constitutionally assigned functions." 433 U.S. at 443.

Yet Defendants also repeatedly cite *Mazars* as controlling authority. But, as the district court correctly recognized, *Mazars* involved a challenge to a congressional subpoena rather than enacted legislation. *See* JA290. The Supreme Court emphasized in *Mazars* that "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," and that it may do so only as an "auxiliary to the legislative function." 591 U.S. at 862 (quotations omitted). "Because this power is justified solely as an adjunct to

the legislative process, it is subject to several limitations." *Id.* at 862-63 (quotations omitted). Those "limitations," including that "[t]he subpoena must serve a valid legislative purpose," *id.*, were key to the balancing test that the Court laid out, *see id.* at 869-70.

Given the stark differences between Congress's core power to enact legislation and its lesser power to subpoena records in furtherance of enacting legislation, it would be a category error to directly apply the *Mazars* test to the Records Act. When exercising its enumerated "legislative powers," U.S. Const. art. I, § 1, Congress may use "all means which are appropriate," so long as its "end [is] legitimate" and "within the scope of the constitution," *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). There is thus no general requirement that legislation be "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 591 U.S. at 870. And of course, Congress may and usually does legislate—as it did with the Records Act—for purposes other than obtaining information to facilitate further legislation.

While rejecting Defendants' contention that *Mazars* controls, the district court found that *Mazars* provides guidance to the extent that it outlines high-level "legal standards relevant for interbranch disputes and, broadly speaking, which interests and burdens are cognizable and how they should be

weighed." JA289. Based on the general principles identified in both *GSA* and *Mazars*, the district court considered three factors in assessing Defendants' separation-of-powers challenge: (1) "Congress's purpose in enacting the Records Act"; (2) "whether the intrusion imposed by the Act is reasonably tailored to its legislative goal"; and (3) "the extent to which it prevents the President from fulfilling his constitutionally assigned duties." JA290.

Regardless of whether this Court applies the two-step test from *GSA* or the district court's three-factor inquiry, the Records Act complies with the separation of powers. All relevant considerations "indicate that the Presidential Records Act is likely constitutional." JA295.

Under either framework, Defendants' claim of Article II authority to ignore the Records Act must be evaluated through the prism of Justice Jackson's tripartite framework for assessing assertions of Presidential power. *See* JA273-74. Because the President's desire to disregard the Act's requirements is "incompatible with the expressed … will of Congress," the President's "power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring). Accordingly, to pre-

vail on their claim that the Records Act violates the separation of powers, Defendants must show that the President's constitutional authority is "'so conclusive and preclusive' that it displaces congressional authority to pass contrary legislation in that arena." JA288 (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). Defendants do not come close to meeting that standard; the Constitution does not assign the President any authority over recordkeeping practices.

### A. Congress crafted the Records Act to serve important legislative aims while carefully limiting intrusion on the Presidency.

**1.** The district court identified several important legislative purposes served by the Records Act, including that it "preserve[s] the materials for legitimate historical and government purposes," "promot[es] efficiency and accountability in the Executive Branch," and "protects effective transitions of power." JA291 (quotations omitted).

Defendants' only response is to suggest an absence of exacting congressional findings justifying the Act. *See* Defs.' Br. 30. As an initial matter, the Supreme Court "ha[s] never required Congress to make particularized findings in order to legislate," absent circumstances not presented here, such as the infringement of an individual right that triggers strict scrutiny. *Gonzales*

*v. Raich*, 545 U.S. 1, 21 (2005); *see United States v. Lopez*, 514 U.S. 549, 562 (1995); *Perez v. United States*, 402 U.S. 146, 156 (1971). *Mazars* is not to the contrary. It requires findings to support a subpoena, not to support a law.

In any event, Defendants' claim that Congress failed to support the Records Act with detailed fact-finding is demonstrably false. While Congress acted quickly to enact the Preservation Act before President Nixon's records became irretrievable, it recognized the need for broader systemic reform grounded in a more thorough and deliberate process involving all three branches of government. Accordingly, Congress created a National Study Commission on Records and Documents of Federal Officials "to recommend a clear and definite policy with respect to the treatment of the papers of federal officials" moving forward. Carl McGowan, *Presidents and Their Papers*, 68 Minn. L. Rev. 409, 431 (1984); *see* 44 U.S.C. §§ 3315-3324 (1976).

After concluding its study, the Commission determined that "the systematic preservation of governmental records and documents is essential for three reasons": (1) "To aid the continuing operations of the government"; (2) "To enable the people to judge the conduct of the government on the basis of maximum information, made publicly available as soon as feasible, consistent with such competing public interests as the preservation of national

security and the safeguarding of Constitutional rights and privileges"; and (3) "To assure the people the fullest possible reconstruction of their national history." Final Report 3. Invoking both the Property Clause and the Necessary and Proper Clause, the Commission observed that "[a]n individual who seeks or accepts public office should recognize that materials created in the discharge of the business of the public belong to the public." *Id.*

The Commission identified "[t]he records and papers of the Presidency" as a particularly "invaluable historical resource," but acknowledged that Presidential decision-making is "sensitive and delicate." *Id.* at 29. The Commission accordingly proposed legislation that would protect the President's ability to "receive candid and uninhibited advice" while also ensuring "that activities, deliberations, decisions, and policies that reflect the performance of his constitutional and statutory duties are adequately recorded and maintained," in "keeping with the public nature of Presidential materials, and the eventual right of the public to access to them." *Id.*

The Commission's findings were *the* basis for the Records Act. *See S. 3494 Hearing* 1-2. Reiterating the Commission's findings, Senator Nelson—who was not only a co-drafter of the bill but also a Commission member—explained that the legislation "will ensure the creation of a fully documented, rich

historical record of all future Presidencies" and "will also contribute to the achievement of greater governmental accountability to the people than presently exist[s]." *Id.* at 4. The House Report similarly invoked the Commission's study. *See* H.R. Rep. No. 95-1487, pt. 1, at *8 & n.12. Defendants do not challenge the significance of any of these legislative purposes.

The Supreme Court recognized the validity of the Preservation Act's similar aims in *GSA*. Defendants are wrong to suggest that the Supreme Court upheld the Preservation Act only because Congress's "legislative need" was "tied to the specific threat that records of the Watergate scandal would be destroyed." Defs.' Br. 19. The "justifications" that the Court found sufficient were not specific to Watergate and apply equally to the Records Act: "establish[ing] regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes"; ensuring that "[a]n incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions"; and protecting "the American people's ability to reconstruct and come to terms with their history." 433 U.S. at 452-53. The Court concluded that "Congress can legitimately act to rectify the hit-or-miss approach that has characterized past attempts to protect these substantial interests by entrusting the

materials to expert handling by trusted and disinterested professionals." *Id.* The Court's sole discussion of Watergate in the relevant sections of the decision was a single paragraph describing "[o]ther substantial public interests," after the Court had already found "adequate justifications." *Id.*

**2.** Congress tailored the Records Act to achieve these purposes, while including several layers of safeguards to protect the President's prerogatives. The Act is narrowly drafted to cover only "material that is essential to carrying out the statutory scheme." JA292. The Act expressly excludes "personal records," such as "diaries, journals, or other personal notes," along with records relating to electoral and non-official activities. *Id.*

The Act authorizes the President to dispose of records that lack "administrative, historical, informational, or evidentiary value" upon consultation with the Archivist, an Executive Branch officer. 44 U.S.C. § 2203(c). The Act prevents disclosure of any presidential records to the public until at least five years after the President leaves office, *id.* § 2204(b)(2), and up to 12 years for several significant categories of records, *id.* § 2204(a). And even once that sequestration period ends and records become available for possible disclosure, the Act establishes a notice and waiting-period process that ensures former Presidents have an opportunity to assert executive privilege over any records

from their administration before they are released. If the incumbent President upholds the privilege claim, the records in question are withheld, and if he does not, the former President may seek judicial review. *Id.* §§ 2208, 2204(e). As the district court concluded, "the careful construction of the statute demonstrates that the law only reaches materials that are genuinely necessary to achieve valid legislative purposes." JA292.

Defendants admit that "Congress perhaps could have justified some requirements for some categories of records," but assert that Congress failed to sufficiently tailor the Records Act to particular needs. Defs.' Br. 30. As explained above, *supra* Section I, that concession alone is fatal for Defendants' facial challenge.

In any event, Defendants offer next to nothing to substantiate their claim of insufficient tailoring. Remarkably, they identify only one type of record that they believe should be excluded from the Act's preservation requirements: "lists of persons whom the President considered but declined to pardon."[2] Defs.' Br. 25. And even that one example fails to show inadequate tai-

[2] Defendants vaguely point to "records as to which a claim of privilege might be difficult to maintain" even though they "implicate sensitive matters," but then acknowledge that this Court has held that the one example they offer—

loring. To be sure, Congress is "disabl[ed]" from directly regulating the President's use of his "conclusive and preclusive" powers. *Trump v. United States*, 603 U.S. at 608 (quotations omitted). But the Records Act does not in any way regulate how the President exercises those powers. It merely specifies that he cannot destroy the record of his exercise of the power.

**3.** The Records Act does not prevent the President from fulfilling his constitutionally assigned duties. Dispositively, Defendants cannot point to any proof that the Act imposes substantial burdens. As even OLC conceded, the Records Act does "not place a severe and direct burden on the President personally." OLC Op., 2026 WL 963007, at *17. And as to everyone else covered by the Act, the only concrete example of a burden OLC cited is that "the White House Counsel's Office spends a considerable amount of time ensuring the President's compliance with the PRA," *id.*, which is not a constitutionally cognizable burden.

Defendants focus principally on two unsubstantiated burdens: that the Act "may chill the President's advisors from offering candid or unpopular advice" and that the Act "impos[es] improper burdens on White House

---

White House visitor logs—is subject to the Records Act without raising any separation-of-powers concerns. Defs.' Br. 27 n.2 (citing *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 227-28 (D.C. Cir. 2013)).

operations." Defs.' Br. 17; *see id.* at 26-29. Not only have Defendants presented no evidence that such burdens have occurred, but as the district court correctly concluded, the Act provides the President numerous protections that render any conceivable burden on the presidency "minor." JA292.

Congress considered the possibility of chill on candid advice and carefully calibrated the Records Act to minimize that risk. *See, e.g.*, *S. 3494 Hearing* 1-2, 13, 19-20; H.R. Rep. No. 95-1487, pt. 1, at *8, *13. To "balance[e] ready availability of the records against the prospect that premature disclosure might have a 'chilling effect' on Presidents and the frankness of advice they could expect from their staffs," H.R. Rep. No. 95-1487, pt. 1, at *8, the Act delays public access to presidential papers for at least five years after a President leaves office, with the President able to extend that period to twelve years for most significant records, 44 U.S.C. § 2204(a), (b)(2). As the Supreme Court recognized in *GSA*, "[t]he expectation of the confidentiality of executive communications … has always been limited and subject to erosion over time after an administration leaves office." 433 U.S. at 451. In the meantime, custody of the records rests with the Archivist, which "constitutes a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns." *Id.*

Even once the sequestration period ends, the President can assert privilege to prevent disclosure of sensitive communications. "The canonical form of executive privilege … is the presidential communications privilege," which "allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" *Thompson*, 20 F.4th at 25 (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997)). The communications privilege "applies not only to materials viewed by the President directly, but also to records 'solicited and received by the President or [the President's] immediate White House advisers who have broad and significant responsibility' for advising the President." *Id.* at 25-26 (quoting *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114 (D.C. Cir. 2004)). Presidential privilege shields unpopular advice from "political opponents and zealous journalists looking to embarrass both the former President and the advisors." *See* Defs.' Br. 28-29.

The Records Act thus incorporates a communications privilege that prevents the very chilling effect that Defendants speculate the Records Act might cause. In light of these protections, "it is difficult to imagine that advisors would shrink from offering the President their honest opinions on matters of

national importance." JA293. Defendants present no evidence to suggest that President Trump's advisers are being less than candid with him.

Defendants posit that "the mechanisms for asserting privilege contained in the Presidential Records Act are imperfect." Defs.' Br. 29. They argue that the Act "poses a risk of inadvertent disclosure of sensitive or privileged information." *Id.* But they do not cite a single example of this ever happening in the Records Act's 45-year history. And their claim ignores the Act's guarantee that both the former President's team and the incumbent President's team can review all records before disclosure. 44 U.S.C. § 2208.

Defendants also claim, based on this Court's decision in *Thompson*, that "where an incumbent President declines to assert privilege, a court may well give less weight to a former President's claim." 20 F.4th at 29. But when denying a stay in *Thompson*, the Supreme Court emphasized that this Court had "analyzed … President Trump's privilege claims … without regard to his status as a former President," such that "his status as a former President necessarily made no difference to the court's decision." 142 S. Ct. at 680. The *Thompson* litigation demonstrates the system working as it should, with President Trump utilizing the Records Act's judicial review provisions and receiving full consideration of his privilege claims, up to the Supreme Court.

As for the administrative burden, "nothing contained in the Act renders it unduly disruptive of the Executive Branch and, therefore, unconstitutional on its face." *GSA*, 433 U.S. at 445. "[O]f course, there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." *Id.* The Executive Branch complies with FOIA, the Federal Records Act, and the Privacy Act without issue, and "[s]uch regulation of material generated in the Executive Branch has never been considered invalid as an invasion of its autonomy." *Id.*

Against this backdrop, Defendants offered zero evidence in the district court that the Records Act imposes such substantial burdens that "it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *GSA*, 433 U.S. at 443. And no presidential administration, up to and including Defendants in opposing the injunction below, has ever claimed as much. When the Records Act was being considered, "OLC testified before Congress that the law posed 'no substantial separation of powers problems.'" JA294 (quoting *Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations*, 95th Cong. 87, 89 (1978)). And although OLC has now adopted a different view, it contends only that "the [Records Act] *might* burden White House personnel

to a degree that prevents them from effectively advising and assisting the President." OLC Op., 2026 WL 963007, at *32 (emphasis added; quotation omitted). It is quite telling that, despite the Executive Branch's nearly 50 years of experience complying with the Records Act, Defendants can offer no more than this "bald assertion" that the Act might—or might not—impose intolerable burdens. JA294.

Contrary to Defendants' suggestion, the district court did not find that Executive Branch "acquiescence" alone means that a law can never violate the separation of powers. Defs.' Br. 41. But in the circumstances of this case, the fact that every President since the Records Act was signed into law, including President Trump in his first term, has complied with the Act is highly probative because of the specific nature of Defendants' claim—that the Act prevents the President from carrying out his constitutional functions. If that were true, we would know by now.

Defendants' failure to establish that the Records Act "prevents the Executive Branch from accomplishing its constitutionally assigned functions" alone dooms Defendants' challenge under *GSA*'s burden-shifting framework. 433 U.S. at 443.

### B. *GSA* confirms that the Records Act is constitutional.

If any doubt remained that the Records Act does not violate the separation of powers, *GSA* removes it. Although *GSA* addressed the Preservation Act rather than the Records Act, its reasoning is binding on this Court and goes a long way toward resolving this appeal. *See Bucklew v. Precythe*, 587 U.S. 119, 136 (2019) ("[J]ust as binding as [a] holding is the reasoning underlying it."). Nixon raised almost identical separation-of-powers arguments as Defendants do here, and the Supreme Court rejected Nixon's arguments for many of the same reasons that the district court gave for rejecting Defendants' arguments below.

Defendants say that the Preservation Act was upheld only because of the exigencies of securing President Nixon's papers in the wake of Watergate. Defs.' Br. 36-38. But the Supreme Court's conclusion that the Preservation Act was constitutional did not depend on Watergate-specific concerns. Across the relevant sections of *GSA*, *see* 433 U.S. at 441-55, the Court mentioned Watergate only once, and did so only in noting "other … substantial interests" supporting the Act, after having already found "adequate justifications" for the law not specific to Nixon. *Id.* at 452-53. Instead, the Court upheld the con-

stitutionality of the Preservation Act based on safeguards that are quite similar to those embedded in the Records Act, including that an Executive Branch official would oversee management of the records and that the President could claim privilege before records were released. *Id.* at 443-44.

Defendants also say that the Records Act is a "much more dramatic deviation from historical tradition" than the Preservation Act was because the Records Act "asserts title to and control over basically every official paper that concerns the President." Defs.' Br. 1; *see also id.* at 18-19. But the Preservation Act was not limited to "a narrow category of records." Section 101(b) of the Act provided that GSA would take "complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials … of Richard M. Nixon." *GSA*, 433 U.S. at 434.

In short, the Court considered President Nixon's separation-of-powers argument based on general constitutional principles and determined that his argument was "inconsistent with the origins of that doctrine, recent decisions of the Court, and the contemporary realities of our political system." 433 U.S. at 441. The same is true here.

### C. Defendants' remaining arguments lack merit.

**1.** Defendants point to *Mazars* and *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004), but neither supports their position. As explained above, *see supra* pp. 44-46, *Mazars* is relevant only at a high level of generality, insofar as it outlines some of the relevant separation-of-powers principles. But the case itself turned on specific constraints applicable to Congress's subpoena power—constraints that do not apply to legislation like the Records Act.

*Cheney* involved a district court's order granting intrusive discovery against the Vice President in a civil lawsuit regarding an advisory task force. The discovery requests "ask[ed] for everything under the sky" from the Vice President, requiring immediate disclosure that could "interfere with the officials in the discharge of their duties and impinge upon the President's constitutional prerogatives." 542 U.S. at 372-73, 387. The Supreme Court granted relief from these discovery orders based on "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id.* at 382. In those circumstances, the intrusion on the Executive Branch far outweighed the value of the overbroad civil discovery requests.

*Cheney* has no bearing on the Records Act, which reflects the will of Congress rather than private litigants. And the Records Act serves more important purposes than discovery requests in a one-off lawsuit, and provides substantially greater protections to presidential confidentiality and privilege.

**2.** Much of Defendants' separation-of-powers argument focuses on a single provision of the Act that makes presidential records available to Congress before they become available to the public, "if such records contain information that is needed for the conduct of [Congress's] business and that is not otherwise available," but "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke." 44 U.S.C. § 2205(2)(C). Defendants contend that this specific provision "aggrandizes Congress at the expense of the Executive." Defs.' Br. 33.

This Court has previously enforced § 2205(2)(C) without questioning its constitutionality. *See Thompson*, 20 F.4th at 35-37. And for good reason: It does little more than give Congress superior access *over the public* to presidential records, and even then only after the President has left office, and only as to records "needed for the conduct of [Congress's] business and that [are] not otherwise available." 44 U.S.C. § 2205(2)(C). The provision does not restrict in any way a former President's ability to assert constitutionally based

privileges over any requested documents. If the dispute ultimately goes to litigation, the court will apply "carefully tailored balancing tests that weigh … constitutional interests." *Thompson*, 20 F.4th at 25.

But even if Defendants had identified a constitutional problem with § 2205(2)(C), that would not entitle them to the facial relief they seek. *See supra* Section I. The mismatch between Defendants' arguments and their assertion of facial unconstitutionality is particularly acute here, given that Plaintiffs are private parties who seek to access presidential records through the Act's ordinary processes, following the sequestration period. The exception allowing earlier access to Congress is unimplicated here; the time for Defendants to challenge § 2205(2)(C) is when there is an actual congressional request pursuant to it.

And even if Defendants could properly raise a challenge to § 2205(2)(C) in the context of this case, Defendants would have to show that § 2205(2)(C) is not severable from the rest of the statute. *See Seila*, 591 U.S. at 233-34. Defendants' opening brief fails to make that argument, so it is forfeited. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). In any event, Defendants could not possibly overcome the "strong presumption of severability" with respect to § 2205(2)(C). *Barr*, 591 U.S. at 625. The Records Act's requirements

relating to preservation, transfer to NARA, access by a future President, and public access in no way depend on the operation of § 2205(2)(C).

**3.** Finally, Defendants decry the Records Act as "a novel aberration from th[e] well-settled tradition" of "Presidents retain[ing] personal control over their records." Defs.' Br. 35. Of course, constitutional power is determined not by presidential practice but by constitutional text, and here the text of the Property Clause and the Necessary and Proper Clause give Congress authority to regulate the government's property, including presidential records. *See supra* Section II. The fact that Congress did not use that enumerated authority before 1974 does not remove it from the text of the Constitution. Again, "[n]o branch may rely on adverse possession to claim power that the Constitution vests elsewhere." *Slaughter*, 146 S. Ct. at 2303-04. It is Defendants' theory of adverse possession that violates the separation of powers, not the Records Act.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

Dated: August 19, 2026

Respectfully Submitted,

/s/ Kelsi Brown Corkran
Kelsi Brown Corkran
William Powell
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
GEORGETOWN LAW
*600 New Jersey Ave., N.W.*
*Washington, DC 20001*
*(202) 661-6728*
*kbc74@georgetown.edu*

Jonathan E. Maier
Nikhel S. Sus
Lauren C. Bingham
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
*P.O. Box 14596*
*Washington, DC 20044*

*Counsel for Appellees Freedom of the Press Foundation and Citizens for Responsibility and Ethics in Washington*

/s/ Daniel F. Jacobson
Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
John Robinson
JACOBSON LAWYERS GROUP PLLC
*5100 Wisconsin Ave., N.W., Ste. 301*
*Washington, DC 20016*
*(301) 823-1148*
*dan@jacobsonlawyersgroup.com*

Loree Stark
Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
*1030 Fifteenth Street, N.W.*
*Washington, DC 20005*

*Counsel for Appellees American Historical Association and American Oversight*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,981 words. This document was prepared in 14-point Century font, a proportionally spaced typeface, using Microsoft Word.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson