ORAL ARGUMENT SCHEDULED FOR NOVEMBER 16, 2026
No. 26-5185

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN HISTORICAL ASSOCIATION, *et al.,*

*Plaintiff-Appellees,*

v.

DONALD J. TRUMP, *et al.,*

*Defendants-Appellants.*

On Appeal from an Order of the U.S. District Court
For the District of Columbia
Case No. 1:26-CV-01169-JDB (Bates, J.)

# BRIEF OF *AMICI CURIAE* TRUDY HUSKAMP PETERSON, JOHN W. CARLIN, DAVID S. FERRIERO, DEBRA STEIDEL WALL, COLLEEN J. SHOGAN, WILLIAM J. BOSANKO, AND GARY M. STERN IN SUPPORT OF APPELLEES

John F. Hundley (No. 44915)
Christopher A. Hatfield (1024182)
BALLARD SPAHR LLP
1909 K Street, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: hundleyj@ballardspahr.com
Email: hatfieldc@ballardspahr.com

Counsel for *Amici Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

A. Parties and Amici. All parties, intervenors, and *amici* appearing in the proceedings below are listed in Appellant's Brief.

B. Rulings Under Review. An accurate reference to the rulings at issue appears in Appellant's Brief.

C. Related Cases. An accurate statement regarding related cases appears in Appellant's Brief.

## DISCLOSURE STATEMENT UNDER D.C. CIR. Rule 26.1

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, *amici* are individuals to whom Rule 26.1 does not apply.

## STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP, AND FINANCIAL CONTRIBUTIONS

All parties have consented to the filing of this brief. *See* Cir. R. 29(b).

Pursuant to Fed. R. App. P. 29(a)(4)(E), no counsel for a party has authored this brief in whole or in part, and no person other than *amici* contributed money that was intended to fund the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), counsel for *amici* certify that a separate brief is necessary to provide the perspective of *amici*, as former leaders and high-ranking officials of the National Archives and Records Administration, regarding how the Presidential Records Act operates in practice and the minimal burden it imposes on the functionality of the Executive Branch. The brief draws on *amici*'s extensive practical experience to address this significant legal point.

## TABLE OF CONTENTS

Page

INTEREST OF THE AMICI CURIAE ........................................................ 1

ARGUMENT ........................................................................................ 3

I. THE PRA IS CONSTITUTIONAL AND DOES NOT UNCONSTITUTIONALLY BURDEN THE PRESIDENT. ........................ 3

A. Prior Presidents, Congress, and the Supreme Court Recognized The Need to Preserve Presidential Records. ........................................ 3

B. The PRA Helps, And Does Not Interfere, With Executive Functions. ........................................................................ 11

1. NARA helps to reduce any administrative burden on presidents regarding preserving presidential records, and presidents retain ultimate control over those records. .............. 12

2. NARA provides vital preservation assistance to incoming presidents. ................................................................ 15

3. The PRA preserves presidential power and discretion, which NARA helps to facilitate. ............................................. 19

CONCLUSION ...................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Historical Association v. NARA*,
310 F. Supp. 2d 216 (D.D.C. 2004)....23

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991)....11, 13

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013)....14, 15

*Nixon v. Administrator of Gen. Servs.*,
433 U.S. 425 (1977)....8, 9, 15–16

*Nixon v. Administrator of Gen. Servs.*,
408 F. Supp. 321 (D.D.C. 1976)....20

*Nixon v. Sampson*,
389 F. Supp. 107 (D.D.C. 1975)....7

*Pub. Citizen v. Burke*,
843 F.2d 1473 (D.C. Cir. 1988)....12

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026)....12

*United States v. McElvenny*,
No. 2 Civ. 3027, 2003 WL 1741422 (S.D.N.Y. Apr. 1, 2003)....17

*United States v. Navarro*,
No. 23-5062, 2024 WL 1364354 (D.C. Cir. Apr. 1, 2024)....17

**Statutes**

44 U.S.C. § 2102....12

44 U.S.C. § 2103(a)....12

44 U.S.C. § 2103(c)....13

44 U.S.C. § 2112....6

44 U.S.C. § 2201(2)....13

44 U.S.C. § 2201(3) ....................14

44 U.S.C. § 2203(c) ....................13

44 U.S.C. § 2203(c)-(e)....................13

44 U.S.C. § 2203(f)(1) ....................16

44 U.S.C. § 2204(a) ....................20

44 U.S.C. § 2204(b) ....................14

44 U.S.C. § 2204(b)(1)....................20

44 U.S.C. § 2204(b)(3)....................21

44 U.S.C. § 2204(c)(1)....................14

44 U.S.C. § 2204(c)(2)....................22

44 U.S.C. § 2204(e) ....................21, 22

44 U.S.C. § 2205(2) ....................21

44 U.S.C. § 2205(2)(A)....................21

44 U.S.C. § 2208(c)(2)(C) ....................22

44 U.S.C. § (a)(1)-(a)(6) ....................20

National Archives Act of 1934, Pub. L. 73-432, 48 Stat. 1122....................4

Presidential Recordings and Materials Preservation Act, Pub. L. 93-526, 88 Stat. 1695 (1974)....................7, 8

Presidential Records Act of 1978 ....................*passim*

Records Act....................3

88 Stat. 1696 § 104(a)(5) ....................8

88 Stat. § 102(a) ....................7

88 Stat. § 104(a)(1) ....................8

88 Stat. § 104(a)(6) ....................8

**Legislative Materials**

Hearings before a Subcommittee of the Committee on Government Operations on H.R. 10998 (the Presidential Records Act of 1978) and Related Bills, 95th Cong., 2d Sess., (Feb. 23, 28, Mar. 2, 7, 1978) ....................9

H.R. 1101, 95th Cong. (1978)....................10

H.R. 10998, 95th Cong. (1978)....................10

H.R. Rep. No. 95-1487 (1978)....................9, 10, 20

**Federal Regulations**

36 C.F.R. § 1270.20 ....................15

36 C.F.R. § 1270.40(a)....................20

36 C.F.R. § 1270.40(c)....................20

**Executive Branch Materials**

Exec. Order 13489 §§ 2-3 ....................23

Exec. Order 13526, § 5.2 ....................1

**Other Authorities**

Carl Bretscher, *The President and Judicial Review under the Records Act*, Geo. Wash. L. Rev. 1477, 1481 & n.34 (1992) ....................3

Jimmy Carter, *Statement on Signing Into Law H.R. 13500, the Presidential Records Act of 1978*, November 6, 1978, https://www.presidency.ucsb.edu/documents/statement-signing-into-law-hr-13500-the-presidential-records-act-1978 ....................9

David S. Ferriero, *NARA's Role Under the Presidential Records Act and the Federal Records Act*, Prologue Magazine, Summer 2017, https://www.archives.gov/publications/prologue/2017/summer/archivist-pra-fra ....................15

THE DECLARATION OF INDEPENDENCE, para. 6 (U.S. 1776) ....................3

Final Report of the National Study Commission on Records and Documents of Federal Officials (1977) ....................9

Franklin D. Roosevelt Presidential Library and Museum, "Dedication," https://www.fdrlibrary.org/dedication ........................................5

*History of the Truman Library & Museum*, Harry S. Truman Library and Museum, https://www.trumanlibrary.gov/about/history ..............................5

David E. Hoffman, *A digital tsunami is coming. The National Archives is in trouble*, WASHINGTON POST (Sept. 20, 2024) .............................17

David McMillen, *Moving Out, Moving In: The National Archives' Important Role When the Presidency Changes Hands*, Prologue (Winter 2016), Vol. 48, No. 4, https://www.archives.gov/publications/prologue/2016/winter/presidential-transitions ..........................................................................17

"NARA 101, PART 9. Legislative Archives, Presidential Libraries, and Museum Services," National Archives and Records Administration, https://www.archives.gov/foia/directives/nara0101-part09 ..............................17

"National Archives History," National Archives and Records Administration, https://www.archives.gov/about/history....................................4

"*Presidential Libraries: Frequently Asked Questions*," National Archives and Records Administration, April 15, 2026, https://www.archives.gov/presidential-libraries/about/frequently-asked-questions ..............................................................................4

*Types of Presidential Collections*, National Archives and Records Administratio, https://www.archives.gov/presidential-records/research/types-of-presidential-collections ..............................................6

Rodney A. Ross, "*The National Archives: The Formative Years, 1934-1949*" https://www.archives.gov/files/about/history/sources/ross.pdf.................4

Nancy Kegan Smith, *Escorting a Presidency Into History: NARA's Role in a White House Transition*, Prologue (Winter 2008), Vol. 40, No. 4, https://www.archives.gov/publications/prologue/2008/winter/transitions.html ........................................................................17

Brian Chandler Thompson, *Making History: The Sitting Modern President and the National Archives*, Government Information Quarterly, Vol. 12, No. 1 (1995) ...................................................................17

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| PRA | Presidential Records Act |
| NARA | National Archives and Records Administration |
| FOIA | Freedom of Information Act |
| GSA | General Services Administration |
| PRMPA | Presidential Recordings and Materials Preservation Act |

## INTEREST OF THE *AMICI CURIAE*

*Amici* are former leaders and high-ranking officials of the National Archives and Records Administration ("NARA") who are familiar with the Presidential Records Act ("PRA") and the executive branch operations under the PRA, the constitutionality of which is at issue in this case. Trudy Huskamp Peterson served as the Deputy Archivist of the United States and then as Acting Archivist of the United States from March 25, 1993 to May 29, 1995. John W. Carlin served as the Archivist of the United States from May 30, 1995 to February 15, 2005. David S. Ferriero served as the Archivist of the United States from November 6, 2009 to April 30, 2022. Debra Steidel Wall served as the Deputy Archivist of the United States and then as Acting Archivist of the United States from May 1, 2022 to May 17, 2023. Colleen J. Shogan served as the Archivist of the United States from May 17, 2023 to February 7, 2025. William J. Bosanko served as the Deputy Archivist of the United States and then as Acting Archivist of the United States from February 7, 2025 to February 16, 2025, and also served as NARA's Chief Operating Officer and the Director of the Information Security Oversight Office (the office within NARA responsible for overseeing the classified national security information system, as per Executive Order 13526, § 5.2). Gary M. Stern served as NARA's General Counsel from September 1998 to January 2025 and also served as NARA's Chief Freedom of Information Act Officer, Senior Agency Official for Privacy, and Senior Agency

Official for Controlled Unclassified Information. *Amici* have served within the Executive Branch under presidents of both major political parties, have extensive experience with administering and implementing the PRA on a day-to-day basis, and have intimate knowledge of its text and history.

# ARGUMENT

## I. The PRA Is Constitutional and Does Not Unconstitutionally Burden the President.

The constitutionality of the PRA is best understood in its historical and legal context, as well as how it practically functions.

### A. Prior Presidents, Congress, and the Supreme Court Recognized The Need to Preserve Presidential Records.

Upon the Nation's founding, the government did not specifically address whether and how to manage and preserve its records.[1] Accordingly, from the late 18th century into the early 20th century, presidents traditionally regarded their official papers as their personal property. Doing so, however, not only led to the haphazard loss and destruction of important historical records, but it also hampered access to presidential papers at the expense of the vital needs of the other branches of government, successive administrations, and the public. *See* Carl Bretscher, *The President and Judicial Review under the Records Act*, 60 Geo. Wash. L. Rev. 1477, 1481 & n.34 (1992).

---

[1] However, fourth on the list of the grievances against the King in the Declaration of Independence was that: "He has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public Records, for the sole purpose of fatiguing them into compliance with his measures." THE DECLARATION OF INDEPENDENCE, para. 6 (U.S. 1776). The Founders believed that the lack of legislative access to public records was a serious offense, preventing the legislature from understanding what the executive is doing.

Almost a hundred years ago, Congress came to realize the value of maintaining an accurate historical record of the federal government. To remedy the situation, Congress passed and President Franklin D. Roosevelt signed into law the National Archives Act of 1934, Pub. L. 73-432, 48 Stat. 1122, which established the National Archives as an agency whose mission was to preserve, care for, and provide access to the official records of the federal government.[2] Construction of the National Archives Building on Pennsylvania Avenue had already begun in 1933, and staff began to occupy the building even before it was completed two years later.[3] Soon after the National Archives came into existence, presidential records became an integral part of the institution.

President Franklin D. Roosevelt quickly recognized the importance of his presidential papers to the American people and the extent to which they could serve as a valuable resource for his successors, Congress, historians, scholars, and the public as a record of the decisions made at the highest level of the Executive Branch of the government.[4] Accordingly, in 1939, he donated his papers to the federal

---

[2] *See* "National Archives History," National Archives and Records Administration, https://www.archives.gov/about/history.

[3] *See* Rodney A. Ross, "*The National Archives: The Formative Years, 1934-1949*" https://www.archives.gov/files/about/history/sources/ross.pdf.

[4] "*Presidential Libraries: Frequently Asked Questions*," National Archives and Records Administration, April 15, 2026, https://www.archives.gov/presidential-libraries/about/frequently-asked-questions.

government and created the first Presidential Library and Museum to give access to the public to view items related to his Presidency. In his remarks at the library's dedication ceremony in 1941, President Roosevelt emphasized that "[t]he dedication of a library is in itself an act of faith. To bring together the records of the past and to house them in buildings where they will be preserved for the use of men and women in the future, a Nation must believe in three things. It must believe in the past. It must believe in the future. It must, above all, believe in the capacity of its own people so to learn from the past that they can gain in judgment in creating their own future." Franklin D. Roosevelt Presidential Library and Museum, "Dedication," https://www.fdrlibrary.org/dedication. He noted further that, as a secure depository for his presidential materials, the library would serve as "proof – if any proof is needed – that our confidence in the future of democracy has not diminished in this Nation and will not diminish." *Id.*

Successive presidents quickly adopted President Roosevelt's vision of safeguarding our country's history, as did President Roosevelt's immediate predecessor. President Truman remarked that his presidential library "will belong to the people of the United States. My papers will be the property of the people and be accessible to them. And this is as it should be. The papers of the Presidents are among the most valuable sources of material for history. They ought to be preserved, and they ought to be used." *History of the Truman Library & Museum*, Harry S.

Truman Library and Museum, https://www.trumanlibrary.gov/about/history. Thus, for the National Archives' first 40 years, every president voluntarily donated his papers when he left office, under a deed of gift that established broad provisions for access by the public and by government officials in all three branches.[5]

Moreover, in 1955, during President Eisenhower's presidency, Congress enacted the Presidential Libraries Act ("PLA"). *See* 44 U.S.C. § 2112. The PLA established a process by which the Presidents could donate their papers and related materials, along with a presidential library building, to the federal government, which would then be federally funded and maintained by the National Archives so that all of the records would be preserved, cared for, and made available to the American public and subsequent administrations. *Id.* While the PLA did not obligate the President through force of law to donate his presidential papers, it became the practice and tradition for each President to do so.[6] *Id.*

---

[5] *Types of Presidential Collections*, U.S. National Archives and Records Administration, https://www.archives.gov/presidential-records/research/types-of-presidential-collections .

[6] Note, however, that former President Obama elected not to donate a presidential library building to the National Archives, but instead constructed a wholly private presidential center in Chicago (which does not contain any presidential records). NARA separately operates a digital Obama Presidential Library and retains exclusive control over all Obama presidential records and artifacts, as it also does with respect to the presidential records of President Trump's first term and the Biden presidential records.

Yet Congress realized that, following President Nixon's Watergate scandal, the voluntary nature of this approach was untenable. Just prior to his resignation, President Nixon entered into an agreement with the General Services Administration ("GSA"), of which the National Archives was a part at that time, which would have prevented others from accessing his presidential papers for a period of three years and would have required the destruction of the Watergate tapes by September 1984 at the latest. *See Nixon v. Sampson*, 389 F. Supp. 107, 161 (D.D.C. 1975). Through this agreement, President Nixon also asserted the right to destroy any tape at any time, so that he could prevent the tapes being used to "injure, embarrass, or harass any person and properly to safeguard the interests of the United States." *Id.*

Congress acted quickly to prevent the destruction of the Watergate tapes, enacting a law aimed at preserving these specific recordings and all of Nixon's other presidential records: the Presidential Recordings and Materials Preservation Act ("PRMPA"), Pub. L. 93-526, 88 Stat. 1695 (1974). This law expressly abrogated President Nixon's agreement with GSA, prohibited GSA from destroying the tapes, and established government control over all of the tapes, papers, and other presidential materials, consisting of approximately 42 million pages of documents and 880 tape recordings. PRMPA § 102(a), 88 Stat. at 1696. The PRMPA also directed the GSA to promulgate regulations providing public access to the tapes and other materials, in line with the "need to provide the public with the full truth, at the

earliest reasonable date, of the abuses of governmental power" that occurred during Watergate, as well as to all other materials of "general historical significance." *Id.* § 104(a)(1) & (6), 88 Stat. at 1696. While the law ensured that President Nixon could not unilaterally hide the contents of the tapes, it also preserved the ability of "any party[]" to assert "any legally or constitutionally based right or privilege" which might limit access to the recordings. *Id.* § 104(a)(5), 88 Stat. 1696. The law also required the National Archives to return to President "Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance" – i.e., all materials that were personal to President Nixon. *Id.* § 104(a)(7), 88 Stat. 1696. Significantly, Title II of the PRMPA also established a National Study Commission on Records and Documents of Federal Officials.

The Supreme Court upheld this statutory framework for dealing with presidential papers in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977), rejecting President Nixon's constitutional challenges and holding that the PRMPA struck an appropriate balance between the "substantial public interests" in preserving access to President Nixon's records and his limited constitutional rights. *Id.* at 453, 455. The Court reasoned that President Nixon's interest in completely preventing disclosure of his papers was outweighed by Congress's interest in "restor[ing] public

confidence in our political processes" and "gaug[ing] the necessity for remedial legislation." *Id*. at 453.

Following *Nixon v. Administrator* and the detailed findings and recommendations of the National Study Commission,[7] Congress passed and President Carter signed into law the Presidential Records Act of 1978 to apply to all future presidents. *See* H.R. Rep. No. 95-1487 (1978), at *6 (noting that the principles established by *Administrator* "would govern legislation dealing more broadly with control of and access to Presidential papers").[8] The primary purpose of this legislation was to "establish the public ownership" of presidential papers and to ensure "the preservation and public availability of these records at the end of a Presidential administration." *Id*. at *2. Now, instead of a former president being able

[7]Final Report of the National Study Commission on Records and Documents of Federal Officials (1977), at 29-32; *see* Hearings before a Subcommittee of the Committee on Government Operations on H.R. 10998 (the Presidential Records Act of 1978) and Related Bills, 95th Cong., 2d Sess., (Feb. 23, 28, Mar. 2, 7, 1978) (PRA Hearings).

[8] In his signing statement, President Carter stated: "I am especially pleased to sign the Presidential Records Act of 1978, which will ensure that Presidential papers remain public property after the expiration of a President's term. In the past there were no statutory restrictions on the disposition of Presidential papers. Retiring Presidents, Vice Presidents, and their staffs could take their papers with them as their own private property. Under the new law, all but the most personal of these papers will remain in the hands of the Federal Government after an administration leaves office." Jimmy Carter, *Statement on Signing Into Law H.R. 13500, the Presidential Records Act of 1978*, November 6, 1978, https://www.presidency.ucsb.edu/documents/statement-signing-into-law-hr-13500-the-presidential-records-act-1978.

to withhold, or even destroy, the records of his presidency for any reason, the papers would be government property, under the exclusive control of the President while in office and then under the control of the Archivist of the United States when the President leaves office.

Congress also debated what framework would best ensure access to presidential records after the president left office, whether by the public or by the successor president, Congress, or the courts, while preserving the rights and interests of the former president. Congress considered, but rejected, provisions that would have made presidential records available to the public immediately upon conclusion of a president's tenure, *see* H.R. 10998, 95th Cong. (1978), as well as legislation that would have allowed a president to have absolute authority to restrict access to his records for up to 15 years from the end of his tenure, *see* H.R. 1101, 95th Cong. (1978).

Ultimately, neither of these models properly balanced the need for "ready availability of the records" against a potential to chill the "frankness of advice" presidents receive from their staff. H.R. Rep. No. 95-1487 (1978), at *8. Instead, as explained in more detail below, Congress adopted a legal framework that closely tracked the PRMPA model upheld by the Supreme Court in *Nixon v. Administrator*, while also incorporating the prior voluntary practices initiated by President Roosevelt. The new law has been followed without objection by all presidents

beginning with President Reagan until President Trump's second term. As this Court has recognized, Congress intended to "balance" twin goals. The first goal was to establish "the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office[.]" *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991). The other goal was to "minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Id.* As explained further below, Congress achieved both goals by enacting the PRA.

### B. The PRA Helps, And Does Not Interfere, With Executive Functions.

In implementing the PRA for multiple decades, *amici* have worked directly with the White House and Justice Department lawyers and records officials in the Bill Clinton, George W. Bush, Barack Obama, Donald Trump, and Joe Biden administrations, as well as the PRA representatives of every former president dating back to Ronald Reagan. No prior president (including President Trump during his first term) has ever even suggested that the PRA was unconstitutional or unduly burdensome.

### 1. NARA helps to reduce any administrative burden on presidents regarding preserving presidential records, and presidents retain ultimate control over those records.

As referenced above, Congress established the National Archives to be a nonpartisan agency within the Executive Branch composed almost entirely of career professionals who would impartially steward the permanent records of the government. 44 U.S.C. § 2102. The agency is run by the Archivist of the United States, who is a presidential appointee and operates pursuant to the president's authority and control under Article II of the Constitution. *See Pub. Citizen v. Burke*, 843 F.2d 1473, 1478 (D.C. Cir. 1988). But that appointment must be made "without regard to political affiliations and solely on the basis of the professional qualifications required to perform the duties and responsibilities of the office of Archivist." 44 U.S.C. § 2103(a). Because the Archivists are "subject to the President's superintendence," they are also removable at the president's will. *Trump v. Slaughter*, 146 S. Ct. 2283, 2295 (2026).[9] The statute also establishes the Deputy Archivist of the United States, "as a career reserved position," who, "[i]n the event

[9] NARA's enabling statute requires, however, that if the President removes the Archivist, the President "shall communicate the reasons for any such removal to each House of the Congress." 44 U.S.C. § 2103(a). President Trump did not communicate his reasons to Congress for removing Colleen Shogan as Archivist of the United States on February 7, 2025.

of a vacancy in the office of the Archivist, . . . shall act as Archivist until an Archivist is appointed under subsection (a)." 44 U.S.C. § 2103(c).

The PRA respects this constitutional chain of command. Put simply, "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong*, 924 F.2d at 290. Its core requirement is that the President must simply preserve all of the "presidential records" created or received during his tenure, as defined by the PRA at 44 U.S.C. § 2201(2) (with an option to dispose of records "that no longer have administrative, historical, informational, or evidentiary value," 44 U.S.C. § 2203(c)[10]), so that they can be transferred to the National Archives when he leaves office. Moreover, implementing the PRA's modest command to preserve all presidential records is now largely an administrative function performed by information technology ("IT") officials in the White House Office of Administration, given that the overwhelming majority of presidential records are created or received in electronic formats.

The requirement to transfer the official records of the presidency is entirely consistent with the voluntary practice followed by prior presidents upon the founding of the National Archives in 1934. Notably, the PRA gives Congress and

---

[10] Such disposal requires that the president first obtain the written views of the Archivist. *See* 44 U.S.C. § 2203(c)-(e). This provision allows the Archivist to request the advice of Congress if she or he has concerns with the intended disposal, which has never occurred.

the public a right to access the records only of *former* presidents. 44 U.S.C. § 2204(b);[11] *see also Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 228 (D.C. Cir. 2013) ("[T]he PRA gives the President 'virtually complete control' over 'Presidential records' during his term of office," (citations omitted)). Thus, the access provisions of the PRA do not apply to the presidential records of the sitting president. In addition, "personal records," as defined by the PRA at 44 U.S.C. § 2201(3), are not subject to government control.

NARA serves as the primary federal agency responsible for administering and assisting the president and his advisors regarding compliance with the PRA across three distinct phases: during the incumbent administration, in the course of the presidential transition, and throughout the post-presidency archival management of the presidential records that have been transferred into NARA's custody. During a sitting presidency, NARA officials work directly with the White House Counsel's Office, the White House Office of Records Management, the Office of Administration, and other White House offices that deal with records and artifacts. NARA provides technical guidance on proper recordkeeping practices, helping White House staff distinguish between non-record personal items and official

[11] Such public access begins five years after the president leaves office, and is administered through the Freedom of Information Act ("FOIA"), with certain limitations and requirements specific to the PRA. 44 U.S.C. § 2204(c)(1).

presidential records across physical and digital formats, including emails, messaging platforms, and social media posts. *See* 36 C.F.R. § 1270.20; *see also* David S. Ferriero, *NARA's Role Under the Presidential Records Act and the Federal Records Act*, Prologue Magazine, Summer 2017.[12]

In light of the extensive protections for sitting presidents, every presidential administration since the PRA's inception until the current administration has consulted with NARA on how to best comply with the PRA—without ever questioning its constitutionality. The PRA and NARA's regulations establish that the president has ultimate control over his records while in office but can delegate the day-to-day administrative responsibilities of maintaining and preserving those records to subordinates. Indeed, as this Court has observed, Congress enacted the PRA "to avoid the very 'separation of powers concerns' and 'outside interference with the day-to-day operations of the President and his closest advisors[.]'" *Judicial Watch,* 726 F.3d at 228. As a result, the president faces no undue administrative bother in complying with the PRA.

**2. NARA provides vital preservation assistance to incoming presidents.**

In *Nixon v. Administrator of General Services*, the Supreme Court declared that:

---

[12] https://www.archives.gov/publications/prologue/2017/summer/archivist-pra-fra.

> [a]n incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that . . . define or channel current governmental obligations. Nor should the American people's ability to reconstruct and come to terms with their history be truncated by an analysis of Presidential privilege that focuses only on the needs of the present. Congress can legitimately act to rectify the hit-or-miss approach that has characterized past attempts to protect these substantial interests by entrusting the materials to expert handling by trusted and disinterested professionals.

433 U.S. at 452-453.

To this end, NARA plays a significant role in presidential transitions. Upon completion of the President's term or terms in office, responsibility for the control and preservation of presidential records passes from the President to the Archivist of the United States. 44 U.S.C. § 2203(f)(1). In other words, when the President leaves office on January 20, legal ownership and physical custody of all Presidential records automatically shift from the outgoing president to the Archivist of the United States. NARA officials help the White House to coordinate the logistical task of securing, packing, and transporting millions of classified and unclassified documents, electronic data archives, and official gifts from the White House complex to secure NARA storage and IT facilities (including to designated presidential libraries).[13] During this time, NARA also fields frequent requests for

---

[13] For example, "[d]uring the Bush-Obama transition, two Boeing 747 cargo planes, a DC-8 transport, and 25 trucks moved records and gifts from Washington, D.C., to

preserved records from the incoming president's national security advisors. After the transition, NARA archivists preserve, process, and provide access to these collections.[14] These efforts, subject to resource constraints, include ensuring continued preservation of electronic presidential records on what has been described as a "digital tsunami" of unstructured electronic records, including emails and other forms of electronic messaging and social media.[15]

---

a temporary storage facility in Texas to await completion of the George W. Bush Library. That was 44,759 cubic feet of materials weighing 804,866 pounds—about the same as the weight of four Boeing 727 cargo planes." David McMillen, *Moving Out, Moving In: The National Archives' Important Role When the Presidency Changes Hands*, Prologue (Winter 2016), Vol. 48, No. 4, https://www.archives.gov/publications/prologue/2016/winter/presidential-transitions; *see also* Nancy Kegan Smith, *Escorting a Presidency Into History: NARA's Role in a White House Transition*, Prologue (Winter 2008), Vol. 40, No. 4, https://www.archives.gov/publications/prologue/2008/winter/transitions.html.

[14] *See* "NARA 101, PART 9. Legislative Archives, Presidential Libraries, and Museum Services," National Archives and Records Administration, https://www.archives.gov/foia/directives/nara0101-part09 (describing institutional roles in providing preservation and access services for presidential records); Brian Chandler Thompson, *Making History: The Sitting Modern President and the National Archives*, Government Information Quarterly, Vol. 12, No. 1 (1995), at 17. NARA also seeks the return of any records that may not have been transferred into its custody. *See United States v. Navarro*, No. 23-5062, 2024 WL 1364354, at *2 (D.C. Cir. Apr. 1, 2024); *United States v. McElvenny*, No. 2 Civ. 3027, 2003 WL 1741422, at *1 (S.D.N.Y. Apr. 1, 2003).

[15] David E. Hoffman, *A digital tsunami is coming. The National Archives is in trouble*, WASHINGTON POST (Sept. 20, 2024), https://www.washingtonpost.com/opinions/2024/09/20/national-archives-troubles-digital (citing a figure of 634 million White House emails in the then-current custody of NARA).

The preservation of these records is vital to maintaining the continuity of governance from one administration to another. An incoming presidential administration does not govern in a vacuum; it inherits ongoing, highly complex domestic programs and long-term foreign initiatives. Preserving presidential records ensures that new leaders can have immediate and ongoing access to the data, strategy, and rationale behind past policy decisions. Without NARA's maintenance of the prior presidents' historical records, incoming officials would face significant information gaps, which risk repeated mistakes, delayed implementation of critical legislation, or the inadvertent dismantling of bilateral commitments.

Moreover, maintaining continuity is directly tied to protecting national security. Geopolitical tensions do not pause for an inauguration. Presidential records include the entire holdings of the National Security Council (as well as all of the White House offices that have been determined to solely advise and assist the president[16]), such as sensitive intelligence assessments, treaty negotiations, and operational contingency plans. Ensuring that these files are preserved and seamlessly made available to new administration officials allows incoming national security advisors and cabinet officials to evaluate active threats, maintain diplomatic

[16] Including the Homeland Security Council, Domestic Policy Council, National Economic Council, Council on Economic Advisors, President's Intelligence Advisory Board, and Office of Administration.

momentum, and make informed decisions during unexpected global crises. In fact, in *amici*'s experience, the most frequent requests for preserved presidential records come from the incoming president's national security advisors, who are in regular need of the classified records of their predecessor.

In sum, the PRA helps to bridge the gap between the outgoing and incoming administrations. By maintaining an unbroken historical record, NARA and the PRA help ensure that the essential knowledge, stability, and operational know-how of the president and executive branch endure.

#### 3. The PRA preserves presidential power and discretion, which NARA helps to facilitate.

The PRA does not just complement an incumbent president's power. It also provides extensive latitude to former presidents. For example, the PRA allows a president, when leaving office, to restrict, for up to twelve years, public access to records that (1) are classified and involve national defense or foreign policy, (2) relate to appointments to public office, (3) are exempt from disclosure under certain federal statutes, (4) contain trade secrets or other privileged or confidential commercial or financial information obtained from a person, (5) constitute "confidential communications requesting or submitting advice, between the President and the President's advisers, or between such advisers[,]" or (6) are

personnel, medical, and similar files implicating personal privacy.[17] 44 U.S.C. § 2204(a); *see also* 36 C.F.R. § 1270.40(a).

NARA officials review these restriction claims, process requests made under FOIA beginning five years after the president leaves office, and respond to "special access" requests issued by sitting administrations, Congressional committees, and court orders. Through these combined duties, NARA officials safeguard historical transparency, ensure executive accountability, and preserve the heritage of the American presidency in a manner similar to how they treated the donated papers of Presidents Hoover, Roosevelt, Truman, Eisenhower, Kennedy, Johnson, Ford, and Carter.[18]

The PRA tasks the Archivist with protecting "[a]ny Presidential record or reasonably segregable portion thereof containing information within a category restricted by the President[,]" from public access for the designated time period. 44 U.S.C. § 2204(b)(1); *see also* 36 C.F.R. § 1270.40(c). The PRA precludes judicial review of the Archivist's designations "[d]uring the period of restricted access[,]"

---

[17] The restrictive categories in the PRA are consistent with the restrictions that pre-PRA presidents imposed in their deeds of gifts. *See Nixon v. Administrator of General Services*, 408 F. Supp. 321, 338 n.19 (D.D.C. 1976).

[18] As the PRA legislative history explains: "It is anticipated that the Archivist will process the former administration's papers in a manner roughly similar to current practices. . . . It is also expected that the Archivist will follow past practice in applying the restrictive categories in former Presidents' deeds of gift . . . ." H.R. Rep. No. 95-1487 (1978), at 15.

except for "any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges." 44 U.S.C. § 2204(b)(3), (e).

In addition, the PRA mandates that the Archivist provide access to restricted presidential records when they are:

- subpoenaed or subjected to other judicial process by a court as part of a civil or criminal proceeding;
- requested by an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available"; or
- requested by either House of Congress or a committee acting within its jurisdiction and the information is "needed for the conduct of its business and [is] not otherwise available[.]"

44 U.S.C. § 2205(2).[19]

But disclosure under this section is "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke[.]" *Id*. In addition, the PRA makes clear that "[n]othing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be

[19] Grand juries and courts have relied upon 44 U.S.C. § 2205(2)(A) to get access to records needed for judicial proceedings.

available to an incumbent or former President." 44 U.S.C. § 2204(c)(2). Thus, the substantive law governing a current or former president's claim of executive privilege remains rooted in the Constitution, with the PRA merely providing the procedural framework for the claim to be considered and, if necessary, litigated. For instance, the PRA states that the Federal District Court in this Circuit "shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges," 44 U.S.C. § 2204(e). It then expressly incorporates this possibility into the timeline the process may take with respect to public access requests, *see id.* at § 2208(c)(2)(C) (directing the Archivist to release information "unless otherwise directed by a court order in an action initiated by the former President under section 2204(e) of this title or by a court order in another action in any Federal court").

Beyond the PRA's statutory text and NARA's regulations, presidents have issued successive Executive Orders to implement the PRA while still protecting their power. The current one is Executive Order 13489, which was issued by President Obama in 2009 and remains in effect with respect to "special access requests" made by the incumbent president, Congress, and the courts under section 2205(2) of the PRA. It establishes that the Archivist must provide notice to the incumbent and former presidents of his intent to disclose presidential records. The incumbent and former presidents then generally have 30 days within which they can raise a claim

of executive privilege before the Archivist discloses the relevant records to the requester. *See* Exec. Order 13489 §§ 2-3.

Prior to 2021, no former or incumbent President had ever asserted executive privilege against a special access request by Congress.[20] Rather, issues and concerns of both the former and incumbent presidents were always worked out through the accommodations process, whereby the scope of a request could be narrowed, highly sensitive information could be redacted, and access could be provided on a read-only basis. In 2021, former President Trump became the first and only president to formally assert executive privilege, over certain specified records requested by the January 6th Committee. When incumbent President Biden decided not to honor the former president's claim of privilege and directed the Archivist to provide the records to the Committee, former President Trump exercised his right to seek judicial review.

In sum, the PRA's history, text, implementing regulations, and practical application all work together to preserve presidential records without aggrandizing the legislative branch or impermissibly limiting energy in the executive.

---

[20] And there was only one occasion when a former president asserted executive privilege against a public access FOIA request, which former President Reagan did in 2001, over eleven documents totaling 74 pages, after the 12-year PRA restrictions had expired. Incumbent President George W. Bush also concurred in the privilege assertion. *See American Historical Association v. NARA*, 310 F. Supp. 2d 216, 224 (D.D.C. 2004).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Dated: August 26, 2026

**BALLARD SPAHR LLP**

By: */s/ Christopher A. Hatfield*
John F. Hundley (No. 44915)
Christopher A. Hatfield (1024182)
1909 K Street, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: hundleyj@ballardspahr.com
hatfieldc@ballardspahr.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,247 words, excluding the parts exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: August 26, 2026

*/s/ Christopher A. Hatfield*
Christopher A. Hatfield