**ORAL ARGUMENT SCHEDULED FOR OCT. 16, 2026**

Nos. 26-5185, 26-5186

IN THE

# United States Court of Appeals for the District of Columbia Circuit

AMERICAN HISTORICAL ASSOCIATION, et al.,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia

**BRIEF FOR FORMER SENIOR NATIONAL SECURITY OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

SYDNEY FOSTER
NATHANIEL A.G. ZELINSKY
SARAH ARMSTRONG*
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
(202) 521-8750
sfoster@washingtonlitigationgroup.org

*Counsel for Amici Former Senior National Security Officials*

*Admitted only in Massachusetts; practicing under supervision of D.C. Bar members*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**1. Parties and *Amici*.** Except for the following *amici* appearing in this Court, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Appellants:

Donald Ayer, John Bellinger III, William Braniff, John O. Brennan, Steven A. Cash, James R. Clapper, Gregory Craig, Mary B. DeRosa, Stephen DeVine, Stuart Gerson, Avril Haines, General Michael Hayden, Brett M. Holmgren, Alan Kreczko, Hon. Michael Luttig, Barbara L. McQuade, Brian H. Nilsson, Ambassador Thomas Pickering, John Podesta, Alan Raul, Ambassador Susan E. Rice, Nicholas Rostow, Gregory L. Schulte, Hon. Abraham D. Sofaer, and Jonathan M. Winer.

**2. Rulings Under Review.** References to the rulings at issue appear in the Brief for Appellants.

**3. Related Cases.** This case has not previously been before this Court or any court other than the district court. Counsel for *amici* are

unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Sydney Foster
SYDNEY FOSTER

## CERTIFICATE AS TO SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that this separate *amicus* brief is necessary. *Amici curiae* are former national security officials who have worked on security matters at the senior-most levels of the U.S. government. They have served in leadership roles in both Republican and Democratic administrations. It is necessary for them to file a separate *amicus* brief to offer their unique perspective on the national security implications of this case and to explain, based on their extensive experience, the impact the Presidential Records Act has on officials in the Executive Office of the President.

/s/ Sydney Foster
SYDNEY FOSTER

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ C-1

CERTIFICATE AS TO SEPARATE BRIEFING ........ C-3

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ v

STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT ..... 1

PERTINENT STATUTES ........ 5

ARGUMENT ........ 5

- I. The Government Records Covered By The PRA Are Produced By Broad Swaths Of Federal Workers. ........ 5
- II. The PRA Furthers Critical National Security Goals And Facilitates The Incumbent President's Exercise Of Executive Power. ........ 11
- III. The PRA Neither Prevents The President From Receiving Candid Advice Nor Imposes Any Undue Administrative Burdens. ........ 23

CONCLUSION ........ 26

CERTIFICATE OF COMPLIANCE

APPENDIX – LIST OF *AMICI CURIAE*

# TABLE OF AUTHORITIES

**Cases:**

*Armstrong v. Exec. Off. of the President*,
90 F.3d 553 (D.C. Cir. 1996) .......... 6, 10

*Jud. Watch, Inc. v. U.S. Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013) .......... 6, 10

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 22

*Nixon v. Adm'r of Gen. Servs.*,
408 F. Supp. 321 (D.D.C. 1976),
*aff'd*, 433 U.S. 425 (1977) .......... 16, 17, 18, 19

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) .......... 16, 18, 19

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .......... 20

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) .......... 12

**Constitutional Provisions:**

U.S. Const. art. II. .......... 22

**Statutes:**

Federal Records Act,
44 U.S.C. §§ 2901 *et seq.* .......... 10

Freedom of Information Act,
5 U.S.C. § 552 .......... 10, 24

Presidential Records Act,
44 U.S.C. §§ 2201 *et seq.* .......... 1
44 U.S.C. § 2201(2) .......... 2, 6
44 U.S.C. § 2201(2)(B)(ii) .......... 6
44 U.S.C. § 2202 .......... 2, 13
44 U.S.C. § 2203 .......... 2, 15
44 U.S.C. § 2203(g) .......... 10, 13

44 U.S.C. § 2204(a)(5) ........ 24
44 U.S.C. § 2204(b)(2)(A) ........ 24
44 U.S.C. § 2204(c)(1) ........ 24
44 U.S.C. § 2204(e) ........ 24
44 U.S.C. § 2205(2) ........ 12
44 U.S.C. § 2205(2)(B) ........ 3, 11, 13, 19, 22
44 U.S.C. § 2206(2) ........ 12
44 U.S.C. § 2207 ........ 6
44 U.S.C. § 2208(a)(1)(A)(i) ........ 24
44 U.S.C. § 2208(c)(2)(C) ........ 24

Public Documents Act,
Pub. L. No. 93-526, 88 Stat. 1698
(codified at 44 U.S.C. §§ 3315 *et seq.*) ........ 12

3 U.S.C. § 105(a) ........ 7

50 U.S.C. § 3021(e)(3) ........ 7

**Regulations:**

36 C.F.R. § 1270.38 ........ 24
36 C.F.R. § 1270.44(a)(2) ........ 12
36 C.F.R. § 1270.44(d) ........ 12
36 C.F.R. § 1270.44(f) ........ 12

**Legislative Materials:**

H.R. Rep. No. 95-1487 (1978) ........ 10, 12, 17, 24

Nat'l Study Comm'n on Records & Documents of Fed. Officials,
*Final Report* (Mar. 31, 1977) ........ 9, 12, 24

Nat'l Study Comm'n on Records & Documents of Fed. Officials,
*Memorandum of Findings on Existing Custom or Law, Fact & Opinion* (undated) ........ 9, 17

*Presidential Records Act of 1978: Hearings on H.R. 10998 & Related Bills Before a Subcommittee of the House Committee on Government Operations*, 95th Cong. (1978) ........ 9

**Other Authorities:**

Aamer Madhani & Zeke Miller, *Incoming Trump Team Is Asking White House National Security Council Civil Servants About Their Loyalty*, Associated Press (Jan. 13, 2025), https://perma.cc/ZBM9-AE7A .......................................................... 21

Brief for Federal Appellees, *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977) (No. 75-1605), 1977 WL 189792 .................. 18, 23

Center for Presidential Transition, *The 2020-21 Presidential Transition: Lessons Learned & Recommendations* (Jan. 20, 2022), https://perma.cc/PYF7-2L32 .................................... 22

Cong. Oversight of the White House, 45 Op. O.L.C. __, 2021 WL 222744 (Jan. 8, 2021) .................................9

Cong. Rsch. Serv., R44828, *The National Security Council: Background & Issues for Congress* (2017), https://www.congress.gov/crs_external_products/R/PDF/R44828/R44828.3.pdf........................................................................7

Cong. Rsch. Serv., R46129, *The Presidential Records Act: An Overview* (2026), https://perma.cc/Z26B-JF85 ...............................8

Constitutionality of the Presidential Recs. Act, 50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026) .............................. 23

Letter from Joshua Fisher, Director of the White House Office of Admin., to Russell Vought, Director of the Office of Mgmt. & Budget (Sep. 30, 2025), https://perma.cc/C6E4-P7Y6 .......................7

Nat'l Archives & Records Admin., *Guidance on Presidential Records* (2016), https://perma.cc/M67G-UANS......................................7

William J. Clinton Presidential Library & Museum, *Memcons and Telcons,* https://perma.cc/8ZMC-TQAF ....................... 13

## GLOSSARY

| | |
|---|---|
| EOP | Executive Office of the President |
| FOIA | Freedom of Information Act |
| NSC | National Security Council |
| PRA | Presidential Records Act |

## STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT

*Amici curiae* are former senior officials who worked on national security issues for the United States in both Republican and Democratic administrations.[1] In particular, *amici* include, among others, career and politically appointed national security officials who served in positions with the National Security Council (NSC) or the White House Office—two entities in the Executive Office of the President (EOP) that are covered by the Presidential Records Act (PRA), 44 U.S.C. §§ 2201 *et seq*. Based on their time in government, *amici* have experience with the requirements and impact of the PRA, and they know how officials in the NSC and the White House Office advise Presidents of both political parties on important matters of national security. *Amici* hold different views on a variety of subjects, including matters related to national

---

[1] A list of *amici* appears in the appendix to this brief. No counsel for a party to this case authored this brief in whole or in part; no party or party's counsel contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for *amici* contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief, which is submitted pursuant to Federal Rule of Appellate Procedure 29(a)(2).

security. But *amici* have come together to file this brief to offer the Court their perspective on the necessity and legality of the PRA.

*Amici* underscore three important points: *First*, the PRA governs voluminous government records produced by myriad employees working within the Executive Office of the President. 44 U.S.C. § 2201(2). With respect to the NSC alone, Congress has authorized the executive to appoint 200 "professional staff" to assist the Council. 50 U.S.C. § 3021(e)(3). The records created by these individuals and hundreds of other similar EOP employees, many of whom are career civil servants, are subject to the PRA. But most of these employees rarely, if ever, interact with the President. The documents they generate in the course of their work are important government records, and they are in no way analogous to the President's personal property, as Defendants contend.

*Second*, the PRA serves important national security purposes, facilitates continuity in operations from one administration to the next, and promotes the exercise of executive power by the incumbent President. In particular, the PRA ensures that information critical to our national security is preserved, 44 U.S.C. §§ 2202-2203, and that an incumbent President has access to such information in a predecessor's

records when the information is "not otherwise available" and yet is "needed for the conduct of current business of the incumbent President's office." *Id.* § 2205(2)(B). To highlight one important example, the NSC's archived documents will sometimes contain the only relevant records of a former President's conversations with foreign leaders. It can be crucial for an incumbent President to access those records to understand what occurred in a prior administration—including the nature of any representations made, negotiations conducted, and commitments agreed to in high-level communications between a foreign power and the United States.

Should Defendants prevail in this litigation and facially invalidate the PRA, an outgoing President could treat all such records as his personal property and leave his successor a blank slate with respect to important aspects of our Nation's foreign relations every four or eight years, disadvantaging the United States on the world stage. That bizarre result would unnecessarily hamstring the incumbent chief executive and hinder him in carrying out his Article II functions. Defendants are therefore wrong to characterize the PRA as an effort by Congress to "aggrandize" its own powers at the expense of the executive branch.

Instead, this is a case about whether a former President, who is no longer in office, can undermine the incumbent President's exercise of executive power, including in important areas of national security. The obvious legitimacy of legislation preserving national security records for use by future Presidents is fatal to Defendants' facial challenge to the PRA. *See* Appellees' Br. 27-30.

*Third*, in *amici*'s first-hand experience, Defendants are flatly wrong to suggest that the PRA has a chilling effect on advice provided to the President and imposes undue administrative burdens. Indeed, it is telling that no President until now, including President Trump in his first term, challenged the constitutionality of the PRA on these grounds. Moreover, in enacting the PRA, Congress was attentive to the concerns Defendants now raise. In particular, Congress enacted provisions to ensure that the most sensitive Presidential records are generally inaccessible for twelve years and that, even after that period expires, a former President can assert privileges against disclosure. In *amici*'s extensive experience, these statutory protections are more than adequate to guarantee the President receives candid advice from his advisors, and the statute in no way imposes undue administrative burdens.

## PERTINENT STATUTES

All applicable statutes are contained in the Brief for Appellants.

## ARGUMENT

### I. The Government Records Covered By The PRA Are Produced By Broad Swaths Of Federal Workers.

The PRA governs the records produced by a vast apparatus of entities and individuals operating within the Executive Office of the President, ensuring that those troves of government documents are preserved and accessible to future Presidents, among others. Notwithstanding the scale and nature of the documents covered by the statute, Defendants invoke Presidents' historical practices to argue that those records must, as a constitutional matter, be treated as a President's own "private property." Appellants' Br. 4-8, 34-35. That counterintuitive result, which would permit a President, once he becomes a private citizen, to retain, sell, donate, or "destroy[]" voluminous and sensitive government records, *id.* at 5-7, is as wrong as it sounds. Among other things, Defendants' argument ignores the reality that the "presidential files" early Presidents regarded as their own "private property" bear no resemblance to the extensive government records covered by the PRA.

The PRA applies to documents created or received by "the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President" in connection with the exercise of the President's official or ceremonial duties. 44 U.S.C. § 2201(2). The statute likewise applies to "Vice-Presidential records," *id.* § 2207, but it does not cover a President's or Vice President's "personal records," *id.* § 2201(2)(B)(ii), (3).

Most relevant to *amici*, the PRA applies to the NSC, *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 556, 567 (D.C. Cir. 1996), and the White House Office, *see Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216, 225, 228 (D.C. Cir. 2013), which includes the Office of the White House Counsel. In addition, the White House has taken the view that the statute covers at least eight other EOP entities, including the "Office of the Vice President, Council of Economic Advisors, Executive Residence, Office of Administration, Office of Policy Development ([Domestic Policy Council] and [National Economic Council]), . . . President's Commission on White House Fellows, . . . President's Intelligence Advisory Board," J.A. 242 n.1, and the U.S. DOGE Service, *see* United States DOGE Service Records

Retention Policy (Mar. 25, 2025), Doc. 13-2, *Am. Oversight v. DOGE*, No. 25-cv-409 (D.D.C. Mar. 27, 2025). *See generally* Nat'l Archives & Records Admin., *Guidance on Presidential Records* 2 (2016), https://perma.cc/M67G-UANS (providing inexhaustive list of covered entities).

The staffing of these EOP entities varies from administration to administration but has been substantial in all modern administrations. As just one benchmark, these entities employed at least 840 individuals in September 2025. *See* Letter from Joshua Fisher, Director of the White House Office of Admin., to Russell Vought, Director of the Office of Mgmt. & Budget, at 4 (Sep. 30, 2025), https://perma.cc/C6E4-P7Y6. The NSC alone has included as many as 400 or more employees in prior administrations. *See, e.g.*, Cong. Rsch. Serv., R44828, *The National Security Council: Background & Issues for Congress* 11-12 (2017), https://www.congress.gov/crs_external_products/R/PDF/R44828/R44828.3.pdf. And today, the NSC is authorized by Congress to employ up to 200 "professional staff," not including personnel in "support or administrative positions." 50 U.S.C. § 3021(e)(3); *see also, e.g.*, 3 U.S.C. § 105(a) (authorizing the employment of staff in the White House Office

and imposing limits on the rates of pay for the 100 highest-paid employees and other lower-paid staff).

It goes without saying that the vast majority of the hundreds of employees subject to the PRA rarely—if ever—interact with the President, and thus the records they generate are obviously not analogous to the President's personal property, as Defendants claim. Underscoring this point, the number of government records collected under the PRA is massive. For example, the National Archives and Records Administration received approximately 300 million emails from the Obama administration alone. *See* Cong. Rsch. Serv., R46129, *The Presidential Records Act: An Overview* 13 (2026), https://perma.cc/Z26B-JF85. In short, in no way are the records of the hundreds of employees covered by the PRA—who perform wide-ranging work for the federal government and are paid with funds appropriated by Congress—analogous to the personal papers early Presidents treated as their own.

Indeed, it is well known that the White House grew substantially in size during the twentieth century. Once the "administrative state dramatically expanded," President Franklin D. Roosevelt "realized that he needed more staff to enable him to carry out his mounting

responsibilities," and Congress therefore authorized the President to establish the EOP in 1939. Cong. Oversight of the White House, 45 Op. O.L.C. __, 2021 WL 222744, at *3-5 (Jan. 8, 2021) (recounting this history and describing the expansion following the creation of the EOP); *see also* Nat'l Study Comm'n on Records & Documents of Fed. Officials, *Final Report* 13-14 (Mar. 31, 1977) (*Nat'l Study Comm'n Report*); Nat'l Study Comm'n on Records & Documents of Fed. Officials, *Memorandum of Findings on Existing Custom or Law, Fact & Opinion* 24-28 (undated) (*Nat'l Study Comm'n Memo*).[2]

The White House ultimately became "establish[ed] . . . as an organizational apparatus," Cong. Oversight of the White House, 2021 WL 222744, at *1, and Congress, after creating a Commission to study the matter, properly passed the PRA to ensure that all of the EOP's important and voluminous documents were preserved and protected. In

---

[2] As explained *infra* on page 12, Congress created the National Study Commission on Records and Documents of Federal Officials to recommend legislation on the proper disposition of presidential records and to perform related functions. The Commission's cited report and memo are reprinted in relevant part in *Presidential Records Act of 1978: Hearings on H.R. 10998 & Related Bills Before a Subcommittee of the House Committee on Government Operations*, 95th Cong. (1978). *See id.* at 433-47 (report); *id.* at 467-529 (memo).

doing so, Congress complemented the Federal Records Act, 44 U.S.C. §§ 2901 *et seq.*, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552, which govern the preservation of, and public access to, documents created by other components of the executive branch, including EOP components not covered by the PRA. *See, e.g.*, *Armstrong*, 90 F.3d at 555-558 (explaining that these two statutes impose more demanding requirements on the executive branch and observing that the PRA applies when the other two statutes do not); *see also, e.g.*, *Jud. Watch*, 726 F.3d at 216, 227-28, 232.

Finally, particularly relevant to *amici*, it bears emphasizing that it would be especially problematic to treat NSC records—records that often contain the Nation's most sensitive national security information—as the President's own property. *See, e.g.*, H.R. Rep. No. 95-1487, at 5 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732, 5736 (committee report accompanying PRA). The PRA ensures that once a President's term ends, NSC records are transmitted to the National Archives and Records Administration, 44 U.S.C. § 2203(g), which has a long history of securing sensitive records and permitting only authorized persons to access them.

## II. The PRA Furthers Critical National Security Goals And Facilitates The Incumbent President's Exercise Of Executive Power.

If Defendants prevail in this case, and national security documents generated by the NSC become a President's "personal property," Appellants' Br. 44, that would lead to yet another problem—those important documents may then be inaccessible to future administrations that might need them to perform their executive functions. In *amici*'s view, that result would have adverse national security implications because it would deprive an incumbent President of critical information about the Nation's affairs.

Defendants repeatedly portray (*e.g.*, Appellants' Br. 22) this case as a situation in which a law "aggrandizes" Congress at the expense of the executive, but that framing is deeply misleading. Instead, the PRA preserves and protects executive power because it establishes a mechanism for the incumbent President to access "information" in a predecessor administration's files "that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. § 2205(2)(B). It is telling that Defendants' brief wholly ignores that important statutory right granted

to an incumbent President—a right that is subject to any privileges invoked by a former President, thus striking a balance between the prerogatives of the two Presidents. *Id.* §§ 2205(2), 2206(2); 36 C.F.R. § 1270.44(a)(2), (d), (f); *Trump v. Thompson*, 20 F.4th 10, 28, 31 (D.C. Cir. 2021).

Indeed, the need to provide incumbent Presidents access to information in their predecessors' files was a key reason Congress enacted the PRA. That purpose is evident from the face of the statute and the relevant legislative history, including the reports and memoranda of the National Study Commission on Records and Documents of Federal Officials—an entity Congress created to recommend legislation on presidential records and to perform related tasks, *see* Public Documents Act, Pub. L. No. 93-526, §§ 201-203, 88 Stat. 1698, 1698-1702 (1974) (codified at 44 U.S.C. §§ 3315 *et seq.*). *See, e.g.*, H.R. Rep. No. 95-1487, at 4, 8 & n.12 (discussing Commission's findings and recommendation); *Nat'l Study Comm'n Report* 3, 30-31.

Consider one important area in which, in *amici*'s experience, an incumbent President's access to past Presidential records can be imperative: to understand the nature of communications between a

former President and his foreign counterparts. In some cases, agencies subject to the Federal Records Act, such as the Department of State, do not have records of calls and meetings between a President and foreign heads of state. Instead, the records may appear only in the NSC's files. Today, those NSC files are preserved by the National Archives, and are accessible to future administrations, because they are classified as "Presidential records" subject to the PRA's preservation requirements. *See* 44 U.S.C. §§ 2202, 2203(g), 2205(2)(B).

As the Clinton Library explains:

> Memoranda of Conversation or "memcons" are the written record of face-to-face meetings between the President or Vice President and heads of state or foreign officials. Memoranda of Telephone Conversation or "telcons" are the written record of those meetings which occur by phone. . . . A team of note takers are present at head of state meetings to ensure that the final memo is as accurate as possible. White House Situation Room Duty Officers and National Security Council staff listen in on foreign leader calls and combine their notes to produce the final telcon.[3]

In *amici*'s experience, it can be important for NSC staff to request and review these records of the previous President's communications

---

[3] William J. Clinton Presidential Library & Museum, *Memcons and Telcons*, https://perma.cc/8ZMC-TQAF.

with foreign counterparts, particularly early in a new President's term in advance of another communication with the same foreign government. Reviewing the records of the communications—as well as related materials, such as preparatory memoranda composed in advance of the call—enables the incumbent administration to better understand a foreign nation's priorities, the history of any negotiations, and prior representations and commitments made in discussions between the United States and the foreign power.

Indeed, for certain non-binding commitments between the United States and foreign countries, which are a significant way in which the United States conducts foreign affairs, the most authoritative record of a commitment with a foreign power may be the NSC documents in the National Archives. But in the absence of documentation of commitments previously made by foreign countries, the President may not be able to hold foreign counterparts to account, or she may need to renegotiate positions those counterparts previously conceded.

It is *amici*'s professional assessment that, if the current chief executive could not access information regarding a predecessor's discussions with foreign powers, the United States would be

disadvantaged on the world stage. Other nations reasonably expect the United States to be able to maintain a degree of continuity across administrations. At a minimum, the incumbent administration must know the prior course of dealing between the United States and another country. But without the record of the former President's discussions with foreign leaders, the United States would be unnecessarily hampered as it conducts high-level diplomacy. In a worst-case scenario, foreign powers could attempt to manipulate an incumbent President by, for example, falsely claiming that the former administration reached an informal agreement on a particular matter. Without the record from the former administration, there may be no way to determine the accuracy of the foreign government's assertions.

True, if Defendants prevail in invalidating the PRA, a former President could still voluntarily supply records at his successor's request. But that assumes that the former President's records were appropriately preserved, something that occurs today by law because of the PRA. *See* 44 U.S.C. § 2203. And "[a]n incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current

decisions that define or channel current governmental obligations." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 452 & n.15 (1977) (*Nixon II*) (explaining that Congress could "legitimately conclude" that a system that requires incumbent Presidents to "apply" to their predecessors' Presidential libraries for "permission to examine records of past governmental actions relating to current governmental problems" was "unstable and ripe for change").

The history surrounding the pre-PRA regime shows that incumbent chief executives have reason to worry that they would not be able to obtain necessary records from former occupants of the Oval Office—concerns that are likely only magnified in today's era of no-holds-barred partisan politics. In the pre-PRA era, "officials of incumbent administrations" made "numerous requests" for "access to materials housed in presidential libraries," the "preponderance" of which concerned "foreign affairs." *Nixon v. Adm'r of Gen. Servs.*, 408 F. Supp. 321, 351 n.41 (D.D.C. 1976) (*Nixon I*), *aff'd*, 433 U.S. 425. And permission was "not uniformly . . . granted." *Id.* at 352. Quite the opposite, as the National Study Commission on Records and Documents of Federal Officials explained, there were "numerous instances in which an

incoming administration [was] handicapped by the lack of records or documents of its predecessor." *Nat'l Study Comm'n Memo* 39-41; H.R. Rep. No. 95-1487, at 8 n.12.

During the Kennedy administration, for example, a dispute arose with the French government over whether "the United States had failed to support France and Britain after the Soviet Union had threatened a nuclear attack" in 1956. *Nixon I*, 408 F. Supp. at 352 n.42. The Kennedy administration requested documentation contradicting the French government's claims from the custodian of President Eisenhower's papers, but the request was rebuffed based on "doubts that [it] truly involved national security." *Id.* (explaining the custodian insisted on a personal request by the Secretary of Defense to President Eisenhower—an action the Kennedy administration did not undertake "to preserve cordial relations" with the former president, among other reasons); *Nat'l Study Comm'n Memo* 39-41 (discussing this example and others).

As Arthur Schlesinger, Jr., explained, "No President should ever have to apply to the library of one of his predecessors, as President Kennedy had to apply to the Eisenhower Library in 1962 to find the memorandum of a presidential conversation with an English Prime

Minister, or as President Johnson had to apply to the same library in 1967 for presidential correspondence with a Prime Minister of Israel." *Nixon I*, 408 F. Supp. at 352 (citation omitted). The Department of Justice has previously agreed that it is important for an incumbent President to have access to national security information contained in a predecessor's presidential files. It explained, for example, that "officials of the [Ford] administration found it necessary to review portions of the presidential materials from [the Nixon] administration concerning SALT negotiations with the Soviet Union, our relations with the People's Republic of China, the Vietnamese negotiations concluded in 1973, and negotiations regarding the Middle East situation." Brief for Federal Appellees at 28-29, *Nixon II*, 433 U.S. 425 (No. 75-1605), 1977 WL 189792 (Gov't *Nixon II* Brief). Some "important documents, such as memoranda of conversations between [President Nixon] and foreign leaders, c[ould] be found only in the materials" covered by the PRA's predecessor, which applied only to President Nixon. *Id.* at 29.

The PRA puts these concerns about an incumbent President's access to critical national security information to bed. The statute protects the incumbent's ability to exercise executive power by ensuring

that she generally has access to information from her predecessors' records "that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. § 2205(2)(B). As was the case with the PRA's predecessor statute, "Congress can legitimately act" to "protect the[] substantial interests" in preserving presidential records "for legitimate historical and governmental purposes," *Nixon II*, 433 U.S. at 453, and to "promot[e] efficiency and accountability in the Executive Branch." J.A. 291.

The records of conversations with foreign leaders provide a notable instance in which an administration may seek access to archived NSC records to "conduct" the "current business of the incumbent President's office," 44 U.S.C. § 2205(2)(B), but they are by no means the only such circumstance. Consider another: NSC lawyers may, at times, access records of prior legal advice to ensure consistency on legal positions over time within the executive branch and to better understand why a particular legal decision was made in the past. *See, e.g.*, *Nixon I*, 408 F. Supp. at 350 & n.40 ("Governmental programs and policies do not expire every four or eight years; the information and lessons gained from past

experience do not evaporate the moment a new President is inaugurated.”).

For example, due to the NSC’s role as a body that generates advice for the President, the executive branch normally opposes Congress’s efforts to require briefings from NSC staff. But during the Clinton administration, NSC staff briefed Congress on at least one occasion. As a result, when the George W. Bush administration faced a similar circumstance, NSC legal staff reviewed briefing materials prepared during the Clinton administration to learn why that earlier decision had been made. This anecdote underscores that, just as a President must be able to understand the course of dealings with a foreign power, an incumbent President needs access to similar information about the relations between the two political branches. Otherwise, the incumbent President would face a disadvantage in inter-branch disputes, in which the prior “tradition of negotiation and compromise” dictates how the branches approach and resolve conflicts. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 861 (2020).

NSC material from a former administration can also be important in the immediate aftermath of a presidential transition. If Defendants’

challenge to the PRA were to succeed and a President could treat all NSC documents created during her term as the President's own private property, then she could take some or all of those documents with her when she leaves office. But threats to the Nation bridge the cycle of presidential administrations, and NSC staff for the new administration—many of whom typically also served the prior administration[4]—may need to access their own or their predecessors' files to continue performing their functions. The PRA enables NSC staff to access that information, thus facilitating continuity in the government's national security operations during presidential transitions.

The need for information generated by a predecessor is especially acute, moreover, if the outgoing administration does not effectuate a warm transition to the incoming one, and instead forces the incumbent President to piece together the state of ongoing affairs after entering into

---

[4] *See* Aamer Madhani & Zeke Miller, *Incoming Trump Team Is Asking White House National Security Council Civil Servants About Their Loyalty*, Associated Press (Jan. 13, 2025), https://perma.cc/ZBM9-AE7A (explaining the National Security Adviser under President Biden "inherited most of his NSC staff from the outgoing Trump administration").

office. *Cf.* Center for Presidential Transition, *The 2020-21 Presidential Transition: Lessons Learned & Recommendations* (Jan. 20, 2022), https://perma.cc/PYF7-2L32 ("The Biden transition claimed they were not supplied with some crucial information related to national security, the budget, COVID-19 trends and vaccine preparation, and more."). Here too, if the PRA does not govern and the outgoing President owns all NSC documents as personal property, she can deprive her successor of crucial "information needed for the conduct of current business." 44 U.S.C. § 2205(2)(B).

These examples in which the incumbent President may rely on the PRA to obtain access to Presidential records refute Defendants' narrative that the PRA represents "the encroachment or aggrandizement of one branch [of the federal government] at the expense of the other." Appellants' Br. 33 (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 382 (1989)). Instead, from *amici*'s perspective, the PRA reflects an important tool of the *incumbent* President to effectively exercise the "executive Power" with which she is "vested." U.S. Const. art. II. "Far from constituting a breach of executive autonomy," the statute "ensur[es] that the Executive Branch will have access to the

materials necessary to the performance of its duties." Gov't *Nixon II* Brief at 29 (making those points about the predecessor to the PRA).

Indeed, without the right the PRA grants incumbent Presidents to information in their predecessors' records, the current chief executive could find herself at the mercy of a predecessor—who, despite no longer being in office, could frustrate the workings of government. This kind of fraught conflict between a former President and an incumbent President is untenable as practical matter and is incompatible with the structure of the Constitution, which creates the Presidency as a continuing office, vested in one individual at a time.

## III. The PRA Neither Prevents The President From Receiving Candid Advice Nor Imposes Any Undue Administrative Burdens.

Finally, *amici* stress that, based on their first-hand experience serving the United States, Defendants are wholly incorrect (Appellants' Br. 26) that the PRA "threatens to chill presidential advisers from providing unpopular advice, impairing the sound functioning of the Presidency." Constitutionality of the Presidential Recs. Act, 50 Op. O.L.C. __, 2026 WL 963007, at *17 (Apr. 1, 2026) (citation modified).

Indeed, Congress carefully crafted the PRA to avoid a "possible chill on advice." H.R. Rep. No. 95-1487, at 15; *id.* at 8; *Nat'l Study Comm'n Report* 3, 7, 29-31. By law, Presidential records are generally sequestered from the public for five years after the President leaves office. 44 U.S.C. § 2204(b)(2)(A); 36 C.F.R. § 1270.38. In addition, a former President may bar public access to the most sensitive records for a total of twelve years after his term ends, including any "confidential communications requesting or submitting advice, between the President and the President's advisers, or between such advisers." 44 U.S.C. § 2204(a)(5). At all times, including after the end of that twelve-year period, the Freedom of Information Act—replete with exemptions from public disclosure—provides an additional backstop against the release of sensitive information to the public. *Id.* § 2204(c)(1) (cross-referencing 5 U.S.C. § 552 but noting that FOIA Exemption 5 does not apply to PRA materials). Furthermore, when the Archivist plans to publicize a record created during a former President's term, the former President must receive advance notice and may bring suit to assert a claim of executive privilege. *See* 44 U.S.C. §§ 2204(e), 2208(a)(1)(A)(i), (c)(2)(C).

In *amici*'s experience, these measures are more than enough to ensure that the President obtains candid advice from advisors. It bears emphasizing the background on which *amici* draw in offering this assessment. Most *amici* served in positions covered by the PRA, including positions in the highest levels of the government. And all *amici* routinely interacted with officials covered by the PRA. Yet, over their collective years of service, *amici* continued to offer their candid advice to the President and other superiors and colleagues. And, in their experience, their colleagues did the same. The PRA had no meaningful impact on the advice they provided.

To the extent Defendants suggest (Appellants' Br. 29) that the statute also imposes undue administrative burdens on the executive, that too does not accord with *amici*'s experience. In both regards, it is notable that no President since the enactment of the PRA in 1978, including President Trump in his first term, has challenged the statutory regime on these sweeping grounds. Defendants have mustered no reason to invalidate this landmark statute and hamstring the workings of the executive branch.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

/s/ Sydney Foster
SYDNEY FOSTER
NATHANIEL A.G. ZELINSKY
SARAH ARMSTRONG*
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
(202) 521-8750
sfoster@washingtonlitigationgroup.org

*Counsel for Amici Former Senior National Security Officials*

August 26, 2026

**Admitted only in Massachusetts; practicing under supervision of D.C. Bar members*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and D.C. Circuit Rule 32(e)(3) because the brief contains 4,850 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared using Microsoft Word in a proportionally spaced typeface, 14-point Century Schoolbook font.

/s/ Sydney Foster
SYDNEY FOSTER

## APPENDIX – LIST OF *AMICI CURIAE*

**Donald Ayer**, Deputy Attorney General (1989-1990); Principal Deputy Solicitor General (1986-1988); United States Attorney, E.D. California (1982-1986).

**John Bellinger III**, Legal Adviser to the Department of State (2005-2009); Senior Associate Counsel to the President and Legal Adviser to the National Security Council (2001-2005).

**William Braniff**, Director, United States Department of Homeland Security Center for Prevention Programs and Partnerships (2023-2025).

**John O. Brennan**, Director, Central Intelligence Agency (2013-2017); Deputy National Security Advisor for Homeland Security and Counterterrorism and Assistant to the President (2009-2013).

**Steven A. Cash**, Senior Advisor, Department of Homeland Security Office of Intelligence & Analysis (2022-2025).

**James R. Clapper**, Director of National Intelligence (2010-2017); Under Secretary of Defense for Intelligence (2007-2010); Director, National Geospatial-Intelligence Agency (2001-2006); Director, Defense Intelligence Agency (1991-1995).

**Gregory Craig**, White House Counsel (2009-2010); Assistant to the President and Special Counsel (1998-1999); Director of Policy Planning at the Department of State (1997-1998).

**Mary B. DeRosa**, Deputy Counsel to the President and Legal Adviser to the National Security Council (2009-2011); Legal Adviser/Deputy Legal Adviser to the National Security Council (1997-2001).

**Stephen DeVine**, Deputy Legal Adviser, National Security Council (2000-2002).

**Stuart Gerson**, Acting Attorney General of the United States (1993); Assistant Attorney General, Civil Division (1989-1992); Assistant United States Attorney for the District of Columbia (1972-1975).

**Avril Haines**, Director of National Intelligence (2021-2025); Principal Deputy National Security Advisor (2015-2017).

**General Michael Hayden**, Director of the Central Intelligence Agency (2006-2009); Principal Deputy Director of National Intelligence (2005-2006); Director of the National Security Agency (1999-2005).

**Brett M. Holmgren**, Assistant Secretary of State for Intelligence and Research (2021-2024); Special Assistant to the President and Senior Director for Intelligence Programs, National Security Council (2015-2017).

**Alan Kreczko**, Legal Advisor, National Security Council (1982-1987).

**Hon. Michael Luttig**, Circuit Judge, United States Court of Appeals for the Fourth Circuit (1991-2006); Counselor to the Attorney General (1990-1991); Assistant Attorney General and Deputy Assistant Attorney General, Office of Legal Counsel (1989-1990).

**Barbara L. McQuade**, United States Attorney, E.D. Michigan (2010-2017); former Co-Chair, Terrorism and National Security Subcommittee, Attorney General's Advisory Committee of United States Attorneys, U.S. Department of Justice.

**Brian H. Nilsson**, Deputy Assistant Secretary of State for Defense Trade Controls (2015-2017); Director of Non-Proliferation, Export Controls, National Security Council (2008-2015).

**Ambassador Thomas Pickering**, Undersecretary of State for Political Affairs (1997-2000); U.S. Ambassador to Russia (1993-1996); U.S. Ambassador to India (1992-1993); U.S. Ambassador to the United Nations (1989-1992); U.S. Ambassador to Israel (1985-1988); U.S. Ambassador to Jordan (1974-1978).

**John Podesta**, Senior Advisor to the President for International Climate Policy (2022-2025); Counselor to the President (2014-2015); Chief of Staff to the President (1998-2001); Deputy Chief of Staff to the President (1997-1998); Assistant to the President and Staff Secretary (1993-1995).

**Alan Raul**, Vice Chairman, Privacy and Civil Liberties Oversight Board (2006-2008); General Counsel to the Office of Management and Budget (1988-1989); Associate Counsel to the President (1986-1988).

**Ambassador Susan E. Rice**, U.S. Ambassador to the United Nations (2009-2013); National Security Advisor (2013-2017).

**Nicholas Rostow**, Special Assistant to the President and Legal Adviser to the National Security Council (1987-1993).

**Gregory L. Schulte**, Executive Secretary, National Security Council (2003-2005).

**Hon. Abraham D. Sofaer**, Legal Advisor, Department of State (1985-1990); District Judge, United States District Court for the Southern District of New York (1979-1985).

**Jonathan M. Winer**, United States Special Envoy for Libya (2013-2017); Deputy Assistant Secretary of State for International Law Enforcement (1994-1999).