**ORAL ARGUMENT SCHEDULED FOR OCTOBER 16, 2026**
**Nos. 26-5185, 26-5186**

# In the United States Court of Appeals for the District of Columbia Circuit

AMERICAN HISTORICAL ASSOCIATION, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DONALD TRUMP, *in his official capacity as President of the United States and in his personal capacity, et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia, No. 1:26-cv-1169 (Hon. John D. Bates)

## BRIEF OF 106 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Benjamin C. Mizer
Rachel F. Cotton
Samuel F. Callahan
Samuel I. Ferenc
Connor J. Morgan
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000
benjamin.mizer@arnoldporter.com

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* submit this certificate as to parties, rulings, and related cases.

**A. Parties and Amici.** Except for *amici curiae* who are signatories to this brief, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Appellants.

**B. Rulings Under Review.** References to the rulings at issue appear in the Brief for Appellants.

**C. Related Cases.** *Amici* are unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ *Benjamin C. Mizer*
Benjamin C. Mizer

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING PURSUANT TO CIRCUIT RULE 29

All parties have consented to the filing of this *amicus curiae* brief. Pursuant to Circuit Rule 29(d), counsel certifies that a separate brief is necessary to provide the Court with deeper context regarding the legislative history and purposes of the Presidential Records Act from the perspective of current Members of Congress.

/s/ *Benjamin C. Mizer*
Benjamin C. Mizer

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS PURSUANT TO CIRCUIT RULE 29

No party or party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No other person contributed money that was intended to fund the preparation or submission of this brief.

/s/ *Benjamin C. Mizer*
Benjamin C. Mizer

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING PURSUANT TO CIRCUIT RULE 29 ........ ii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS PURSUANT TO CIRCUIT RULE 29 ........ iii

TABLE OF AUTHORITIES ........ vi

GLOSSARY ........ viii

INTEREST AND IDENTITY OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Congress Carefully Designed the Presidential Records Act to Achieve Important Purposes While Respecting Critical Interests ........ 3

A. Congress Established a Commission to Study and Propose Recommendations for Preservation of Federal Documents ........ 4

B. Congress Relied on the Commission's Report and Adopted the Presidential Records Act ........ 6

C. The PRA's Legislative History Confirms Congress's Purposes .. 10

1. Resolving Questions Over Ownership and Confirming Congress's Authority to Legislate ........ 10

2. Preserving Public Access to the Historical Record ........ 12

3. Furthering Executive Continuity and Democratic Accountability ........ 13

D. Congress Avoided Constitutional Concerns Through Reasonable Accommodations and Tailoring ........ 15

1. Congress Accounted for Executive Privilege ........ 15

2. Congress Worked to Limit Any Chilling Effect ........ 17

3. Congress Gave the Act an Appropriately Narrow Scope ........ 18

4. Congress Ensured Custody of Presidential Records Remains in the Executive Branch Subject to Presidential Control ........ 20

II. Defendants Ignore Congress's Clearly Stated and Legitimate Legislative Purposes and Accommodations for Presidential Interests .......................................21

III. Congress's Purposes and the Public Interest Will Be Irreparably Harmed if the Presidential Records Act Is Invalidated.......................27

CONCLUSION ..........................................................................................29

CERTIFICATE OF COMPLIANCE ..........................................................30

CERTIFICATE OF SERVICE ...................................................................31

ATTACHMENT ........................................................................................32

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

***Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991)....................3, 15, 27

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977)....................4, 11, 15, 19

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)....................26

*Pub. Citizen, Inc. v. DOJ*,
111 F.3d 168 (D.C. Cir. 1997)....................15

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021)....................21

**Statutes**

44 U.S.C. § 2201(2)....................19

44 U.S.C. § 2204(a)....................18, 23

44 U.S.C. § 2204(c)(2)....................17

44 U.S.C. § 2205(2)....................17, 26

44 U.S.C. § 2205(2)(C)....................25

Presidential Recordings and Materials Preservation Act,
Pub. L. No. 93-526, 88 Stat. 1695 (1974)....................4, 5

Presidential Records Act of 1978,
Pub. L. No. 95-591, 92 Stat. 2523 (1978)....................3, 4, 9

Presidential and Federal Records Act Amendments of 2014,
Pub. L. No. 113-187, 128 Stat. 2003 (2014)....................21

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

**Legislative Materials**

*124 Cong. Rec.
33860 (1978) ........................................................................................16, 18
34894 (1978) ..............................................................................................6
34895 (1978) ........................................................................................16, 17
34896 (1978) ...................................................................................6, 7, 8, 27
34897 (1978) ..............................................................................................6
36843 (1978) ......................................................................................8, 9, 15
36844 (1978) ..........................................................................................6, 17
36845 (1978) ..........................................................................................5, 27
38284 (1978) ......................................................................................6, 9, 28

160 Cong. Rec.
603 (2014) ..................................................................................................21
608 (2014) ..................................................................................................28

*H.R. Rep. No. 95-1487 (1978) .................. 10, 11, 12, 14, 15, 16, 17, 18, 20, 21, 28

H.R. Rep. No. 113-218 (2014) ..........................................................................21

**Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations*, 95th Cong. (1978) .......................................... 5, 6, 10, 11, 12, 13, 14, 16, 18, 19

*Hearing on S. 3494 Before the S. Comm. on Gov't Affs.*, 95th Cong. (1978) ..........................................................................................20

**Other Authorities**

*Requests by Individual Members of Congress for Executive Branch Information*, 43 O.L.C. Op. 42 (2019) .................................26

*Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026) ........................22, 23, 24, 25

# GLOSSARY

| | |
|---|---|
| OLC | Office of Legal Counsel |
| PRA | Presidential Records Act |

## INTEREST AND IDENTITY OF *AMICI CURIAE*

*Amici* are 106 Members of Congress who are well qualified to speak to the context, history, and purposes of the Presidential Records Act, as reflected in the Act's legislative history. *Amici*, who include the leadership of committees with jurisdiction over issues concerning the preservation of presidential records and relevant Article I authorities, have a strong interest in ensuring that the Presidential Records Act is upheld and adhered to by every presidential administration. *Amici* submit this brief in support of affirmance to highlight the Act's critical purposes and illuminate its legislative history, which makes clear that Defendants' arguments in this case disregard the enacting Congress's expressly stated aims and its careful and longstanding balancing of Executive Branch interests.

A full list of *amici* appears in the Attachment.

## INTRODUCTION

The Executive Branch asks this Court to strike down the Presidential Records Act (PRA), a nearly fifty-year-old statute adopted and amended with overwhelming bipartisan support and—until this year—adhered to by Presidents of both parties. In the wake of an unprecedented opinion from the Department of Justice's Office of Legal Counsel (OLC), Defendants ask this Court to jettison the PRA because Congress supposedly overstepped its constitutional bounds in declaring presidential papers public property.

The PRA rests on a solid constitutional foundation, as the Plaintiffs in these consolidated cases have amply described. *Amici*—current Members of Congress—write separately to address issues on which they have particular insight: the context, history, and foundational public purposes of the PRA. As the legislative record from the enacting Congress reflects, the PRA ensures the preservation of critical government records, makes the historical record accessible for the benefit of the public and future administrations, and promotes continuity in the Executive Branch. The Executive's attempt to invalidate the statute threatens those public interests.

*Amici* offer three principal points to aid the Court's analysis. *First*, the legislative record demonstrates that Congress carefully designed the PRA to achieve important public purposes while respecting presidential interests: Congress incorporated accommodations for executive privilege, potential chilling effects, and Executive-Branch control over regulated records. *Second*, Defendants' brief and the OLC opinion on which it relies largely ignore this detailed legislative record, failing to grapple with either the legitimate purposes Congress identified or the accommodations Congress made for presidential prerogatives. *Third*, if the PRA is invalidated, the congressional purposes reflected in the Act's text will be irreparably harmed, and with them the public interest in ensuring presidential records are preserved and accessible for future administrations and the nation at large.

This Court should affirm the decision below.

## ARGUMENT

### I. Congress Carefully Designed the Presidential Records Act to Achieve Important Purposes While Respecting Critical Interests

"Congress enacted the PRA 'to insure the preservation of and public access to the official records of the President.'" *Armstrong v. Bush*, 924 F.2d 282, 287 (D.C. Cir. 1991) (quoting Pub. L. No. 95-591, 92 Stat. 2523, 2523 (1978)). The statute was "carefully drafted to keep in equipoise important competing political and constitutional concerns." *Id.* at 290. Congress sought to "establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office." *Id.* At the same time, "keenly aware of … separation of powers concerns," Congress "sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Id.*

The end result was a "carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term." *Id.* at 291. A review of the context and history of the PRA confirms the importance and legitimacy of Congress's policy aims and its attentiveness to the sensitive considerations the legislation implicated.

### A. Congress Established a Commission to Study and Propose Recommendations for Preservation of Federal Documents

Congress passed the PRA in 1978 to establish a statutory framework for "the preservation of and public access to the official records of the President." Pub. L. No. 95-591, 92 Stat. 2523, 2523 (1978). The Act was the culmination of a multi-year, interbranch effort to balance undisputedly important public interests in preservation of and access to presidential materials with the President's interests in maintaining personal privacy and ensuring that future disclosure requirements would not unduly limit the candor of advice from White House staff.

The path to the PRA began after the events of Watergate and the resignation of President Richard Nixon, when Congress passed the Presidential Recordings and Materials Preservation Act, Pub. L. No. 93-526, 88 Stat. 1695 (1974), to ensure the preservation of materials from the Nixon White House. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 429 (1977) ("*GSA*"). Recognizing that existing law did not specify the ownership of official presidential records, Congress in the bill established the National Study Commission on Records and Documents of Federal Officials (Commission), which included members of Congress, a White House official, Executive Branch staff, and the Librarian of Congress. Pub. L. No. 93-526, § 202, 88 Stat. 1695, 1699-1700. The Commission was tasked with studying "problems and questions with respect to the control, disposition, and preservation of records and documents produced by or on behalf of Federal officials, with a view toward the

development of appropriate legislative recommendations." *Id.* at 1699; *see also* 124 Cong. Rec. 36845 (statement of Sen. Nelson).

The Commission published its report in 1977. Final Report of the National Study Commission on Records and Documents of Federal Officials, March 31, 1977 [hereinafter Commission Report], *reprinted in part in Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations*, 95th Cong. 433 (1978) [hereinafter *Hearings on H.R. 10998*]. The report advised Congress that "[t]he systematic preservation of governmental records and documents is essential for three reasons": "[1] To aid the continuing operations of the government;" "[2] To enable the people to judge the conduct of the government on the basis of maximum information, made publicly available as soon as feasible"; and "[3] To assure the people the fullest possible reconstruction of their national history." *Id.*

The Commission recommended that "all records and documents accumulated by all Federal officials in the discharge of their official duties," including the President, "should be recognized by Congress to be the property of the United States," and made accessible to the public "at the earliest feasible time." *Id.* at 433, 436. Access to "governmental documents," the Commission explained, "is a necessary basis of responsible government, without which the claims of popular sovereignty cannot be realized." *Id.* at 436. Although "providing immediate access" would be unwise, "total closure of these materials is neither necessary nor

appropriate." *Id.* at 437. The Commission therefore recommended granting federal officials the right to impose restrictions on access for no more than fifteen years, with exceptions for national security and personal privacy. *Id.*

### B. Congress Relied on the Commission's Report and Adopted the Presidential Records Act

Drawing heavily from the Commission's report, *see* 124 Cong. Rec. 36844 (statement of Sen. Percy), Congress invested "months of effort" considering various recordkeeping-related bills, holding multiple hearings, and debating competing proposals, *see id.* at 34894 (statement of Rep. Brooks). The House passed an initial version with "broad, bipartisan support" on October 10, 1978, *see id.* at 34897 (statement of Rep. Thompson), and it passed the final bill as amended by the Senate with "overwhelming bipartisan support" four days later, *id.* at 38284 (statement of Rep. Brooks).

Before the initial vote on October 10, the bill's sponsors discussed its context, history, and purposes on the House floor. The lead sponsor, Representative L. Richardson Preyer of North Carolina, recognized that Presidents since George Washington had traditionally "removed the papers of their administrations" on leaving office. *Id.* at 34896. Representative Preyer observed, however, that the question of ownership remained unsettled because, among other things, presidential records are "produced at public cost and for public purpose." *Id.* He further noted

that the Commission had recommended adopting legislation "to settle in favor of the public the ownership and disposition surrounding [presidential] papers." *Id.*

To that end, Representative Preyer continued, the House Government Operations Subcommittee on Government Information and Individual Rights held four days of hearings and "examined in depth the various proposals put forward by the National Study Commission." *Id.* Representatives then "worked closely with the White House and Justice Department to come to agreement over the final wording of the legislation," which also "gathered the support of the various professional societies representing journalists, historians, and archivists." *Id.*

Another sponsor, Representative John Brademas of Indiana, explained that the drafters were "motivated by three principal concerns": "First, the need to promote the creation of the fullest possible documentary record; Second, the need to insure the preservation of that record; Third, the need to provide for all possible access to these materials at the earliest possible time, consistent with the requirements of national security, personal privacy, and the like." *Id.* at 34894-95. "The bill responds effectively to all three of these concerns," he explained, while making substantial accommodations for executive interests. *Id.* at 34895. Critically, the drafters "sought to encourage the free flow of ideas within the executive branch by allowing the President to restrict access to his Presidential materials for a period of not longer than 12 years." *Id.*

"[T]he best way to insure that the ideas would be expressed, and also that they would be set down in writing and be available to later researchers," Representative Brademas continued, "was to permit the institution of a 'buffer period,' so to speak, during which time these materials could be protected" with certain narrow exceptions. *Id.* With this approach, the bill "strikes a reasonable balance between the public's right to have access to the work product of the Government on the one hand and the need to provide for a free flow of ideas within the executive branch on the other." *Id.* Representative Brademas also noted that the legislation recognized the President's privacy interests in personal records like "diaries," which would be exempted from "mandatory disclosure" to "encourage their creation in the first place and keep alive the possibility of a voluntary gift of these materials." *Id.*

The Senate debated the bill following passage by the House. Senator Charles Percy of Illinois echoed the House sponsors in explaining that presidential papers "have immense historical value," yet "have traditionally been removed by the President at the end of his term to be released at his discretion," leaving "[h]istorians and archivists … concerned about the loss of valuable information." *Id.* at 36843. Senator Percy also emphasized that "while it is crucial to protect the public interest in these papers, we must also protect the constitutional rights of the individuals involved" and "must not interfere with the effective functioning of the White House by 'chilling' the free flow of advice or by imposing a heavy administration burden."

*Id.* at 36844. The bill addressed these concerns "by exempting truly personal papers and by allowing the President to restrict access to sensitive information for up to 12 years after leaving office." *Id.*

Senator Percy and others proposed amendments to the House-passed bill to further those purposes. *Id.* Senator Gaylord Nelson of Wisconsin, who had sponsored the 1974 Presidential Recordings and Materials Preservation Act and represented the Senate on the Commission, spoke in favor of the bill and amendments. *See id.* at 36845-46. Having studied the Commission's recommendations, "the past practices of Presidents under the system of private ownership of Presidential papers," and "the constitutional issues which must be dealt with when legislating in this area," Senator Nelson believed that "legislation to assert public ownership was essential, but [also believed] that the legislation must be carefully drawn to insure protection of the President's constitutional rights to privacy and freedom of association and to safeguard the confidentiality of the White House decisionmaking process." *Id.* at 36845. The House-passed bill, as amended by the Senate, "meets these criteria." *Id.* The Senate adopted its amendments that day, and the House agreed via unanimous consent on October 14. *Id.* at 38283-84. President Carter signed the bill on November 4, 1978. *See* 92 Stat. at 2523.

### C. The PRA's Legislative History Confirms Congress's Purposes

The floor remarks of the PRA's sponsors reflected Congress's months-long effort to study and develop a record of the legislation's purposes. Extensive materials from committee hearings and a committee report illustrate that those interests included: (1) resolving questions over ownership of official presidential records and confirming Congress's constitutional authority to do so; (2) preserving the historical record and making it accessible to historians, political scientists, journalists, and the public at large; and (3) promoting continuity in the Executive Branch and supporting the success of each new President by ensuring access to the knowledge and resources of the previous administration.

#### 1. Resolving Questions Over Ownership and Confirming Congress's Authority to Legislate

Congress's first purpose was to clarify the law regarding ownership of official presidential records. As the House Committee on Government Operations explained in its report on the bill, "[n]o definitive legal decision is currently available concerning the ownership of these papers." H.R. Rep. No. 95-1487, pt. 1, at 7 (1978) [hereinafter House Report]. In testimony before a House subcommittee, Deputy Assistant Attorney General for OLC Lawrence Hammond agreed that existing law was ambiguous. *See* Statement of Lawrence A. Hammond at 110-11, *Hearings on H.R. 10998* [hereinafter OLC Testimony]. On the one hand, "Presidents ha[d] been regarded as possessing a property right in their papers"; on the other, "a

governmental interest in the regulation and disposition of such materials ha[d] also been recognized." *Id.* at 110 (citing competing authorities). Hammond noted that the Supreme Court had "expressly reserved judgment" on ownership in its recent decision upholding the Presidential Recordings and Materials Preservation Act. *Id.* at 110-11 (citing *GSA*, 433 U.S. at 445 n.8).

"On policy grounds, however, [all of] the witnesses were in general harmony that that which is generated, created, produced, or kept by a public official in that administration and performance of the powers and duties of a public office belongs to the Government and may not be considered private property of the individual." House Report at 8. That position aligned with the Commission Report, which had "strongly recommended legislation to settle the ownership question in favor of the public." *Id.* Herbert Brownell, the Commission Chair and former Attorney General under President Eisenhower, testified that the Commission's recommendation was based on "detailed study and review of the opinion of present and former Government officials, historians, political scientists, members of the media, and others." *Hearings on H.R. 10998*, at 308.

Importantly, no one—including OLC—disagreed that Congress had constitutional authority to vest title in presidential records in the United States and to regulate the preservation of and access to the records. House Report at 7-8. The Commission Report cited the Constitution's Property Clause and the Necessary and

Proper Clause to conclude that "Congress has the authority to declare documentary material generated by Federal officials in connection with their official duties to be public property." Commission Report at 434. Hammond agreed, testifying that "[i]t is well established that the work product of government employees prepared at the direction of their employer or in the course of their duties is government property," and that "extend[ing] this principle to cover records prepared or received by the President in the course of his duties" would present "no substantial separation of powers problems." OLC Testimony at 111. Indeed, "all of the witnesses were in agreement" on Congress's constitutional authority to act. House Report at 7.

**2. Preserving Public Access to the Historical Record**

In addition to facilitating the preservation of presidential records by declaring them public property, Congress also sought to make the preserved records accessible to the public, particularly for historians, political scientists, and journalists. The Commission Report had noted that "[t]he documents of a nation preserve its memory, the record of its errors and triumphs, and offer the citizens of a republic the means to understanding and judgment." Commission Report at 435. The House subcommittee heard extensive witness testimony to this effect. For example, the Executive Secretary of the Organization of American Historians testified that passage of the proposed legislation "would enable historians concerned with recent American history to function more effectively and play more successfully their roles

as servants of the public's need to know about the operations of Government." *Hearings on H.R. 10998*, at 252. The chair of the American Political Science Association agreed, testifying that "[p]olitical scientists cannot contribute fully to wise policy for the future, nor can they address themselves to recurring problems likely to be relevant for future administrations, unless they are able to study the objective record of prior administrations." *Id.* at 247.

Leaders in journalism testified similarly. A representative of the Reporters Committee for Freedom of the Press, Mark Spooner, told Congress that "access to presidential materials is of great value to the political health and vitality of the United States." *Id.* at 373. Spooner and others were adamant that decisions about preservation of presidential records should not be subject to the unbounded discretion of the president "who has made [each] record." *Id.* at 194 (testimony of leading journalism professor). "The records of the nation's chief executive office are far too important," Spooner said, "to entrust them to a single individual who might be motivated by his personal interests rather than by the nation's welfare." *Id.* at 378-79.

### 3. Furthering Executive Continuity and Democratic Accountability

Finally, Congress sought to advance the first purpose identified in the Commission Report: "aid[ing] the continuing operations of the government." Commission Report at 433. The then-status quo was based on "[v]olunteerism": A

President could access their predecessors' records only if his predecessors both maintained the records and granted access. House Report at 5. As the Commission stated (in the outmoded parlance of the time), "[t]here are numerous instances in which an incoming administration has been handicapped by the lack of records or documents of its predecessor." *Id.* at 8 n.12 (quoting a staff memorandum reporting Commission findings, as reprinted in *Hearings on H.R. 10998*, at 505).

Hearing witnesses testified similarly. Spooner—of the Reporters Committee—reported that "incumbents have been forced to go hat-in-hand to a former office-holder or to his heirs to ask for permission to see documents that are relevant to the on-going affairs of the Government." *Hearings on H.R. 10998*, at 361. The journalism community, he explained, believed that such "Presidential materials are an invaluable national resource" and "are essential to the on-going functioning of the Presidency." *Id.* Another witness related detailed accounts of the Kennedy and Nixon administrations having to navigate high-stakes international negotiations by relying on memory and guesswork, rather than documentary evidence, because their predecessors had "taken away" the evidence of the prior interactions with the countries involved. *Id.* at 319-20.

Based on this evidence, Congress agreed with the Supreme Court's assessment in *GSA* that "[a]n incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of

past decisions that define or channel current governmental obligations." 124 Cong. Rec. 36843 (statement of Sen. Percy) (quoting *GSA*, 433 U.S. at 452). Congress thus intended for the Act to "terminate … the reliance on volunteerism"; going forward, the PRA would "assure creation and maintenance of the fullest possible documentation of White House activities." House Report at 2, 7.

### D. Congress Avoided Constitutional Concerns Through Reasonable Accommodations and Tailoring

As the floor remarks of the PRA sponsors made clear, *see* section I.B, *supra*, Congress was "keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations," *Armstrong*, 924 F.2d at 290—including executive privilege, potential chilling effects on White House advisors, general concerns about breadth, and presidential control over officials charged with archiving and maintaining the records. Congress accordingly included in the PRA several elements to accommodate and mitigate these potential concerns. Ultimately, it enacted legislation with an "elaborate structure" that provides for public ownership of presidential records while still allowing a former President to "play[] a significant role even after he leaves office." *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997).

#### 1. Congress Accounted for Executive Privilege

The legislative record reflects that Congress took seriously the need to respect executive privilege, consistent with the "urg[ing]" of witnesses "that due

consideration be given to the expectation of confidentiality of Executive communications." House Report at 8. In particular, Hammond—the OLC witness—testified that early draft bills "f[ell] short of what we think the Constitution requires in one respect": they "provide[d] no opportunity for an assertion of the Presidential privilege should that become necessary at some time" after the maximum restriction period lapsed. OLC Testimony at 133. The concern was heightened because the drafts did not require the Archivist to consult with former Presidents before making potentially privileged records accessible. *Id.* at 124-25.

As a remedy, Hammond suggested that the "proposal could be modified to provide some reasonable mechanism for assertion of the privilege in appropriate cases." *Id.* at 133. With that change, he advised, "courts might well conclude that a balance struck in this way would both satisfy Congress' legitimate desire to assure greater access to information and preserve the essential viability of the presumptive privilege for confidential communications." *Id.* OLC believed such a mechanism would also need to mandate that the Archivist provide notice to the former President before releasing potentially privileged records. *Id.* at 100.

Congress accepted OLC's recommendation. As lead sponsor Representative Preyer clarified in a floor colloquy with Representative Brademas, "[t]he bill is intended neither to limit nor to expand any constitutionally based privilege." 124 Cong. Rec. 34895; *see also id.* at 33860 (statement of Rep. Brooks) ("Accessibility

[of presidential records] would be subject to any rights, defenses, or privileges a former or sitting President or others might assert"); House Report at 17 (recognizing the Act "is not intended to modify the legal and constitutional rights of parties concerning the availability of Presidential or Executive branch records"). And the Senate amended the House bill to expressly add that "nothing in this Act shall be construed to confirm, limit, or expand any constitutionally based privilege which may be available to an incumbent or former president." 124 Cong. Rec. 36844; *see* 44 U.S.C. § 2204(c)(2); *see also id.* § 2205(2) (accounting for executive privilege).

**2. Congress Worked to Limit Any Chilling Effect**

Congress also understood the risk that "premature disclosure [of presidential records] might have a 'chilling effect' on Presidents and the frankness of advice they could expect from their staffs." House Report at 8. The legislative record is replete with evidence of Congress's attention to that concern. *See, e.g.*, 124 Cong. Rec. 34895 (statement of Rep. Brademas) ("It was our view that the threat of immediate disclosure of Presidential material upon the end of a President's term in office could well have a chilling effect on the willingness of his staff to express potentially controversial views, a process vital to the President for the proper conduct of his office."); House Report at 15 ("[T]he premature dis[c]losure of sensitive presidential records will eventually result in less candid advice being placed on paper and a depleted historical record.").

To address that concern, Congress adopted the views of "[t]he majority of the witnesses" at the House hearings, who had "urged recognition of some period of time after a President leaves office to control access"; Congress therefore provided that an outgoing President could restrict certain categories of sensitive records from public access for an extended period. House Report at 8. Although "16 of the 18 witnesses felt that a period of 10 years or less … would be sufficient," *id.* at 9, Congress ultimately provided 12 years, *see* 124 Cong. Rec. 33860; *see also* 44 U.S.C. § 2204(a).

In identifying the materials eligible for release restrictions, Congress took its lead from past Executive Branch practices, "follow[ing] closely the restrictive categories chosen by previous Presidents in drawing up donor agreements entrusting the records of their administration to the government." House Report at 15. OLC found this approach appropriate. As Hammond testified, "[b]y precluding all unessential disclosures for a reasonable period, the chilling effect … would be avoided." OLC Testimony at 132.

### 3. Congress Gave the Act an Appropriately Narrow Scope

Congress also carefully defined the category of *official* presidential records to which the Act would apply, tightening the statutory language in response to OLC's concerns. Two examples are illustrative.

First, after reviewing multiple proposals, Hammond expressed OLC's preference for defining official records to include only "those that 'relate to' the performance by the President of particular official functions." *See* OLC Testimony at 113-14, 114 n.7. An alternative proposal would have more broadly covered "all matters that arise 'in the course of conducting' his official functions." *Id.* OLC preferred the former definition because it was "narrower" and respected that "virtually everything the president receives comes to him in the course of his official duties." *Id.* Congress followed OLC's preference and adopted a definition using the "relate to" formulation. 44 U.S.C. § 2201(2).

Second, OLC cautioned that early drafts did not sufficiently protect the President's First Amendment interests related to "participation in political affairs" and "role as head of his national political party." OLC Testimony at 114. As Hammond explained, the President "may well receive considerable information and material that relate to partisan political matters," and "[s]uch materials, while of historical interest, would not seem to fall within the realm of the President's official duties or even ceremonial functions." *Id.* at 114-15. Moreover, the President's "right to receive such information is as firmly grounded in the First Amendment as are the other associational aspects of the President's political role." *Id.* at 115 (citing *GSA*, 433 U.S. at 467).

Congress acknowledged this concern and narrowed the PRA accordingly. As the House Report described, "changes were made so that the act would not impinge on the President's first amendment right to free speech or political association." House Report at 2. Even if a record "might have a tangential effect upon [the President] or his staff's official or ceremonial responsibilities," if it "consist[ed] of purely personal political communications," the record is not within the PRA's scope. *Id.* Only communications involving political activities that "relate to or have a 'direct' effect upon the carrying out of the official or ceremonial duties of the President" are covered. *Id.*

#### 4. Congress Ensured Custody of Presidential Records Remains in the Executive Branch Subject to Presidential Control

Lastly, Congress sought to mitigate undue interference with Executive Branch operations by ensuring that custody of official presidential records remained under presidential control. That was not a foregone conclusion; Congress heard testimony supporting protection of the records' custodian from removal. For example, the Executive Director of the Society of American Archivists testified that it was "absolutely mandatory" that the PRA protect the Archivist from presidential removal. Statement of Ann Morgan Campbell, *Hearing on S. 3494 Before the S. Comm. on Gov't Affs.*, 95th Cong. 21 (1978).

Congress rejected that proposal. An initial draft "would have provided for the appointment of the Archivist of the United States by the President, with the advice

and consent of the Senate, for a term of 10 years with removal for good cause only." House Report at 2. But an amendment "delete[d]" that provision: Congress determined "the actual control of Presidential papers must remain within the executive branch," and thus "limitations ... on the authority of the President to remove [the Archivist] would be constitutionally suspect." *Id.*

* * *

The PRA's legislative history thus confirms that Congress accepted input from the Executive Branch and narrowed the statutory regime to avoid constitutional pitfalls and respect presidential prerogatives.[1]

## II. Defendants Ignore Congress's Clearly Stated and Legitimate Legislative Purposes and Accommodations for Presidential Interests

The Executive Branch now seeks to overturn the PRA and cast aside nearly fifty years of bipartisan adherence to its requirements. In their brief, Defendants ignore the detailed legislative record of Congress's protection of the public interest

[1] Congress amended the PRA to cover electronic records and messages in 2014. Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2, 128 Stat. 2003, 2006. The amendments also codified procedures governing invocations of executive privilege by former Presidents before the release of their materials. *See* H.R. Rep. No. 113-218, at 4 (2014); *Trump v. Thompson*, 20 F.4th 10, 30 (D.C. Cir. 2021) (explaining the procedures adopted). The 2014 bill was passed by a unanimous 420 to 0 vote in the House and adopted in the Senate by unanimous consent. *See* 160 Cong. Rec. 603-09 (House); *id.* at 14487-91 (Senate). The bipartisan support for the amendments reflected the consistent practice by Presidents of both parties, who had adhered to the PRA's requirements for the nearly four preceding decades.

and careful balancing of presidential interests in crafting and adopting the PRA, instead relying primarily on a novel OLC opinion that makes the same mistakes. *See Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007, at *14 (Apr. 1, 2026); Br. 3, 15, 26-27, 29, 31, 34-37, 41, 45-47 (relying on OLC opinion).

The 2026 OLC opinion states that "there is scant evidence of any valid legislative purpose for targeting the records subject to the PRA." 2026 WL 963007, at *14. Yet the opinion cites the nearly thousand-page record from the House hearings just once, and only to downplay the importance of OLC's testimony in support of the bill. *Id.* at *29 n.13. OLC cites the House Report just three times, and only to criticize short passages from the report stripped of their context. *Id.* at *15, *19, *34. The opinion gives virtually no attention to the purposes Congress expressly identified for the Act, nor to the accommodations Congress included to mitigate the concerns about interference with presidential authority on which the OLC opinion dwells. *See id.* at *31-32. It is difficult to credibly declare that a statute has "no identifiable and valid legislative purpose" while disregarding the voluminous materials that document Congress's detailed goals and intent. *Id.* at *1.

Defendants' brief relies significantly on the 2026 OLC opinion and shows similar disregard for the legislative record. Defendants insist that "Congress has entirely failed to articulate reasons for requiring the creation, preservation, and

eventual disclosure of any category of presidential record." Br. 30; *see id.* at 40 (similar). Waving away the historical and legislative record as "[v]ague gesturing towards historical preservation and governmental efficiency," Defendants claim that Congress failed to "provide a legislative justification" for the statute. *Id.* at 31-32.

That is patently incorrect. As detailed in Part I, *supra*, Congress studied and documented multiple discrete and nationally important purposes for adopting the PRA, building on the recommendations of the Commission Report and testimony from an array of witnesses that showed the need to recognize and codify the public's interest in, and rights to, presidential documents. Defendants' apparent policy disagreement with Congress's justifications for the PRA undermines neither their validity nor Congress's constitutional authority to legislate here.

Defendants also minimize the careful attention Congress gave to concerns like a potential chilling effect on White House advisors. Relying on the novel OLC opinion, Defendants assert that the PRA "may chill the President's advisers from offering candid or unpopular advice, because there is uncertainty as to whether the President will invoke the privilege on that specific topic." Br. 26 (quoting *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *31). No one disagrees that legislation requiring immediate public disclosure could have such an effect—which is precisely why Congress provided up to 12 years after the end of an administration for the former President to maintain confidentiality. 44 U.S.C.

§ 2204(a); *see supra* section I.D.2 (collecting legislative history). Defendants' failure to consider Congress's well calibrated choice to account for these concerns makes its worry that the PRA "*may* chill" White House advisors unpersuasive.

So too with Defendants' hypothetical concerns that the PRA "'poses a risk of inadvertent disclosure of sensitive or privileged information' given the 'sheer volume of records that must be created, preserved, and reviewed.'" *Id.* at 29 (quoting *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *32). Defendants claim that "[t]he risk is not just that records will ultimately be disclosed, but also that the Act 'might burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties.'" *Id.* (quoting *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *32). These ungrounded fears about what the PRA's framework "might" do fail in the face of what it *has* done—successfully—for decades.

Defendants notably concede that "Congress might have been able to craft a tailored law within its authority in this context," but they assert in conclusory fashion that "Congress neither tailored its legislation to particular needs sufficient to justify access to presidential records nor provided a justification rooted in the proper exercise of its legislative powers." Br. 30-31. Defendants also lament that the PRA does not include "Congressional findings." *Id.* Both claims are demonstrably false.

The legislative record contains precisely such findings, along with substantial evidence of Congress's efforts to tailor the PRA to respect and accommodate Executive Branch interests. *See* sections I.B-D, *supra*.

That includes Congress's attention to documents concerning the presidential pardon power, which Defendants highlight to show the Act's supposed infirmity. *See* Br. 25-26, 30 (citing *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *15). Congress heard testimony from OLC that, although "[t]he constitutional propriety of [the legislation] may vary depending upon whether it touches those Article II functions which belong, by textual commitment, exclusively to the Executive Branch, such as the pardon power," OLC did not "regard this as a matter of great significance since the functions that are exclusively Executive in nature are the small portion of the Chief Executive's duties." OLC Testimony at 117 n.8. Determining that the PRA was appropriate, despite awareness of a narrow class of materials that might be subject to executive privilege claims, was a legitimate exercise of Congress's authority under the Property Clause and the Necessary and Proper Clause.

The same is true for Defendants' concern about Congress "aggrandiz[ing]" its power by directing the Archivist to make records available to either House of Congress or a committee if "such records contain information that is needed for the conduct of its business and that is not otherwise available." Br. 20 (quoting 44 U.S.C.

§ 2205(2)(C)). Defendants ignore that the provision is still subject to valid claims of executive privilege and any other "rights, defenses, or privileges which the United States or any agency or person may invoke." 44 U.S.C. § 2205(2).

Moreover, an OLC opinion just seven years ago addressed the provision's scope—reasoning that it authorizes requests only by committee chairs, not ranking members or others absent a chair's delegation—without raising any question about its constitutionality. *See Requests by Individual Members of Congress for Executive Branch Information*, 43 O.L.C. Op. 42, 43 (2019). That is because the PRA's constitutionality has been long settled between the political branches. *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (explaining that the Supreme Court "has treated practice" between the branches "as an important interpretive factor even when the nature or longevity of that practice is subject to dispute"). Defendants' poorly justified about-face here further undermines their novel position.

Defendants lastly argue that the PRA is "a novel aberration from th[e] well-settled tradition" of "interbranch dialogue and accommodation" over the legislature's need for presidential records. Br. 35. "Instead of negotiation and accommodation," Defendants assert, "Congress walked away from the bargaining table and adopted a one-size-fits-all measure to seize title to and control over presidential records." *Id.* Once again, the legislative record refutes Defendants' argument. It is indisputable that the PRA was the result of a yearslong, interbranch

effort—beginning with the Commission and culminating with the House sponsors "work[ing] closely with the White House and Justice Department to come to agreement over the final wording of the legislation"—to craft a framework for preserving presidential records that all agreed was necessary and appropriate. 124 Cong. Rec. 34896 (statement of Rep. Preyer). It is Defendants' current position that is novel and divorced from interbranch practice.

## III. Congress's Purposes and the Public Interest Will Be Irreparably Harmed if the Presidential Records Act Is Invalidated

Each of Congress's primary purposes for the PRA was designed to further the public interest. Congress resolved the question of who owns official presidential records in favor of the public; ensured official presidential records would be preserved for and accessible by the public; and facilitated the success of each new President for the benefit of the public the President is popularly elected to serve. If compliance with the Act lapsed, it is the public who would be harmed.

And that harm would be both immediate and irreparable. Immediate harm occurs each time a presidential record is destroyed, rendering it "lost forever to history" and incapable of restoration by a future President who agrees to comply with the PRA. *Armstrong*, 924 F.2d at 288; *see* 124 Cong. Rec. 36845 (statement by Sen. Nelson recognizing that the failure to preserve official presidential records would cause the public to be "irreparably harmed"). If records are not preserved

when generated, the public purposes underlying the PRA would be wholly undermined.

Contrary to Defendants' argument below, it is irrelevant to Plaintiffs' claim of irreparable harm that the public would not be able to access records at risk of destruction today for several years after the current President leaves office.[2] Harm to the public occurs the instant the White House destroys an official record, regardless of when the injury is actually felt. Moreover, Congress decided to delay the public's ability to access records specifically to ameliorate the Executive Branch's concern about a potential chilling effect. House Report at 8. It would be profoundly inequitable if the Executive Branch could pervert this congressional concession to deprive the public of any access to the records that an "overwhelming bipartisan" coalition granted in 1978, 124 Cong. Rec. 38284, and that a unanimous Congress reaffirmed in 2014, 160 Cong. Rec. 608.

[2] Below, Defendants argued that the current President's records would not be accessible "until January 2034 at the earliest" and claimed "[t]hat fact by itself precludes a finding of imminent, irreparable harm." Mem. in Opp. to Pls.' Mot. for Prelim. Inj. & Stay at 10, *Am. Hist. Ass'n v. Trump*, No. 1:26-cv-1169 (D.D.C. Apr. 21, 2026), ECF No. 19.

## CONCLUSION

The preliminary injunction issued by the district court should be affirmed.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Benjamin C. Mizer*

Benjamin C. Mizer
Rachel F. Cotton
Samuel F. Callahan
Samuel I. Ferenc
Connor J. Morgan
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000
benjamin.mizer@arnoldporter.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,461 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: August 26, 2026

/s/ *Benjamin C. Mizer*
Benjamin C. Mizer

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, pursuant to Fed. R. App. P. 25(d) and Cir. R. 25, I caused the foregoing brief to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: August 26, 2026

/s/ *Benjamin C. Mizer*
Benjamin C. Mizer

## ATTACHMENT

1. **Jamie Raskin**
   Representative of Maryland
2. **Robert Garcia**
   Representative of California
3. **Joseph D. Morelle**
   Representative of New York
4. **Katherine Clark**
   Representative of Massachusetts
5. **Pete Aguilar**
   Representative of California
6. **Joe Neguse**
   Representative of Colorado
7. **Gabe Amo**
   Representative of Rhode Island
8. **Yassamin Ansari**
   Representative of Arizona
9. **Becca Balint**
   Representative of Vermont
10. **Nanette Barragán**
    Representative of California
11. **Joyce Beatty**
    Representative of Ohio
12. **Donald S. Beyer Jr.**
    Representative of Virginia
13. **Sanford D. Bishop, Jr.**
    Representative of Georgia
14. **Suzanne Bonamici**
    Representative of Oregon
15. **Brendan F. Boyle**
    Representative of Pennsylvania

16. **Julia Brownley**
Representative of California

17. **Nikki Budzinski**
Representative of Illinois

18. **Salud O. Carbajal**
Representative of California

19. **André Carson**
Representative of Indiana

20. **Ed Case**
Representative of Hawaii

21. **Sean Casten**
Representative of Illinois

22. **Kathy Castor**
Representative of Florida

23. **Judy Chu**
Representative of California

24. **Steve Cohen**
Representative of Tennessee

25. **J. Luis Correa**
Representative of California

26. **Joe Courtney**
Representative of Connecticut

27. **Jasmine Crockett**
Representative of Texas

28. **Jason Crow**
Representative of Colorado

29. **Danny K. Davis**
Representative of Illinois

30. **Diana DeGette**
Representative of Colorado

31. **Chris Deluzio**
Representative of Pennsylvania

32. **Mark DeSaulnier**
Representative of California

33. **Maxine Dexter**
Representative of Oregon

34. **Debbie Dingell**
Representative of Michigan

35. **Lloyd Doggett**
Representative of Texas

36. **Sarah Elfreth**
Representative of Maryland

37. **Adriano Espaillat**
Representative of New York

38. **Dwight Evans**
Representative of Pennsylvania

39. **Lizzie Fletcher**
Representative of Texas

40. **Lois Frankel**
Representative of Florida

41. **Laura Friedman**
Representative of California

42. **John Garamendi**
Representative of California

43. **Jesús G. “Chuy” García**
Representative of Illinois

44. **Sylvia Garcia**
Representative of Texas

45. **Dan Goldman**
Representative of New York

46. **Maggie Goodlander**
Representative of New Hampshire

47. **Al Green**
Representative of Texas

48. **Steven Horsford**
Representative of Nevada

49. **Glenn F. Ivey**
Representative of Maryland

50. **Pramila Jayapal**
Representative of Washington

51. **Henry C. "Hank" Johnson, Jr.**
Representative of Georgia

52. **William Keating**
Representative of Massachusetts

53. **Ro Khanna**
Representative of California

54. **John B. Larson**
Representative of Connecticut

55. **George Latimer**
Representative of New York

56. **Teresa Leger Fernández**
Representative of New Mexico

57. **Mike Levin**
Representative of California

58. **Sam T. Liccardo**
Representative of California

59. **Ted W. Lieu**
Representative of California

60. **Zoe Lofgren**
Representative of California

61. **Stephen F. Lynch**
Representative of Massachusetts

62. **John W. Mannion**
Representative of New York

63. **Doris Matsui**
Representative of California

64. **Lucy McBath**
Representative of Georgia

65. **Jennifer L. McClellan**
Representative of Virginia

66. **Betty McCollum**
Representative of Minnesota

67. **Analilia Mejia**
Representative of New Jersey

68. **Robert J. Menendez**
Representative of New Jersey

69. **Grace Meng**
Representative of New York

70. **Dave Min**
Representative of California

71. **Gwen S. Moore**
Representative of Wisconsin

72. **Seth Moulton**
Representative of Massachusetts

73. **Jerrold Nadler**
Representative of New York

74. **Eleanor Holmes Norton**
Representative of the District of Columbia

75. **Alexandria Ocasio-Cortez**
Representative of New York

76. **Nancy Pelosi**
Representative of California

77. **Scott H. Peters**
Representative of California

78. **Brittany Pettersen**
Representative of Colorado

79. **Chellie Pingree**
Representative of Maine

80. **Mike Quigley**
Representative of Illinois

81. **Delia C. Ramirez**
Representative of Illinois

82. **Luz M. Rivas**
Representative of California

83. **Deborah K. Ross**
Representative of North Carolina

84. **Andrea Salinas**
Representative of Oregon

85. **Mary Gay Scanlon**
Representative of Pennsylvania

86. **Jan Schakowsky**
Representative of Illinois

87. **Bradley Scott Schneider**
Representative of Illinois

88. **Robert C. "Bobby" Scott**
Representative of Virginia

89. **Brad Sherman**
Representative of California

90. **Lateefah Simon**
Representative of California

91. **Melanie A. Stansbury**
Representative of New Mexico

92. **Greg Stanton**
Representative of Arizona

93. **Marilyn Strickland**
Representative of Washington

94. **Shri Thanedar**
Representative of Michigan

95. **Bennie G. Thompson**
Representative of Mississippi

96. **Dina Titus**
Representative of Nevada

97. **Rashida Tlaib**
Representative of Michigan

98. **Paul D. Tonko**
Representative of New York

99. **Lori Trahan**
Representative of Massachusetts

100. **Lauren Underwood**
Representative of Illinois

101. **James Walkinshaw**
Representative of Virginia

102. **Debbie Wasserman Schultz**
Representative of Florida

103. **Maxine Waters**
Representative of California

104. **Bonnie Watson Coleman**
Representative of New Jersey

105. **George T. Whitesides**
Representative of California

106. **Frederica S. Wilson**
Representative of Florida