**[ORAL ARGUMENT SCHEDULED FOR OCTOBER 16, 2026]**
**Nos. 26-5185, 26-5186**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN HISTORICAL ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

DONALD TRUMP, *in his official capacity as President of the United States and in his personal capacity*, *et al.*,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

# REPLY BRIEF

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A. Parties and Amici**

American Historical Association and American Oversight are Plaintiffs-appellees in No. 26-5185.

Freedom of the Press Foundation and Citizens for Responsibility and Ethics in Washington are plaintiffs-appellees in No. 26-5186.

Donald J. Trump, in his official capacity as President of the United States of America; the Executive Office of The President of the United States; James David Vance, in his official capacity as Vice President of the United States of America; the Office of the Vice President of the United States; the White House Office; Susan Wiles, in her official capacity as White House Chief of Staff; National Archives and Records Administration; and, Bradford P. Wilson, in his official capacity as Archivist of the United States* are defendants-appellants in Nos. 26-5185 and 26-5186.

Philip C. Droege, in his official capacity as Director of the Office of Records Management; National Security Council; Catherine Keller, in her

* Bradford P. Wilson has been automatically substituted for his predecessor. *See* Fed. R. App. P. 43(c)(2).

official capacity as Executive Secretary of the National Security Council; Homeland Security Council; Stephen Miller, in his official capacity as Homeland Security Adviser; Council on Economic Advisers; Christopher Phelan, in his official capacity as Chairman of the White House Council of Economic Advisers;* Executive Residence; Robert B. Downing, in his official capacity as White House Chief Usher; President's Intelligence Advisory Board; Devin Nunes, in his official capacity as Chairman of the President's Intelligence Advisory Board; Office of Administration; Joshua Fisher, in his official capacity as Director of the Office of Administration; Jacob Reses, in his official capacity as Chief of Staff to the Vice President; United States DOGE Service; Amy Gleason, in her official capacity as Acting Administrator of the United States DOGE Service; United States Department of Justice; and Todd Blanche,† in his official capacity as Attorney General of the United States are defendants-appellants in No. 26-5185 only.

No amici curiae appeared in district court, although John H. Page and David Krucoff sought and were denied leave to appear as amici.

* Christopher Phelan has been automatically substituted for his predecessor. *See* Fed. R. App. P. 43(c)(2).

† Todd Blanche has been automatically substituted for his predecessor. *See* Fed. R. App. P. 43(c)(2).

The following appeared as amici curiae in support of plaintiffs-appellees in this Court: Trudy Huskamp Peterson; John W. Carlin, David S. Ferriero; Debra Steidel Wall; Colleen J. Shogan; William J. Bosanko; Gary M. Stern; Donald Ayer; John Bellinger III; William Braniff; John O. Brennan; Steven A. Cash; James R. Clapper; Gregory Craig; Mary B. DeRosa; Stephen DeVine; Stuart Gerson; Avril Haines; General Michael Hayden; Brett M. Holmgren; Alan Kreczko; Hon. Michael Luttig; Barbara L. McQuade; Brian H. Nilsson; Ambassador Thomas Pickering; John Podesta; Alan Raul; Ambassador Susan E. Rice; Nicholas Rostow; Gregory L. Schulte; Hon. Abraham D. Sofaer; Jonathan M. Winer; Jamie Raskin; Robert Garcia; Joseph D. Morelle; Katherine Clark; Pete Aguilar; Joe Neguse; Gabe Amo; Yassamin Ansari; Becca Balint; Nanette Barragán; Joyce Beatty; Donald S. Beyer Jr.; Sanford D. Bishop, Jr.; Suzanne Bonamici; Brendan F. Boyle; Julia Brownley; Nikki Budzinski; Salud O. Carbajal; André Carson; Ed Case; Sean Casten; Kathy Castor; Judy Chu; Steve Cohen; J. Luis Correa; Joe Courtney; Jasmine Crockett; Jason Crow; Danny K. Davis; Diana DeGette; Sylvia Garcia; Chris Deluzio; Mark DeSaulnier; Maxine Dexter; Debbie Dingell; Lloyd Doggett; Sarah Elfreth; Adriano Espaillat; Dwight Evans; Lizzie Fletcher; Lois Frankel; Laura

Friedman; John Garamendi; Jesús G. "Chuy" García; Dan Goldman; Maggie Goodlander; Al Green; Steven Horsford; Glenn F. Ivey; Pramila Jayapal; Henry C. "Hank" Johnson, Jr.; William Keating; Ro Khanna; John B. Larson; George Latimer; Teresa Leger Fernández; Mike Levin; Sam T. Liccardo; Ted W. Lieu; Zoe Lofgren; Stephen F. Lynch; John W. Mannion; Doris Matsui ; Lucy McBath; Jennifer L. McClellan; Betty McCollum; Analilia Mejia; Robert J. Menendez; Grace Meng; Dave Min; Gwen S. Moore; Seth Moulton; Jerrold Nadler; Eleanor Holmes Norton; Alexandria Ocasio-Cortez; Nancy Pelosi; Scott H. Peters; Brittany Pettersen; Chellie Pingree; Mike Quigley; Delia C. Ramirez; Luz M. Rivas; Deborah K. Ross; Andrea Salinas; Mary Gay Scanlon; Jan Schakowsky; Bradley Scott Schneider; Robert C. "Bobby" Scott; Brad Sherman; Lateefah Simon; Melanie A. Stansbury; Greg Stanton; Marilyn Strickland; Shri Thanedar; Bennie G. Thompson; Dina Titus; Rashida Tlaib; Paul D. Tonko; Lori Trahan; Lauren Underwood; James Walkinshaw; Debbie Wasserman Schultz; Maxine Waters; Bonnie Watson Coleman; George T. Whitesides; and Frederica S. Wilson.

### B. Rulings Under Review

Defendants appeal from the memorandum opinion and orders issued by the district court (Bates, J.) on May 20, 2026. The opinion is not yet published but is available at 2026 WL 1412395.

### C. Related Cases

This case has not previously been before this Court or any court other than the district court. Counsel for defendants-appellants are unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ vii

GLOSSARY ........ xii

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 4

THE PRESIDENTIAL RECORDS ACT IS UNCONSTITUTIONAL. ........ 4

CONCLUSION ........ 32

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Beckford v. Tobin*,
(1749) 27 Eng. Rep. 1049 (Ch.) .................... 22

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) .................... 7

*Board of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) .................... 21

*Brown & Williamson Tobacco Corp. v. Williams*,
62 F.3d 408 (D.C. Cir. 1995) .................... 15

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) .................... 4–5, 8, 9

*Citizens United v. FEC*,
558 U.S. 310 (2010) .................... 27, 31

*Clinton v. Jones*,
520 U.S. 681 (1997) .................... 1

*Committee on Ways & Means v. U.S. Department of the Treasury*,
45 F.4th 324 (D.C. Cir. 2022) .................... 27, 28

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017) .................... 9

*Department of the Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .................... 13

*Duquesne Univ. of the Holy Spirit v. National Lab. Rels. Bd.*,
975 F.3d 13 (D.C. Cir. 2020) .................... 24–25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................... 12

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 12, 24

*Gonzales v. Raich*,
545 U.S. 1 (2005) .......... 30

*Immigration & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) .......... 24

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
847 F.3d 735 (D.C. Cir. 2017) .......... 13

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) .......... 22, 23

*Loving v. United States*,
517 U.S. 748 (1996) .......... 20

*NetChoice v. Moody*,
603 U.S. 707 (2024) .......... 26

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .......... 23

*Nixon v. GSA*,
433 U.S. 425 (1977) .......... 1, 2, 23

*Nixon v. United States*,
978 F.2d 1269 (D.C. Cir. 1992) .......... 22

*Perez v. United States*,
402 U.S. 146 (1971) .......... 30

*Phillips v. Washington Legal Found.*,
524 U.S. 156 (1998) .......... 22

*Public Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989) .......... 11

*Schilling v. Speaker of the U.S. House of Representatives*,
633 F. Supp. 3d 272 (D.D.C. 2022),
*aff'd on other grounds*, 102 F.4th 503 (D.C. Cir. 2024) ................................ 15

*Sealed Case (Epsy), In re*,
121 F.3d 729 (D.C. Cir. 1997) ........................................................ 7, 11, 14, 16

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) .................................................................... 7–8

*Shelby County v. Holder*,
570 U.S. 529 (2013) .......................................................................................... 30

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .............................................................................. 5, 6, 7, 8, 24

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ...................................................................................... 24

*Trump v. Thompson*,
142 S. Ct. 680 (2022) ................................................................................... 13, 17

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ............................................................................ 17

*Trump v. United States*,
603 U.S. 593 (2024) .............................................................................. 6–7, 11, 24

*United States v. Danks*,
221 F.3d 1037 (8th Cir. 1999) .......................................................................... 31

*United States v. Lopez*,
514 U.S. 549 (1995) ..................................................................................... 30, 31

*United States v. Salerno*,
481 U.S. 739 (1987) ..................................................................................... 25, 27

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S. 155 (1980) .......................................................................................... 22

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .................... 24, 28, 29

**U.S. Constitution:**

Art. II, § 1, cl. 1 .................... 11

**Statutes:**

Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228,
116 Stat. 1350 (2002)
§ 214(d), 116 Stat. at 1366 .................... 28

44 U.S.C. § 2201(2) .................... 8

44 U.S.C. § 2201(2)(B) .................... 10

44 U.S.C. § 2201(3) .................... 10

44 U.S.C. § 2203(g)(1) .................... 2

44 U.S.C. § 2205(2)(B) .................... 20

44 U.S.C. § 2208 .................... 2

44 U.S.C. § 2208(b)(1) .................... 17

**Legislative Materials:**

U.S.:
H.R. Rep. No 95-1487 (1978) .................... 9, 10, 15

U.K.:
HC Deb (24 Jan. 1980) .................... 19

**Other Authorities:**

Susan David deMaine, *Access to the Justices' Papers: A Better Balance*,
110 Law Libr. J. 185 (2018) .................... 16

Jodi Kantor, *How the Supreme Court Locks Away Its Own History*, N.Y. Times (Sep. 1, 2026), https://perma.cc/5E8Z-Q24X .......................... 3, 16

Neil A. Lewis, *Chief Justice Assails Library on Release of Marshall Papers*, N.Y. Times (May 26, 1993), https://perma.cc/HB6E-AY42 .......................... 16

Pauline Maier, *American Scripture: Making the Declaration of Independence* (1998) ........................................................................... 22

U.K. Gov't, Civil Service Management Code § 4.2.7 (Nov. 2016) .................... 19

U.S. Dep't of Justice:

*Administration of Coral Reef Resources in the Northwest Hawaiian Islands*, 24 Op. O.L.C. 183 (2000) ..................................................... 21

*Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026) .......... 1, 3, 12-13, 18, 23, 24

*Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. 108 (2019) ........................................................ 13, 18

Steve Vladeck, The Justices' Papers, *One First* (Sep. 7, 2026), https://perma.cc/G86Y-GNDL ............................................... 16

Kathryn A. Watts, *Judges and Their Papers*, 88 N.Y.U. L. Rev. 1665 (2013) ..................................................................... 16

Yes Minister: *Big Brother* (BBC television broadcast, aired Mar. 17, 1980) .......................................... 19

## GLOSSARY

| | |
|---|---|
| OLC | Office of Legal Counsel |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Presidential Records Act is a sledgehammer in an area in which Congress is required to use a scalpel. It sweeps broadly to encompass records in which Congress has no legitimate interest and chills the candid advice on which the President relies to perform his constitutional duties. Plaintiffs' efforts to minimize or evade these separation-of-powers problems are unavailing, as are their efforts to stretch the Supreme Court's decision in *Nixon v. GSA*, 433 U.S. 425 (1977), to fit a new context. And their standard-of-review argument is misplaced.

This case boils down to a simple question: Does the Presidential Records Act exceed Congress's constitutional authority over the President in violation of the separation of powers? As the Office of Legal Counsel (OLC) concluded, that question must be answered in the affirmative. *See Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, 2026 WL 963007 (Apr. 1, 2026).

One branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quotation marks omitted). Congress oversteps its enumerated powers when it interferes with the President's "constitutionally assigned functions" through

a statute whose effects are not "justified by an overriding need to promote objectives within the constitutional authority of Congress." *GSA*, 433 U.S. at 443. The Presidential Records Act fails to satisfy that demanding standard because it sweepingly regulates all documents related to the President's conclusive and preclusive powers and because it chills presidential advisers from offering the President candid advice. Nor does the Act provide any means for the President to selectively enforce its obligations to render the statute consistent with the separation of powers.

Congress paid only lip service to these problems when it enacted the Presidential Records Act. Although Congress must proceed with the utmost caution when it seeks to regulate the President directly, the Presidential Records Act covers the waterfront. It requires the President to preserve all official records, and it requires that records must be made "available to the public as rapidly and completely as possible," 44 U.S.C. § 2203(g)(1), except for records covered by a valid invocation of executive privilege, *see id.* § 2208. Further underscoring the statute's constitutional deficiencies, Congress enacted it in the face of a longstanding tradition of Presidents' controlling their own records. Plaintiffs make much of the procedure for invoking claims of privilege, asserting that it shows Congress was cognizant of separation-of-

powers concerns. However much attention Congress may have paid to that issue, the legislative branch failed to craft a statute that actually respects the separation of powers.

Congress has not seen fit to regulate the records of judges and justices in the same way as with the President's records. And for good reason: such an unprecedent intrusion on judicial independence would run roughshod over the separation of powers. *See Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *1. The Justices recognize that disclosing information about their deliberations would impair the functions of the Supreme Court. *See* Jodi Kantor, *How the Supreme Court Locks Away Its Own History*, N.Y. Times (Sep. 1, 2026), https://perma.cc/5E8Z-Q24X. Nor has Congress seen fit to expose its members' records; instead, it broadly asserts Speech or Debate Clause privilege to protect those papers. But for the President, Congress has abandoned caution and demanded radical transparency.

Plaintiffs obtained an injunction from the district court premised on their argument that the Presidential Records Act is constitutional across the board. They now seek to flip the burden onto the government to defend the statute across the board. That argument fails both because the government

is not pressing a challenge to the statute in order to seek relief from a court and because, in any event, the Act is facially unconstitutional.

The district court held that the Presidential Records Act is constitutional and required the government generally to comply with it. That conclusion was erroneous, and the preliminary injunction should be vacated.

## ARGUMENT

### THE PRESIDENTIAL RECORDS ACT IS UNCONSTITUTIONAL.

1. The Presidential Records Act requires the preservation and, with limited exceptions, the disclosure, of all the President's official records. Congress has no authority to impose such burdens on the Presidency. *See* Opening Br. 22–32.

That is especially so because Congress provided virtually no justification for the Act apart from empty platitudes. Plaintiffs point to generic statements about enhancing government operations, encouraging democratic accountability, and enabling historical study. *See Final Report of the National Study Commission on Records and Documents of Federal Officials* 3 (1977) (*National Study Commission Report*). These high-level justifications cannot justify a congressional regulation of the President, much less a regulation as sweeping as the Presidential Records Act. *See Cheney v.*

*U.S. Dist. Ct.*, 542 U.S. 367, 386–87 (2004); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 869–71 (2020). As the government explained, these sorts of generalities would support any number of highly intrusive measures like a presidential body camera. *See* Opening Br. 38–39. What Congress failed to do is identify specific categories of documents tied to specific invocations of need.

All relevant cases make clear that a more granular showing is required. Even plaintiffs purport to recognize, for example, that *Mazars* "outlines some of the relevant separation-of-powers principles." Br. 61. For as the Supreme Court explained in *Mazars*, when Congress seeks the President's records, "courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake," including determining whether Congress's asserted interest "warrants the significant step of involving the President" or could instead be pursued through "other sources," whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective," and whether the subpoena imposes undue "burdens" on the President. 591 U.S. at 869–71.

Congress transgressed these limitations on its power. It swept in all records, regardless of burden, regardless of availability in other, less

sensitive parts of the Executive Branch, and with no apparent regard for the chilling effect on the President's ability to obtain candid advice from his closest advisers. Plaintiffs thus give short shrift to the relevant separation-of-powers principles to which they purport to adhere.

Elsewhere, plaintiffs seek to distinguish *Mazars* on the ground that "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," such that its authority to issue subpoenas must be tied to "a valid legislative purpose." Br. 44–45 (quoting *Mazars*, 591 U.S. at 862–63, 869–70). But Congress also lacks any freestanding power to regulate presidential records. *See* Opening Br. 43–47. The entire question in this case is whether Congress's enumerated powers should be interpreted so broadly as to allow the intrusion on the Executive Office of the President that it attempted here. Plaintiffs' apparent view that Congress need not identify a legitimate purpose and tailor its actions to minimize the burden on the Presidency in this context underscores their refusal to come to grips with the relevant separation-of-powers principles.

The principles outlined in *Mazars* thus apply more broadly than plaintiffs acknowledge. The Supreme Court looked to *Mazars* in articulating the basis for the President's immunity from criminal prosecution. *See Trump*

*v. United States*, 603 U.S. 593, 610, 615, 629 (2024) (citing *Mazars*, 591 U.S. at 868, 871). And this Court too has looked to the decision in conducting separation-of-powers analysis. *See Blassingame v. Trump*, 87 F.4th 1, 20 (D.C. Cir. 2023). Moreover, there is no reason that the concerns articulated in *Mazars* about congressional aggrandizement apply less in this context. *See* 591 U.S. at 867. Rather, Congress's ability to compel the President to produce information "implicates" its own set of "constitutional considerations," *In re Sealed Case* (*Espy*), 121 F.3d 729, 753 (D.C. Cir. 1997), which do not depend on the procedural mechanisms Congress employs.

Plaintiffs fare no better in seeking to distinguish *Cheney* because it involved district-court litigation rather than an Act of Congress. That factual distinction makes no difference to the applicable separation-of-powers principles. To make matters worse, to the extent that the context is relevant, it cuts against plaintiffs. Congress's interests in accessing presidential records "are not sufficiently powerful to justify access to the President's personal papers when other sources could provide Congress the information it needs," even though the documents may well be required to be disclosed in a judicial proceeding. *Mazars*, 591 U.S. at 870; *see also Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir.

1974) ("There is a clear difference between Congress's legislative tasks and the responsibility of a grand jury, or any institution engaged in like functions."). Similarly, while "burdens on the President's time and attention stemming from judicial process and litigation" may not "cross constitutional lines," congressionally imposed burdens "should be carefully scrutinized, for they stem from a rival political branch" that may have "incentives" to misuse its power. *Mazars*, 591 U.S. at 871. Congress's aggrandizement demonstrates that the concerns animating *Cheney* are fully applicable here. *See* Opening Br. 22–24; *Cheney*, 542 U.S. at 383–88.

2. On the other side of the ledger, plaintiffs' suggestion that the Presidential Records Act is narrow or adequately tailored do not survive even the most cursory scrutiny. Start with the statute's sweeping definition of presidential records, which encompasses:

> documentary materials … created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2). That definition includes all documents. It includes all the President's duties. And it uses a pair of broadening phrases—"relate to" and

"have an effect upon"—to sweep up everything tangentially connected to those duties. *See Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) (Congress "characteristically employs the phrase ['relate to'] to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates."). Congress "ask[ed] for everything under the sky." *Cheney*, 542 U.S. at 387.

The legislative history on which plaintiffs (Br. 54) and their amici rely only underscores the sweeping scope of the Act. Plaintiffs and amici note that Congress was aware of separation-of-powers concerns. *See, e.g.*, Pls.' Br. 54; Br. for Members of Congress 3. But what matters is whether Congress took steps to address these concerns, not whether it was aware of them. And the steps it took plainly were inadequate.

The *National Study Commission Report*, for example, merely asserted that delayed release would ameliorate any "'chilling' effect." *See National Study Commission Report* 30. The main congressional committee report similarly embraced the broadest definition of presidential records, H.R. Rep. No. 95-1487, pt. 1, at 11 (1978), and while it acknowledged the possibility that mandatory retention and disclosure could chill the advice the President received, it too relied solely on delayed release to remedy this

problem, *id.* at 15. And Congress tellingly did not subject its own Members' records to any disclosure requirement at all, despite the recommendation of the same Commission—suggesting Congress was well aware that it was burdening a rival Branch while sparing itself. *See infra* pp. 14–15.

As their only direct example of tailoring, plaintiffs point (Br. 51) to the exclusion of "personal records" from the definition of "presidential records." *See* 44 U.S.C. § 2201(2)(B), (3). Congress, however, explained that it excluded personal records not out of respect for the separation of powers but for the First Amendment. H.R. Rep. No. 95-1487, pt. 1, at 2, 7, 11–12. Without that carve-out, "the act would … impinge on the President's [F]irst [A]mendment right to free speech or political association by including as government property records that might have a tangential effect upon his or his staff's official or ceremonial responsibilities[ ] but consist of purely personal political communications." *Id.* at 2. Far from narrowly tailoring the scope of the Presidential Records Act, Congress grudgingly accommodated the President's political activities. *See id.* at 12. And when it came to the President's official activities, Congress covered the entire field.

Plaintiffs also assert that the Presidential Records Act "does not in any way regulate" how the President carries out his conclusive and preclusive

powers because "[i]t merely specifies that he cannot destroy the record of his exercise of the power." Br. 53. But, of course, mandating document retention and disclosure is a form of regulation. "[T]he President's access to honest and informed advice and his ability to explore possible policy options privately are critical elements in presidential decisionmaking." *Espy*, 121 F.3d at 751. An Act that inhibits Presidential advisers from giving candid advice on the President's exercise of his exclusive and preclusive powers inhibits the exercise of those powers. *See, e.g.*, *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 466 (1989) (applying constitutional avoidance to avoid "formidable constitutional difficulties" if Federal Advisory Committee Act restricted consultations over judicial nominations). Congress may not evade these limits through indirect means because "the Constitution deals with substance, not shadows." *Trump v. United States*, 603 U.S. at 631 (cleaned up).

More fundamentally, the Constitution establishes the President's office and vests "[t]he executive Power" directly in him, U.S. Const. art. II, § 1, cl. 1, and Congress may not use even its express legislative powers to defeat or curtail the President's constitutional prerogatives. Any legislation regulating the President thus would bear the significant risk that it would

unconstitutionally "impair [the President] in the performance of [his] constitutional duties." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010) (quotation marks omitted); *cf. Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (requiring an "express statement" "before assuming [Congress] intended" to regulate the President, "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Legislation that directly regulates the President thus demands the most searching constitutional scrutiny. Plaintiffs cannot wave away the separation-of-powers problems inherent in the Presidential Records Act by reframing the Act's direct regulation of how the White House operates as a merely incidental housekeeping requirement. Congress has intruded in an area where its enactments are inherently suspect, and the resulting statute is extraordinarily invasive.

3. After misstating the relevant constitutional principles, plaintiffs err again in analyzing the scope and effect of the Presidential Records Act.

As OLC explained, the Presidential Records Act "may chill the President's advisers from offering candid or unpopular advice, because there is uncertainty as to whether the President will invoke the privilege on that specific topic." *Constitutionality of the Presidential Records Act*, 2026 WL

963007, at *31 (citing *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. 108, 111–14 (2019)). That point should be beyond peradventure. For it is "obvious … that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); *see also Trump v. Thompson*, 142 S. Ct. 680, 681 (2022) (Kavanaugh, J., statement respecting denial of application for stay).

Plaintiffs complain (Br. 25) about a lack of evidence regarding chill, but this Court has recognized the basic "understanding that employees would be chilled from … rigorous deliberation if they feared it might become public." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017); *see also id.* ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances." (cleaned up)). Indeed, this Court has confronted arguments casting doubt that presidential advisers will be chilled before and it has rejected them, explaining that it was "not so sanguine that presidential advisers will never be dissuaded from expressing unpopular but correct opinions out of a fear of disclosure, or that able individuals will not shrink

from assuming a position as presidential adviser in the first place if by doing so they step unprotected into the limelight." *See Espy*, 121 F.3d at 750. Instead, it has treated the potential of chill as "almost inevitabl[e]." *Id.*

Plaintiffs seek (Br. 54–57) to diminish the chilling effects of the Presidential Records Act by suggesting that delayed disclosure and the possibility of an assertion of privilege solve any problem. That argument fails three times over.

*First*, Congress plainly understands that the specter of eventual public disclosure can chill candid communications and impair essential government decision-making, even if disclosure is delayed. We know this because Congress has conspicuously declined to make its own Members' official papers publicly available at all. The same Commission on which plaintiffs and their amici rely also recommended that the official papers of Members of Congress (and of federal judges) should be treated as property of the United States and subject to similar retention and publication requirements as the Presidential Records Act imposes on the President. *See National Study Commission Report* 35–37, 39–41. Yet for all of its ostensible concern for preserving the documentary legacy of our government, Congress has never seen fit to take the same medicine it has forced the President to swallow.

Congress's approach of "transparency for thee but not for me" highlights the separation-of-powers problem posed by omnibus legislation imposing retention and disclosure obligations on the President alone.

Indeed, Congress regularly asserts that its papers enjoy constitutional protection from compulsory production under the Speech or Debate Clause. *See, e.g.*, *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995). Members of Congress recognize that compulsory disclosure of sensitive documents may have a chilling effect on their own activities and deliberations. *See id.* at 417 (permitting discovery "would, according to the congressmen, necessarily 'chill' Congress' ability to attract future confidential disclosures"); *see also Schilling v. Speaker of the U.S. House of Representatives*, 633 F. Supp. 3d 272, 283 (D.D.C. 2022) ("Requiring Defendants to disclose those materials (if they exist) would chill Congress's investigative function."), *aff'd on other grounds*, 102 F.4th 503 (D.C. Cir. 2024). Yet despite recognizing the risk that indiscriminate disclosure would hinder legislative activities, Congress in 1978 dismissed the risk of chill in the Executive Branch in the same blasé manner as the congressional amici do today. *See* H.R. Rep. No. 95-1487, pt. 1, at 8, 15; Br. for Members of Congress 17–18.

This risk of chill and the attendant separation-of-powers concerns apply to the judiciary as well. Plaintiffs maintain a notable silence on whether their theory extends to judicial records, but nothing in their brief limits their argument to the President. And scholars have argued that Congress can and should assert ownership over judicial papers just as they have with presidential papers. *See, e.g.*, Kathryn A. Watts, *Judges and Their Papers*, 88 N.Y.U. L. Rev. 1665, 1691–96, 1714–20 (2013); Susan David deMaine, *Access to the Justices' Papers: A Better Balance*, 110 Law Libr. J. 185, 208–09 (2018); Steve Vladeck, The Justices' Papers, *One First* (Sep. 7, 2026), https://perma.cc/G86Y-GNDL. But as the Court has recognized, disclosure of the justices' papers may inhibit their deliberations. *See* Kantor, *supra*; Neil A. Lewis, *Chief Justice Assails Library on Release of Marshall Papers*, N.Y. Times (May 26, 1993), https://perma.cc/HB6E-AY42.

*Second*, plaintiffs place great faith in the Presidential Records Act's inadequate mechanisms for asserting executive privilege. Again, the adequacy of the protections is best analyzed from the perspective of a presidential adviser who must decide what advice to offer the President. *See Espy*, 121 F.3d at 750 (looking to this perspective). For "[w]ithout sufficient assurances of *continuing* confidentiality, Presidents and their advisers would

be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends." *Thompson*, 142 S. Ct. at 681 (Kavanaugh, J., statement respecting denial of application for stay).

Consider what a presidential adviser must evaluate. The adviser would know that, in polarized times, an incumbent President may not be willing to invoke executive privilege on behalf of a political rival. *See, e.g.*, *Trump v. Thompson*, 20 F.4th 10, 20–22 (D.C. Cir. 2021). The adviser would know that in such circumstances, although ordinarily an assertion of executive privilege is presumptively valid, the former President would need to sue and would bear the burden of persuading a court that executive privilege applies. *See id.* at 38. The adviser would know as well that "the decision to assert any claim of constitutionally based privilege against disclosure of a Presidential record … must be made *personally* by a former President." 44 U.S.C. § 2208(b)(1) (emphasis added). The adviser thus would know that after the death of the President he serves, any privilege claim could be made only by whoever the incumbent President is at the time the records are sought. Considering these factors together, the adviser must acknowledge a significant risk of disclosure in the future. These risks support OLC's conclusion that the Presidential Records Act "may chill the President's advisers from offering

candid or unpopular advice." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *31 (citing *Testimonial Immunity*, 43 Op. O.L.C. at 111–14).

Plaintiffs are similarly mistaken to raise (Br. 62–64) what they regard as a severability argument regarding the provision that provides Members of Congress with access to presidential records. Plaintiffs' insistence that no challenge to that provision, standing on its own, would be ripe at this time highlights that a presidential advisor would have no assurance that confidential communications, which the Act requires the Executive Office of the President to preserve, will be kept confidential. The cited provision thus exacerbates the harms associated with the preservation provisions that are directly at issue, as well as highlighting the degree to which the Act constitutes aggrandizement of Congress at the expense of the President. But plaintiffs are mistaken to attempt to isolate the separation-of-powers problems with the Act as a whole in that, problematic single provision.

*Third*, plaintiffs seem to assume (Br. 54–55) that separation-of-powers and chill concerns attach only to public disclosure of presidential records because the five-year embargo and 12-year period of restricted access apply only to public disclosure. But even the Act's requirement to document

activities and to preserve those records internally—such that a President's successors in office or their advisers may scrutinize and deploy the records for any purpose, including to pillory or condemn their predecessors—may chill an adviser from offering candid advice on a controversial subject.

Other democracies recognize this reality. By long-standing convention, in the British government "after a General Election a new Administration does not have access to the papers of a previous Administration of a different political complexion." HC Deb (24 Jan. 1980) (977) cols. 306W. In general, this convention not only precludes new officials from learning what their predecessors have said but also requires civil servants "to withhold papers which show the advice given by officials to the previous Minister."[4] *Id.*; *see also* U.K. Gov't, Civil Service Management Code § 4.2.7 (Nov. 2016). The "main objective" of this policy is "to protect Ministers from the political embarrassment that would arise if their successors saw documents that it was not appropriate for them to see." HC Deb (24 Jan. 1980) (977) col. 307W; *see also* Yes Minister: *Big Brother* (BBC television broadcast, aired Mar. 17, 1980) (Sir Humphrey: "Minister, would you like everything that you've said

---

[4] The British convention allows for some discretion in whether documents can be shared. *See* HC Deb (24 Jan. 1980) (977) col. 306W.

and done in the privacy of this office to be revealed subsequently to one of your opponents?" Hacker: "I see. No."). The Presidential Records Act, however, provides an incumbent President with virtually unfettered access to his predecessor's records. *See* 44 U.S.C. § 2205(2)(B).

An adviser who wishes to provide the President his most frank counsel on a delicate question may hesitate, therefore, knowing that successors in office may twist his words or meaning for political advantage. Plaintiffs, however, ignore this risk of chill entirely. Indeed, they trumpet (Br. 38–39) the incumbent's access to records as an unalloyed benefit of the Act.

4. Plaintiffs' enumerated-powers arguments (Br. 30–43) likewise fail to justify the Act. As an initial matter, these arguments, if accepted on their own terms, would be inadequate: even where Congress has express authority to enact legislation, "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). Plaintiffs' invocation of Congress's enumerated powers is thus relevant primarily insofar as it illustrates the lack of any clear constitutional basis for the Presidential Records Act.

Plaintiffs correctly note (Br. 30–31) that the Property Clause allows the federal government to regulate federal property. The question here, however, is whether Congress validly converted presidential records into federal property though the Presidential Records Act in the first place. Plaintiffs bypass that question and instead assume that the answer is "yes" and that Congress thus has plenary power to regulate the records. But logically, plaintiffs must first address whether the Presidential Records Act validly effectuated that transfer. As explained, *see* Opening Br. 22–38, it did not. And because the Property Clause gives the federal government no authority over private property absent some "some actual and substantial property interest of the federal government," *see Administration of Coral Reef Resources in the Northwest Hawaiian Islands*, 24 Op. O.L.C. 183, 198 n.19 (2000) (quotation marks omitted), it is of no use to plaintiffs here.

Plaintiffs' argument also rests on a misunderstanding of property law. Plaintiffs correctly recognize (Br. 33) that the Constitution does not create property rights. Rather, "[p]roperty interests … are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). These understandings may come from settled

tradition and common law. *See, e.g.*, *Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998) ("[I]nterest follows principal ...." (quoting *Beckford v. Tobin* (1749) 27 Eng. Rep. 1049, 1051 (Ch.))). And under longstanding American tradition, "Presidents exercised complete dominion and control over their presidential papers."[5] *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992). The government, "by *ipse dixit*, may not transform [that] private property into public property without compensation." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980).

Plaintiffs' Necessary and Proper Clause argument does even less. That provision is not a freestanding grant of authority, but instead "allows Congress to enact laws 'incidental to those powers which are expressly given.'" *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1946 (2026). The clause "does not tolerate outcomes that would undermine

---

[5] Amici former NARA officials note that the Second Continental Congress complained that the King "'ha[d] called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public Records,'" and from that grievance amici draw the conclusion that "[t]he Founders believed that the lack of legislative access to public records was a serious offense, preventing the legislature from understanding what the executive is doing." Former NARA Officials Br. 3 (quoting Declaration of Independence, para. 6 (1776)). But the Declaration of Independence refers to the records of the colonial legislatures themselves, not the records of the British executive. *See* Pauline Maier, *American Scripture: Making the Declaration of Independence* 110–11 (1998).

the structure of the federal government established by the Constitution." *Id.* at 1947 (cleaned up) (quoting *NFIB v. Sebelius*, 567 U.S. 519, 559 (2012) (lead opinion). Laws that flunk that test are "not *proper* means for carrying into Execution Congress's enumerated powers," but instead "merely acts of usurpation which deserve to be treated as such." *NFIB*, 567 U.S. at 559 (cleaned up). Moreover, plaintiffs' argument (Br. 37–39) about aiding the Executive Branch to carry out its functions might be relevant to some hypothetical law preserving presidential records for inspection by future Presidents, but they are not relevant to the broad sweep of the Presidential Records Act. *See also Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *28.

5. *Nixon v. GSA*, 433 U.S. 425 (1977), does not resolve the constitutionality of the Presidential Records Act. *See* Opening Br. 36–38. Rather, "it addressed a materially narrower statute under extraordinary circumstances." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *28. Plaintiffs seek (Br. 50–51) to minimize that impact by noting that the Supreme Court discussed non-Watergate related rationales for the act. *See GSA*, 433 U.S. at 452–53. But even there, "[t]he Court was addressing Nixon's materials specifically—records of Watergate, an aborted

Presidency, and ongoing criminal and congressional investigations. Ensuring the incumbent's access to *those* records and the public's ability to reconstruct *that* history served concrete needs that the Court believed were sufficient to justify what it viewed as a limited intrusion on a former President." *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *29. It does not follow from that "situated reasoning" that a broader law, "appl[icable] to all Presidents in perpetuity," is necessarily valid. *Id.*

Furthermore, plaintiffs fail to recognize that since *GSA*, there has been a sea change in how courts understand the separation of powers. In particular, subsequent decisions have retrenched Executive power against legislative encroachment. *See, e.g.*, *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983); *Free Enter. Fund*, 561 U.S. 477; *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015); *Mazars*, 591 U.S. 848; *Trump v. United States*, 603 U.S. 593; *Trump v. Slaughter*, 146 S. Ct. 2283 (2026). A case like *Mazars* thus provides crucial insight into how separation-of-powers questions involving the President's records play out under modern doctrine. In light of those doctrinal shifts, this Court should not extend *GSA* beyond its holding, which was that Congress validly provided for federal ownership of the Nixon tapes and related records of a failed presidency. *See Duquesne*

*Univ. of the Holy Spirit v. National Lab. Rels. Bd.*, 975 F.3d 13, 15 (D.C. Cir. 2020) (en banc) (Pillard, J., concurring in the denial of rehearing en banc) (in approaching a precedent which "rests on an outmoded form of" analysis, "[e]ven as we respect it as binding precedent, we should not extend its reach beyond what the decision requires").

6. Plaintiffs open their brief (Br. 27–28) not by defending the Act but with an argument about the standard of review. Plaintiffs urge, in particular, that the government must satisfy the standard established in *United States v. Salerno*, 481 U.S. 739, 745 (1987), for a facial challenge to the constitutionality of an Act of Congress and thus "establish that no set of circumstances exists under which the Act would be valid." *Id.* That argument fails for two independent reasons.

*First*, plaintiffs ignore that it is they who have obtained an injunction that requires the Executive Office of the President to comply with the Presidential Records Act in all respects. *See* Notice of Compliance, JA303 (preliminary injunction "require[s] a reinstatement of the *status quo ante*, under which Defendants treat the Presidential Records Act as binding upon them and establish records policies informed by that treatment"). So, for example, the injunction would preclude the White House Counsel from

ordering White House Staff not to preserve records memorializing the President's exercise of conclusive and preclusive powers. Such an injunction would plainly be inappropriate if the Presidential Records Act was unconstitutional in some circumstances because a court may not order the President to obey a statute that exceeds Congress's authority to enact.

This impermissible injunction resulted from plaintiffs' litigation choices. Plaintiffs asserted in their complaints that the Presidential Records Act is facially valid in all circumstances. *See* American Historical Ass'n Complaint, JA51–53; Freedom of the Press Foundation Complaint, JA485. Plaintiffs obtained a preliminary injunction based on that theory. *See* Memorandum Opinion, JA295. Plaintiffs cannot now seek to flip the burden of defending the sweeping injunction they obtained by demanding that the government identify specific situations where the law cannot be validly applied. Plaintiffs sought to enforce the Act across the board and must be held to that choice. *See NetChoice v. Moody*, 603 U.S. 707, 723 (2024) ("[Plaintiffs] chose to litigate these cases as facial challenges, and that decision comes at a cost.").

In *Salerno* itself, the criminal defendants had not "claimed that the Act is unconstitutional because of the way it was applied to the particular facts of

their case." 481 U.S. at 745 n.3. Rather, they expressly brought a facial challenge, urging that the statute was unconstitutional in all circumstances and thus could not be validly applied at all. Here, plaintiffs are defending an injunction that does not merely apply the Presidential Records Act in a particular instance but instead compels the government to comply with it across the board. Plaintiffs are the ones who must demonstrate that the Act is valid in all circumstances, for "the distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

Plaintiffs' reliance on *Committee on Ways & Means v. U.S. Department of the Treasury*, 45 F.4th 324 (D.C. Cir. 2022), fails for similar reasons. In that case, President Trump's trust, several of his companies, and their namesake intervened in litigation brought by a House committee against federal agencies. *Id.* at 328. As intervenors, they filed a crossclaim against the agencies asserting, in relevant part, that a federal statute was facially unconstitutional. *Id.* at 329. The district court dismissed the crossclaim, the intervenors appealed, and this Court affirmed. *Id.* at 329–30, 341. The intervenors argued both that a particular request made to the Internal Revenue Service for tax documents was improper because it lacked

a legitimate legislative purpose, and that the statute authorizing the request was facially invalid because it did not expressly require a legitimate legislative purpose. *See id.* at 330. This Court applied the *Salerno* standard to the latter challenge, which was explicitly a facial challenge as distinguished from the (already-rejected) contention that the statute was unconstitutional as applied to the facts of the case. *Id.* at 340. This Court concluded that the "statute can be properly applied in numerous circumstances, including the one before the court." *Id.* But here, the government as defendant does not seek any relief from the Court against operation of the statute.

More instructive is *Zivotofsky*. There, Congress had enacted a statute compelling the Secretary of State to allow U.S. citizens born in Jerusalem to list Israel as the place of birth on their passports. 576 U.S. at 7 (citing Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 214(d), 116 Stat. 1350, 1366 (2002)). The parents of a U.S. citizen born in Jerusalem sued to enforce the passport requirement, *id.* at 8, and in defending against their request for equitable relief, the government argued that the statute violates the separation of powers, *see id.* at 10. The Supreme Court agreed, holding that Congress had infringed upon the President's

exclusive power to recognize foreign states. *Id.* at 32. That holding does not depend on whether there might have been some circumstance under which the statute would reflect the President's views and thus not intrude on presidential power, and the Court did not mention the *Salerno* standard. Rather, because the statute arrogated to Congress some of the President's exclusive power, the statute could not be enforced against the Executive Branch. *See id.* at 30 (Congress is disabled from legislating in this area). The same mode of analysis applies here.

Plaintiffs cannot escape the fact that the district court ordered the Executive Office of the President to comply with a sweeping set of obligations that compel the President's closest advisers to maintain all records related to the President's conduct, to the advice they offer the President, and to the President's deliberations over how he carries out his functions, for the express purpose of making those records subsequently available to the President's successors, Congress, and the public. That obligation is improper, and the injunction should be vacated.

*Second*, the Presidential Records Act is facially unconstitutional. Article II demands that Congress act in a more narrowly tailored way when

it seeks to regulate the President directly. Congress failed to do so. And when a law is insufficiently tailored, it cannot be enforced.

Congress was required to make specific findings to justify the Presidential Records Act, and to tailor the Act to the particular situation it sought to address. *See supra* pp. 4–12. Congress's failure to do so is fatal to its exercise of legislative power here. Plaintiffs' assert (Br. 47–48) that the Court has not required Congress to make findings to support statutes, but they point to cases challenging Congress's exercise of its Commerce Clause power without any horizontal separation-of-powers concerns present. *See Gonzales v. Raich*, 545 U.S. 1 (2005); *United States v. Lopez*, 514 U.S. 549 (1995); *Perez v. United States*, 402 U.S. 146 (1971); *see also Lopez*, 514 U.S. at 563 ("Congress normally is not required to make formal findings as to the substantial burdens that an activity has *on interstate commerce*." (emphasis added)). And the Supreme Court has held facially invalid Congressional enactments for which Congress has failed to make findings and to tailor appropriately extraordinary exercises of its legislative power. *See Shelby County v. Holder*, 570 U.S. 529, 553 (2013).

The Supreme Court has also concluded that statutes are facially invalid because Congress has employed a chainsaw rather than a scalpel. In *Lopez*,

the Supreme Court held invalid a statute criminalizing the possession of guns in school zones even though many of those guns passed through interstate commerce. *See* 514 U.S. at 561–62; *cf. United States v. Danks*, 221 F.3d 1037, 1039 (8th Cir. 1999) (amended federal statute criminalizing possession of a firearm in a school zone is constitutional because it contains a jurisdictional element). Similarly, in *Citizens United*, the Court held a restriction on corporate election expenditures "overinclusive because it covers all corporations, including nonprofit corporations and for-profit corporations with only single shareholders." 558 U.S. at 362. Although the degree of overbreadth was comparatively narrow and although the Court acknowledged that "other regulatory mechanisms" might be appropriate, it rejected the entire funding restriction on its face. *See id.* The same logic applies with greater force here where the requirement of narrow tailoring safeguards the separation of powers.

## CONCLUSION

For the foregoing reasons and those stated in the government's opening brief, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

SEPTEMBER 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,438 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi